UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * NO. 1:17-CR-00034 |
| | * |
| REALITY LEIGH WINNER | * |

* * * * * * * * * * * * * * * * * *

### DECLARATION OF REALITY LEIGH WINNER

NOW COMES Reality Leigh Winner, who under penalty of perjury and from her own personal knowledge, states:

1. I am over 18 years of age and competent to give testimony in this matter.

2. I have personal knowledge of all facts and circumstances in this Declaration.

3. On June 3, 2017, after coming home from the grocery store, I was confronted with two armed male FBI agents outside my home. At that time, I was advised that law enforcement had a search warrant for my house, my car, and my person. From the moment law enforcement said that they were with the FBI and had a search warrant not only for my house and car, but also my person, I understood that I was not free to leave.

4. After brief conversation, eight more male, armed law enforcement agents, appeared to execute the search warrant. Those agents came through my front door and immediately began rummaging through my house. They were not accompanied by any female agents or employees. I therefore understood that I would have to continue to wait and would not be free to leave.

5. After moving my dog to the fenced part of my yard, providing law enforcement the keys to my car in response to their request, confirming for law enforcement the firearms that I lawfully possessed and the location of such firearms in my house, and providing assistance to law enforcement regarding my cell phone, the two original FBI agents told me that they wanted to speak with me and asked if I would rather speak with them in my house or at the FBI office. They advised meeting with me would be voluntary and stated that it would be "worth [my] time" to "listen." I was not told at that time, nor at any time, that I was free to terminate the questioning at any time or free to leave the premises at any time. Nor was I advised then or at any time that I had a right to remain silent; that anything I said could be used against me; that I had a right to counsel; that if I could not afford counsel; a court would appoint counsel to represent me; and that if I decided to answer questions then without an attorney present, I would still have the right to stop answering at any time until I spoke with an attorney.

6. The FBI agents then asked if they could speak with me in a small, unfurnished back room in my house. The room is no more than 7' by 9'. I told the agents that the room was "creepy" and "weird" and that I did not like to go back there. After they suggested going back there, I acquiesced.

7. In entering the back room, as the questioning began, I sat with my back against the wall, with both armed law enforcement agents standing in front of me. Both of the agents were physically blocking the exit to the room. The door to the room, which was on the opposite side of the room of where I was standing, was nearly shut. There was an item hanging on the door that prevented it from being shut completely.

8. During this time, the other eight male law enforcement officers were continuing to rummage through my house.

9. The interview began with small talk, with a brief discussion of my employment, how I made my way to Augusta, Georgia, my history in the military, my workout regimen and various injuries I've suffered.

10. After this small talk, the agents reiterated to me that they had search warrants and advised that they wanted to get my side of the story. The agents specifically advised me at that time that they had a search warrant for my person.

11. The FBI agents in the room then began questioning me about a "report" that I had allegedly mishandled classified information.

12. I answered their questions regarding my job, but then the agents told me that they knew "a lot more" than what they were telling me in their questioning, and that "telling a lie to an FBI agent" is not a good thing, stressing that this was my "opportunity" to tell the truth.

13. Law enforcement then interrogated me about the whereabouts of a particular document, telling me that the document at issue had made its way outside of the building where I worked, and that, "far and "away," I was the "most likely candidate" as the culprit of their investigation. The agents told me that the evidence they had was "compelling."

14. The FBI agents continued questioning me about the document, advising me that the document that was published had been folded in half, was post-marked from Augusta, and telling me the name of the media publication in which it appeared.

15. After sharing this information with me, the agents told me that they thought I had just "made a mistake," that I had a "good career," and that if I was the culprit and

did it because of political reasons, that would make them feel better that they didn't "have a real serious problem."

16. Law enforcement specifically asked me whether I believed the disclosure of the document compromised the "sources and methods" contained in the document, to which I advised that it was likely those "sources and methods" had already been compromised.

17. I specifically told law enforcement that, "whatever we were using had already been compromised, and that this report was just going to be like a one drop in the bucket."

18. Given the nature of the questioning, as well as the physical characteristics of the interrogation, and the search warrants that were contemporaneously being executed at my house and car, I then asked the FBI agents whether I was going to be arrested or was going to jail. One agent told me that he did not know the answer to that "yet." The other answer advised that they would have to "make some phone calls."

19. The FBI agents then ended the interrogation, which lasted approximately twenty-five minutes.

20. After the questioning ended, I was instructed to stand out in my front yard, where I stood for some time until another agent told me to wait in the fenced yard with my dog.

21. Finally, two female law enforcement officers arrived on the scene, arrested me, and transported me to jail. In total, it took approximately two hours from the time the original two FBI agents up until the time the two female officers showed up.

22. During the entirety of my encounter with law enforcement on June 3, 2017, prior to being arrested, I was never provided any *Miranda* warnings.

23. During the entirety of my encounter with law enforcement on June 3, 2017, I was never searched despite the agents advising me that they had a search warrant for my person. In fact, I was not physically searched until after my arrest.

24. During the entirety of my encounter with law enforcement on June 3, 2017, I was never told I was free to leave and, in fact, given the circumstances, I never felt free to terminate the interrogation or leave my home.

*Reality Leigh Winner*
Reality Leigh Winner

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2017, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel of record for all parties.

/s/ John C. Bell, Jr.
JOHN C. BELL, JR.

COUNSEL FOR DEFENDANT