**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

|                                  |     |              |
|----------------------------------|-----|--------------|
|                                  | *   |              |
| **UNITED STATES OF AMERICA**     | *   |              |
|                                  | *   |              |
| **v.**                           | *   | **CR 1:17-34** |
|                                  | *   |              |
| **Reality Leigh Winner**         | *   |              |
|                                  | *   |              |
| **Defendant**                    | *   |              |

*************

**GOVERNMENT'S RESPONSE TO MOTION TO REOPEN DETENTION HEARING
PURSUANT TO 18 U.S.C. § 3142(f) AND IMPOSE CONDITIONS OF RELEASE**

The United States of America, by and through its undersigned counsel, hereby opposes the Defendant's motion to reopen her detention hearing and be released from pretrial detention subject to conditions.  As set forth below, this Court's prior determination that the Defendant should be detained pending trial was, and remains, correct.  The Defendant violated one of the most important oaths a person can make to protect the United States, and there is no reason to believe she will have any greater respect for potential conditions of release imposed by this Court.  The Defendant has shown an aptitude for deception and concealment, and she has the capacity to cause further harm to U.S. national security if released.

The information proffered by the defense as "new" information to justify reopening the detention hearing in many instances is not actually new, nor does it affect the merits of the Court's prior decision to detain the defendant.  Similarly, any delay in this case since the initial detention hearing has been caused by the defense, and this Court should not permit the defense to cause delay and then use such delay as a basis to release the defendant.  The cases cited by the defense are also inapposite.

At the same time, the Defendant is an attractive candidate for recruitment by well-funded foreign intelligence services and non-governmental organizations and media outlets that advocate and procure the unauthorized disclosure of classified information.  The Defendant has researched how to move to areas of the world in which she would be very difficult to apprehend, and she possesses language skills that would enable such a move—as well as knowledge of highly classified information to trade for assistance.  The government's case against the Defendant is strong, and she has every reason to flee and cause additional harm.  Accordingly, the Court should not reverse its prior decision to detain the Defendant.

## I.      PROCEDURAL BACKGROUND

The Defendant was arrested after a search warrant was executed at her residence on June 3, 2017, for evidence of, *inter alia*, violations of Title 18, United States Code, Section 793(e) (hereinafter, "Section 793(e)").  During the execution of that search warrant, the Defendant admitted to committing that crime.  The Defendant was arrested and charged by criminal complaint on June 5, 2017, with one count of violating Section 793(e), the maximum penalty for which is imprisonment for ten years.  On June 7, 2017, the Defendant was indicted on one count of Section 793(e).  The Defendant was arraigned on the indictment on June 8, 2017.  On that date, the Court also ordered the Defendant detained pending trial.  *See* Transcript of Arraignment and Detention Hearing, 1:17-cr-34, at 109 (June 8, 2017) (hereinafter, "Tr.").[1]

At the Defendant's arraignment and detention hearing, this Court specifically found that the government had carried its burden both of "proving by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the

---

[1] The Defendant was subsequently charged with one count of violating Section 793(e) in a superseding indictment that did not differ substantively from the original indictment.

[D]efendant as required for this case," and "also, by clear and convincing evidence, that no combination of conditions will reasonably assure the safety" of the community. *Id.* The Court made those determinations based on the nature of the crime charged, the weight of the evidence, and the characteristics of the Defendant.

The Court specifically relied on several factors in deciding to detain the Defendant. First, regarding the nature of the offense, the Court stated:

> [H]ere, the nature and circumstances of the offense alleged is that this defendant violated a top secret security clearance by giving the media information deemed to be top secret by the executive branch agencies in charge of that information.
>
> And by deeming it such, the Government has said that publication of this information would put our country in grave danger. So I think the nature and circumstances of that type of offense militates in favor of detention, not of release.

*Id.* at 105.

Next, the Court found that "the weight of the evidence here is strong." *Id.* In addition to the Defendant's admission to agents of the Federal Bureau of Investigation (FBI) in a voluntary interview at her residence, the Court relied upon Defendant's further inculpatory statements in recorded telephone calls from jail and circumstantial evidence conclusively establishing the Defendant's guilt. *Id.* at 105-06.

The Court then turned to the Defendant's character. While noting that some of the Defendant's inflammatory statements may have been "in jest," *id.* at 107, the Court correctly discerned a side to the Defendant's personality, unknown to many of those close to her—and certainly unknown to the family members the Defendant offered as witnesses and now relies upon in arguing for release—that "really concern[ed]" the Court "in terms of whether she's a risk of flight and a danger to our community." *Id.* at 106-07. The Court focused in particular on facts that the Defendant does not dispute: (1) she researched whether she could insert a USB

drive into a classified computer system without being detected; (2) she then did insert a USB drive into a classified computer system;[2] (3) she had installed the Tor browser (which permits functionally secure and anonymous online activity) and researched its most secure settings; (4) she researched how to obtain an email account that advertises itself as offering "free, one-click, read-only burner" accounts; (5) she made a statement about burning down the White House, even if in jest; (6) she had a fascination with the Middle East and terrorism; and (7) she praised a Taliban leader's "Christ-like vision to have a fundamentalist Islamic" state. *Id.* at 107-08. The Court could not "square that kind of remark by her with who her parents know and the service she's given to the community." *Id.* at 108. The Defendant's ability to maintain alternate personae and conceal the truth have not changed since the Court made these determinations.

The Court further noted the Defendant's statement to her mother that she was prepared to "go nuclear in the press" unless the Court released her. *Id.* at 108. That statement is not only a direct challenge to this Court's authority, but also points directly to the core of the government's strong belief—and the Court's conclusion—that the Defendant presents a danger to the community. As the Court asked, "how much does she know from all the time she's had a top secret security clearance both before and after her time of military service, and who might she tell?". *Id.* at 108-09. Nothing has changed in that regard. Similarly, nothing should change the Court's decision to detain the Defendant.

---

[2] The government does not possess the USB drive and thus has not been able to analyze it. The government's review of system logs has not revealed conclusively whether the Defendant was able to move any data to the USB drive. In any event, the government has provided the Court with sufficient information to affirm the Court's prior detention decision without regard to whether the Defendant successfully moved files to the drive.

## II.    LEGAL STANDARDS

In ruling on a motion for pretrial detention, the Court must determine whether any condition or combination of conditions will reasonably assure the appearance of the defendant as required, and the safety of any other person and the community.  18 U.S.C. § 3142(f).  The standards of proof differ with respect to the "risk of flight" and "dangerousness" prongs of the statute.  A defendant may be detained if her risk of flight is established by a preponderance of the evidence.  *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985).  A defendant may be detained if the government demonstrates by clear and convincing evidence that she presents a danger to the community.  18 U.S.C. § 3142(f).

In making these determinations, the Court must evaluate several enumerated factors to determine "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ."  18 U.S.C. § 3142(g).  These factors include:

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including: the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*Id.*  The Court must balance these factors in determining whether a defendant should be detained pending trial.

### III.    ARGUMENT

The Court correctly found at the Defendant's initial detention hearing that the government had established by a preponderance of the evidence that the Defendant presents a risk of flight, and by clear and convincing evidence that she presents a danger to the community. None of the Defendant's arguments warrant reconsideration of that decision, and the arguments in favor of detention remain compelling.

### A.  The Defendant's Arguments and Factual Assertions Have No Bearing on the Court's Decision To Detain the Defendant

The Defendant offers factual claims and legal arguments in support of her effort to be released from detention.  Her factual assertions, to the extent that they are accurate, do nothing to undermine the decision on June 8 to detain her.  Her legal arguments also are without merit.

### 1.  *Much of the Information Cited by the Defendant Is Not "New," Nor Do Any of Her Factual Assertions Bear on This Court's Prior Decision To Detain Her*

As "new" evidence, the defense relies on a June 29, 2017 email from the government clarifying two statements from the initial detention hearing: (1) a recitation of a phone call of the Defendant, in which she said she leaked a document (rather than documents), and (2) evidence concerning the reasons why the Defendant asked her mother to transfer money.  Because the Court did not rely on either statement at the Defendant's initial detention hearing, neither correction has any bearing on the Court's decision to detain the Defendant.

The Defendant, through a fellow inmate, insisted that her mother immediately transfer $30,000 out of the Defendant's account because "they might freeze it."  The government has never intimated to the Defendant or the Court that it would move to freeze any of the Defendant's assets.  While defense counsel suggests the Defendant merely sought to set aside $30,000 "because she wanted to make sure she could pay her bills," the Defendant makes absolutely no mention of paying bills in her panicked phone call.  Rather, once assured that her

mother will move the money immediately, the Defendant moves on to discuss fundraising efforts and media attention related to her case. The government submits that although the Defendant does not expressly mention the Court's decision to release her appointed counsel, it is highly likely that decision precipitated the withdrawal of nearly all the funds in her account.

Likewise, the "new" points that the defense makes with respect to the Defendant's character, physical and mental condition, and ties to the community are unpersuasive and provide no basis for reopening the detention hearing.  Initially, defense counsel claims that the Defendant "has great respect for this country."  Dkt. No. 96-1 at 3.  To the extent that counsel refers to the Defendant's current respect for the authority of U.S. Government institutions, that claim is contradicted by the evidence presented at the initial detention hearing and further described herein.  The Defendant should not be trusted to abide by any promise, oath, or affirmation made to the Court or to anyone else.  She must be kept in confinement until her day in court.

Nor do the Defendant's claims regarding her health status withstand scrutiny.  The Defendant notes that she suffers "gastrointestinal issues as a result of a change to her diet, which is vegan and Kosher, which is material to her history and characteristics."  *Id.* at 9.  The Defendant's recent letters, however, suggest she is quite happy with the cuisine at the Lincoln County Jail.  While this is a minor point compared to some of the other considerations at issue, it reflects the Defendant's willingness to use any argument, even if directly contradicted by the facts, to elicit the Court's sympathy.  It is also reminiscent of her statement in a recorded jail call, before her initial detention hearing, that she would cry and use her gender and race to convince this Court to release her.  The Court should repudiate such tactics.

The Defendant has no real ties to the Southern District of Georgia other than her rented home, a yoga studio where she used to teach part-time, and her former job to which she will not be welcomed back.  That her mother is willing to move from Texas and reside in the Defendant's rental home does not change the quality of the Defendant's connections to the district—they remain entirely tenuous and temporal.  Neither the Defendant nor her family owns property in the district, has a permanent job in the district, or has any other family members in the district.  They thus have no substantial familial, financial, contractual, or even emotional ties to the area.

Finally, the Defendant is currently unemployed and her security clearance suspended, which deprives the Defendant of her most lucrative job prospects.

*2.   Any Delay in the Case Since the Court's Detention Ruling Has Been Caused by the Defendant*

At the Defendant's arraignment, at the request of the government, the Court designated this case a complex case under the Speedy Trial Act, in large part because this prosecution involves classified information and the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III.  The role of CIPA in this case is not, therefore, a new factor to consider, as the Defendant argues.  *See* Dkt. No. 96-1 at 5.  Moreover, in contrast to the Defendant's claim that the Court extended the Defendant's trial date "at the behest of the parties," *id.*, the Defendant herself requested scheduling changes that required the extension.  The government did not join the Defendant's request, but rather deferred to the Defendant and the Court.  *See* Dkt. No. 93.

The government has satisfied every deadline in this case, including classified and unclassified discovery as well as an unusually short deadline for the filing of a motion pursuant to Section 4 of CIPA.  The only scheduling factor that has changed since the Court first ordered the Defendant detained is delay that the Defendant has caused herself.  The government takes no

position as to whether that delay is justified, but the Defendant cannot claim that it violates her

rights or entitles her to different treatment when she herself requested the delay.

> 3. *The Cases Cited by the Defense Are Distinguishable*

The defense provides a lengthy chart of cases in purported support of its position that

"Courts routinely grant bail to defendants charged with similar offenses." *See* Dkt. No. 96-1 at

14-20. But the defendants in this chart are not similar to the Defendant, nor in many instances

are the crimes committed similar to the Defendant's crime. A number of the defendants in the

chart were charged with a misdemeanor violation of 18 U.S.C. § 1924. *See United States v.*

*Nishimura*, No. 1:15-cr-145-KJN (E.D. Cal.); *United States v. Petraeus*, No. 3:15-cr-47-DCK

(W.D.N.C.); *United States v. Berger*, No. 1:05-MJ-175-DAR (D.D.C.). The nature and

seriousness of a misdemeanor offense, and the sentence those defendants faced, are simply not

comparable to this case. Other defendants in the chart were charged with retention, which is a

notably different offense than transmission, as one of the primary concerns justifying the

detention of the Defendant in this case is her propensity to provide classified national defense

information to the press. *See United States v. Hitselberger*, Case No. 1:12-cr-231 (D.D.C.);

*United States v. Ford*, Case No. 8:05-CR-98-PJM/ 8:05-cr-235-PJM (D. Md.). In one case cited

by the defense as a supposedly comparable case, the defendant was charged by information,

waived indictment, and pled guilty less than two weeks later to a violation of 18 U.S.C. § 798(a).

*See United States v. Leibowitz*, Case No. 8:09-cr-632 (D. Md.). Finally, in other cases cited by

the defense, the issue of detention was not litigated or the Court did not provide the basis for

release. *See United States v. Kiriakou*, Case No. 1:12-cr-127 (E.D. Va.); *United States v.*

*Sterling*, Case No. 1:10-cr-485 (E.D. Va.); *United States v. Drake*, Case No. 1:10-181 (D. Md.);

*United States v. Stephen Jin-Woo Kim*, Case No. 1:10-cr-225 (D.D.C); *United States v. Franklin,*

*Rosen, and Weissman*, Case No. 1:05-CR-225 (E.D. Va.).

But most important, detention decisions must be considered on a case-by-case basis, and none of the defendants in any case cited by the defense presents the unique circumstances presented here:  a defendant who has shown repeated contempt for her country; devised and executed a plan to harm her country; has conducted herself in a manner since arrest that shows she still harbors that contempt and intends to further harm our country, as evidenced by her lack of remorse in recorded telephone comments and threat to "go nuclear in the press" unless this Court releases her; and a demonstrated desire to live abroad and the resources and skills necessary to do so.  The weight of the evidence against the Defendant is overwhelming, and unlike many of the defendants identified by the defense, so is the sentence the Defendant is facing.

In that regard, the District Court's detention decision in *United States v. Harold Martin III* is instructive.  Like the Defendant in this case, Martin is a former member of the United States Armed Services, was working as a contractor with a security clearance when he was arrested, and is accused of stealing TOP SECRET//SCI information.  But in that case, Martin is charged with unlawful retention—not transmission—of documents containing information relating to the national defense.  Nonetheless, following a hearing before a United States District Judge, Martin is detained pending trial based solely on the flight risk he presents.[3]

**B.   The Factors Under the Bail Reform Act Still Weigh in Favor of Detention**

The foundation upon which the Court relied in its well-reason determination in favor of detention remains as solid as it was on June 8.  Indeed, the government's arguments based on the four factors this Court should consider are just as, if not more, compelling.  As summarized

---

[3] Martin was ordered detained by a United States Magistrate Judge and then, after a motion to reconsider, by a United States District Judge.  The Magistrate Judge and District Judge in *Martin* considered only the defendant's risk of flight, and not the danger he presented to the community.

above, the Court examined the four factors those analyses require:  (1) the nature and
circumstances of the offense; (2) the weight of the evidence; (3) the Defendant's history and
characteristics; and (4) the danger the Defendant presents to the community.  Each of those
factors continues to support the Court's detention of the Defendant, notwithstanding any of the
defense's arguments.

*1. Nature and Circumstances of the Offense*

The offense charged involves betraying the trust placed by our country in an individual
who swore an oath to protect it.  The Defendant committed the offense charged notwithstanding
her knowledge that her conduct both was illegal and harmful to U.S. national security.

Critically, while not an element of the crime charged, the Defendant knew that her
actions "reasonably could be expected to cause exceptionally grave damage" to U.S. national
security.  She had been trained multiple times not only on the rules governing the handling and
disclosure of classified information, but also on the meaning of a "TOP SECRET" classification
and a "SENSITIVE COMPARTMENTED INFORMATION" (SCI) restriction.  Moreover, the
Defendant told the FBI:

| | |
|---|---|
| Agent: | Uhm, in regards to the document that you did put out, when you - did you realize that-the technical capabilities in that article? |
| Defendant: | Sources and methods. |
| Agent: | Sources and methods are valuable to adversaries. |
| Defendant: | Yeah. |
| Agent: | Did you know that before you printed it off, as you were taking it out? |
| Defendant: | Yes. |
| Agent: | Okay. Uhm, did you know that if that got out, that those sources and methods could be compromised? |

Defendant:      If they haven't been already, then yes.

Tr. at 08172.[4]  In fact, the Defendant's offense did—as she knew it might—cause extremely grave damage to the national security of the United States.  The harm is not speculative or hypothetical, but is concrete, measurable, and directly attributable to the Defendant's misconduct.

The criminal conduct in this case thus involved not only the fundamentally dishonest act of violating an oath and the law, but also total disregard for U.S. national security.  This factor clearly weighs in favor of detention, as the Court indicated at the initial detention hearing.

     *2.   Weight of the Evidence*

As described above, the Court at the initial detention hearing noted the strength of the evidence.  The Court now has access to the transcript and recording of the Defendant's voluntary interview with the FBI and can see and hear exactly how directly the Defendant admitted to the crime charged.  The Defendant repeated that admission in recorded calls from jail, and as the Court noted, the circumstantial evidence of the Defendant's guilt is strong.

     *a. Elements of the Crime*

To convict a defendant under Section 793(e), the government must prove that a defendant in unauthorized possession of a document containing information relating to the national defense (hereinafter, "national defense information" or NDI) retained that document without authorization, or transmitted it to someone not entitled to receive it, and knew that doing so was

---

[4] Again, because it is not an element of the crime, the Defendant's self-serving comment to the FBI that "whatever we were using has already been compromised, and this report was just going to be like a one drop in the bucket," *see* Dkt. No. 96-1 at 8, is not relevant.  And in any event, as the government has informed the defense, significant harm did result from the Defendant's crime.

against the law.[5]  National defense information is a "generic concept of broad connotations,

referring to the military and naval establishments and related activities of national preparedness."

*Gorin v. United States*, 312 U.S. 19, 28 (1941).  Courts also require that, to constitute NDI,

information must be "closely held."  *See United States v. Squillacote*, 221 F.3d 542, 576-77 (4th

Cir. 2000); *United States v. Heine*, 151 F.2d 813, 817 (2d Cir. 1945).  The classification of the

document and the means the Defendant used to steal it and smuggle it out of her place of

employment are both strong evidence that it was "closely held."

### b. The Case Against the Defendant

Considering the elements the government must prove, the government's case against the

defendant is simple, straightforward, and overwhelming.  Most notably, during her voluntary

interview with the FBI on June 3, 2017, the Defendant admitted that she unlawfully stole the

document at issue (which consisted of intelligence reporting), retained it, and transmitted it to

someone not authorized to receive it.  She admitted knowing the sensitive and classified content

of the intelligence reporting, printing it, secreting it under her clothing, removing it from the

building, putting it in an envelope, and mailing it to an Online News Outlet.[6]  *See* Exhibit A

---

[5] Of particular note, the clause in Section 793(e) that refers to a defendant's "reason to believe" that retained or disclosed information "could be used to the injury of the United States or to the advantage of any foreign nation" does not apply in this case.  Courts have uniformly held, consistent with a grammatically correct reading of Section 793(e), and based on the Commentary to the relevant section of the United States Sentencing Guidelines, that that clause only applies to *intangible* information.  *See, e.g.*, United States v. Rosen, 445 F. Supp. 2d 602, 643 (E.D. Va. 2006) ("Finally, with respect *only* to intangible information, the government must prove that the defendant had a reason to believe that the disclosure of the information could harm the United States or aid a foreign nation . . . ." (emphasis added)); *see also* U.S.S.G. § 2M3.3 cmt. 2.  Cases involving *tangible* information, such as the document in this case, require no such scienter.

[6] The government has not publicly identified the outlet, which is referred to herein as the "Online News Outlet."  An additional news outlet that the defendant researched is referred to herein as the "Print News Outlet."  In addition, to protect sources and methods, the U.S. Intelligence Community ("USIC" or "IC") agency that originated the report the Defendant unlawfully

(Transcript of Defendant's Interview) at 08159-62.  She admitted wanting the Online News Outlet to publish the intelligence reporting, even though she knew the Online News Outlet did not have authority to receive the information.  *Id.* at 08165, 08173.  She admitted she knew the intelligence reporting concerned sensitive technical capabilities—sources and methods—and that those sources and methods could be compromised by her disclosure.  *Id.* at USAO- 08172.[7]

In addition to her confession to the FBI, the Defendant admitted her criminal conduct on the telephone following her arrest.  In a recorded call with her sister, the Defendant had the following conversation:

| | |
|---|---|
| WINNER: | Oh boy [sister's name], I screwed up. |
| SISTER: | Well it's gonna be ok. |
| WINNER: | I don't know if I'm getting out of this. |
| SISTER: | You don't know if what? |
| WINNER: | I don't think I'm getting out of this. |
| . . . | |
| SISTER: | Oh, it's not because you put the wrong birthday for [sister's husband]? |
| WINNER: | No. I leaked a document. And they were able to trace it back to me. And it's kind of an important one. |

In addition to these direct admissions, circumstantial evidence proves the Defendant leaked the intelligence reporting at issue to at least one media outlet.  The intelligence reporting

---

retained and disclosed is referred to herein as "IC component," and a foreign country is referred to herein as "Foreign Country."

[7] The defense cites a pending motion to suppress as material to the weight of the evidence.  The motion to suppress is meritless, and in any event, as indicated in the text, the circumstantial evidence is itself overwhelming, especially when coupled with the Defendant's recorded telephone calls from jail admitting that she leaked an important document.

included a classified attachment.  Records from the Defendant's workplace show only two

individuals who printed the reporting and the attachment, both of which were transmitted to the

Online News Outlet by mail shortly thereafter.

The Defendant's online activity further corroborates her guilt.  Specifically, records of

the Defendant's workplace establish the Defendant printed the intelligence reporting, including

the attachment, on May 9, 2017.  An examination of the Defendant's personal cellular phone

shows she conducted the following online searches and viewed the following webpages on and

after that date:

- On May 9, the Defendant searched for the secure mailing address of a Print News Outlet, viewed a document called "How to Share Documents and News Tips with [Print News Outlet] Journalists" on the Print News Outlet's website, searched for an Online News Outlet and "secure drop," and viewed the Online News Outlet's page containing instructions for the anonymous transmission of leaked information.
- On May 12, a few days after she mailed the leaked document, the Defendant searched online for the Print News Outlet referenced on May 9, as well as the Online News Outlet to which she transmitted the leaked document, and viewed the homepages of both publications.
- On May 13, the Defendant searched for the Print News Outlet, viewed its homepage, and then searched "[IC component] leak" and "[IC component] leak [Foreign Country]" on multiple occasions.
- On May 14, the Defendant searched for and viewed the Print News Outlet's homepage, and then searched within the Print News Outlet's website for the name of the relevant IC component.  She also searched for and viewed the Online News Outlet's homepage.
- On May 22, the Defendant viewed both the Print News and Online News Outlets' websites, and she searched for the name of the relevant IC component within both websites.

Additionally, a representative of the Online News Outlet to whom the Defendant mailed

the intelligence reporting sent a text message to another government contractor, sending pictures

of the intelligence reporting and stating that the representative received the intelligence reporting

in an envelope postmarked, "May 10, Augusta GA."  That message and the Defendant's online

activity establish that the Defendant mailed the intelligence reporting at issue to the Online News

Outlet on or about May 9, 2017.  The online activity further suggests she transmitted the same intelligence reporting to the Print Media Outlet, as well (and lied to the FBI about it).

The evidence will further conclusively establish that the information the Defendant unlawfully retained and disclosed related to national defense and was "closely held."  It was highly classified, tightly controlled, and had not been released publicly.  The Defendant and her counsel have made several statements that the sources and methods the Defendant disclosed were already in the "public domain."  *See, e.g.*, Transcript of September 14, 2017 hearing at 17-18.  The evidence will clearly demonstrate that is untrue.

Finally, the significant sentence the defendant is facing provides incentive to flee.  Violation of 18 U.S.C. § 793(e) is punishable by up to ten years' confinement, a $250,000 fine (or both), and up to three years' supervised release.  Pursuant to the United States Sentencing Guideline (U.S.S.G) § 2M3.3, the Defendant's base offense level is 29.  That level is increased by two levels pursuant to U.S.S.G. § 3B1.3, because the Defendant abused her position of trust.  Even with a criminal history category I, the Defendant's Guideline range is substantial:  108-135 months.  *See United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1358 (M.D. Fla. 2003) ("[T]he stronger the government's case, especially if the sentence will be severe, the greater a defendant's incentive to flee"); *United States v. Almasri*, Crim. A. No. H-07-155, 2007 WL 2964780, at * 1 (S.D. Tex. Oct. 10, 2007) (finding severity of potential ten-year sentences weighed in favor of detention).

### 3.  History and Characteristics of the Defendant

The Court's observations regarding the Defendant's history and characteristics recited at the initial detention hearings remain valid.  Additional evidence, found primarily in the Defendant's electronic communications, adds weight to the factors that already concerned the

Court enough to warrant detention.  As set forth below, the Court should be seriously concerned about the Defendant's duplicity and lack of trustworthiness, as well as her ability to flee.

To begin, the charged conduct itself involves one of the most serious breaches of trust that can occur within government service, which would be a sufficient basis to conclude that the Defendant will not hesitate to disregard any conditions this Court imposes.  The Defendant's conduct even beyond the crime charged, however, evinces the contempt that she harbors for the authority of the U.S. Government.[8]  The Defendant has repeatedly expressed disdain for the security requirements she swore to uphold, and she has expressed praise for individuals who are alleged to have harmed U.S. national security by unlawfully retaining or disclosing classified information.  The Defendant's duplicity is starkly illustrated by the fact that she researched opportunities to access classified information (multiple searches for jobs requiring a security clearance on ClearanceJobs.com) at the same time in November 2016 that she searched for information about anti-secrecy organizations (Anonymous and Wikileaks).

On or about February 9, 2017, the Defendant accepted a position as a contract linguist with Pluribus International.  She was assigned to a facility on Fort Gordon Military Reservation in Georgia, where, with her TOP SECRET//SCI security clearance, she knew she would have access to some of the nation's most highly classified information.  Among other things, she signed a standard non-disclosure agreement (NDA) promising to keep secret the classified information she learned.  She provided a sworn statement—just as she has provided sworn statements to this Court—that she accepted this responsibility "without any mental reservation or purpose of evasion."

---

[8] To be sure, the Defendant chose to enlist in the United States Air Force and serve her country. The position she held, and the trust that she was given, however, became the instrumentality of her crime once she decided to betray her country and her oath.

The Defendant's private communications, however, again reinforce the Court's initial concern about the Defendant: "who is she?  What are her characteristics?  What is she in terms of her personality and her loyalties and the kind of person she is?".  Tr. at 106.  For example, the Defendant repeatedly expressed contempt for her oath.  On February 9, 2017, after her initial security training, the Defendant sent a message to her sister, via Facebook:

> I just had my security training and the security officer was talking about threats, and how the insider threat is actually the largest, and *it was hard not to laugh* when he was like, "yeah so uh we have guys like Edward Snowden who uhh thought they were doing the right thing, but you know, they weren't so uh we uh have to keep an eye out for that insider threat, especially with contractors…"

(emphasis added).

On or about February 25, 2017, the Defendant engaged in the following Facebook chat with her sister, which again is relevant to the Court's concerns:

| WINNER: | I have to take a polygraph where they're going to ask if I've ever plotted against the gov't |
| WINNER: | #gonnafail |
| SISTER: | Lol!  Just convince yourself you're writing a novel |
| WINNER: | Look, I only say I hate America like 3 times a day.  I'm no radical  It's mostly just about Americans obsession with air conditioning |
| SISTER: | But you don't actually hate America, right? |
| WINNER: | I mean yeah I do it's literally the worst thing to happen on the planet.  We invented capitalism the downfall of the environment. |

This exchange first indicates the Defendant's own opinion that she could not pass a security polygraph examination, in a context reflecting her belief that she had lied.  Whether or not the Defendant actually feels hatred for the United States, these statements are as difficult to "square" with the image of the Defendant that she and counsel present to this Court.

On March 7, 2017, the Defendant searched for online information about Vault 7, Wikileaks's alleged compromise of classified government information.  Later on March 7, 2017, the Defendant engaged in the following Facebook chat with her sister in which she expressed her delight at the impact of the alleged compromise reported by Wikileaks:

| | |
|---|---|
| SISTER: | OMG that Vault 7 stuff is scary too |
| WINNER: | It's so awesome though.  They just crippled the program. |
| SISTER: | So you're on Assange's side |
| WINNER: | Yes.  And Snowden. |

The Defendant's subsequent conduct demonstrates that she was not merely expressing an opinion.  Rather, having sought and accepted a position that granted her access to classified information, the Defendant educated herself about communicating securely and anonymously.  Some of her research was specific to communications with news outlets.  A forensic examination of the Defendant's cellular telephone revealed that on February 7, 2017, just two days before starting work with Pluribus International, the Defendant used her phone to capture an image of a webpage listing eight "securedrop" addresses[9] for media outlets seeking leaked information.  Moreover, on March 7, 2017, the same date that she reacted positively to the alleged compromise reported by Wikileaks, the Defendant also performed an online search for "tor email,"[10]

---

[9] Securedrop is defined as "an open-source whistleblower submission system that media organizations can use to securely accept documents from and communicate with anonymous sources."  https://securedrop.org/.

[10] This was not the Defendant's first research into communicating over Tor, which is a system involving multiple layers of encryption and rerouted communications that renders online interactions (such as web browsing and email) functionally secure and unattributable.  On August 6, 2016, the Defendant used her personal cell phone to search for "tor on chromebook" and view "An Introduction to Tor on Chrome OS."  As the Court is aware, the Defendant installed the Tor browser, through which individuals use Tor, on her personal computer on February 1, 2017, and the FBI recovered from the Defendant's residence handwritten notes about how to download and install Tor at its most secure setting.  The Court is further aware of the

indicating that she was searching for a secure and anonymous means to communicate something. There are thus ample reasons to conclude that the Defendant does not act consistently with her promises or with the image that she chooses to project, and that the Defendant cannot be trusted to obey any conditions the Court places upon her.

The Defendant also has the desire to flee to parts of the world from which it would be extremely difficult to compel her return.  She has displayed a keen interest in residing outside of the United States, in places such as Kurdistan, Iraq, Jordan, the Palestinian territories, and Afghanistan.  She has written of a desire to travel to the Middle East and meet with Taliban military leaders.  In short, the Defendant was eager to leave the United States even before she was indicted.  Based on her history, the Defendant would be able to reside, work, own property, and speak the language in areas from which securing her return to the United States would be extremely difficult.  *See United States v. Hitselberger,* 909 F. Supp. 2d 4, 8 (D.D.C. 2012) ("Weighing the proffered evidence, the court acknowledges that Mr. Hitselberger presents some risk of flight.  He has considerable linguistic skills and a demonstrated ability to live abroad.").

Finally, when FBI agents searched the Defendant's residence on June 3, 2017, they found a document containing highly sensitive information acquired as a result of her employment relating to foreign intelligence targets associated with terrorist activity.  When coupled with the Defendant's searches for untraceable email accounts and her establishment of an anonymous, self-destructing inbox, this is clearly cause for concern.

---

Defendant's research into removing and replacing cellular phone SIM cards, and her research into creating an email account at "slippery.email," which advertises itself as "one-click, read-only burner mailboxes."  Further investigation has determined that the handwritten notes found in the Defendant's residence contained the URL for a slippery.email inbox, which URL grants the user access to the account.

### 4.   *Nature and Seriousness of Danger Posed by Release*

The Defendant possesses knowledge of highly classified U.S. Government information, is unemployable in her most lucrative fields of expertise, and is in need of financial assistance. She thus presents an extremely attractive recruitment target for foreign intelligence agencies as well as well-financed non-governmental organizations that encourage and support disclosures of classified information.

While the Defendant has already demonstrated that she possesses sufficient motivation to reveal such information, if released, she would have the additional incentive to seek both support for flight and renewed media attention.  Needless to say, given the scope of the Defendant's knowledge, any further unauthorized disclosure by her of classified information reasonably could be expected to cause additional exceptionally grave damage to U.S. national security.  Although the Defendant is detained, her communications, other than those with her legal team, are monitored, and she does not have access to any online communications, by which she could further disclose classified information.  The certainty of these restrictions is only possible if she is detained.  Simply put, there is no realistic way to prevent further dissemination of classified information by the Defendant if she is released, and there is no reason to believe that she would obey an Order by this Court limiting her communications.  Any such Order would only be enforceable after the fact of a breach by the Defendant, and then it would be too late.  The additional damage to national security already would have occurred.

The Defendant asks this Court to rely upon her word that she would obey the Court's release conditions and refrain from further criminal activity.  But the Defendant gave similar assurances to the U.S. Government, and the result of the government placing that trust in the Defendant is now before this Court.

## IV.     CONCLUSION

This Court's prior determination ordering detention is firmly supported by the evidentiary

record and law and should be affirmed.

<div style="margin-left:40%;">

Respectfully submitted,
James D. Durham
Acting United States Attorney

By:    _____/s/_____
Jennifer G. Solari
Assistant United States Attorney

_____/s/_____
David C. Aaron
Julie Edelstein
Trial Attorneys
U. S. Department of Justice
National Security Division

</div>

## **CERTIFICATE OF SERVICE**

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 27th day of September 2017.

JAMES D. DURHAM
ACTING UNITED STATES ATTORNEY

*//s// Jennifer G. Solari*

Jennifer G. Solari
Assistant United States Attorney

Post Office Box 8970
Savannah, Georgia 31401
Telephone No:  912-652-4422