# EXHIBIT A

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE Document 112-1 Filed 10/03/17 Page 2 of 126

**73 Colum. L. Rev. 929**

**Columbia Law Review**
May, 1973

Article

Harold Edgar [a1] Benno C. Schmidt, Jr. [aa1]

Copyright © 1973 by Directors of The Columbia Law Review Association, Inc.; Harold Edgar, Benno C. Schmidt, Jr.

# THE ESPIONAGE STATUTES AND PUBLICATION OF DEFENSE INFORMATION

**TABLE OF CONTENTS**

| | |
|---|---|
| I. Introduction: New York Times Co. v. United States | 930 |
| II. The Espionage Statutes: An Overview | 936 |
| A. The Espionage Statutes | 937 |
| B. The Legislative History | 939 |
| III. Section 794 | 942 |
| A. Subsection 794(a) | 943 |
| B. Subsection 794(b) | 944 |
| 1. Plain Meaning | 945 |
| 2. Legislative History | 946 |
| (a) The Publication Provisions of S. 8148 | 947 |
| (b) The Publication Provisions of S. 2 | 950 |
| (c) The House Debates on Section 794: H.R. 291 | 959 |
| (d) The Conference Reports and Final Enactment of 794 | 961 |
| 3. Subsection 794(b): Conclusion | 965 |
| IV. Subsections 793 (a) and (b) | 966 |
| A. Subsections 793(a) and 793(b) | 967 |
| B. Preliminary Considerations | 966 |
| 1. Related to the National Defense | 969 |
| (a) Legislative Background | 969 |
| (b) The Judicial Response | 974 |
| 2. Intent or Reason to Believe That it is to be Used to the Injury of the United States or to the Advantage of a Foreign Nation | 986 |
| (a) The Problems of Plain Meaning | 987 |
| (i) Injury or Advantage | 987 |
| (ii) Intent and Reason to Believe | 989 |
| (b) Legislative Background | 991 |
| (i) The Senate | 991 |
| (ii) The House | 995 |
| (c) Summary | 996 |
| V. Subsections 793(d) and 793(e) | 998 |
| A. Introduction | 998 |
| B. The 1911 Act | 1002 |
| C. The 1917 Act | 1005 |
| 1. S. 8148 | 1007 |
| 2. S. 2 | 1012 |
| 3. H.R. 291 | 1016 |
| 4. The Conference | 1019 |
| 5. Epilogue to Section 1 (d) | 1020 |

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 3 of 126

D. The 1950 Act                                                                      1021
E. Conclusion                                                                        1031
1. Publication and Conduct Incidental Thereto                                        1032
2. Culpability                                                                       1038
(a) Willfully                                                                        1038
(b) Transfer or Retention of Information                                             1046
3. Documents and Information                                                         1047
4. Entitled to Receive It                                                            1050
5. Summary                                                                           1057
VI. Subsection 793(c)                                                                1058
II. Other Statutes Bearing on Publication of Defense Information                     1060
A. 18 U.S.C. § 952                                                                   1060
B. 18 U.S.C. § 798                                                                   1064
C. The Photographic Statutes: 18 U.S.C. §§ 795, 797 and 50 U.S.C. App. § 781         1069
D. 50 U.S.C. § 783(b)                                                                1073
E. The "Restricted Data" Statutes: 42 U.S.C. §§ 2271-81                              1074
VIII. Conclusion: Room for Improvement                                              1076

**\*930  I. *Introduction: New York Times Co. v. United States*** [1]

We began this lengthy study of the espionage statutes with grand designs. Our original goal, suggested by the Pentagon Papers litigation, was to elaborate the extent to which constitutional principles limit official power to prevent or punish public disclosure of national defense secrets. But this plan was short-lived. The more we considered the problem, the more convinced we became that the central issues are legislative. The first amendment provides restraints against grossly sweeping prohibitions, but it does not, we believe, deprive Congress of considerable latitude in reconciling the conflict between basic values of speech and security.

When we turned to the United States Code to find out what Congress had done, we became absorbed in the effort to comprehend what the current espionage statutes mandate with respect to the communication and publication of defense information. The longer we looked, the less we saw. Either advancing myopia had taken its toll, or the statutes implacably resist the effort to understand. In any event, whether the mote be in our eye or in the eyes of the draftsmen, we have not found it possible to deal with the espionage statutes except at forbidding length. This has cautioned us against augmenting our study by detailed efforts to spell out statutory alternatives, a task further complicated by our unfamiliarity with the Government's side of the secrecy story, particularly the extent to which important security interests have in fact been compromised by public disclosure of defense secrets. Consequently, our conclusion suggests only some general principles that should control legislative action--principles not reflected in the two proposals currently before Congress as part of the revision of the federal criminal law. The current statutes come first, and we save the rest for another day.

The New York Times commenced publication of the Pentagon Papers [2]  **\*931**  on June 13, 1971. The event created little stir until the Executive Department threatened legal proceedings to halt the presses. [3]  We may not know for a long time, if ever, precisely why this unprecedented course was chosen. Current speculation, however, emphasizes the Administration's fear that budding relations with Communist China would be nipped if secrets could not be guaranteed. [4]  That it is even plausible that such a bruising domestic confrontation would be undertaken to facilitate relations with Mao is a measure of the complexity and the irony of current statecraft.

The battle was soon over. Proceedings in the lower courts took a mere two weeks. The Supreme Court heard argument on June 26 and delivered its opinion on June 30. The stakes were as high as the pace was fast, for the principles that clashed were fundamental notions of national security and freedom of speech and press, the two values measured against which other interests are so often treated as but straws in a wind. Not surprisingly, however, the Supreme Court decided the case without making much concrete law. Among the ten opinions [5]  produced in *New York Times Co. v. United States*, the only proposition commanding a majority of the Court was the naked and largely uninformative conclusion that on

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 4 of 126

the record the Government had not met its heavy burden to justify injunctive relief against publication. Prior restraints, the Court reaffirmed, are available only in the most compelling circumstances. [6]

The central theme sounded in the opinions of the six majority Justices was reluctance to act in such difficult premises without guidance from Congress. That reluctance necessarily lost the case for the Government, which argued that, without regard to legislation, the President's constitutional powers as Commander-in-Chief and foreign relations steward entitled him to injunctive relief to prevent "grave and irreparable danger" to the public interest. The Government's brief in the Supreme Court did not even cite the espionage statutes, let alone take a position on whether the New York Times and the Washington Post had violated criminal laws by publishing the Pentagon Papers or by their conduct in obtaining and retaining the alleged **932** national defense information. When litigation moves this quickly and the underlying statutory problems are so complex, one cannot be sure that tactics represent deliberate assessments of statutory coverage rather than acquiescence to the demands of instantaneous response. Presumably, however, the Government ignored the statutes in the Supreme Court [7] because they do not expressly authorize injunctive relief, whether or not they make publication or retention criminal. [8] If publishing the papers were criminal, injunctive relief might have been thought barred, either by the principle that equity will not enjoin a crime or by an assessment that Congress explicitly declined to authorize injunction proceedings. If publication were not criminal, then Congress valued free speech higher than possible security risks, and the Court was bound to accept that judgment.

The Government's failure to discuss the legislative materials, however, did not deflect judicial focus from them. All the Justices concurring with the judgment, including the late Justice Black who found the first amendment dispositive in any event, stressed the Government's failure to premise its case on legislative authority. Thus the Supreme Court's decision resembles in result a similar failure for unadorned claims of executive power in *Youngstown Steel*. [9] Perhaps the Government would have fared better by arguing that in this context interstitial power is appropriately used to enjoin contemplated criminal behavior or to limit the consequences of completed crimes, thus testing head-on in the Supreme Court whether the espionage statutes were in fact being violated.

Accepting the premise that there was no statutory basis available for granting injunctive relief, we believe several considerations support the Supreme Court's refusal to forge new rules concerning the disclosure of national secrets. First, it has inadequate tools for the task: ad hoc evaluations of executive claims of risk are not easily balanced against first amendment language and gloss. The spacious generalities of the constitutional text **933** provide only vague standards if, as we believe, they do not compel acquiescence in the publication of all information whatever its source, defense importance, or minimal significance for public debate. Furthermore, there are no judicial precedents even remotely analogous from which the Court could have drawn an appropriate and satisfactory rule to fit the case. Street demonstrations, apocalyptic rhetoric, obscenity, libel, and the rest of first amendment judicial fare are poor materials from which to fashion permissions and restraints on the publication of national security secrets. Moreover, even if standards could be formulated from these sources, the judicial process is not well suited to judge the risks inherent in releasing particular secrets. The task necessarily requires conjectures, [10] and adequate conjectures cannot be made without an overview of the substance and interrelationship of military and diplomatic policy that the judicial process cannot provide, a concession that only the late Justice Harlan was willing to accept. [11]

Second, dissemination of secret information often arises in the context of heated disagreements about the proper direction of national policy. A secret may be disclosed to demonstrate the futility of current policy, and one's assessment of the disclosure's impact on security will depend on one's reaction to the policy. Official efforts to suppress, therefore, trigger political debate on the broader question, and that in turn threatens the public perception of detached judgment that underlies acceptance of judicial law-making. Third, as Justice White noted in his opinion, [12] it would be particularly unsatisfactory to build a judge-made system of rules in an area where much litigation must be done in camera. Proper understanding of judicial decisions defining the scope of the first amendment is especially dependent upon full elaboration

Case 1:17-cr-00034-JRH-BKE Document 112-1 Filed 10/03/17 Page 5 of 126

of the facts on which judgment has turned. Judicial attempts to provide the rules governing publication of defense secrets would produce little more than a series of ipse dixits as unenlightening as the per curiam opinion in the Pentagon Papers case.

Thus, the tendency to see problems of grand sweep in constitutional perspective should be resisted in the case of publication of defense information. The legislative process is better suited to accommodate the need for secrecy **\*934** with preservation of free speech about national security matters of prime political importance. General rules about specific categories of defense-related information cannot be fashioned by courts.

While the Court was therefore right to decline the executive branch's invitation to fashion judicial rules without statutory guidance, it is somewhat surprising that the Executive found it necessary to proceed without a clear statutory basis. Few problems have had a greater claim to post-war legislative concern than the issue of national security, and security is, by and large, equally compromised by the publication of secrets in newspapers or magazines available to all as it is by their transfer to foreign spies in encoded microdots. Differences in the detrimental consequences of the breach lie primarily in the hope that foreigners do not read carefully [13] and in the advantage to the would-be secret-keeper of knowing that his efforts have probably failed. The latter consideration varies in importance depending on whether the secrets revealed concern easily altered contingency plans or, by contrast, blueprints for entrenched weapons systems.

Plainly, the best way of ensuring secrecy is to keep all defense-related information from everyone outside the Government. [14] But that policy would deprive citizens of the opportunity to understand, evaluate and vote on official conduct and, to the extent that the information is scientific, would greatly retard technological progress. [15] Both the problem and the conflict in values are obvious, and one might expect that Congress had responded to it in a reasonably clear-cut way. Unfortunately, however, the legislation applicable to revelation of defense secrets was not drafted to reconcile the competing demands of national security and public debate about matters of prime political importance.

There is an additional, fundamental problem: the legislation is in many respects incomprehensible. Legal practitioners must often overlook this and accept as irrebuttable the presumption that the draftsman was an artist with a complex vision, whose canvas is coherent if only brooded upon long enough. The proposition is false, and one of the major issues presented by the espionage **\*935** statutes is how demonstrably false it must be before courts treating first amendment problems can rightly insist that they be given a more comprehensible legislative instruction.

In view of the great difficulty of understanding the espionage statutes, it is most regrettable that several Justices gave vent to irritation against the newspapers by volunteering readings of the statutes quite unnecessary to a decision in the injunction proceedings. Although the injunctions were denied, the satisfaction that would-be scoop readers might otherwise have enjoyed was thoroughly chilled by dicta amounting to admonition in several opinions that the present espionage statutes may authorize criminal sanctions against the newspapers and their reporters for their roles in the Pentagon Papers affair. Despite the Justices' warnings, no criminal liability under the espionage statutes for publication has materialized. The prosecution of Daniel Ellsberg and Anthony Russo proceeded, however, on statutory premises that would in effect criminalize publication by subjecting to liability the communication and retention activities that necessarily precede publication. That aborted proceeding has left the statutory question unresolved.

Justice White was the principal author of the warnings. His opinion, joined by Justice Stewart, detailed a construction of section 793 of title 18 that would impose criminal liability on newspapers for retaining defense secrets. [16] He noted, moreover, that "the issue of guilt or innocence would be determined by procedures and standards quite different from those that have purported to govern these injunctive proceedings" [17] --a clear reference to the traditional wisdom viewing the first amendment as less of a restraint on sending publishers to jail than it is a bar to the issuance of injunctive relief against publications. Justice Stewart wrote for himself that the criminal statutes "are of very colorable relevance to the apparent circumstances of these cases." [18] Chief Justice Burger and Justice Blackmun, in dissent, respectively registered

"general agreement"[19] and "substantial accord"[20] with Justice White's views, evidencing a surprising willingness to speculate about matters extraneous to a litigation which they complained had proceeded too hurriedly for careful judgment on the relatively narrow questions briefed and argued. Justice Marshall, while not approving the construction, noted its "plausibility."[21] With opinions reaching afar in such unusual fashion, one may well ask "who won"?[22]

**\*936** The legal posture of publication of defense information cannot comfortably be left to inferences from these dicta. These tentative readings of the espionage statutes are a loaded gun pointed at newspapers and reporters who publish foreign policy and defense secrets. We have lived since World War I in a state of benign indeterminacy about the rules of law governing defense secrets. In a community where there exists consensus about the desirable ends of foreign policy and the propriety of using force to accomplish them, at least among those with access to defense secrets, the argument might plausibly be made that the Brandeisian preference for clarity and stability should be inverted. It may be better that the issues are left unsettled than settled rightly. Shared premises preclude serious security breaches, while firm rules threaten too much at their margins. Put that delicate approach mandates reliance upon the presence of ambiguities, both constitutional and statutory, that do not survive many trips to the courthouse. Indeed, in the Court's first exposure to the problem of the right to publish, several Justices could not resist the temptation to discourse on the law of post-publication criminality. The urge is understandable; the unspoken rules of the defense establishment have unraveled in the pressures of the Vietnam War. and legal questions are pressed to resolution.[23]

## II. THE ESPIONAGE STATUTES: AN OVERVIEW

The major challenge in construing the espionage statutes is to give the draftsmen's language a meaning that approximates what Congress thought it was doing and what proponents of broader legislation have repeatedly insisted it has done. The framework for the present statutes is the Espionage Act of **\*937** 1917. It was enacted after a series of legislative debates, amendments and conferences that may fairly be read as excluding criminal sanctions for well-meaning publication of information no matter what damage to the national security might ensue and regardless of whether the publisher knew its publication would be damaging. Despite the apparent thrust of the legislative history, however, the language of the statutes has to be bent somewhat to exclude publishing national defense material from its reach, and tortured to exclude from criminal sanction preparatory conduct necessarily involved in almost every conceivable publication of defense matters.

It is the apparent reach of the language of these provisions, particularly 18 U.S.C. § 793(e), that attracted the Justices' dicta. In most such cases of conflict between a statute's language and evidence of the legislators' intent, there is soundness in the view, as Holmes put it, that "we do not inquire what the legislature meant, we ask only what the statute means."[24] Here, however, the legislative intention behind the Espionage Act is given added significance because Congress has, since 1917, repeatedly been told by Executive Branch sponsors of broader statutes that the present laws do not cover publication of secret information damaging to national security. No prosecution premised on publication has ever been brought under the espionage laws, even though numerous opportunities have been presented. Moreover, the prosecution of Daniel Ellsberg and Anthony Russo for unlawful retention of defense information under subsection 793(e) was the first effort to apply the espionage statutes to conduct preparatory to publication.

The discrepancy between legislative intent and apparent effect complicates the choice of an analytic approach to the materials. Our resolution of the problem is to provide an initial overview of the statutes and their legislative history. Then we will present a detailed analysis of the individual statutory provisions and the legislative record that generated them, and interweave the pertinent case law that has interpreted them.

## A. *The Espionage Statutes*

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 7 of 126

The relevant espionage statutes are codified in sections 793-798 of Title 18 of the United States Code. The basic provisions are sections 793 and 794. Section 794 contains comprehensive provisions bearing on transfer of defense information to foreigners. Subsection 794(a) punishes actual or attempted communication to a foreign agent of any document or information "relating to the national defense," if the communication is "with intent or reason to believe that it [the information] is to be used to the injury of the United States or to the advantage of a foreign nation." Subsection 794(b), which is applicable only in time of war, also deals with transfer of information to foreigners and prohibits collecting, recording, publishing, or communicating **\*938** information about troop movements and military plans "with intent that the same shall be communicated to the enemy." Subsections 794(a) and 794(b) thus create offenses involving the intentional transmission of information to foreigners. Both subsections also criminalize preparatory conduct intended to achieve the proscribed results; subsection 794(a) expressly prohibits attempts, and subsection 794(b) accomplishes much the same result, as it prohibits collecting and recording the protected information with intent to communicate it to an enemy. Subsection 794(c) makes criminal, and punishes equivalently with the completed offense, conspiracies to violate the other subsections.

In addition to section 794's seemingly comprehensive coverage of espionage activities, section 793 defines six offenses, each involving conduct which would be preliminary to foreigners' acquisition of information. Subsections 793(a) and 793(b) prohibit entering an installation or obtaining or copying a document "connected with the national defense" for "the purpose of obtaining information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation." Subsections (c), (d), and (e) are more sweeping, and make criminal receipt of material knowing that it has been obtained in violation of other espionage provisions, communication of defense-related material or information to any person not entitled to receive it, and retention of such information. Subsections 793(d) and 793(e) proscribe willful conduct, while subsection (c) appears to prohibit any receipt of defense information by one who knows of an actual or contemplated breach of the espionage laws. Because these statutes do not explicitly on their face require an ulterior intent to harm the United States, subsections (c), (d), and (e) may make criminal nearly all acquisitions by newspapers of "national defense" information, a term defined so broadly by the courts that it comprehends most properly classified information. Congress, however, did not understand the provisions to have that effect, and they have never been so employed.

Other important provisions of Title 18 directed at breaches of security are section 798, which prohibits publication of information dealing with the special category of communications intelligence, and section 79?. which prohibits photographing or making a graphical representation of any vital military equipment or installation that the President has defined "as requiring protection against the general dissemination of information relative thereto," without first obtaining permission from the appropriate military authority. Section 797 prohibits subsequent publication of such a photograph.

The major questions concerning the espionage statutes are: (1) what type of revelation or communication is a necessary element of the particular offense, and if so, is it accomplished, in the statutory sense, by publication or preparatory communications: (2) what state of mind with respect to the consequences **\*939** for United States' interests is made a material element of the different offenses, and how should the mental state of a person who publishes information be characterized under the various culpability standards; and, (3) what information is subjected to statutory restraints under various standards ranging from "information related to the national defense" to "classified communications intelligence."

These central questions of coverage cannot be satisfactorily resolved by analysis only of statutory language and judicial constructions. Therefore, legislative history becomes of necessity a major interpretive resource. Although the history of these statutes is more than usually confused, ambiguous, and voluminous, neither we nor, more importantly, the courts have any choice but to turn to it for enlightenment.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 8 of 126

## B. *The Legislative History*

The basic provisions of sections 793 and 794 of the Code were enacted in the Espionage Act of 1917 and have remained almost unchanged since its passage. Congress, however, has grappled with the problems of accommodating secrecy and public speech on at least five occasions since 1911. In each instance, the legislative debates have focused on the problem of how to protect military secrets from spies without promulgating broad prohibitions that would jeopardize the legitimate efforts of citizens to seek information and express views concerning national security.

The Defense Secrets Act of 1911 [25] was the first attempt by Congress to **\*940** protect military information. Before passage of that act, the only federal laws of general applicability relating to espionage were statutes dealing with treason, [26] unlawful entry into military bases, [27] and the theft of governmental property. [28] The 1911 statute proscribed several vaguely defined information-gathering activities in and around military installations that have been carried over into subsections 793(a) and (b), but lacked the important requirement of intent to injure the United States or advantage a foreign nation that was added in the 1917 Act. The 1911 statute also prohibited communication of defense information to persons "not entitled to receive it," although who and what was covered was unclear. This inartful language has been carried over to the present subsections 793(d) and (e), which present the most difficult problems of interpretation of any of the espionage statutes. The 1911 statute provided a more severe penalty for communication, regardless of intent, of illegally obtained information to a foreign government. It was thus a precursor of section 794(a) as well.

The word "publishes" did not appear in the 1911 statute, and nothing in the lackadaisical debates which led to it reflected an awareness that publication of defense information might pose a problem for national security. In contrast, three-hundred pages of the Congressional Record attest to the attention given to the Espionage Act of 1917, [29] which was first introduced in the 64th Congress two days after President Wilson announced to a joint session of Congress the severance of diplomatic relations with Germany. Heated debate stretched over two frenetic sessions and encompassed three bills and two conference reports. Concern about enemy spying, triggered by American entry into World War I, accounted for some of the increased consideration, but most of the significant debate was not provoked by worry over espionage in the usual sense.

Two different matters dominated the legislative history. First, the Wilson Administration proposed to censor, or punish after the fact. (exactly which was never resolved) publication of defense information in violation of Presidential regulations. The desirability of such a measure was seen by its adherents to derive from the obvious harm that would befall military interests **\*941** when untimely publications fell into enemy hands. Proponents of the measure pointed to the Civil War experience when the Union cause had been jeopardized by newspaper retailing of military plans. Second, sponsors of the Espionage Act were eager to carry over and broaden the proscriptions on information-gathering contained in the 1911 Act. They were content to rely on prosecutorial discretion to ensure that the provisions would not be invoked against innocent citizens merely curious about military policy.

In response to these proposals Congress engaged in its most important and extensive debate on freedom of speech and the press since the Alien and Sedition Acts. The preoccupation was not academic. Congressmen feared that President Wilson or his subordinates would impede, or even suppress, informed criticism of his Administration's war effort and foreign policy under the guise of protecting military secrets.

Both proposals were ultimately defeated. Express controls on publication not conditioned on a narrow intent requirement were rejected by close votes in both the Senate and House; after parliamentary maneuvering, a conference report reinstating the controls was also defeated. The only surviving prohibition was that now found in section 794(b), which forbids publication of military information "with intent that the same shall be communicated to the enemy." Whether this action represented legislative animosity to any general controls on publication is not clear, however. The issue of restrictions on publications was tied to the highly partisan question whether President Wilson could decide,

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

or, worse to his critics, delegate the authority to decide what information was subject to restraint against general dissemination. Accordingly, it is often debatable whether solicitude for freedom of the press or political anxiety about the powers of a war-time President led Congress to resist broad prohibitions on publication.

The information-gathering activities proscribed by the 1911 Act were made criminal in the 1917 Act, for the most part, only when performed with "intent or reason to believe that the information is to be used to the injury of the United States or to the advantage of any foreign nation." Only the 1911 Act's vague proscription against communication of defense material to a person "not entitled to receive it" was brought forward into the Espionage Act without significant change.

Despite the rejection of the proposed flat ban on publication and the inclusion of an intent requirement in most of section 793, the legislative history of the Espionage Act does not yield simple answers to the problems of publication and preliminary information-gathering. The congressional action did not leave the law utterly without impact on publication and information-gathering, but rather made them illegal when done with certain culpable states of mind such as "intent" or "reason to believe." Ascertaining the meaning of such phrases is thus a central task. Unfortunately, the proponents of culpability **942** requirements were more concerned with obtaining their inclusion than elucidating their meaning. Ambiguity pervades the Espionage Act, as, indeed, the whole of the federal criminal law, as to whether intent to cause a result requires a conscious purpose to bring it about or is to be inferred from action when occurrence of the result is a virtual certainty.

The basic provisions of sections 793 and 794 have been changed importantly only once since 1917. As a little-noted aspect of the massive Internal Security Act of 1950, section 793 was extended by the addition of subsection (e). [30] This provision departed from the established pattern of the 1917 Act by imposing a prohibition applicable to everyone, not conditioned on any special intent requirement, on communication of information relating to the national defense to persons "not entitled to receive it." Mere retention of defense information was also made a crime.

The problem of regulating publication in the interest of national security also received explicit attention in 1932, when Congress, in response to the publishing activities of a former State Department code-breaker, made criminal the publication by federal employees of any matter originally transmitted in foreign code. [31] Broader controls on publication were debated once more and. for the most part, rejected in 1950 with the passage of section 798 dealing only with the publication of information concerning domestic codes and communications intelligence operations. [32] The 1932 and 1950 legislation reflects more than Congress' view of how to treat public speech about the quite specific categories of information covered by those statutes. The debates suggest also the understanding of Congress and the Executive Branch that the 1917 Espionage Act was not applicable to publication of general defense information, a classification which would subsume the narrower categories of information. Other retrospective views of the 1917 Act were reflected in 1957 in the unsuccessful recommendation of the Commission on Government Security that publication of classified information be made a crime. [33]

With this overview of the espionage statutes and their legislative history hopefully affording a general perspective for detailed analysis, we will now consider the individual statutory provisions as they bear on public speech about national security.

## III. SECTION 794

Section 794 concerns the transfer of information to foreigners and conduct undertaken to accomplish that result. The section consists of two primary subsections, with a third covering conspiracies to commit the substantive offenses.

**943**  A. *Subsection 794(a)*

Subsection 794(a) provides:

> Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life. [34]

This provision raises several major questions of interpretation: 1) What is meant by "communicates, delivers, or transmits ... to any foreign government, or to any ... citizen thereof?" Is publication of a newspaper that is certain to reach foreign hands within the scope of this language? 2) What "documents, writings, ... or information" are covered by the concept "relating to the national defense?" 3) What is the mental element required by the language "with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation?" The answer to the first of these questions is dispositive in assessing the application of 794(a) to publication; accordingly the meaning of "relating to the national defense" and the culpability standard will be discussed in connection with other provisions of broader sweep in which the same formulations appear.

Both the language of 794(a) and the clear intent of Congress confirm that the provision does not reach public speech. Subsection 794(a) proscribes communition *to* a foreign recipient. Presumably, the drafters did not believe that a person who publishes a fact communicates it *to* foreigners in the statutory sense simply because foreigners may read the publication. To be sure, the statute adds that communication may be "direct or indirect," but that phraseology seems better read as directed at communication between citizens when the transmitter realizes that his contact is but a link in an intended chain to a foreign recipient. If this reading of "direct or indirect" is accepted, section 794(a) does not impose liability for routine publication, because the required specificity of purpose to communicate to foreigners is lacking. Moreover, it may be argued that the draftsmen saw a difference between publishing--used in the dictionary sense of "to make publicly (generally) known"--and communicating, even though the latter term might ordinarily be thought to comprehend all transmissions of information, including publication. While 794(a) prohibits communication, delivery or transmittal **\*944** of information, the word "publishes" appears in subsection 794(1)) where both "communicates" and "publishes" are used. By implication, the drafters thought the latter mode of communication was not reached by subsection 794(a).

The legislative history strongly supports this conclusion, as a brief summary will demonstrate. When Congress enacted 794(a) and 794(b) as part of the Espionage Act of 1917, the proposed legislation reported by the Judiciary Committees of both House and Senate contained a third provision that would have authorized the President to issue regulations prohibiting publication of any designated national defense information. [35] This potential blanket restriction on publication was the major focus of the debates on the Espionage Act and was defeated in both House and Senate despite a last-minute personal appeal by President Wilson. For purposes of construing 794(a), the defeat of the proposal is significant because opponents of a general prohibition argued that the only controls on publication of general national defense information consistent with sound public policy were accomplished by what is now 794(b). [36] Supporters of 1 he provision argued conversely that 794(b) was not sufficient because it prohibited only publication with intent to communicate to the enemy, and that a general prohibition, not conditioned on a mental requirement, was necessary. [37] Significantly, neither supporters nor opponents ever asserted that 794(a)'s prohibition on communication to a foreigner had any bearing on the problem posed by publication of defense information. Thus, both language and legislative history demonstrate that section 794(a) concerns only that communication which occurs in typical espionage.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 11 of 126

## B. *Subsection 794(b)*

Subsection 794(b) is applicable to public speech about military matters since it explicitly covers publication as well as communication. The general offenses defined by 794(b), like those in 794(a), are drawn in terms of transmission, or intended transmission, of information to foreigners. Subsection 794(b) provides:

> Whoever, in time of war, with intent that the same shall be communicated to the enemy, collects, records, publishes, or communicates, or attempts to elicit any information with respect to the movement, numbers, description, condition, or disposition of any of the Armed Forces, ships, aircraft, or war materials of the I nited States, or with respect to any works or measures undertaken for or connected with, or intended for the fortification or defense of any place, or any other information relating to the public defense, which might be useful to the enemy, shall be punished by death or by imprisonment for any term of years or for life. [38]

**\*945**  1. *Plain Meaning*. Apart from its coverage of publication, 794(b), is, in most respects, narrower than 794(a). The categories of protected information are narrower than those described by 794(a)'s vague "relating to the national defense" standard if "any other information related to the public defense," as used in 794(b), is limited to matters of the same *genus* as the items specifically described. Furthermore. 794(b) prohibits communications to "the enemy" whereas 794(a) prohibits transfers intended or likely to advantage "a foreign nation." On the other hand, 794(b) is somewhat broader because the required culpability is only the mere intent that information be communicated. The actor's state of mind with respect to the injurious consequences of the communication is irrelevant.

A perplexing question as to 794(b)'s coverage arises from its applicability only in time of war. In 1953, Congress enacted 18 U.S.C. § 798, which declares that "acts which would give rise to legal consequences and penalties under section 794 when performed during a state of war shall give rise to the same legal consequences and penalties when performed" for the duration of the Presidentially-proclaimed state of national emergency or until concurrent resolution of Congress declares otherwise. [39] Insofar as the proclamation of national emergency has been continued to this day, subsection 794(b) is purportedly in force. Whether the sentiment which moved Congress in 1953 has been successfully implemented is, however, questionable. The subsection proscribes communication to the "enemy," but in the absence of war. who is the enemy? The statute gives the President no power to make that determination, nor do any Executive Orders purport to do so. Moreover, we question whether subsection 794(b) may be applied if open hostilities are commenced without declared war. Because of increasing interrelationships among nations and the untenability of "total war." cooperation in some areas is likely to coincide with the pursuit of violent solutions in others. Under such circumstances it is questionable whether a citizen may be forced to guess at what point hostilities become sufficiently intense--from the sending of "advisers," to protective reactions, to tactical reprisals--to make another nation an "enemy," particularly insofar as the statute does not explicitly require intent to aid the enemy cause.

In any event, assuming its applicability, 794(b) thus far appears to cover little not already covered by the more general standards of 794(a). [40] In two respects, however, it is broader. Unlike subsection 794(a), which **\*946** punishes attempts, subsection 794(b) makes criminal specific acts-- "collects, records or attempts to elicit"--which are probably on the preparation side of the preparation/attempt line. More important, subsection 794(b) is broader than 794(a) in expressly making "publishing" criminal, thus bringing newspapers within its purview. Publication, however, is criminal only if done with the "intent that [information] shall be communicated to the enemy." If this intent requirement is read to mean conscious purpose--a construction suggested by the absence of the "reason to believe" standard used in the culpability formulation of 794(a)--then, paradoxically, prosecution of normal publication under subsection 794(b) is a virtual impossibility. The purposes underlying publication will almost always be to inform the public, affect national policy or sell newspapers; that foreigners will read the publication is a known, but not motivating, factor.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 12 of 126

It seems anomalous to proscribe "publishing" but condition responsibility on a mental requirement that will almost never be present. Is it possible that Congress desired such a result? Should it be avoided by reading "intent" to mean "with knowledge" that the enemy will learn? Since no case law illuminates the issue, a detailed study of the legislative record is the only source of enlightenment.

*2. Legislative History*. The story of the Espionage Act of 1917 is essentially the tale of how the Wilson Administration fought and lost the battle for broad controls on all information relating to our military efforts. It submitted bills which, if enacted, would have given the President full power to restrict the divulgence of government secrets, public access to defense places, and public discussion and reporting of matters relating to the war. At first, the Executive Department got its way--the initial Administration bill, S. 8148, sailed through the Senate by a huge margin in substantially the terms its sponsors desired. Then, however, the newspapers brought their pressure, as considerable then as now, to bear on Congress, especially in connection with the most sweeping of the prohibitions on publication of defense information. As the newspapers' ire mounted, so did congressional reluctance to enact sweeping proposals. The House took no action on S. 8148, and the Senate Judiciary Committee rethought the matter.

When the next session opened and successor measures, S. 2 and H.R. 291, were debated, the Administration forces could not win acceptance of broad prohibitions. First, both the House and Senate committees narrowed the scope of provisions that limited public access to defense installations by requiring some culpable purpose beyond satisfaction of curiosity. Second, and most important, the Administration could not, despite vigorous efforts, secure enactment of any form of censorship provision, even though it accepted increasingly narrow formulations of the prohibition.

Thus the scope of the Espionage Act was gradually narrowed. Assessment **\*947** of the intended scope of subsections 794(a) and 794(b), consequently, can be measured in part by looking to the objections which led to the defeat of broader provisions, but which Congress did not believe were grounds for concern with respect to the statutes it enacted.

(a) *The Publication Provisions of S. 8148*. The earliest version of section 794 was section 2 of chapter 1 of S. 8148, [41] which contained three subsections, the first two of which were comparable to the present 794(a) and 794(b), with the important exception that 2(a) did not include the intent requirement later added to 794(a). The third subsection, 2(c), would have empowered the President to issue regulations controlling the publication of a broad range of defense information. It provided:

> Whoever, in time of war, in violation of regulations to be prescribed by the President, which he is hereby authorized to make and promulgate, shall collect, record, publish, or communicate, or attempt to elicit any information with respect to the movement, numbers, description, condition, or disposition of any of the armed forces, ships, aeroplanes, or war materials of the United States, or with respect to the plans or conduct, or supposed plans or conduct of any naval or military operations, or with respect to any works or measures undertaken for or connected with, or intended for the fortification or defense of any place, or any other information relating to the public defense or calculated to be, or which might be, useful to the enemy, shall be punished by a fine of not more than $10,000 or by imprisonment for not more than three years, or by both such fine and imprisonment. [42]

The Senate debate on section 2 was surprisingly limited; almost nothing was said about subsections 2(a) and 2(b), and what little debate there was focused on subsection 2(c). Although it was ultimately stricken from the Espionage Act, the censorship provision is of the greatest significance in assessing 794(a) and 794(b), and, as we shall subsequently show, other provisions of the Espionage Act as well.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L.Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 13 of 126

The feature of 2(c) that drew the most criticism was the absence of any intent requirement. Senator Cummins attacked it as "an absolute suppression of free speech" and "an absolute overthrow of a free press." [43] Significantly, he did not object to subsection 2(b), which prohibited publication with intent to communicate to the enemy, other than by unsuccessfully trying to amend it to narrow the range of information covered. [44] Cummins' strong objection **948** to 2(c) thus was derived not from opposition to any and all prohibitions on publication, but rather from opposition to prohibitions not conditioned on intent to communicate with the enemy. [45] The debate was primarily cast on the assumption that general publication would in many instances lead to receipt of information by the enemy. If knowledge of this probable consequence satisfied an intent requirement, it would have been redundant to insist on it in a prohibition on publication. Cummins, therefore, presumably believed that intent, as used in 2(b), required explicit proof of conscious purpose to inform the enemy, and would not be satisfied by inference from knowledge of the predictable consequences of publication. We stress Cummins' position on these provisions because he was certainly the most voluble, and perhaps the most influential, Senate critic of general publication controls. His views probably come closest to reflecting the reasons which ultimately led a majority of Senators, in the next Congress, to strike 2(c) from the Espionage Act.

The supporters of 2(c) also interpreted Cummins' intent requirement to necessitate proof of guilty purpose. Senators Walsh and Nelson, two of the Administration's leading supporters, opposed inclusion of such a standard because newspaper disclosures of defense information could aid the enemy even though the paper and its reporter were entirely innocent of evil motives. [46] **949** Again, presumably neither would have objected if intent had been understood to mean only knowledge of the probable result. [47]

**950** S. 8148, section 2(c) intact, was passed by the Senate on February 20, 1917, by the overwhelming majority of 60-10. [48] The 64th Congress adjourned before the House could act on the bill, and new espionage legislation was considered in the 65th Congress.

(b) *The Publication Provisions of S. 2.* Section 2 of the Senate bill S. 2, introduced in the 65th Congress, contained three subsections virtually identical to the provisions of section 2, chapter 1, of S. 8148. The Senate debate was more extensive than in the previous session, and most of the pertinent discussion focused on subsection 2(c), identical to 2(c) of S. 8148 except for the addition of two cosmetic and largely self-cancelling provisos to the effect, respectively, that the subsection should not be used to restrict discussion and criticism of government policies, but further providing that no discussion or criticism should convey information covered by the subsection. [49] In the Senate of the 65th Congress, 2(c) was defeated. Again the objections raised against it, but not against 2(a) or 2(b), are valuable evidence of the Senate's understanding of the limits on the latter provisions, ultimately codified as 794(a) and 794(b).

Section 2(c) was attacked on three different grounds. First, opponents claimed that the provision would establish a system of prior restraint censoring **951** newspaper publication of news about the war. Second, the provision was challenged as delegating unlimited power to the President to decide what information should not be published. Third, objection was again made to the lack of a specific culpability standard. In all three respects, 2(c) differed from 2(b), which was accepted by the Senate virtually without debate. While it cannot be shown with certainty which of these objections, or what combination of them, was responsible for the defeat of 2(c), the objection to the absence of intent must be evaluated if the legislative history is to shed light on Congress' understanding of the intent requirement codified in subsection 794(b). Obviously, if 2(c) was rejected on the prior restraint or executive power grounds, the defeat would imply nothing about the intent provision in 2(b). Two questions, then, must be answered concerning the objection to lack of intent: 1) was it the main reason for the defeat of 2(c), and, if so, 2) what understanding as to the intent requirement of 2(b) rendered it, and not 2(c), acceptable to Congress. Our first task, therefore, is to assess the relative force of the objections to 2(c).

The debate concerning prior restraint is interesting for two reasons. First, it indicates that the opponents to 2(c) tended to invoke the first amendment strictly along Blackstonian lines, only as a prohibition on pre-publication controls. [50]

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 14 of 126

Second, the supporters of 2(c) did not attempt to meet the objection directly. Walsh and Overman, for instance, never asserted that a system of prior restraint would be constitutional; instead, they contended that 2(c) was intended to authorize only post-publication controls. [51] Thus, while there **\*952** was strong opposition to censorship, we strongly doubt that this objection led to the defeat of 2(c). We believe the Senate did not reject 2(c) on an interpretation of its meaning not required by its language and vigorously rejected by its chief proponents. The issue was cast in terms of the propriety of punishment, not whether publication might be enjoined. [52]

More meaningful in the debate, we believe, was the objection to the provision's broad delegation to the President of authority to promulgate regulations prohibiting publication of an unlimited range of military or defense information. Fear of unfettered executive power appeared, at least initially, to be the most politically potent objection to 2(c). Senator Brandegee, for example, argued that the section would give the President "authority to make any regulations he sees fit about what people say to each other ... [and about] what information newspaper reporters shall obtain ...." [53] Similarly, Senator Hiram Johnson warned: "We may well pause ... lest in our tenderness for democracy abroad we forget democracy at home." [54] Other Senators took the objection a step farther, arguing that the unlimited power granted by the measure could not feasibly be exercised by the President, and therefore would be delegated by him to subordinates in the War Department. [55]

Supporters of 2(c) did not claim that the measure provided concrete standards limiting the President's power to regulate publication by punishment after the fact. Rather, they argued that delegation was constitutional, that legislating categories of protected information in advance was an impossible task, and that it was necessary in wartime to trust Presidential authority. [56] The delegation issue, then, was a source of substantial conflict between supporters and opponents of 2(c), was frequently raised in connection with various efforts to narrow or strike 2(c), and was undoubtedly an important factor in the Senate's rejection of the section. [57]

**\*953** In the final analysis, however, the absence of an intent requirement was, in our opinion, the most significant objection to 2(c). Supporters of the measure advanced a narrow definition of 2(b)'s intent requirement in order to demonstrate the need for the unconditioned prohibition on publication found in 2(c). For example, in an important dialogue with Senator Kellogg early in the debate, Senator Walsh explained why he believed 2(b) was not sufficient to protect the military effort:

> MR. WALSH ... [S]ubdivisions (b) and (c) are intended to meet entirely different conditions. Of course, all will agree that the things denounced by subdivision (b) should be punished; that is, the gathering of these things with the intent and purpose to convey them to the enemy, but ... subdivision (c) is intended to reach the case of a publication of these things without any sinister purpose at all. An energetic and enterprising newspaper reporter, with no purpose at all to aid the enemy, but simply with the very commendable purpose of extending the circulation of his paper, collects a whole mass of this information and publishes it. Another man may gather it and publish it, having some consideration for his own political future or something of that character, having no purpose whatever that it shall be communicated to the enemy.

> MR. KELLOGG. I ask the question with a view of eliciting from the Senator from Montana whether in his opinion subdivision (c) is necessary after enacting subdivision (b)? I did not hear the discussion before the Judiciary Committee, but I take it that the Senator from Montana does not think subdivision (b) is sufficient.

> MR. WALSH. I should say not. I should say, in the first place, that we ought to go quite beyond the case of the man who accumulates the stuff and publishes it with the treasonable purpose of aiding the enemy. We ought to go to the man who incautiously does it, without any such deliberate purpose, but whose acts really are as destructive to our interests as the acts of the man who went about to do it for the very purpose of having the information communicated to the enemy.

> MR. KELLOGG. Would the Senator from Montana think there was any danger of an innocent person seeking information being punished under this act?

> MR. WALSH. I think there is. I have no doubt that there is that danger; and seeing that it is a war measure, applicable only in time of war, the committee believed that we could well afford to subject the innocent citizen to whatever discomfort might come to him by reason of this act, rather than to allow promiscuous publications to be made that might be invaluable to the enemy. [58]

At first, some opponents of 2(c) did not accept Walsh's narrow understanding **\*954** of 2(b)'s coverage; apparently they were not willing to argue for the rejection of 2(c) on the premise that 2(b) reached only, in Walsh's words, "the man who ... publishes ... with the treasonable purpose of aiding the enemy." Senators Borah and Brandagee, for example, in justifying their opposition to 2(c), suggested that the intent requirement of 2(b) should be interpreted as constructive, a reading that would help make 2(c) unnecessary. [59]

At a later and critical stage in the debate, however, the opponents of 2(c) moved to a markedly narrower interpretation of 2(b)'s intent requirement. This different understanding was revealed in discussion of Senator Hiram Johnson's motion to strike 2(c) from S. 2 and provides the clearest evidence in all the legislative history of the 1917 Act of the consensus among **\*955** both supporters and opponents that a reading of intent in 2(b) to mean purpose was the premise on which the vote to strike 2(c) proceeded. The final colloquy between Walsh and Johnson pushed the debate to concrete consideration of publication problems, in contrast to the abstract and obfuscatory level preferred by most of the Senate opponents of the publication provision:

> MR. WALSH. Mr. President, [the motion to strike 2(c)] signifies, as a matter of course, that there is to be no restriction whatever upon the publication of any matter concerning the naval or military forces, or the disposition or movement of the troops, or works intended for the fortification or defense of any place, or anything else the publication of which is unlawful, unless, as provided in subdivision (b), it is intended that it shall get to the enemy. I do not desire to say anything upon that, but I merely desire to inquire of the Senator from California if he was present in the Chamber last night when I inserted in the Record the publication in the New York paper of all about the Navy secret, the spreading of a net across New York Harbor to intercept the entrance of submarines?

> MR. JOHNSON OF CALIFORNIA. In response to the Senator, I will state that I was present. The purpose is to strike out all of subsection (c); and the bill contains ample powers, ample crimes, and ample penalties to reach any intentional design to do aught that is wrong.

* * * *

MR. WALSH. Now, Mr. President, I want to propound a further inquiry to the Senator from California. *I want to inquire of him whether, in his judgment, the publication of such information as that to which I called the attention of the Senate last night should be prohibited?*

MR. JOHNSON OF CALIFORNIA. *That is not the question. The quests one of balancing disadvantages and wrongs. It would be infinitely better that there be such a publication than that the mouths of the citizens of the United States be gagged or the press be muzzled.*

MR. WALSH. *I am obliged to assume that the Senator answers "no"*; that there are contrary considerations of a public nature of so weighty a character as that we ought not to prohibit the publication of information of this character. Have I interpreted the Senator correctly?

MR. JOHNSON OF CALIFORNIA. I assume that the Senator has in part. It is exceedingly difficult to hear over here.

THE PRESIDING OFFICER. The Senator will suspend for a moment. The Senate will be in order.

MR. JOHNSON OF CALIFORNIA. The Senator may interpret my conclusion to be this-- that there are crimes sufficiently described in this particular bill, there are in it enough provisions to meet every requirement that is present in this Nation, and that there is no occasion at this particular time to gag either the press or the people of this country.

MR. WALSH. Of course that is general, and is no answer to my question as to what the view of the Senator is as to whether the publication of information of this character should be prohibited. I take it that his answer is that, in his judgment, it should not be; that the **\*956** papers should be free to publish information of this character if they see fit to do so.

MR. JOHNSON OF CALIFORNIA. The distinguished Senator may take it just exactly as he intellectually determines it to be. The answer I have made to him, and the answer is, I repeat, that while there may be things done that ought not to be done, things that we would not justify and would not desire to be done, the harm that is done by an act of this sort infinitely transcends the harm that would be done by the other sort of act.

MR. WALSH. I so understand the Senator; that is to say, that there are public considerations of so weighty a character that we ought not to attempt to prohibit the publication of matter of this character. That is the question on which the Senate is now called upon to vote. [60]

The next morning the Senate reconvened and almost immediately proceeded to a vote. The Johnson amendment to strike 2(c) was carried by one vote--39 yeas, 38 nays, 19 not voting [61] and the Senate, by the narrowest margin, rejected general controls on publication of military information not conditioned on the intent requirement now found in section 794(b).

How did the successful opponents of 2(c) view the prohibition in 2(b) of S. 2 to which they did not object? Should we look to the early statements that interpreted 2(b) as reaching instances of constructive intent or to the later statements that held that 2(b) reached only publication with a clear purpose to reach the enemy?

The reasons for the discrepancy of views about 2(b) are not clear in the legislative history. It may have been that no consensus on the meaning of intent in 2(b) existed among the opponents of 2(c), and that it happened by chance that Borah, Brandegee, and Thomas, who spoke out early against 2(c), believed in a constructive interpretation of 2(b)'s intent requirement, while Cummins and Johnson, who carried the weight of opposition at the time 2(c) was voted down, believed that 2(b) should be read as requiring purpose to communicate to the enemy. But the issue was posed most concretely in the Walsh-Johnson colloquy just before the vote on the motion to strike 2(c) was taken. We know from the record that Borah, Brandegee, and Thomas were present for the vote taken immediately following the Walsh-Johnson colloquy and did not seek to challenge Walsh's characterization of the issue.

The second possibility is that the opponents' shifting assessment of the reach of 2(b) was tactical. Opponents to 2(c) cannot have been confident at **\*957** the outset of debate on S. 2. Cummins' attack on the parallel provision of S. 8148 had been overwhelmingly beaten in the previous session, and the composition of the Senate was the same. Doubtful of their strength, opponents of 2(c) might initially have urged a broad understanding of 2(b) to help make the former provision seem unnecessary. However, as the debate proceeded, the opposition to 2(c) gathered strength, clearly manifested in successful efforts of opponents of 2(c) to narrow it down in various respects. For example, Senator Smith succeeded in winning Overman's acceptance and the Senate's agreement to a series of amendments which narrowed 2(c) to cover only publication, and also narrowed the categories of information covered by the provision. [62] Following this limited early success, Cummins tried to alter the basic thrust of 2(c) from a control on publication to an authorization for controls on initial disclosure from within the Government. [63] While Cummins **\*958** was unsuccessful, he failed only by six votes. From that point on, presumably, it was apparent that the Senate of the 65th Congress had a more dubious outlook toward general publication controls than did its predecessor in the 64th Congress. [64] As the strength of the opposition to 2(c) became even clearer when the Senate moved to consider successive motions to strike, it may have dawned on Johnson, Cummins, and the others that they could defeat 2(c) even assuming a narrow interpretation of 2(b).

The espionage proposals provoked enormous interest in the country, fired by extensive coverage in the press. The debate on 2(c) was filled with editorials, remonstrances from press associations, and petitions from concerned citizens. In view of the mounting public concern, an assumption of careful coordination among opponents of 2(c) does not seem unwarranted.

Whether the dichotomy in the opponents' understanding of the intent requirement of 2(b) is ascribed to tactics, confusion or lack of agreement, surely it is better to give weight to the later and concrete statement rather than the earlier and general. Both Walsh and Overman saw 2(b) as Johnson understood it in the end. Though the Senate debates on 2(c) are far from clear, we believe a careful consideration of the legislative record in the Senate can lead only to the conclusion

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 18 of 126

that the Senate rejected 2(c) on the assumption that the intent standard of what is now subsection 794(b) was understood to require a showing of purpose to communicate to the enemy.

**\*959**  (c) *The House Debates on Section 794: H.R. 291*. The bill considered by the House, H.R. 291, was introduced on April 2, 1917, the same day President Wilson asked Congress to declare war on Germany. Although section 4 was comparable to S. 2's subsection 2(c), the House bill had no counterpart to subsection 2(b) of the Senate bill, and consequently no predecessor provision to section 794(b). [65] The House debates are both simpler than those in the Senate-- because most of the intelligent commentary was provided by one extraordinarily articulate and influential Congressman-- and less relevant to the meaning of 794(b)--because H.R. 291 had no such provision to serve as a convenient contrast to section 4.

The House debate on section 4 paralleled the Senate discussion of subsection 2(c): the objections were frequently raised that the provision would delegate unlimited power to the President, [66] that it would authorize a system of prior restraints, [67] and that the information covered was entirely vague. [68] However, as was the case in the Senate, the absence of an intent requirement was the preponderant factor in the ultimate defeat of section 4. Underlying all these objections was the theme that, especially in time of national emergency, the people need a free press to facilitate informed discussion and criticism of government action. [69] Section 4 was initially struck by the House, but then a substitute for it was passed which put the House into disagreement with the Senate and left the issue of publication controls to the Conference.

The most powerful opponent of section 4 was Congressman Graham of Pennsylvania, a member of the Judiciary Committee, who championed the amendment to strike the provision and defeated it again when it reappeared in the conference report. His views in opposition, even more so than the views of Cummins in the Senate, gave expression to the consensus of successful opponents of section 4. [70]

**\*960**  In criticizing section 4, Graham focused on the absence of an intent requirement and made clear that the objection would be satisfied only by inclusion of a standard equating intent and bad purpose. [71] Like Johnson in the Senate, Graham recognized that striking section 4 would leave newspapers free to publish material which might be useful to the enemy. [72] As the following dialogue indicates, he was willing to pay this price in order to preserve a press free to criticize national policy.

> MR. BATHRICK. Before the gentleman leaves section 4 I would like to ask him does he think that any information relating to national defense that might be useful to the enemy should be published?

> MR. GRAHAM OF PENNSYLVANIA. I do not.

> MR. BATHRICK. If you strike out this section, everybody will have a right to publish that, will they not?

> MR. GRAHAM OF PENNSYLVANIA. They have the right today.

> MR. BATHRICK. I understand that; but the law is for the purpose of prohibiting the right of anyone to communicate information to the enemy that might injure the country.

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 19 of 126

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

MR. GRAHAM OF PENNSYLVANIA. I think anybody who does it with a guilty purpose can be caught and dealt with under the preceding sections of the bill, and anybody who merely publishes matters here at home and does it in the discharge of what seems to him to be a duty by way of criticism ought not to be prosecuted nor punished under any portion of the bill. [73]

After a series of unsuccessful attempts to narrow the section to meet particular objections, Graham's motion to strike section 4 was accepted by **\*961** the House. [74] The vote was 221 in favor, 167 against, 1 answering "present," and 43 not voting. Immediately after this vote, however, Congressman Gard introduced a variation of section 4 which, he argued, met the objections to earlier versions by legislating what was to be prohibited and giving the jury, rather than the President, final authority to decide what information should be deemed "relating to the national defense" and "useful to the enemy." [75] Graham again objected to the lack of an intent requirement and argued that Gard's version was in fact worse because it added an element of uncertainty by leaving the vital determinations to the jury. [76] Despite these objections, the Gard amendment was adopted by a vote of 191 yeas, 185 nays, 1 "present," and 54 not voting. [77]

(d) *The Conference Reports and Final Enactment of 794.* After separate **\*962** action on the Espionage Act of 1917 in the House and the Senate, the provisions now codified in 18 U.S.C. 794(a) had been passed, virtually without debate, in both chambers. What is now codified as 794(b) had been passed in the Senate, but no comparable provision existed in the House bill. The provision granting the President power to prohibit publication of defense information, section 2(c) of S. 2 and section 4 of H.R. 291, had been struck in both the Senate and the House, but Congressman Gard's variation on section 4 had passed the House by a narrow margin.

The conferees on the Espionage Act--Senators Overman, Fletcher, and Nelson, and Representatives Webb, Volstead, and Carlin--made the Senate bill the basis for their agreement, thereby including 794(b). However, they added to the conference report still another broad prohibition on publication. [78] This provision provoked heated partisanship when the report was first presented to the House. Republicans caucused and decided as a matter of party policy to oppose it. Chairman Webb responded by characterizing opposition to the provision as unpatriotic, [79] which led opponents of the measure to respond **\*963** angrily with the charge that an unsuspecting House had been duped by passage of the Gard amendment following the acceptance of Graham's motion to strike. [80]

Congressman Graham now used the intent requirement in section 2 of the conference bill to buttress his contention that publication should not be criminal absent a showing of purpose to aid the enemy.

There are other sections of this title, the first and second, under which the obtaining of many things and any information connected with the national defense to benefit or aid the enemy is made a crime, and in the second section the publication of any information with reference to the national defense for the same purpose is made a crime for which the man who willfully and intentionally and with the purpose of aiding the enemy, which facts must be found by the jury, published the information, shall be punished under the severe penalties that are prescribed in those sections.

No man can sit down and sanely and fairly read these two sections without arriving at the conclusion that there is ample power for the punishment of any villainous newspaper that would attempt to publish anything for the benefit of the enemy; but I want to ask your attention, my friends, to this distinction. A publication might be alleged to be one that gave information to the enemy, and, in fact, to some degree might do so, and

yet be a subject that the papers of the  **\*964**  country as a free press and the men of the country in the exercise of their freedom of speech ought to discuss, and the question would be, Is it more harmful than beneficial? It may be something that would give information to the enemy, but at the same time if left without exposure it might bring a calamity upon one's own country. Under such circumstances, who is to muzzle the press or who is to leave it to the jury to say whether or not on the single and exclusive issue that it is helpful to the enemy, for that is what alone is left outside of "willful publication" to the jury to try? [81]

Supporters of section 4 also adopted a purpose construction of the intent requirements in the 793 provisions and in 794(b) in order to argue the need for section 4:

MR. DYER. This section applies to individuals as well as newspapers. Suppose a newspaper published the movement of a ship going out to sea, a transport, and by reason of that publication the enemy sinks the transport and drowns the men on board. Would there be any punishment unless this section were agreed to?

MR. VOLSTEAD. No: not unless you could show that the editor had published it and put the publication into the hands of the enemy. It would then come under another section. This section is designed to prevent publications of a character that are likely to reach the enemy and that are likely to be injurious to the country. [82]

Thus, the House debate on the conference report paralleled the Johnson-Walsh dialogue in the Senate at the time 2(c) was struck from S. 2, with consideration of whether the advantages of freedom to criticize the Government's war policy outweighed the utility to the enemy of such concrete information as the sailing dates of transports.

Just before the vote on the conference report. Chairman Webb concluded his efforts by reading to the House a last-minute personal appeal for the censorship provision from President Wilson:

The White House

Washington, May 22, 1917

HON. EDWIN Y. WEBB,

House-of-Representatives

MY DEAR MR. WEBB: I have been very much surprised to find several of the public prints stating that the administration had abandoned the position which it so distinctly took, and still holds, that authority to exercise censorship over the press to the extent that that censorship is embodied in the recent action of the House of Representatives is absolutely necessary to the public safety. It, of course, has not been abandoned, because the reasons still exist why such authority is necessary for the protection of the Nation.

I have every confidence that the great majority of the newspapers of the country will observe a patriotic reticence about everything  **\*965**  whose publication could be of injury, but in every country there are some persons in a position to do mischief in this field who cannot be relied upon, and whose interests or desires

THE ESPIONAGE STATUTES AND PUBLICATION OF … 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE Document 112-1 Filed 10/03/17 Page 21 of 126

will lead to actions on their part highly dangerous to the Nation in the midst of a war. I want to say again that it seems to me imperative that powers of this sort should be granted.

Cordially and sincerely, yours,

WOODROW WILSON [83]

Despite the President's appeal, the House voted to recommit the bill to conference with instructions that the conferees delete section 4. The vote was 184 ayes, 144 nays, 5 answering "present" and 96 not voting. [84] The bill returned to conference; on June 7th it was reported back to the House without section 4 and was approved. [85] In the Senate, the first conference report was withdrawn without debate upon notice that the House had voted to recommit with instructions. [86] The second conference report was agreed to by the Senate on June 5th, 1917. [87]

3. *Subsection 794(b): Conclusion.* Despite the considerable confusion pervading particularly the Senate debates on 2(c), the inferences to be drawn about the scope of 794(b) are reasonably clear if the whole pattern of congressional action is considered. The statute is violated only if information about such matters as troop movements and ship sailings is published with the purpose of communicating to an enemy; a newspaper that publishes such detailed information simply to satisfy its readers' curiosity and fill its own coffers does not violate this law. Subsection 794(b), the nation's only general prohibition on publication of vital defense information, is so limited as to be, in practice, insignificant.

The critical distinction drawn in the 1917 debates between publication with the "villainous" or "treasonable" purpose of communicating defense information to the enemy and innocent publication which might have the same effect may well evoke skepticism today. Viewing the problem of publication in modern perspective, many will wonder why Congress would have bothered to pass a statute which, resting on such a distinction, is without significant impact. While today we do not worry about disloyal papers, the 1917 debates indicate substantial congressional concern over newspapers whose loyalties ran to Germany. Several provisions of the Espionage Acts of 1917 [88] and 1918, [89] as well as the Trading With the Enemy Act of 1917, [90] manifested **\*966** this concern. For example, the Trading With the Enemy Act required all the foreign language newspapers of the day to submit sworn translations before publishing stories or editorials about the war. [91] Moreover, the Espionage Act of 1918 contained numerous provisions covering publications which printed seditious material or German propaganda, or which incited insubordination among the troops, curtailment of war production, and the like. [92] Such provisions indicate that an actively disloyal press was a problem perceived as requiring statutory restrictions. [93]

When one considers the additional fact that in 1917 most military information of value to the enemy would be in relatively open view--troop movements, ship sailing dates, or fortification plans--Congress's concern that a disloyal newspaper might publish military information for the purpose of communicating to the enemy is understandable. The Congress which passed 794(b) would not have seen its impact as trivial, and the legislative intention seems reasonably clear that a narrow prohibition on publication was the most Congress was willing to authorize.

## IV. SUBSECTIONS 793(a) AND (b)

### A. *Preliminary Considerations*

Section 793 prohibits four basic categories of activities that augment the probability that defense information will come into foreign hands. Subsections 793(a) and 793(b) cover, respectively, obtaining information by physical intrusion into military installations, and copying or otherwise obtaining any document, model, or note of anything connected with the "national defense." [94] Each subsection includes a rather complicated mental requirement, similar to that found in section 794(a); to be criminal, the conduct must be done "for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation."

The second group of 793 offenses, found in subsections (d) and (e), are the most troublesome of all the espionage statutes. [95] These provisions cover persons who, having lawful or unauthorized "possession" of tangible documents or intangible information "relating to the national defense," either communicate the same "to any person not entitled to receive it," or fail to **\*967** hand it over to appropriate authorities. No mental requirement, other than that the communication or retention be willful, is explicitly made an element of these offenses.

The third type of offense is contained in a catch-all subsection--793(c). This provision makes criminal the receipt of any document or other tangible item if the recipient knows or has reason to believe that the document has been or will be taken or disposed of by any person in violation of any of the provisions of the espionage chapter of Title 18.

Finally, 793(f) covers any person entrusted with or lawfully in possession of tangible or intangible information relating to the national defense who either permits the information to be removed from where it belongs "through gross negligence" or, having knowledge that the information has been removed or delivered to an unauthorized person in breach of his trust, fails to report that fact to his superior. [96] The principal problem posed by this provision is self-incrimination, and we shall not discuss it further.

Section 793 raises substantial issues as to whether much of the flow of defense information between executive branch employees and the press constitutes serious criminal offenses. The overriding question of interpretation is whether newspapers, their reporters, their informants, or anyone who investigates, accumulates, informs about, or retains defense information as a prelude to public speech is covered by the section. Since section 793 crimes are not defined in terms of the actor's intent to transfer information to foreigners, neither the communication/publication distinction found in 794(a), nor 794(b)'s requirement of an intent to communicate to the enemy directly protect such persons from liability under 793.

## B. *Subsections 793(a) and 793(b)*

Subsections 793(a) and (b) state:

> (a) Whoever, for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation, goes upon, enters, flies over, or otherwise obtains information concerning any vessel, aircraft, work of defense, navy yard, naval station, dockyard, canal, railroad, **\*968** arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building, office, research laboratory or station or other place connected with the national defense owned or constructed, or in progress of construction by the United States or under the control of the United States, or any of its officers, departments, or agencies, or within the exclusive jurisdiction of the United States, or any place in which any vessel, aircraft, arms, munitions, or other materials or instruments for use in time of war are being made, prepared, repaired, stored, or are the subject of research or development, under any contract or agreement with the United States, or any department or agency thereof, or with any person on behalf of the United States, or otherwise on behalf of the United States, or any prohibited place so designated by the President by proclamation in time of war or in case of national emergency in which anything for the use of the Army, Navy, or Air

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 23 of 126

Force is being prepared or constructed or stored, information as to which prohibited place the President has determined would be prejudicial to the national defense; or

(b) Whoever, for the purpose aforesaid, and with like intent or reason to believe, copies, takes, makes, or obtains, or attempts to copy, take, make or obtain, any sketch, photograph, photographic negative, blue-print, plan, map, model, instrument, appliance, document, writing, or note of anything connected with the national defense; ... shall be fined not more than $10,000 or imprisoned not more than ten years, or both. [97]

Neither 793(a) nor 793(b) could properly be applied to the act of publication because they do not prohibit communications of any kind. [98] Both subsections, however, cover activities which will in many instances occur prior to publication of defense information. Although 793(b) would not be violated if newsmen received oral reports concerning classified information, it nevertheless potentially casts a broad threat of criminal liability across any publication of a defense-related document or any published analysis based on documentary evidence in the hands of the writer. Although 793(a)'s coverage is not limited to documentary information, it is restricted to entering or obtaining information while upon places connected with the national defense.

To assess the impact of these subsections on activities preliminary to public speech, it is necessary to understand the crucial formulations "respecting [or "connected with"] the national defense," and "intent or reason to believe that ... information is to be used to the injury of the United States, or to the advantage of any foreign nation." These concepts are critical not only in subsections 793(a) and (b), but throughout the espionage statutes; comparable language appears in subsection 794(a), and other subsections of 793 utilize the same phrases or derivations thereof. In contrast to the problems of interpretation we encountered in connection with 794(a) and (b), case law has an important bearing on the application of 793(a) and (b) to public speech **969** and related activities. In addition, the legislative history offers valuable insights, particularly with respect to the meaning of the *mens rea* standard.

1. *Related to the National Defense*. No matter how evil the actor's intent, subsections 793(a) and (b) make activity criminal only if the information involved or sought respects the "national defense." The principal problem in construing this term is to find its limits in an era when every facet of civilian life may have an important bearing on the nation's military capabilities. Learned Hand aptly stated the problem of broad construction:

The amount of iron smelted, of steel forged, of parts fabricated; the number of arable acres, their average yield; engineering schools, scientific schools, medical schools, their staffs, their students, their studies, their curriculums, their laboratories: metal deposits; technical publications of all kinds; such non-technical publications as disclose the pacific or belligerent temper of the people, or their discontent with the government; every part in short of the national economy and everything tending to disclose the national mind are important in time of war, and ... "relate to the national defense." [99]

(a) *Legislative Background*. The problem of interpreting the phrase did not go unnoticed in the 1917 debates, and numerous speakers in both Houses remarked its dangerous breadth. On our reading of the legislative record, however, no consensus for a narrow definition emerged. In the end, a majority of Congressmen was willing to accept the breadth, and, depending on their political predilections, to rely either on prosecutorial discretion or the culpability requirements to avoid harrassment of innocent activities.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 24 of 126

The term originated in the Defense Secrets Act of 1911, which punished anyone who, "for the purpose of obtaining information respecting the national defense," enters any military station, building, office or "other place connected with the national defense"; anyone who, being in such a place, "obtains, takes, or makes ... any document, sketch, ... or knowledge of anything connected with the national defense to which he is not entitled"; anyone without proper authority who receives such a document or information "knowing the same to have been so obtained, taken, or made ..."; and anyone who, having control of any such documents, knowledge, or information "willfully and without proper authority, communicates or attempts to communicate the same to any person not entitled to receive it, or to whom the same ought not, in the interest of the national defense, be communicated at that time." [100]

Briefest attention to the 1911 Act reveals that it was alternately so broad in its first prohibition that it reached an almost unlimited range of legitimate inquiries about military affairs, if they took place on federal property, and so vague in succeeding sections as virtually to defy analysis. The sparse legislative history, however, is almost completely unenlightening. The five-page report  *970  of the House Judiciary Committee, adopted without change as the Senate committee report, contained no clarification of the meaning of "information respecting the national defense," "place connected with national defense," or of other provocative terms such as "knowledge ... to which he is not entitled," or "without proper authority." [101]  The report was interested only in "protect[ing] the nation against spying in time of peace"; [102]  all the examples cited to demonstrate a need for the statute were instances in which information useful in wartime was collected by agents of foreign governments. The perfunctory floor debates barely acknowledged the vagueness of the 1911 Act. No attention was given to the meaning of "relating to the national defense" or the possible application of the statute to non-espionage situations; such questions as were raised were answered by non-sequiturs and irrelevancies. [103]  In view of the fact that the 1911 Act contained no limiting culpability standards, it is surprising that no attention was given to the scope of documents and places "connected with the national defense."

Once the formulation had found its way into the Statutes at Large, Congress in 1917 ignored objection to its essential vagueness, readopted it and even broadened its reach in the Espionage Act. Section 1(a) of S. 8148 followed the pattern of the first clause of the 1911 Act, but it increased the number of places covered, adding such items as dockyards, railroads, and mines, thereby also broadening, by implication, the reach of the *ejusdem generis* phrase "or other place connected with the national defense." [104]  Section  *971  1(b) of the bill went far beyond the comparable provision of the 1911 Act in that its prohibitions were made applicable to anyone, rather than only to persons in the places covered by the first clause. [105]  The subsequent prohibitions of section 1 were similarly not limited by reference back to the entry prohibition. [106]

The meaning of "national defense," did not shift throughout the debates on the Espionage Act. The Senate debates on S. 8148 took note of the vagueness of the term. Cummins, for example, asked whether the term "information respecting the national defense" would encompass "every national energy which makes up an adequate and effective national defense?" [107]  He objected strongly to the additional enumeration of places covered in subsection 1(a), and offered an amendment to strike the words "building, office, or other place connected with the national defense." [108]

Cummins also objected to section 6 of S. 8148, which had no analogue in the 1911 Act. In part, it empowered the President to designate any place as within the prohibitions of subsection 1(a), on the ground that information concerning it would be detrimental to the national defense if revealed. [109]  Here,  *972  Cummins was more successful, and his amendment to limit the President's power of designation to locations "in which anything for the use of the Army or Navy is being prepared or constructed," was accepted notwithstanding Overman's objections. [110]

However, the frequent criticisms of Cummins and others provoked no attempt from the bill's supporters to define the limits of the term "relating to the national defense." Instead, supporters argued that it would be impossible to give

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 25 of 126

a precise definition that would adequately protect sensitive information. The Senate clearly agreed; attempts to limit the term to named places or to specific categories of information, consistently met with defeat. Absorbing this lesson, opponents subsequently focused their energy on limiting the reach of the bill by adding an intent standard. S. 8148 passed the Senate with no real limits in either statutory language or legislative understanding on the term "national defense."

As earlier noted, the 64th Congress adjourned before S. 8148 could be presented for action in the House, and new bills, S. 2 and H.R. 291, were introduced in the 65th Congress. With respect to "national defense," the language and legislative history of S. 2 paralleled the history of S. 8148. The House bill, however, was different in structure and included an even broader conception of national defense. It contained no prohibition directed to entering, and consequently included no enumeration of places "connected with the national defense." Instead, sections 1 and 2 contained entirely non-specific prohibitions against obtaining or communicating documents or information "relating to the national defense." [111] Furthermore, section 4 prohibited publication of "any information relating to the national defense that is **973** or may be useful to the enemy." [112] Finally, unlike the Senate bills, section 1202 of H.R. 291 included a broad definition of national defense:

> The term "national defense" as used herein shall include any person, place, or thing in anywise having to do with the preparation for or the consideration or execution of any military or naval plans, expeditions, orders, supplies, or warfare for the advantage, defense, or security of the United States of America. [113]

There was no debate in the House bearing on the meaning of section 1202; most attention focused on the controversial general prohibition on publication, and discussion of the predecessor provisions to 794 concerned the force of the intent requirement. Sections 1, 2, and 1202 passed the House without significant opposition to the breadth of the term "national defense."

In reconciling S. 2 and H.R. 291, the conferees made the Senate bill the basis of their final agreement. Thus, section 1 of the conference bill prohibited entry into named places as well as those included in the general phrase "or other place connected with the national defense." [114] Believing that the broad enumeration of places in section 1 would imply a broad understanding of national defense, the conferees eliminated section 1202 of the House bill. Although the managers from the House made some confusing statements about why section 1202 was eliminated, we believe it is clear that the conferees continued to understand the term "relating to the national defense" as extremely far-reaching, and that section 1202 was eliminated as surplusage rather than in service of some more narrow meaning. [115]

 **974** Our reading of the legislative history thus offers no limits on the range of the term "relating to the national defense" and its statutory variations. This term, so central to the Espionage Act's prohibitions was without principled limitations in the minds of the Congresses which adopted it.

(b) *The Judicial Response*. As is so frequently the case, the courts were left to grapple with an amorphous phrase, and not surprisingly, their efforts to give content followed the pattern of the congressional debates. Unable to find satisfactory limits inherent in the term itself, the courts invoked the statute's culpability requirements to avoid due process problems of vagueness.

The most important decision construing "related to the national defense" is *Gorin v. United States*, [116] the Supreme Court's first and only confrontation with the problem. During the late 1930's, Gorin, a citizen of the U.S.S.R. paid Salich, an employee of the San Pedro branch of the Naval Intelligence Office, to report the substance of counter-intelligence reports bearing on Japanese activities in the area. The material transferred was described by the court of appeals:

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 26 of 126

The reports consisted principally of a relation of the movements of certain Japanese from one place to another, and activities thereof, such as photography, conferences, and other matters. A few reports dealt with Japanese activities in Mexico, Mexican waters and Central America, and a few reports concerned alleged communists and their activities. None of the reports contained any information regarding the army, the navy, any part thereof, their equipment, munitions, supplies or aircraft or anything pertaining thereto. One report named a number of Japanese 'suspected' of being interested in intelligence work. Most of them, on their face, appear innocuous, there being no way to connect them with other material which the Naval Intelligence may have, so that the importance of the reports does not appear. [117]

 **\*975**  Convicted of violating the precursors of 793(b), 794(a), and 794(c) (conspiracy), Gorin and Salich argued that the information transferred was not covered by the statutes. They contended that "related to the national defense," as used in sections 793(b) and 794(a), must be read in conjunction with section 793(a), which defines "national defense" in terms of protected places and things. Without that limitation of national defense to specified places and things, defendants contended, section 793(b) and 794(a) were vague because everything "relates" to national defense more broadly construed.

Justice Reed's opinion for a unanimous Court rejected, as had the court of appeals, both the proposed construction and the argument that without it the statutes were vague:

The sections are not simple prohibitions against obtaining or delivering to foreign powers information which a jury may consider relating to national defense. If this were the language, it would need to be tested by the inquiry as to whether it had a double meaning or forced anyone, at his peril, to speculate as to whether certain actions violated the statute ....

But we find no uncertainty in this statute which deprives a person of the ability to predetermine whether a contemplated action is criminal under the provisions of this law. The obvious delimiting words in the statute are those requiring "intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation." This requires those prosecuted to have acted in bad faith. The sanctions apply only when *scienter* is established. Where there is no occasion for secrecy, as with reports relating to national defense, published by authority of Congress or the military departments, there can, of course in all likelihood be no reasonable intent to give an advantage to a foreign government. Finally, we are of the view that the use of the words "national defense" has given them, as here employed, a well-understood connotation. They were used in the Defense Secrets Act of 1911. The traditional concept of war as a struggle between nations is not changed by the intensity of support given to the armed forces by civilians or the extension of the combat area. National defense, the Government maintains, is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." We agree that the words "national defense" in the espionage act carry that meaning. [118]

The Court decided with little discussion that the particular reports might be deemed related to national defense. The issue was for the jury to decide, and an adequate basis supported the jury's decision as the intelligence reports gave:

a detailed picture of the counter-espionage work of the Naval Intelligence, drawn from its own files, they must be considered as dealing with the activities of the military forces. A foreign government in possession

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 27 of 126

of this information would be in a position to use it either for itself, in following the movements of the agents reported upon, **\*976** or as a check upon this country's efficiency in ferreting out foreign espionage. [119]

We agree that Gorin and Salich were properly found to have violated the statute. Nonetheless, the Court's opinion, which has set the ground rules for the lower courts, is confused and inadequate in its treatment of three related issues. First, to what extent does information respecting national defense, which encompasses specifically military affairs, also encompass information bearing on broader issues such as over-all national defense policy, the state of civilian defense readiness, economic capacities, and the like? Second, is information defense-related if it pertains to military affairs but is unimportant? Third, does "related to the national defense" include information which the Government has not sought to keep secret, or which has found its way into the public domain despite such efforts?

On the first question, the extent to which information may be defense-related regardless of whether it describes military operations directly, Justice Reed's opinion is internally inconsistent. The first mention of "related to the national defense" assumes that the concept is a wide-reaching one, but one that poses no constitutional difficulties because "scienter" is required to violate the statute. Immediately, thereafter, however, the Court sets out a rather narrow definition. The words "national defense" have a "well understood connotation" and the "traditional concept of war as a struggle between nations is not changed by the intensity of support given to the armed forces by civilians or the extension of the combat arena." [120] This formulation would at least exclude industrial production information and matters bearing on civilian morale from the reach of "national defense." It also suggests, however, that "national defense" is not a hopelessly vague term curable only by scienter requirements.

The third mention of "related to the national defense" defines it broadly once again. Taking its language from the Government's brief, the Court ruled that "national defense is a generic concept of broad connotations, referring to the military and naval establishments *and the related activities of national preparedness*." [121] This standard seems plainly to comprehend national capacity to produce necessary military goods, a matter the "well understood connotation" excluded. Does it also include information about the political and diplomatic establishments which set the boundaries of military action? Lower courts have properly deemed the "generic concept" language the Supreme Court's last word on the scope of national defense. Left in doubt, however, is the breadth of that standard and whether national defense so defined is **\*977** sufficiently precise to withstand constitutional challenge where the actor does not behave with intention to harm the United States or to advantage a foreign nation.

We shall see that this issue becomes important in two subsequent contexts in which newspaper publication or conduct incidental thereto may be thought criminal under current statutes: the meaning of the culpability standard "reason to believe" in subsections 793(a) and (b), [122] and the meaning of "willfully" in subsections 793(d) and (e). [123] Ungenerous construction of either phrase would force newspapers and reporters to speculate at their peril as to just how "generic" the national defense concept is. Partly for this reason, however, as we shall later detail, we believe that these culpability standards should be read to exclude from the reach of the statutes participation in public debate and conduct incidental thereto. On the point with which the Court was concerned, however, we believe the Court's broad definition was right. Purposeful assistance of the agents of foreign governments may properly be regulated broadly, even though the assistance pertains to matters at the periphery of military affairs. But recognizing the appropriateness of defining rather broadly the materials protected against transfer in that context underlines how mistaken it is to treat the materials protected against newspaper disclosure by the same standard.

The second problem *Gorin* treated inadequately is whether and to what extent information must be important in order to be defense-related. For example, is the information that John Jones is a sailor on a nuclear submarine "related to the national defense" because it clearly pertains to military matters, or is that information not covered by the statutes because it has no particular utility to any foreign nation that might acquire it? The issue was raised in *Gorin* because defendants

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 28 of 126

maintained that the counterintelligence hearsay they had transferred was of little significance, which was undoubtedly true. The Supreme Court held, however, that the particular information might properly be found defense-related. Foreign nations, in possession of it, might either follow the suspected Japanese agents themselves, or else they could check on the efficiency of the United States counterespionage effort. The Court's approach to the problem thus assumed, although with no discussion, that some military information might be so worthless as to be outside the statute but it defined the category of the potentially useful information very broadly--an approach that has been followed subsequently in the lower courts as we shall see. [124] Indeed, if the Court's rationale is extended but slightly, any defense matter that is secret may be held "defense related" within the statute, simply because its revelation permits estimation of the efficiency of the United **\*978** States' secrecy system itself, as well as providing foreigners with the opportunity to judge how good their intelligence system was at guessing the matter in question prior to revelation.

Nonetheless, what the Court did in *Gorin* was to define the category of national defense related information in terms of the statutory culpability standard "injury to the United States" or "advantage to a foreign nation." Information that is not susceptible to either use is not defense-related, quite apart from the intent with which it is transferred. The point has special significance in two contexts. First, subsections 793(d) and (e) may be read to make transfer or retention of national defense information criminal regardless of the actor's intentions or expectations in regard to foreign use. Consequently, if the statutes are so read, it is important that their reach is limited by the necessity of showing that mishandling of the information might have potential adverse consequences. Second, the Court's treatment of the issue requires that the prosecutor demonstrate in open court the military significance that defense information may have.

The latter point is an especially troublesome one. The question is not only whether wrongfully motivated transfer of completely trivial defense information should be an offense, but also the price that must be paid to adjudicate in open court the triviality of material that clearly relates to military affairs. First, if the information was transferred to only one nation, then revealing it in open court and describing its significance subsidizes other nations' intelligence services. Second, information may be of vital significance if one knows what to look for, but utterly meaningless otherwise. Suppose, for example, that decoded communications between ships at sea are revealed. They deal with trivial matters. Should the Government be required to prove in court that a good team of foreign cryptographers could, if message logs were kept, break the code in which all messages of a certain type and date were sent, including many of great significance, simply by systematically working through them? People generally spend less time and determined effort on puzzles when they are unsure of whether the puzzle *can* be solved. Knowledge that a solution exists may, in fact, be the single most important discovery on the road to success.

These are the types of problems underlying the issue whether as a general matter criminal sanctions should be visited upon breach of classification orders, without regard to whether information is properly classified. Requiring the Government to prove proper classification may so compromise security that national defense interests require subordination of the interest in imposing punishment. Our problem, whether defense-relatedness may be shown without proof of susceptibility to advantageous or injurious use, is a more refined aspect of the same issue.

Although the problem is not a simple one, we think susceptibility to **\*979** advantageous use should be a required element of defense-relatedness under the current statutes. [125] Congress, except in the most narrowly defined espionage offense-- transfer of classified information by a Government employee to foreign governments [126] --has consistently refused to make classification dispositive of the criminality of transfer. That refusal should be respected in treating this problem.

The third, and in many ways most troublesome aspect of the *Gorin* opinion, is its treatment of the relation between secrecy and the statutory standard of defense-relatedness. The issue arose because Gorin and Salich, in arguing the unconstitutional breadth of the national defense concept claimed that criminal punishment might be imposed for any discussion of any military matters with foreigners, even those matters which were plainly known to the general public. [127] In its brief the Government responded, without conceding the point formally, that secrecy was an element of defense-

relatedness. [128] That approach would permit characterization of "public" information as worthless, and outside the statute on the ground that foreigners could get it easily enough without relying on the actor's conduct. Rather than decide whether and to what extent secrecy was necessary, the Court invoked the culpability provisions:

> Where there is no occasion for secrecy, as with reports relating to national defense, published by authority of Congress or the military departments, there can, of course, in all likelihood be no reasonable intent to give an advantage to a foreign government. [129]

This response simply avoids the problems. First, an enormous amount of useful information in no way tracing back to official publications can be gleaned from newspapers, periodicals, [130] personal observation and interviews, **\*980** Moreover, like most puzzles, several small clues may permit piecing together the entire story. Whether the current espionage statutes are properly read to make criminal the assembling and transmittal of such information is a hard question, which we shall postpone for the moment. The problem is that the Court gave no guidance to its resolution. Surely, whether the actor has an intent to benefit foreign nations does not turn on the secrecy of the information transferred. For example, a foreign military attaché who dutifully mails home a readily available copy of our military appropriations bill does so because he rightfully believes that his country will benefit thereby. The question is not with his intent. If his conduct is not criminal it is because the information is not defense-related, or because the statutory-word "advantage" does not comprehend any and all benefits accruing to foreign governments from receipt of defense-related information.

These three issues have received little focused attention in the lower courts. For the most part, the decided cases have involved military information in the most direct sense. [131] Thus, in only two reported cases has prosecution been grounded upon systematic collection of non-secret information.

In *Gros v. United States* [132] defendant Frances Gros was convicted of conspiracy with her husband and another to violate subsections 794(a) and (b). The evidence was clear that she had helped her husband to send information to his uncle, a lieutenant colonel in the German army. Furthermore, she confessed to agents of the F.B.I. that she realized she had engaged in espionage activities. However, insofar as can be determined from the court of appeals opinion, the transmitted information had been culled from newspapers and personal observations of matters in plain view When the defendant's room was searched, "many newspaper clippings were found there containing information of value to the German Army." One letter

> contained information of value to Germany relating to increased armament and plane manufacture and its effect on prices of food and **\*981** other civilian needs; the supply of silk, wool and aluminium; the low-output in planes due to the lack of organization; the calling of the men for army training and the likelihood that America soon would be in the war. [133]

Without discussion of whether such information related to the national defense, or indication that the conspiracy embraced broader objectives than transmission of this data, the Ninth Circuit held that a violation of the statute had been established and affirmed the conviction. Subsequently, the court reversed itself on rehearing, but on a narrow ground relating to conspiracy law. [134]

The question whether information culled from periodicals and observation "relates to the national defense" was fully explored by Learned Hand in *United States v. Heine*. [135] His opinion ranks second in importance only to *Gorin*. As in

*Gros*, the defendant's purpose was unquestionably to benefit Germany. Born in Germany, but a naturalized United States citizen, Heine shortly prior to United States entry into World War II compiled extensive reports on the United States aviation industry which he mailed to addresses in New York and Lima, Peru, for forwarding to Germany. The evidence justified the inference that he adopted this mailing procedure to avoid detection. The court described the information which Heine collected and transferred:

> The information which Heine collected was from various sources: ordinary magazines, books and newspapers; technical catalogues, handbooks and journals; correspondence with airplane manufacturers; consultation with one, Aldrich, who was already familiar with the industry; talks with one or two employees in airplane factories; exhibits, and talks with attendants, at the World's Fair in New York in the summer of 1940. This material he condensed and arranged in his reports, so as to disclose in compressed form the kinds and numbers of the planes--military and commercial--which were being produced and which it was proposed to produce; the location and capacity of the factories; the number of their employees; and everything else, of which he could get hold, that would contribute to as full a conspectus as possible of the airplane industry. All of this information came from sources that were lawfully accessible to anyone who was willing to take the pains to find, sift and collate it; no public authorities, naval, military or other, had ordered, or indeed suggested, that the manufacturers of airplanes--even including those made for the services-- should withhold any facts which they were personally willing to give out. [136]

Writing for the Second Circuit, Judge Hand held that such activities were not covered by the statute. To give the phrase "related to the national defense" its full breadth, he argued, would bring within the statute a railway map sent **\*982** to a subject of Britain or a citizen of France. The statute specifies only that the recipient be foreign and does not distinguish between friends or foes. In limiting the statute, Judge Hand took as his starting point the language in *Gorin* that indicated that it would not be criminal to transmit information that the military had made public:

> As declared in Gorin v. United States ... and as the judge himself charged, it is obviously lawful to transmit any information about weapons and munitions of war which the services had themselves made public; and if that be true, we can see no warrant for making a distinction between such information, and information which the services have never thought it necessary to withhold at all. There can, for example, be no rational difference between information about a factory which is turning out bombers, and to which the army allows access to all comers, and information about the same bombers, contained in an official report, or procured by a magazine through interviews with officers. The services must be trusted to determine what information may be broadcast without prejudice to the "national defense," and their consent to its dissemination is as much evidenced by what they do not seek to suppress, as by what they utter. Certainly it cannot be unlawful to spread such information within the United States; and, if so, it would be to the last degree fatuous to forbid its transmission to the citizens of a friendly foreign power. [137]

Judge Hand's effort to limit *Gorin* is, on the narrow facts decided, a satisfactory construction of the statute. As in *Gorin* itself, however, the rationale is unsatisfactory. The criminality of transmitting information to foreigners cannot be made to depend on whether "spreading" the same information within the United States is a crime. No matter how sensitive information may be, its well-meaning publication is not criminal, we believe, except under narrow statutes like sections 797 and 798. We have shown that section 794 does not make such conduct criminal; and, as we shall argue, neither does action 793. Consequently, if we are correct, to accept Judge Hand's premise is to gut the espionage statutes of any content whatever, even as to clandestine espionage.

Case 1:17-cr-00034-JRH-BKE Document 112-1 Filed 10/03/17 Page 31 of 126

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

But the validity of the *Heine* approach does not depend on that premise, for the court held only that revelation to foreigners of matters not kept secret by the Government is no offense. The greater difficulty lies in the ambiguities of the concept of "secrets," a point Judge Hand recognized. [138] Essentially, the *Heine* opinion shifts the emphasis that *Gorin* gave to the secrecy problem. *Gorin* did not say that it was lawful to transmit published materials because once in the public domain information is no longer related to the national defense. Instead, the Supreme Court looked to the *scienter* requirement and supposed that in such circumstances there can "in all likelihood be no reasonable intent to give an advantage to a foreign government." [139] **983** While this assertion is valid for the casual mailer of railway maps whom Judge Hand mentioned, it is false for people like Heine and Mrs. Gros unless "advantage" is given some special meaning. The compilation of published reports, interviews, and personal observations in their cases was obviously undertaken with the purpose of benefiting a foreign nation. Consequently, in his treatment of the secrecy issue, Judge Hand revised the *Gorin* approach by removing some "public" defense information from the reach of the statute regardless of the actor's intent. Given the reach of section 794(a), making criminal communication to any foreign nation of any defense information, assembled or not, that result is sound. [140]

The hard problem is what information is "secret" for purposes of the rule. Where *Gorin* avoided the questions by adverting only to information published by the services, *Heine* treated information not suppressed by the services as equivalent to information published by them. The transformation is important, but the result is hard to apply. What facts evidence the Government's lack of desire to suppress? In *Heine*, the question was easily answered because the Government had apparently made no effort whatever to maintain secrecy. More often the problem is one of exceptional difficulty. The Government's readiness to publish information may well reflect its willingness to have it become known; but its failure, and just as often, inability to suppress information may say nothing about its defense significance.

Three different problems complicate the outright rejection of the "related to the national defense" standard as applied to such information. It is impossible to bar all public awareness of, and perhaps newspaper reports concerning, matters of high sensitivity that are in plain view. Nevertheless, the fact that citizen comment on the domestic deployment of troops or the sailing of convoys cannot be suppressed should not remove such information from the reach of the statute simply because many people have learned it. Second, there are some matters that are widely known but nonetheless officially secret because of special problems of Government attribution. To say that widespread awareness of a particular fact undercuts the defense-relatedness of official documents confirming it disregards important diplomatic realities. Third, information about matters the services would surely like to keep secret, **984** and do attempt to keep secret, may be pieced together from the secondary sources, such as their budgets or subcontractors, that the services must release. The *Heine* rationale, because of the peculiar facts, faced up to none of these problems of determining when some matter is to be regarded as in the public domain and therefore beyond the scope of the "relating to the national defense formulation."

Since *Heine*, these issues have arisen only in the context of the significance to be accorded classification where clandestine espionage was prosecuted. What relevance does classification have to the basic problem of whether data inferentially "relate to the national defense"? Is the *Heine* "seek to suppress" standard met if the particular information is properly classified, even though it is also in the public domain? The few scattered *dicta* in espionage cases provide no adequate guidance. [141]

A slightly different issue is what bearing classification has on defense-relatedness even assuming that information is in fact secret. Insofar as the *Gorin* opinion makes defense-relatedness a jury question, it follows, as the courts have held, that classification is not dispositive of whether information relates to the national defense. Unsettled, however, is whether and to what extent classification should be treated as probative evidence of defense-relatedness. Although the cases uniformly allow the fact of classification to go before the jury, two different rationales have been used. In *Gorin*, the court of appeals rejected defendants' claim that they had been prejudiced by the testimony of Salich's superior that he had instructed Salich not to divulge any information to Gorin. Noting that the trial judge had cautioned the jury that this testimony was not to be taken as a statement of law. the court found no error in its admission because the testimony was probative

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 32 of 126

on the issue of whether defendant had "reason to believe" that the information was prejudicial to the United States or advantageous to a foreign nation.[142] This reasoning **985** survived without mention the Supreme Court's review. The second rationale for admission was advanced in *United States v. Soblen*,[143] where the defendants were charged with providing Russian agents with classified information about the O.S.S. The trial judge charged the jury that classification was probative as to defense-relatedness:

> Whether or not the information and documents allegedly sought to be obtained and transmitted by the defendant and his alleged coconspirators concerned, regarded or was connected with the national defense is a question of fact solely for the determination of you, the jury, taking into consideration all the circumstances of the alleged crime and considering the alleged source, origin, character and utility of the information and document ... You may also consider the testimony that the names of certain personnel and their functions within O.S.S. were classified information.[144]

Both approaches are flawed. The *Gorin* rule, admitting classification as probative on the issue of culpability, ignores the extraneous impact on jury determination of defense-relatedness, an impact not likely to be mitigated merely by general instructions to disregard. Furthermore, if *Heine* is good law, an effort to preserve secrecy is a necessary element of the Government's case and is sure to come out anyway. Consequently, as in *Soblen*, the problem of classification should be directly faced. The failure in that and similar cases is that courts have not instructed the jury on the complexity of classification and its frequent use by Government agencies to protect interests other than national defense even as broadly understood by the Congress. The classification system is the principal mechanism of executive information control. To be sure, the Executive Orders that authorize classification make "national defense" the basis upon classification is to be imposed, but it is fruitless to think that the variety of concerns which animate executive secrecy can be lumped properly under "national defense," even granted that Congress saw no sure limit to the phrase. For example, we doubt that the drafters of the Espionage Act envisaged that enhancement of foreign relations by protecting foreign confidences not directly linked to military affairs "related to the national defense."

In our view, the best way to treat the problem under current law is to permit classification to be used for purposes of showing Government intent to maintain secrecy, but to instruct specially that the Government can and does maintain secrecy as to a substantial number of matters which have no "relation to national defense" even within the broad meaning Congress gave that phrase in 1917. That solution is by no means a happy cure to all the problems, but it does at least reduce somewhat the prospect of the jury's being overly influenced by official designation of secrecy.

**986** In conclusion, the meaning of the phrase "national defense," after some sixty years in the statute books, is not much clearer now than it was on the date of its passage. Judicial gloss has not cabined its tendency to encompass nearly all facets of policy-making related to potential use of armed forces. Paradoxically, the limitation attempted by Judge Hand in the *Heine* case may augment the problem by making secrecy the litmus of defense-relatedness and thus put government classification at the fore, despite the multiplicity of purposes which secrecy in fact serves. The expansive reach of the term leaves all-important whether *Gorin* was correct in regarding the statute's culpability formulation as adequate to fend off the dangers of overbreadth.

2. *Intent or Reason to Believe That it is to be Used to the Injury of the United States or to the Advantage of a Foreign Nation.* Sections 793(a) and (b) employ a complicated culpability standard. First, the entering, copying, or obtaining must be done with the purpose of obtaining information respecting the national defense. The mental state so defined is ambiguous only because of the vagueness of the term "national defense." Second, the conduct must be done "with intent or reason to believe that [the defense-related item obtained] is to be used to the injury of the United States, or to the advantage of any foreign nation." As we have seen, this formulation is substantially identical to the standard used in section 794(a).[145]

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE    Document 112-1    Filed 10/03/17    Page 33 of 126

The statutes do not provide definitions of the key terms "intent," "reason to believe," "injury" and "advantage." In this respect, the espionage laws share the characteristic ills of federal criminal law that result from the use of undefined and exceedingly complex culpability standards to demarcate the boundaries of federal offenses. [146] Moreover, these espionage provisions have generated little case law limiting their literal reach. That prosecutions have been directed at clandestine transfer of information to foreign agents has led courts to construe the culpability terms rather broadly Because the courts have not had to confront the culpability issues in the context of public speech, current judicial constructions tend to aggravate the problems of plain meaning constructions.

Sections 793(a) and (b) define offenses of acquisitive conduct, not communication of any sort. Nonetheless, except in the oddest sort of situation, [147] to satisfy the statutes' culpability formulations the conduct must be done with the intention to reveal subsequently the information to someone else. **987** If the actor intends only to use the information to contemplate America's defense posture, he does not run afoul of these two laws. Mere satisfaction of individual curiosity could not possibly injure or advantage nations. In most instances, however, people who make efforts to obtain defense-related information, whether journalists or spies, do so because they envision the possibility of communicating it to others. When the actor expects to tell others, the statute purports to make the acquisition criminal-depending upon whether the intended or predictable consequences of revelation are that the information will be used to injure the United States or to advantage any foreign nation. By establishing predictable consequences as the test of criminality, however, these statutes ignore, on their face, the questions which so concerned Congress in rejecting direct publication controls in section 794: to whom and for what reason is the revelation made.

(a) *The Problems of Plain Meaning*. Sections 793(a) and (b) proscribe certain conduct (gathering, obtaining) when done with a certain state of mind (intent or reason to believe) with respect to the consequences which will ensue upon use of the information (injury to the United States or advantage to foreign nation). We shall start our analysis of the culpability formulation by consideration of the injury and advantage provision.

(i) *Injury or Advantage*. Only the "advantage" aspect of the standard has received judicial elucidation. Although the courts have not devoted great attention to the term, plainly they have chosen to regard it as generally synonymous with "helpful." Thus, the requisite "advantage" may be inferred when foreign agents learn of a particular plant's manufacturing an explosive compound, [148] or of functions performed by various O.S.S. officials. [149] The practical consequence of this broad reading, however, is that if secret information relating to the "national defense" is transferred, reason to believe that advantage will result follows automatically. Other nations like to know what is going on and regard themselves as benefited by whatever information they can obtain.

Possibly courts and prosecutors have chosen to focus on defendants' intention or reason to believe advantage will result, rather than injury, because defendants might assert more plausibly that they did not intend injury. If "injury" is determined with reference to the actor's subjective perceptions, defenses are plausible in three common espionage situations: where trivial information is sold, as in *Gorin*; where the loyal citizen, threatened by blackmail, selects the information to be conveyed to negate the possibility of serious harm; [150] and where a person believes that the United States would benefit **988** from a different political system and acts to bring it about by assisting a foreign nation dedicated to the same ideology. [151] Such defenses, regardless of their potential success, are far harder to assert if "advantage" is read to mean "help" and the prosecution need not show that advantaging foreigners means hurting us. The defendant will seldom be able to prove that he had no reason to believe that the transmitted information would help the intended recipient. It is precisely this reading of the statute that the courts have adopted; the "injury" provision and the "advantage" provision are read as alternate grounds of culpability. Thus, in *Gorin* the Court specifically held that injury to the United States was irrelevant; benefit to the Soviets sufficed. [152] Yet, this broad and disjunctive interpretation of advantage reduces the "injury" standard to surplusage because it is improbable for the United States to be injured

except by conduct which also advantages some foreign nation.[153]  The harm occurs because of a change in the relative strength of the United States; if the United States' side of the balance goes down, then the other side necessarily goes up.[154]  This reading of advantage is curious not only in terms of the usual rule of statutory construction that surplusage is not lightly to be inferred, but also because both the Senate and the House primarily intended to make criminal the conduct of those who gathered information with the purpose that it be used to injure the United States; as passed by the House, the bill did not even include the "advantage" formulation.[155]  Despite this difficulty, however, the statutory language is so clear that we see no alternative to the courts' reading. The statute is clearly phrased disjunctively, and it seems too late in the day to adopt a more limited reading of "advantage," such as "specific strategic military benefit," which would give independence to the concept of injury to the United States.

Serious problems are posed by the breadth of the advantage formulation when possible application of sections 793(a) and (b) to activities preliminary to public speech is considered. As we earlier pointed out, although the culpability standards of the sections contemplate revelation of information, they  **\*989**  draw no obvious line between clandestine transmission and public disclosure. Plainly, the publication of secret defense information will normally advantage foreign nations if advantage means only to help. The benefits accruing to a foreign country from having particular knowledge do not turn entirely on the means of transfer, although there are obvious advantages in knowing more than your adversaries think you do.

If a distinction is to be drawn between the information-gatherer who intends clandestine sale--clearly within the culpability standard of 793(a) and (b) -- and publication, the consequence portion of the formulation will not support it.[156]  The legislative history of the Espionage Act suggests a different analytic route. As we have seen, in rejecting liability for normal publication Congress focused on motive rather than result. Thus, Congress intended to distinguish revelation of defense information in espionage from the same revelation in public debate, on the basis of the intent to inform the public. If a distinction under 793(a) and (b) is to be drawn between obtaining information for espionage and for publication, it should turn on the culpability of the motive, not on a strained construction of what ultimate consequences will ensue.

(ii) *Intent and Reason to Believe*. What meaning in the culpability provisions of section 793(a) and (b) should be given to "intent or reason to believe"? Presumably "intent" means conscious purpose. The usual problem in construing that term, when it is not explicitly defined, is whether it is satisfied if the accused was aware, or, in some instances, should have been aware, that prohibited results were likely to occur. However, the question whether intent may be "constructive" is moot in a formulation that explicitly makes criminal acting with "reason to believe" that the results will ensue. If behavior other than that done with a purpose to bring about a prohibited result is made criminal, it is the "reason to believe" standard which does it.

If the term is read broadly, a person has reason to believe that a result will occur when he is aware of circumstances that would lead most people to believe that it would follow.[157]  The problem with such a broad reading of the espionage statutes is that negligent conduct would be criminal--conduct where the defendant was in fact ignorant of the likelihood of injury or advantage. Although there is no indication that Congress intended so drastic a result, the trial court in *Gorin* charged the jury in a manner susceptible to that interpretation. Salich, who transferred the counter-intelligence reports, consistently maintained that in view of the trivial information contained therein, he did not believe that they could possibly injure the United States or advantage any foreign nation. The judge charged, however, that he was guilty  **\*990**  if "he knew facts from which he concluded, *or reasonably should have concluded*, that the information could be used advantageously by the Soviet Union."[158]  Although the court of appeals and the Supreme Court did not object to this language, neither court manifested awareness of the possibility that the jury's verdict might have rested on a judgment that Salich was not aware of danger but merely impermissibly stupid.

Criminal statutes and the courts that apply them commonly fail to differentiate adequately between an accused's conscious disregard of known risks and his lack of perception of risks. [159] In the great majority of instances, the failure makes little difference because few defendants can avoid the usual judgment that what is obvious to us is obvious to them. [160] Moreover, the circumstances where the problem is of real importance in the criminal law--as, for example, where defendants are drunk or mentally infirm-- are not likely to arise in the context of espionage or public speech about defense matters. Nonetheless, the distinction between the disregard of risks and the failure to perceive them is of sufficient concern in the espionage statutes to warrant close attention. For example, it would be shocking if section 794(a) rendered a man liable to life imprisonment on the basis of a private letter to a foreign friend containing information that he did not realize had defense significance. At a minimum, in the absence of clear evidence of contrary congressional intent, the statute should not be deemed to have been violated unless the defendant was cognizant of a substantial risk that his actions might cause injury or advantage. [161]

Even so limited, however, the "reason to believe" phrase causes obvious difficulties with respect to information-gathering activities in contemplation of public speech about defense-related matters. If words are given their usual meanings, a reporter who obtains secret defense documents, intending that they be published, has reason to believe that the information will subsequently be used to injure the United States or to advantage a foreign nation. [162] Foreigners try to keep up with our journals, just as we keep up with theirs; as a **\*991** consequence of the publication of what was formerly secret, foreign agents may obtain information, the acquisition of which in a clandestine manner would clearly be criminal. For example, had the *Times* published the fact that the Bay of Pigs invasion of Cuba was imminent, [163] is it not pretty clear that Cuba would have been advantaged? Is it not also clear that the *Times* would have had reason to believe such advantage would occur? Yet to make criminal such conduct raises precisely the dangers of interfering with public debate that so alarmed the successful opponents of censorship in 1917. Moreover, such a reading of the statute undercuts the *Gorin* holding that "national defense" is sufficiently limited by the *scienter* requirement in the statute. Problems of vagueness and overbreadth are hardly resolved if the foreseeable consequence of some help to a foreign country is regarded as denoting an evil intent which justifies letting the actor ascertain at his own risk whether the information he publishes falls within the scope of the statutes.

There are accordingly serious problems with a construction of the "reason to believe" phrase that would be satisfied by an awareness of possible forbidden consequences, as opposed to a conscious intent to bring them about. Can Congress possibly have meant what subsections 793(a) and (b) seem to say?

(b) *Legislative Background.* The legislative materials permit no certain conclusions as to Congress' understanding of the cumbersome culpability standard of 793(a) and (b). Unlike the Senate action on subsection 794(b), the vote on 793 did not follow a clearcut presentation of alternative readings. Nevertheless, we conclude that the legislative history of the espionage statutes, taken as a whole, supports the hypothesis that Congress understood the culpability requirement of the gathering offenses of 793(a) and (b) not to be met by an intention to engage in public debate or criticize defense policy. Congress did not even clearly perceive that subsections 793(a) and (b) were related to the problem of public speech with which they were struggling in the debate on 794. Rather, the curious citizen individually concerned with military policy was the symbol of innocence which predominated in their discussions of 793. Because 793(a) and (b) on their face deal with gathering information rather than communicating or publishing it, the possibility that the curious citizen might be a reporter was not seriously considered.

(i) *The Senate.* In the Senate, most of the illuminating debate on the 793 provisions took place in connection with S. 8148. Section 1 of that bill greatly extended the gathering offenses then existing under the Defense Secrets Act of 1911, and followed the 1911 Act in not conditioning criminal responsibility on any culpability requirement other than having "the purpose **\*992** of obtaining information respecting the national defense." [164] Opponents of section 1 urged that it be amended to require intent to injure the United States or advantage a foreign country as an element of the various offenses

defined. [165] Senator Cummins was the most determined advocate of this position. His statements deserve attention because they are typical of the criticisms of the proposal:

> I am ... anxious ... to prevent the revelation ... in a time of war to an enemy or to a foreign country of things that are connected with the movements of our Army and our Navy. But I am not willing in order to bring about that state of efficiency, if it be a state of efficiency, to close the mouths of the hundred million of American people upon all subjects at all times relating to the national defense. I think that if we must allow this one man, however unfortunate it may be, to go unpunished in order that these millions may preserve the liberties which they have acquired through long and arduous labors, we had better allow the one man to go unpunished. But I see no reason for permitting that. It is not hard, I am sure, to prescribe the terms of a statute which will punish any man who attempts to reveal to an enemy or even to a foreign country or who gathers information for the purpose of revealing to an enemy or a foreign country information that ought to be confined to American shores. But it is not necessary to spread a net of this kind in order to catch a fish of that kind. [166]

**\*993**  The chief response to Cummins' criticism, at least if measured by the frequency of its iteration and the stature of its spokesman, was the refrain of prosecutorial discretion voiced by Senator Overman, the manager of the bill. He conceded the broadness and vagueness of section 1, but urged reliance on prosecutors and juries not to indict or convict persons for information-gathering or communication if they were innocent of any intent to aid the enemy. [167] While Overman repeatedly stated that section 1 was designed to cover spying, he argued that a precisely drawn statute could not comprehend all forms of espionage. [168] Cummins pointed out that the activities covered in section 1 could easily be undertaken "for the purpose of obtaining information respecting the national defense" and yet be entirely innocent of any espionage purpose, but Overman strongly opposed the notion that the section 1 prohibitions should be conditioned upon intent to injure the United States or aid a foreign country. Although Overman's primary justification for the sweep of section 1 was fear of spying, when pressed by Cummins, he refused to concede that citizens had any legitimate interest in being informed about questions of national defense. [169] Overman's position carried the Senate in the **\*994**  first round of debates, and section 1 was passed without any mental element other than "a purpose of obtaining information respecting the national defense." [170]

When the Senate later took up identical provisions in S. 2, Overman moved on behalf of the Judiciary Committee an amendment to strike the language "to which he is not lawfully entitled," brought forward from the 1911 Act, and to replace it with "with intent or knowledge that the information to be obtained is to be used to the injury of the United States or to the advantage of any foreign nation." The succeeding subsection (now 793(b)) was similarly amended by the insertion of "with like intent or knowledge." [171] Thus, without debate or explanation from Overman, Cummins' position on an intent requirement carried the day in the 65th Congress. This important change of heart apparently took place behind the scenes in the Judiciary Committee, yet no explanation for the shift appears in the committee report, the debates, or any other source we have been able to find. To assess the significance the culpability requirement that was added to the S. 2 precursors of sections 793(a) and (b), it is obviously crucial to determine what its purpose was understood to be.

There are two possible explanations. On the one hand, critics like Senator Cummins had indicated that they would prefer to tolerate open discussion of military affairs, even at the cost of alerting the enemy. The general thrust of his position of protecting public debate must have been obvious to all listeners in light of his vociferous objections to section 2(c). Thus, one possibility is that political considerations, primarily the coming battle on 2(c), led Overman to acquiesce in the addition of an intent requirement in section 1, where only gathering information was at stake, with the idea that 2(c)

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 37 of 126

would suppress any general revelation of information so obtained. This explanation, if accepted, would bar application of 793(a) and (b) to information-gathering preliminary to publication.

On the other hand, section 1 as originally drafted went considerably beyond what was necessary to prevent revelation of defense information. As pointed out by the critics, the provisions would have made criminal efforts by Congressmen, let alone citizens, simply to find out what the military was doing. Yet mere possession of information is not harmful to national defense interests; harm occurs only when the information comes to the attention of foreigners. Thus, given Overman's strong personal commitment to broad prohibitions on disclosure, another explanation for the amendment may be that he thought the culpability provision insisted upon by Cummins would be satisfied if information were gathered with intent to publicize it. A reason to  **\*995**  believe injury or advantage would occur could then presumably be inferred from the likelihood that the enemy would learn of it. Thus, Overman may have believed that to concede that curiosity would not constitute an offense did not sacrifice the statutory coverage he deemed most important. This explanation would uphold the applicability of the law to activities preliminary to public speech.

We believe that the first explanation is the more credible. It is plain that Cummins' criticisms of S. 8148 led to the intent requirement added to S. 2. Cummins' silence after the Overman amendment must have signified that he thought the gathering offenses were appropriately limited by a culpability standard requiring purpose to reveal to a foreign country. We suspect this was the general understanding in the Senate after the Overman amendment. The issue of revelation of defense information, all must have assumed, would be resolved by the defeat or passage of 2(c).

(ii) *The House*. In the House, the debates are clearer that the gathering offenses were not meant to cover activities in contemplation of public speech, even though this intendment once again reflects inadvertence to the language of the proposed statute. Although the House focus was primarily on section 4 of H.R. 291, some interesting commentary was offered on the first sections, covering roughly the activities now dealt with in subsections (a) and (b) of 793. [172] As explained by the Chairman of the Judiciary Committee, Congressman Webb, section 1 of H.R. 291 was intended to clarify the meaning of the phrase "to which he is not lawfully entitled" which had been used in the 1911 Act. [173] Webb told the House that the ambiguous phrase had been replaced by an intent requirement: "[W]hoever, with intent or knowledge, or reason to believe that the information to be obtained is to be used to the injury of the United States." [174] Notwithstanding the use of the words "knowledge, or reason to believe," Webb invariably spoke of this language as requiring a conscious purpose to injure. [175]

 **\*996**  The strongest evidence that the House understood this culpability formulation to require purpose came from Congressman Graham. In contrast to his opposition to prohibitions on publication without an intent standard, Graham warmly embraced sections 1 and 2 of H.R. 291:

> [T]he Committee has carefully guarded innocent people who might communicate, who might obtain a photograph of some public work connected with the defense of the country, from being held liable for a criminal act, because the Government must prove affirmatively ... that the person obtaining it had a guilty purpose, to wit, to injure the United States. [176]

(c) *Summary*. [177] At least three interpretations of the culpability formulation of subsections 793(a) and (b) will implement the congressional understanding that it should not be applicable to information-gathering where the actor's purpose is publication. First, the courts might say that the legislative history affords an implied defense for those whose information-gathering is pursuant to a good faith purpose to criticize defense policy or participate in public debate. Basically, we think that this is what Congress intended. Unfortunately, it is difficult to point to specific statutory language upon which to rest this interpretation. As a general matter, the judiciary may read justification defenses into statutes when the legislative

THE ESPIONAGE STATUTES AND PUBLICATION OF...,, 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE Document 112-1 Filed 10/03/17 Page 38 of 126

history and the need to **\*997** avoid serious constitutional problems so require. Nevertheless, this method of conforming the statute to its legislative history should be pursued only if no feasible alternative reading more in harmony with the statutory language would accomplish the same result.

Second, one could read "reason to believe" not as stating an independent basis of culpability, but rather as signifying the sort of evidence from which the jury can, in the absence of explanation, infer purpose to injure or advantage. The legislative history is replete with declarations that "evil purpose" is required to violate these laws. Entirely absent, despite the "reason to believe" language, is any indication that Congress understood reckless or negligent behavior to be covered. If "reason to believe" were given this inferential significance, the newsman would be shielded, since his purpose in gathering information would neither be to injure the United States nor to advantage foreign nations; his actual intent to inform the public would defeat the inference of purpose to injure or advantage that would otherwise flow from his acting with knowledge of those consequences.

The difficulty with this reading of the culpability provision is that its neutral application would exempt some traditional cases of espionage that Congress must have meant to cover. Consider, for example, the serviceman who sells defense documents to foreigners. In many instances, he does not act with the conscious purpose of bringing about the statutorily proscribed consequences; his motive is to obtain money for himself, and he may intend, as Salich claimed in *Gorin*, with some justification, that no ill effects should occur. The appropriateness of making his behavior criminal rests not on his evil ends, but rather on his indifference to the results that will flow from the means he has adopted. He should not be allowed to avoid criminal sanctions under subsection 794(a), or 793(a) and (b), by claiming that the inferences that might be drawn from his "reason to believe" should not be drawn because his intent was only to enrich himself. Despite the impression of the language used, senators and congressmen who protested their willingness to punish those who acted with "evil purpose" or "intent" to injure the United States cannot possibly have thought that such conduct should go unpunished.

Another reason for rejecting a purely evidentiary reading of "reason to believe" is that such an interpretation would contradict several of the clear-cut judicial constructions in espionage cases. The few courts that have considered claims by defendants that they did not intend to injure or advantage by transferring defense documents have relied on the "reason to believe" phrase as a means of bringing the conduct under the statutes without searching for dominant motivation. [177a] To employ the "reason to believe" language merely to **\*998** evaluate the defendant's purpose is acceptable only if the sorts of explanations which suffice to defeat inferences of intent are judged to be justifiable ones. This, of course, shifts the inquiry from one into the state of mind of the actor, and converts it into a general inquiry about justification. Here again, such a reading of the statute would constitute a judicial interpolation resting on no conceivable interpretation of statutory language.

The third, and we think preferable, method of giving effect to Congress's understanding of the scope of the bill is to focus on the middle phrase of the culpability formulation: the actor's state of mind with respect to whether the defense material "is to be used" to bring about the proscribed consequences. The passive syntax seems designed to refer to what the information-gatherer understands about the use to which the information will be put by others. The acquisitive serviceman contemplating clandestine transmission of material intends or has reason to believe that its primary use will be to advantage a foreign country or injure the United States. By contrast, while the reporter may be aware that some readers will put published defense materials to that use, he envisions primarily other uses precisely opposite to those prohibited in the statutory formulation. We think that it is consistent with the congressional purpose to focus on what the obtainer thinks will be the principal use of the materials, and that so read, the statute provides a statutory basis for distinguishing conduct which was not intended to be made criminal.

Support for this reading of the culpability standard is found in a 1942 Opinion of Attorney General Biddle which held that defense contractors would not violate the espionage statutes by transferring defense information to our Allies under the Lend-Lease program:

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 39 of 126

Under the circumstances here involved, the primary advantage sought is that of the United States itself; the conferring of an advantage upon an allied nation is but a means to that end. [178]

If this reading of the culpability provisions of 793(a) and (b) is correct, those sections do not apply to the activities of reporters, newspapers, and others who intend to engage in public speech about defense matters.

## V. SUBSECTIONS 793(d) AND 793(e)

### A. *Introduction*

These two provisions are undoubtedly the most confusing and complex of all the federal espionage statutes. Unfortunately, they are also the statutes that pose the greatest threat to the acquisition and publication of defense information by reporters and newspapers. The legislative drafting is at its scattergun worst precisely where greatest caution should have been exercised.

**\*999** The history of subsections 793(d) and (e) encompasses three statutes and forty years. From the start, the key terms were formulated with hopeless imprecision, and as a consequence, the legislative materials indicate a basic and continuing congressional confusion about the ends sought to be achieved. The culmination of this sloppy process was the enactment in 1950 of 793(e), which was an unnoticed departure from the general pattern of the espionage statutes that conditioned all broadly drawn offenses on a showing of culpable purpose.

Subsections 793(d) and (e) provide:

(d) Whoever, lawfully having possession of, access to, control over, or being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it; or

(e) Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it; ...

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 40 of 126

* * * *

shall be fined not more than $10,000 or imprisoned not more than ten years or both.[179]

The subsections are nearly identical. Each creates two offenses: one involves willful communication of defense information to those not entitled to receive it; the other, retention of the material. The common language reflects a shared ancestry in a single precursor provision, section 1(d) of the 1917 Espionage Act, which barred those with "lawful or unlawful" possession of defense documents from communicating them or retaining them in the face of a demand that they be returned. In 1950, when section 1(d) was split into two provisions, treatment of the retention offense was made to depend on **\*1000** whether possession of the material is "lawful," or "unauthorized." In the first instance, the possessor is obligated to return the material only on demand; in the latter, the obligation to return commences on receipt.

The sweep of these provisions seems incredible when measured against the congressional antipathy, manifested both in the 1917 debates and in subsequent confrontations with the problem of secrecy, to broad prohibitions that would hinder public speech on defense matters. No special culpability requirement explicitly restricts their reach. Barring the possible effect of limiting constructions, any "communicating" of defense material or information to anyone not authorized to hear about it is a serious criminal offense. Even retaining possession of such material is unlawful for those who lack special authorization. If these statutes mean what they seem to say and are constitutional, public speech in this country since World War II has been rife with criminality. The source who leaks defense information to the press commits an offense; the reporter who holds onto defense material commits an offense; and the retired official who uses defense material in his memoirs commits an offense.

Congress undoubtedly did not understand 793(d) and (e) or their precursors to have these effects when they were passed or when the problem of publication of defense information was considered on other occasions. If it had so understood the subsections, they probably would not have been enacted in their present form. But while the legislative record is reasonably clear that a broad literal reading was not intended, it is entirely opaque as to any particular narrow meaning. By the same token, while the broad literal meaning of the subsections is almost certainly unconstitutionally vague and overbroad, the statutory language does not point toward any one confined reading as a means of saving them. With both the legislative record and vagueness objections undermining the viability of a broad reading, but with no particular narrow reading having either the imprimatur of Congress or the force of statutory language, the courts may have to declare 793(d) and (e) unconstitutional.

Given the imprecision of the statutory language and the absence of judicial constructions, analysis of the subsections must focus on the legislative materials. Unfortunately, the interrelation of the interpretive problems makes it impracticable to organize such an analysis around substantive issues, as has been done in the preceding sections of this article. Instead, we shall have to follow the development chronologically, through three separate statutes, of the communication and retention offenses now codified in subsections 793(d) and (e). Then we will attempt to pull together the materials in terms of the problems of interpretation posed by these provisions.

Confusion has surrounded these offenses from the first statute in 1911, through the voluminous debates on the Espionage Act of 1917, and into the **\*1001** remarkably casual 1950 amendment that put 793(d) and (e) into their present form. One major problem is the meaning of "not entitled to receive it," which defines to whom communication of defense information is barred. This term has been in the espionage laws since 1911, but it has never been defined by statute and in 1917 a provision that would have given the President power to say who was and was not "entitled to receive" defense information was struck from the Espionage Act. In view of this deletion, it is questionable whether the term can be given meaning by reference to Executive Orders. And even if the President is deemed to have implicit authority to implement the "not entitled" phrase, it is most doubtful whether any existing Executive Orders actually do implement the term. The

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 41 of 126

classification system is exceedingly coy about whether it is backed up by any criminal sanctions. None of the applicable Orders make any reference to the "not entitled to receive it" formulation of 793(d) and (e).

Another vexing problem is whether and to what extent 793(d) and (e) require culpable motivation as an element of the offenses they describe. With respect to communication and retention of tangible "documents" and other enumerated items, the subsections use only the word "willfully," suggesting merely the requirement of knowing or reckless engagement in the act of disclosure, as contrasted to the other espionage provisions which require ulterior purpose to harm United States' interests. However, in the confusion prevailing during the 1950 revision, some members of Congress may well have regarded "willfully" as implying an anti-United States motive. A second question concerning culpability is what function is served by the phrase that modifies "information": "which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation." Does the phrase refer merely to the type of information disclosed or is the actor's awareness of the possible consequences of a particular disclosure an element of the offenses involving "information?"

A third interpretative problem concerns what materials and information are covered by the subsections. Must the tangible documents and intangible information be derived from government sources, or do the subsections also protect information or writings independent of government origin, such as information about troop movements in plain view? Moreover, serious questions arise as to whether particular items should be classified as documents or information. Although subsections (d) and (e) cover both categories, the characterization may nonetheless be significant if the phrase that modifies "information" imposes a significant culpability requirement applicable only to "information" and not to "documents."

Overriding all these interpretive issues is the problem of how the sweeping language of 793(d) and (e) should be reconciled with the clear message of the 1917 and 1950 legislative histories that publication of defense information **\*1002** for the purpose of selling newspapers or engaging in public debate is not a criminal act. Should publication be treated as a mode of conduct distinguishable from communication animated by the same motivation? This was our conclusion as to the proper reading of 794 (a)'s offense of communicating defense information to foreigners, but there are great problems with applying the same analysis to the communication offenses of 793(d) and (e). The latter offenses are not narrowly drawn in terms of the designated recipients of criminal communication, and thus it is well nigh impossible to distinguish publication from communication in this statutory context. Moreover, the legislative history generally treats publication and non-culpable communication as equally deserving of protection. This suggests that Congress' concern not to criminalize publication of defense information must be effectuated by an analysis of 793(d) and (e) that applies across the board to the communication and retention offenses as well.

## B. *The 1911 Act*

The communication offenses of 793(d) and (e) originated in the fourth and fifth clauses of section 1 of the Defense Secrets Act of 1911. [180] The fourth clause covered whoever, in control of any document or knowledge connected with the national defense, "willfully and without proper authority, communicates ... the same to any person not entitled to receive it, or to whom the same ought not, in the interest of the national defense, be communicated at that time." The next clause covered whoever "being lawfully intrusted with any such document ... or knowledge, willfully and in breach of his trust, so communicates ... the same." Unlike the current provisions, the 1911 Act did not make mere retention criminal. Clause four, however, can be read so broadly as to make it an offense for anyone to discuss any defense matter with anyone else unless he has been given permission. On the other hand, it can be read to apply only to specially selected personnel.

The amorphous formulations of the 1911 Act were subjected to no significant scrutiny either in committee [181] or on the floor of Congress. [182] In **\*1003** the House, Congressman Bennet asked what was meant by the phrase "to which he was [not] entitled." Chairman Parker, for the House Judiciary Committee, replied that the statute originally included

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE    Document 112-1    Filed 10/03/17    Page 42 of 126

the word "wrongfully," which had seemed "vague and ambiguous" to the committee and had been replaced by "not entitled." [183] Parker failed to indicate what the new phrase meant or why it was less ambiguous than "wrongfully." No questions were even raised about the meaning of "in breach of his trust," or equally important, the scope of "willfully communicates." [184]

Despite the paucity of legislative guidance, we think that clauses four and five were intended to cover only government employees, and, perhaps, persons who came upon information because of their employment with government contractors or who had a special trust relationship with the Government. First, this limitation is suggested by the overall structure of the 1911 Act. The first three clauses clearly applied to the ordinary citizen, but they contained limited prohibitions. Thus, the citizen who went to certain places for the purpose of obtaining information committed an offense; similarly, he committed an offense if he obtained such information while actually in such a designated place; finally, he committed an offense if he received information that he knew another had obtained in violation of the two earlier prohibitions. In contrast, the prohibition on communications in clause four is not so limited. A prohibition on communication of defense matters without permission, applicable to all citizens, in a statute that made obtaining copies of government documents criminal only if done on government property, is improbable. The statutory context suggests, therefore, that clause four was intended to implement the limited prohibitions on citizen conduct by requiring government employees, or others with officially authorized access to defense information, to be discreet in their disclosures to the general public.

Second, the language used in defining the communication offense is more appropriate to regulating the conduct of government personnel than that of citizens generally. Clause four could be breached only by a communication "without proper authority," and then only to a person "not entitled to receive **1004** it," but no body of statute law spoke to questions of "authority" and "entitlement." Since nothing in the 1911 Act defines the concept, we believe it is fair to read this provision as making conduct criminal only when in disregard of rules concerning communication of defense information known to particular actors who were obliged to comply with them. Thus, clause four presumably referred to military and other orders specifying that certain information or documents should be given only to a limited class of recipients. Such a reading of "authority" and "entitlement" still leaves problems because no general classification or secrecy system existed in 1911, and the issue of who had authority to make such rules would have posed difficulties were the statute applied to non-military government personnel. [185] Nonetheless, the alternative reading of applicability to all citizens is of radical sweep in the context of the 1911 Act, and poses forbidding problems of interpretation of the "authority" and "entitlement" phrases.

Clause five is more clearly limited only to a restricted class of persons. It presupposes that an actor who has been "intrusted" with documents or knowledge--the government employee or contractor--is the target of the prohibition.

Our narrow reading of clauses four and five is supported by the Attorney General's 1916 Report urging new espionage legislation, which indicated that he viewed the 1911 Act as having a narrow reach. He asserted the need for

> [A]n act making it a crime to obtain, without lawful authority, or to communicate to a foreign Government or any officer or agent thereof, or to any other person, any facts or information relative to the national defense obtained by virtue of employment in the service of the United States, or obtained from unlawful access to Government papers or other property, or by fraud upon or connivance with a Government official or employee, or otherwise unlawfully obtained or retained. [186]

The Attorney General clearly did not believe the existing law prohibited all communication about defense matters.

On the assumption that clauses four and five of the 1911 Act were intended to apply only to a limited class of persons, a question of central importance is whether "publication" of defense information by such persons--either by speaking to the

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 43 of 126

public directly or by communicating to a reporter--was criminal. While Congress did not directly address the problem, the structure of the Act indicates that a government employee committed an offense by such behavior, although the listener clearly did not. Unlike the Espionage Act of 1917, the 1911 statute did not use both "communicates" and "publishes." Communicate probably was meant to cover both, as it surely does in **\*1005** ordinary speech. [187] Second, the penalty provisions of the 1911 Act varied sanctions depending on whether the information was communicated to foreign governments. [188] The sentencing distinction makes no sense unless telling American citizens restricted information was also illegal. Therefore, the issue is whether reporters were to be treated differently than other domestic recipients for this purpose. Assuming that the law covered employees only, we see no basis for supposing that Congress would have intended to exempt their interchanges with the press, although the problem was not, as far as we know, considered. Thus, under clause five, the criminality of a statement directly to or intended for the public seems clear unless a phrase, "other than reporter," is to be forcibly interpolated. Under clause four the point is equally clear unless one regards the first amendment as a special source of entitlement to information when the communication is preparatory to public debate. Such a view would be one imposed on the 1911 Act, and does not derive from the statute's language or intimations in its legislative history. The idea that the first amendment would have so infused the "not entitled" phrase would undoubtedly have surprised the Blackstonian conceptions of a 1911 Congress.

The 1911 Act set a pattern for the subsequent legislation by using sweeping language in a statute that was probably intended to have a narrow effect. Once in the statute books, the formless terms of the 1911 Act were accorded a respect and a putative clarity in later legislative stages out of all keeping with the casual process that spawned them.

## C. *The 1917 Act*

In the Espionage Act of 1917, [189] the predecessor provisions of 793(d) and (e) appeared as a single section, 1(d), fashioned from clauses four and five of the 1911 law. It covered:

> [W]hoever, lawfully or unlawfully having possession of, access to, control over, or being intrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, instrument, appliance, or note relating to the national defense, willfully communicates or transmits or attempts to communicate or transmit the same to any person not lawfully entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it .... [190]

This statute extended the 1911 law considerably, adding the offense of retention and, more importantly for our purposes, purportedly broadening the law **\*1006** to control the conduct of both lawful and unlawful possessors of defense documents and hardware. Read literally, subsection 1(d) disregards the actor's relationship to the Government. On the other hand. Congress cut back on the 1911 law's apparent coverage because subsection 1(d) concerned only tangible items, and arguably information derived therefrom. [191] It did not restrict the conduct of a person whose knowledge of information of defense significance came from personal observation.

The confusion in the 65th Congress concerning subsection 1(d) was considerable. The legislative history raises serious doubts as to whether Congress had even a vague understanding of subsection 1(d) by the time the final votes were cast. As previously recounted, the Wilson Administration originally sought broad information controls, and its initial bill, S. 8148, sailed through the 1917 Senate by a huge margin in substantially the terms its sponsors desired. The House, however, reacting to the protests of the nation's newspapers, allowed S. 8148 to die. When the next session opened and S. 2 and H.R. 291 were debated, the Administration forces could not win acceptance of broad prohibitions. First, both the House and Senate committees narrowed the scope of provisions that limited public access to defense installations

by requiring a culpable purpose beyond mere satisfaction of curiosity. Second, and most important, the Administration could not, despite its most vigorous efforts, secure enactment of any form of censorship provision.

Subsection 1(d), however, alone among the major provisions in the original Wilson proposal to the Senate, survived substantially intact. Unfortunately, the legislative record is not plain on whether subsection 1(d)'s hardiness reflects Congress' approval of, or inadvertence to, the effects its literal reading compels. The provision was debated, and then briefly, only during the debate on S. 8148 when the Senate was acquiescent to the Administration's sweeping proposals. At that time, so far as the debates reveal, it was understood to be an extremely broad prohibition against communication of defense matters. In the S. 2 debate, although little mention was made of subsection 1(d), the Senate totally rejected the notion of broad information controls. Did the Senate's understanding of subsection 1 (d)'s language also change?

The House action is much easier to comprehend. The comparable provision that passed the House, section 3 of H.R. 291, was thought from the start to be a narrow provision, applicable we believe only to government employees and contractors. At conference, however, no one indicated that the two houses of Congress had different understandings of the provision's meaning. Instead, the conference proposal based on the original section 1(d) of S. 8148 was enacted without even being mentioned. At the same time, other  **\*1007**  provisions, arguably necessary to give section 1(d) any legal effect, were eliminated.

1. *S. 8148.* When S. 8148 was introduced in the Senate in February, 1917, section 1 (d) was substantially in the form in which it was ultimately enacted. The sole difference was that the proposed law covered "document ... appliance, note or *information* relating to the national defense." [192]  The word "information" was later dropped. The debates on section 1 of S. 8148, however, centered not on section 1(d), but on section 1(a), now subsection 793(a). As will be recalled from our earlier discussion, that section as originally proposed made criminal going on or near designated places to obtain defense information to which one was "not lawfully entitled." Cummins and other critics focused their fire on the "lawfully entitled" language in section 1 (a). The content of the phrase is critical to the meaning of 1(d). Time and again Cummins exploited the fundamental ambiguity of the term. Is one "entitled" to information unless its acquisition is prohibited by some statute or regulation, or is one entitled to nothing unless its acquisition is expressly authorized? Cummins was eager to impress the Senate with section l(a)'s sweep, and he thus argued that the provision required affirmative authorization. [193]  So read, with the absence of any body of statute law or executive regulation creating such entitlement, section 1(a) would indeed have been a remarkably broad prohibition. To take an example Cummins used, asking the Secretary of the Navy a question about a defense-related matter he was not privileged to disclose would technically have been a crime. [194]

Other Senators rejected Cummins' interpretation and insisted that a citizen would be lawfully entitled to information unless some statute or lawful order said he was not to have it. [195]  These reassurances did nothing to alter Senator Cummins' understanding, probably in large part because Senator Overman, the bill's sponsor, was confused and inconsistent. Overman clearly believed that "not lawfully entitled" meant that the citizen had acted in violation of a statute or rule, rather than that he had not been expressly authorized, but too often he spoke inconsistently:

> **\*1008**  ... this matter is covered by using the words "not lawfully entitled." That means against any statute of the United States or against any rule or regulation prescribed.

> Now the Senator wants to limit us to a statute. We will have to go to work here and pass a thousand statutes or more if you limit it to that. This language is general. It does not particularize. Any man who goes in and on and approaches the places named for the purpose of obtaining information on these matters is punishable under this law. What business has any man to go, without lawful authority, in and upon our national-defense stations for the purpose of getting information? Why, there is no American citizen who

needs to have the information unless he goes by lawful authority; and if he goes without lawful authority he ought to be punished, because he goes for the purpose of giving the information to an enemy. [196]

Despite Overman's confusion and Cummins' stubborn insistence that entitlement required authorization, the debates on subsection 1(a) reveal a general consensus that one was not "lawfully entitled" to information only if someone's orders or statutes precluded its acquisition. Presumably by the phrase used in subsection 1(d), "not lawfully entitled to receive it," was similarly understood.

The debate never focused, however, on who had the power, and by what authority, to issue the necessary implementing orders. As we shall see, that is a central and very complicated question under the current subsections 793(d) and (e). S. 8148, drafted in the Executive Branch, [197] included a provision, section 6, which gave the President important rule-making authority under the Act as a whole. It stated:

> The President of the United States shall have power to designate any place other than those set forth in paragraph (a) of section 1 hereof as a prohibited place for the purposes of this chapter, on the ground that information with respect thereto would be prejudicial to the national defense; he shall further have the power, on the aforesaid ground, to designate any matter, thing, or information belonging to the Government, or contained in the records or files of any of the executive departments, or of other Government offices, as information relating to the national defense, to which no person (other than officers and employees of the United States duly authorized) shall be lawfully entitled within the meaning of this chapter: Provided, however, That nothing herein contained shall  **\*1009**  be deemed to limit the definition of such information within the meaning of this chapter to such designated matter, thing, or information. [198]

Our judgment, based on the structure of S, 8148, is that the Administration intended section 1(d) and section 6, to provide statutory authority for a classification system backed by criminal sanctions. Pursuant to section 6, the President could designate any "matter, thing or information belonging to," or in the files of, the Government as being information related to the national defense. It granted him power beyond what he had as Commander-in-Chief, and, fairly read, would have precluded legal challenge to the factual basis for characterization of particular information as defense-related. Once such an order was made, section 1(d) was triggered, and only "duly authorized" persons would be "entitled to receive it." In such cases, therefore, section 6 would have resolved the fundamental ambiguity inherent in the entitlement concept brought forward from the 1911 Act: all citizens would be disentitled unless authorized by executive regulation. Similarly, Presidential orders under section 6 would implement section 1(a) and 1(b) of S. 8148 (now subsections 793(a) and (b))-- prohibitions against, respectively, going on certain places to obtain, or obtaining, information to which one was not entitled. If a person knowingly went to the War Office to obtain a document protected under section 6, he would have violated both section 1(a) and 1(b). If he obtained the document and communicated it to someone not authorized by Executive Order to have it, he would have violated section 1(d).

This rather neat Administration package of gathering and communicating offenses implemented by executive definition of who was "not entitled" to obtain or receive defense information was unraveled when the conference ultimately cut most of section 6 from the Espionage Act. The problem, however, is whether the executive rule-making authority there set out was intended to be the exclusive means by which the "not entitled" language of section 1 (d) was to be given effect, and if so, whether the ultimate rejection of section 6 left section 1(d) without content. [199]

Unfortunately, there was little informative discussion either in the debates on section 1(a) or otherwise of the relationship between section 6 and the other provisions of the S. 8148. Only Senator Works clearly saw that "lawfully entitled" was

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 46 of 126

intended to be defined by recourse to the provisions in section 6;[200] Senator Cummins, although he marvelled that section 6 could even be proposed,[201] did not explicitly ground his understanding that "entitlement" **1010** required express authorization upon section 6's grant of power to limit information to those "duly authorized" to have it. Quite clearly moreover, Senator Sutherland did not see the relationship. He conceived the President or his agents as having power to issue rules bearing upon "entitlement" pursuant to his powers as Commander-in-Chief,[202] and he made no mention of section 6.

The interesting question is what the rest of the Senate was thinking. Senator Cummins subsequently proposed amending section 1(a) to prohibit entry onto premises in violation of "a statute or lawful order of the President Of the United States,[203] which would conform section 1(a) to Senator Sutherland's understanding without making use of the "entitlement" language. One possible objection to the proposal, that the President might be precluded from broad delegation of authority to his agents, was not made. Instead Senator Townsend urged the amendment's rejection because he doubted the President's constitutional authority to make rules about the variety of places covered by the Act;[204] and Senator Overman pressed that the entitlement language merely retained a concept that the 1911 Act had already placed in the statute books.[205] Thus, the role that section 6 was to play in defining "entitlement" was never clarified.

The lengthy, and ultimately unedifying debate on section 1(a), and the meaning of "lawfully entitled" as there used, precluded lengthy debate on the same issues as raised by section 1(d).[206] Whether the not entitled language in 1(d) also had meaning independent of Presidential action under section 6 was never considered. Indeed, the only time that 1(d) was debated in the S. 8148 debates was in response to Cummins' proposal to strike the retention offense.[207] This amendment was rejected, but the debate upon it is important. Cummins construed 1 (d) to require a citizen to provide authorized government personnel with whatever defense information he had personally collected from whatever sources; otherwise he would be unlawfully retaining it. He thus did not understand the enumerated items covered by 1(d) to be restricted to documents or information that originated with the Government and which the **1011** President had designated under section 6. He posed the case of a man who knew how many bushels of corn or wheat have been raised in Iowa. On the assumption that such matters relate to the national defense, was it not wrong, Cummins argued, to compel him to turn over his findings to any authorized Government official?[208] Surprisingly, everyone who commented accepted Cummins' broad reading of the statute as correct, but deemed it appropriate to compel such cooperation.[209]

If defense documents and information were covered by section 1(d) without regard to their source, any private conversation concerning national defense matters was a criminal communication. Surely even S. 8148 had not planned to go that far because section 2(c), the censorship provision, was triggered only by Presidential regulations. Yet when discussion turned to section 2(c), Senator Lee specifically pointed out section 1(d)'s sweeping scope.

> I am inclined to think that item (c) [the publication provision] is absolutely correct. As has been pointed out, it applies to times of war; it applies to military movements in time of war ...

> I think it is all right; but when you go back to section (d), on page 3--we have passed that, but it may yet come up in the Senate--I think that is as far in the wrong as the provision under discussion is right.

> Eliminating certain of the parenthetical sentences, subdivision (d) would simply read:

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 47 of 126

> Whoever, lawfully or unlawfully, having possession of information relating to the national defense willfully communicates or transmits the same to any person not lawfully entitled to receive it shall be punished--

> And so forth.

> That, I take it, Mr. President, is aimed at any newspaper reporter who gets any kind of information about military matters in time of peace. [210]

Lee's observations prompted no rejoinders that he had exaggerated 1(d)'s coverage. Section 1(d) received no further attention, and S. 8148 was passed. [211]

At this point in the legislative history, subsection 1(d) seems to have been understood as a sweeping prohibition on communication and retention of **\*1012** defense information whether or not derived from government sources. There are problems of course, with imputing to the Senate as a whole observations by critics who were trying to alarm by stressing the statute's breadth. Nonetheless, this reading is supported by the untroubled Senate passage of 2(c) at this first stage of its legislative consideration. Not a word was said to show that the proposed language had a narrow intendment although Senator Overman said only spies and traitors need fear prosecution. In terms of the issues we posed at the outset of our discussion of subsections 793(d) and (e), the Senators who spoke consistently assumed the broadest possible coverage for section 1(d).

2. *S. 2*. Section 1(d) was no more at the forefront of discussion in the debates upon S. 2 than it had been in the earlier discussion of S. 8148. The only action directly taken on 1(d) was adoption of an amendment, proposed at the outset of Senate consideration of S. 2 by Senator Overman for the Judiciary Committee, which deleted the word "information." [212] The most plausible explanation for this action emerges if one relates it back to Cummins' criticism of the retention offense in S. 8148. He had stressed the impropriety of compelling the citizen, in time of peace as well as war, to furnish the Government with privately gathered defense information. The impropriety, in Cummins' view, was magnified because of the breadth of "related to the national defense."

In our opinion, Cummins misconstrued the statute; subsection 1(d) of S. 8148 was properly interpreted to mean that "information" referred only to matters that originated with the Government, with the retention offense understood to further the Government's interest in custody of its own papers. Reading section 1(d) in connection with the proposed section 6 makes this clear. [213] The problem was, however, that 1(d) was poorly drafted in that it treated the two offenses-- communication and retention in the face of demand--in a single sentence. Our hypothesis is that rather than split the two offenses to vary slightly the matters covered depending on whether communication or retention was at stake, the committee obliged Cummins by simply dropping "information" for both offenses. That simplistic course was regrettable on two grounds. First, no affirmation was made that the items covered by section 1 (d) were Government documents, and second, the issue of coverage posed by the statute's language was transferred from the retention offense to the communication offense. After the amendments were adopted, was divulging the information contained in a document an offense, or was transferring the actual document or an exact replica of it the only conduct which violated the section? From both the remarks of Senator Overman at **\*1013** the time of amendment, [214] and other scattered comments, [215] we think it reasonably clear that revelation of the contents of a document was understood to be an offense.

The more difficult tasks in appraising the effect of S. 2 on subsection 1 (d) concern, first, the inferences to be drawn from rejection of the censorship provision, and second, the Senate's understanding of "entitlement to receive" as used in 1(d) once that term was deleted from section 1(a) by substituting a culpability requirement for it.

We have earlier set forth the legislative materials pertaining to the rejection of the proposed section 2(c). [216] The Senate, which had passed 2(c) of S. 8148 without much concern, was subsequently bombarded with newspaper-inspired protests, including a petition signed by a million citizens. [217] Apparently this intense pressure and misgivings of many Senators on grounds of principle, motivated efforts to limit 2(c). [218] Every new try came up against the same fundamental problem: no matter how they couched 2(c) with provisos to protect the right to criticize the Government, the possibility remained that it would provide a basis for suppressing vigorous, and useful, criticism of the war effort. Faced with this dilemma, the Senate chose to risk free speech.

What effect should that decision have upon understanding section 1(d), which, like 2(c), was intended by the Administration to be a broad prohibition? Nothing in the S. 8148 debates suggested narrow meanings for 1(d); to the contrary, the Senators who spoke construed it more broadly than even the Executive had intended. Reintroduced in nearly the same language in S. 2, it never received further clarification. It may therefore be argued that the rejection of 2(c) should not affect the interpretation of 1(d). Section 2(c) was broader than 1(d) in that the former barred publications within the scope of  **1014  whatever regulations were issued, regardless of whether the Government was the source of the information. Section 1(d) by contrast was concerned only with government documents, although some Senators appeared to be confused on the point. [219] Consequently, rejection of 2(c) does not logically mandate imputation of altered understanding about the scope of 1(d). Nonetheless, it is unrealistic to assume that the Senate rejected 2(c) but still intended to permit prosecution for publishing material that emanates from a government official. The Senate realized that newspapers, especially in wartime, get most of their information about government from people who are in government. [220]

The examples that were given in the debate are instructive. Proponents of section 2(c) argued that free speech was sufficiently safeguarded by the proviso protecting "criticism" of the conduct of the war. Opponents protested that criticism was impossible unless grounded on revelation of information with some potential for injurious use. The most prominent example of vigorous criticism that the Senate considered was Lord Northcliffe's revelation, in the London Times, that British soldiers were being killed because of shoddy munitions. [221] Lord Northcliffe's information came from British military sources; read literally, section 1(d) would have authorized punishment of American officials had they revealed comparable information to newspapers--at least if the information had been derived from documentary sources; it might also have provided authority for punishing the newspaper (if communicating comprehends publishing) and newspaper reporters for their communications leading up to publication. Whether the Senate understood that section 1(d) might be applied to the divulging government employee is unclear, since no one interjected 1(d) into the discussion at that point. In view of the praise accorded Lord Northcliffe, it is certain, however, that the Senate intended, by voting against 2(c), not to make criminal a newspaper's or newspaper reporter's obtaining or revelation of such information.

We have also noted Senator Walsh's reading into the record a newspaper article concerning the emplacement of a submarine net in New York harbor. [222] Although there was some indication that the Government might earlier have  **1015  leaked this story in testimony before Congress, [223] the Senate addressed the issue in terms of whether this sort of story should be suppressed. It was apparent, and indeed expressly recognized, that the likely source of such stories would be Government officials. [224] Nonetheless, the Senate chose not to criminalize such newspaper disclosures. This unwillingness did not, in our view, stem directly from according a special value to "publishing" not shared by communicating information generally. To the contrary, the Senate generally was more concerned for the ordinary citizen than the newspapers, and had indeed earlier dropped "communicate" from 2(c) on that ground. [225] Rather, the rejection

was premised on the judgment that the consequences of authorizing suppression of discussion were more serious than the likely military benefits.

To be sure, insofar as section 1(d) prohibited only the divulgence of documents and other tangible materials, one may say that the Senate's unwillingness to make disclosure criminal did not extend to circumstances where the secrecy of government documents was compromised. That assumes, however, far greater technical understanding of the Bill than anything in the debates reveals. Thus, our conclusion is that rejection of section 2(c) necessarily implies that section 1(d) was thought to be limited to, at most, revelations by persons officially entrusted with Government documents. The spread of section 1(d) suggested by its language "lawful or unlawful possession," and supported by earlier debate, found no support at the last moment.

It is much more difficult to reach firm conclusions on the intended technical meaning of "entitled to receive it." When S. 2 was introduced in the Senate by Senator Overman for the Judiciary Committee, he offered amendments that added the "intent or reason to believe" standard to sections 1(a) and 1(b), replacing the "to which he is not lawfully entitled" formulation of 1(a). Thus, the "not entitled to receive" standard survived only in section 1(d). The committee unfortunately presented no report, and Overman offered no explanation of why the committee chose to retain the phrase in light of the difficulties it had caused during the earlier debate, or what it was to mean.

There are two plausible explanations other than inadvertence. The Judiciary Committee may have preserved the "entitled to receive" language in section 1(d) because it was thought to present fewer problems in that context than had the same language in section 1(a). Such a belief might have been grounded upon section 6's provision of an orderly process of executive regulation for ascertaining who was "not entitled" to receive restricted documents  **\*1016**  and information for the purposes of 1(d). An alternative, but equally significant, explanation is that the Judiciary Committee may have thought that l(d)'s application was limited to the "first" divulgence of matter by a Government employee or other person entrusted with documents by the government, and that it did not create liability for an endless chain of subsequent transmittals. Although nothing we have found bears directly upon the subject, that committee members such as Cummins, who made deletion of the "entitlement" language their *cause célèbre* in the S. 8148 debates, said not a word about its preservation in section 1 (d) of S. 2, implies to us that at that point they either deemed section 1(d) to be of limited scope or thought that the vagueness of "entitlement" was cured by section 6.

3. *H.R. 291*. The House debates on H.R. 291's equivalent to section 1 (d) are, by contrast to the Senate proceedings, a model of clarity. The House Judiciary Committee carefully assembled the various proposals and did its homework, perhaps prompted by the growing chorus of newspaper disapproval of the action taken in the Senate on S. 8148. Although highly ambiguous at points, H.R. 291 was nonetheless reasonably well drafted. Moreover, and again in contrast to the situation in the Senate, its sponsor on the floor, Chairman Webb, understood the legislation he was proferring. Debaters who simply misunderstood the Bill were corrected, rather than being met with irrelevancies or claims that prosecutorial discretion cures all flaws in the drafting of criminal prohibitions.

Section 3 of H.R. 291 provided:

> Whoever, having possession of, access to, control over, or being entrusted with any information, document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, model, instrument, appliance, or note, belonging to, intended for, or under the control of the United States, relating to the national defense, willfully and without proper authority communicates or transmits or attempts to communicate or transmit the same to any person, or willfully retains the same and fails to deliver it on demand to the person lawfully entitled to receive it, or through gross negligence permits the same to be removed from its proper place of custody, or delivered to anyone not lawfully entitled to receive it, or to be lost, stolen, abstracted, or destroyed, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both. [226]

The prohibition explicitly pertained only to government documents and information, a point that had caused confusion in the Senate. Furthermore, the language and structure of the section, linking unauthorized divulgence with grossly negligent loss, emphasized its preeminent concern with the conduct of government employees. The House Report accompanying the legislation made that focus clear:

> **\*1017**  Section 3 ... punishes an officer or trustee of our national defense secrets who willfully communicates such secrets to a person not lawfully entitled to receive them and punishes such person if he through gross negligence permits any document, etc., to be lost or stolen, etc. [227]

Unfortunately, one crucial ambiguity was unresolved. Could someone other than a government employee or person entrusted with information violate the law? If a government employee violated the law by telling an ordinary citizen a secret without authority, did the citizen violate the law if he told it to another? On the one hand, the use of the language "without proper authority" suggests that a person must be one who is subject to authority--normally a person who agrees to abide by certain rules. We drew that inference in connection with the 1911 law. [228]  On the other hand, section 3, in contrast to the 1911 statute, was expressly limited to matters that were, in a sense, the Government's. Given the explicitly limited coverage of section 3, the argument is better that the absence of authority means the absence of permission.

The only direct evidence pertaining to the question to be found in the House debate is ambiguous. Before turning to it, two passing remarks should be noted. Congressman Walsh, an opponent of section 4, the House equivalent of section 2(c), was asked whether there should not be some basis for protecting government secrets. His response was curious:

> MR. WALSH. Information of that character is in the custody of some one, and the President can absolutely prohibit its being imparted to anyone else.

> MR. PLATT. But suppose some one gets it and publishes it. He can not punish him.

> MR. WALSH. He can punish the person who imparted the information, and under another section the person making it public can be also heavily punished. [229]

Apparently, Walsh thought that section 3 was not the basis for punishing a person who passed secrets. The problem is what other section he had in mind, in light of his firm opposition to the censorship provision. Other than sections 3 and 4, there were no sanctions that did not require some added culpability. Shortly thereafter, Congressman Volstead took the floor and summarized the legislation.

> The third section prohibits officers, employees, and other people intrusted with information from divulging that information. It is perhaps a little broader than that, but that is the general purpose of the section. [230]

Was it a "little broader" in that it prohibited citizens from communicating matters that had been wrongfully divulged?

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 51 of 126

**\*1018**  The discussion directly on point occurred in the course of debates on an amendment proferred by Congressman Graham. He construed section 3 as a breach of trust provision only. To make that understanding clear, he urged amending section 3 to read:

> Whoever, having possession of, access to. or control over any document, writing, code book, signal book, etc., under the control of the United States relating to the national defense, or being intrusted by any such person with any information relating to the national defense, willfully and without proper authority communicates. [231]

In support of the amendment, which transposed the positioning of the word "information," he stated:

> It is capable of a double interpretation, and I think both are there included. A man might be in possession of information. As was suggested by my colleague, he might receive a letter from his son in the naval service, and he would be in possession of information and he might communicate or mention that to some one else, and therefore be liable to the penalty provided in this section, whereas the section was never intended to meet or touch any such innocent performance as that. [232]

In addition, however, Graham recognized that a consequence of his amendment would be to remove from the coverage of the statute instances where a military officer transmitted "information" that was not derived from secret documents (for example, personal observations.) Graham approved that result on the ground that "this is a breach of trust section, and on that ground alone it should be interpreted. Now. if a military officer gives information to somebody else, we turn to the prior section to find the bases for punishing him if it has been done with a guilty intent and knowledge." [233]

The House rejected the proposed amendment at the urging of Congressman Walsh:

> The only effect of inserting that in there, in my opinion, would be to get this section all balled up. The intention is that whoever has possession of this information, or whoever is intrusted with it, shall be punished. Now, you put the intrusting clause as applied only to the information and not to the other matters set out in the section, and we will not be able to punish anybody who has possession of this information, whether he gets it rightfully or wrongfully. The language reads "whoever is intrusted with information, code book," and so forth. To transfer it after the word "defense" does not change the effect of the section or what we are seeking to punish, except to weaken the section. [234]

**\*1019**  Walsh's comment can be taken in either of two ways. On the one hand, read in connection with his earlier remark about coverage of the person who relayed secrets and assuming he mispoke in identifying the section pursuant to which punishment was authorized, his comment indicates an understanding that section 3 reached non-employees who pass on secrets. On the other hand, he may merely have been opposed to immunizing the military or other official who passes on secrets and whose knowledge of them is not derived from documents.

The issue of breadth of coverage was never firmly settled. In our judgment, however, the latter explanation is the more plausible one to impute to the House as a whole.

4. *The Conference*. The Senate bill was made the basis for reconciling the different bills passed by the House and Senate. Thus, the Senate quite naturally accepted the conference report without further debate on 1(d). Oddly enough, the House

also accepted section 1(d) of S. 2 without debate. Either no one in the House noticed l(d)'s more sweeping application to persons "lawfully or unlawfully" in possession of defense documents (with no specification that the documents belong to the Government) or else they thought the change in language insignificant. Probably the failure is due to the statement in the conference report to the House that no "material change" from the House provisions was effected in the conference bill. [235]  No suggestion was made that 1 (d) differed from section 3 of H.R. 291 in covering more than persons who had governmentally-bestowed custody of certain defense-related materials. In our view, the conference's assertion strengthens the inference that at this point the Senate also considered section 1(d), despite its language, to be a provision of very limited scope.

The conferees, *sub silento*, did make one momentous alteration in S. 2: they deleted much of section 6. The President was not authorized to designate protected information which only duly authorized persons might receive. The conferees' reasons for taking this step are entirely obscure, and the action was not even mentioned in the conference report or on the floor of either chamber. Our speculation is that the decision to eliminate section 6 was tied to the effort to secure passage of a general prohibition on publication. Broad delegations to the President had been one of the principal objections to sections 4 and 2(c), and although section 6 was not directly tied to the censorship issue, it was an extremely broad delegation. To sweeten the "publication" pill, particularly in the House, this executive power was deleted.

Whatever the reasons for dropping section 6, however, the consequence is to raise serious issues of whether section 1(d) was, and current subsections 793(d) and (e) are, enforceable criminal laws. We shall postpone extended  **1020 consideration until after surveying the extraordinary confusion that permeated the 1950 amendment. For now it suffices to ask by what authority is entitlement to receive information to be ascertained, since the provision that was designed to answer that question was struck from the Espionage Act?

5. *Epilogue to Section 1(d)*. Whatever the doubts about the intent of Congress in passing section 1 (d) of the Espionage Act, one point of subsequent: history is plain. Congress and the Executive operated for the next thirty-three years on the assumption that 1(d) did not effectively criminalize the non-culpable publication or other revelation of information relating to national security. Three statutes were passed in those years prohibiting publication of discrete categories of highly sensitive information, without regard to anti-American or pro-foreign intent. [236]  No one ever suggested in connection with these later statutes that section 1(d) already covered the matter. We shall discuss these provisions in detail in a later section, but a brief preview is in order now, while our focus is on the meaning of section 1(d).

Section 952 of Title 18, enacted in 1933, dealt in a purposefully narrow way with the pervasive problem of the former official who discloses sensitive information in his memoirs. Congress was moved to act by a notorious little book about the State Department's intercepting and breaking the diplomatic dispatches of a then friendly foreign nation. The result was a limited prohibition barring government employees from publishing any foreign code or anything transmitted in such a code. The absence of reference to section 1(d) in the debates on section 952 suggests that the 1917 provision was not thought to deal with publication, even by government employees retailing official information. Although there might at the time have been some question whether such codes "relate to the national defense," they would seem clearly to fall within the *Gorin* definition.

In 1938. the complementary sections 795 and 797 of Title 18 were enacted to prohibit the taking and disseminating-- including publishing--of photographs of military installations and equipment designated by the President. The third statute was enacted in 1950, when section 798 of Title 18 was adopted to prohibit the communication and publication of classified information about our cryptographic operations. The House Report expressly stated that prior law made such revelations criminal only when done with intent to injure the United States. As originally proposed, section 798 would have barred revelation of all defense information obtained from official sources, but congressional opposition cut down the scope of the bill to cover only the narrow category of communications intelligence information.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 53 of 126

The passage of these statutes, particularly the cryptography bill where defense-relatedness cannot be doubted, is strong evidence that no part of the **\*1021** 1917 Act, including section 1(d), was thought to cover publication by citizens or former government employees. Accordingly, the subsequent statutory history is strong support for a narrow understanding of section 1(d). No evidence emerges from the later record as to what precise narrow reading was assumed however, and thus the mystery of section 1(d) is not resolved.

**D.** *The 1950 Act*

Congress last amended the Espionage Act in 1950. [237] At that time three deceptively simple steps were taken to create the present subsections 793(d) and (e). First, section 1(d) of the 1917 law was split into two parts, the new subsection (e) to cover people not connected with the Government (unauthorized possessors). The purpose of the distinction was to oblige the ordinary citizen to return defense information to the Government without the need for an official demand. Second, Congress added to the list of covered material "information" which, in contrast to the enumerated tangible items, is subject to the prohibitions on communication and retention only when "the possessor has reason to believe [the information] could be used to the injury of the United States or to the advantage of a foreign nation." Third, causing or attempting to cause the commission of either offense was made a violation of the subsections.

In the course of enacting these amendments, Congress compounded the confusion surrounding the earlier versions of 793(d) and (e). It was overlooked that the communication offenses in the 1917 law were probably intended and had consistently been construed to apply, at most, only to government employees. Futhermore, in an amazing oversight, Congress imposed no overall culpability requirement in 793(e), although the most complete committee explanation of the bill logically called for one. The meaning of "willfully"--the subsections' only general culpability requirement--was, by and large, ignored. Where its meaning was considered, the views stated were generally either self-contradictory or supported by reasoning so preposterous as to subvert any claim to interpretive authority. The meaning of the specific culpability requirement for "information" was left obtuse; moreover, the inclusion of information in the retention offenses presumably makes it criminal to retain one's memories. The "entitlement" concept, once again, was uncritically brought forward from the previous statute as the central element in the offenses, without attention to what meaning it has in the absence of express statutory authorization for some defining and implementing procedure. In addition, although everyone proceeded on the assumption that the tangible items and "information" protected by the statutes must belong to the Government, the statutory language does not require it. What constitutes "informa- **\*1022** tion" under the subsections was left unclear; nothing in the legislative record indicates whether "information" comprises only oral reports about the tangible items protected, or includes all knowledge of defense matters. Finally, nothing was said about the scope of the "causing" offense. The law's prohibition on "causing" a communication would therefore seem to include a newsman's inquiry about defense matters he knows to be secret.

Thus, review of the 1950 legislative record shows that for the third time in as many attempts, Congress had virtually no understanding of the language and effect of 793(d) and (e). The confusion can be explained only by a congressional preoccupation with proposals having nothing to do with the communication and retention of defense materials and information. Subsections 793(d) and (e) were tucked away among the many provisions of the Internal Security Act of 1950, a massive effort to deal with what was then perceived to be the serious threat of domestic communism. [238] Most of the legislative concern was directed to the Act's registration, [239] public employment, [240] and criminal conspiracy sections, [241] provisions that had nothing to do with 793(d) and (e).

The revision of section 1(d) was prompted by the recommendations of an executive department study group, the Interdepartmental Intelligence Committee, composed of representatives of the Justice Department, Army Intelligence and the C.I.A. To implement its recommendations, two bills, S. 595 and H.R. 4703, were submitted by the Attorney General. [242] Both bills contained the three important changes in section 1(d) that were previously described, and both bills were reported out by the respective Judiciary Committees in May, 1949.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 54 of 126

Because the floor debates did not pay significant attention to the revision of 793(d) and (e), the Senate and House committee reports provide the principal guidance as to what each chamber intended. Guidance is limited, however, as both reports drew heavily upon the Attorney General's letter which accompanied the drafts prepared in the Executive department. Moreover, the reports justified the need for dividing section 1(d) into parts by reference only to the retention offense; no thought was given to the effect of the division on the communication offenses.

In the Senate report, it was stated that conditioning the criminality of retention upon demand, as section 1(d) had done, was pointless where possession was unauthorized, since the Government does not know whom to ask. [243]  **\*1023**  The dangers inherent in such unauthorized possession were deemed self-evident. The report left open important questions concerning the breadth of the term "information" and the meaning of the qualifying "reason to believe" phrase. It is silent as to whether "information" was intended to be independent of documents and other specified tangible items protected against communication, or whether it was included simply to make clear that oral revelation of the contents of a protected document was criminal. The "reason to believe" phrase presents a more subtle ambiguity. The report states expressly that the phrase modifies only "information" and not the other enumerated items, such as documents and notes. [244]  As proposed by the Attorney General, the statute would have prohibited the transfer of "information which could be used," etc. The Senate committee amended this to read, as in the current law, "information which *the possessor has reason to believe* could be used," etc. The purpose of the amendment, the report states, "is to require some degree of scienter in order to constitute a violation of the subsection insofar as the unlawful transmission of 'information' is concerned." [245] Unfortunately, that comment still leaves unclear what sort of scienter is required. Does the "reason to believe" phrase simply describe the "quality" of information, any transfer of which is criminal regardless of probable effect, or does it instead look to the actor's awareness of possible consequences of a particular communication? The use of the word "could" in 793(d) and (e), in contrast to the language "*is* to be used" in the culpability formulations of 793(a) and (b), seems to indicate that the actor need only be aware of the general quality of the information in order to make divulgences criminal. Yet the Committee's statement that the language requires "some degree of scienter" would normally refer to a mental state with respect to the particular activity--communication or retention--covered by the statute.

If the Senate Report is inexplicit on these issues, the House Report on H.R. 4703 is inexplicable. [246]  The House Report, like that of the Senate, was preoccupied with retention of government papers. That subsection 793(d) and (e) would bar an unspecified range of communications was not adverted to. Moreover, the report indicates how confused the House Judiciary Committee was on vital questions concerning the culpability requirement made a condition of the various offenses:

> Subsection 1 (d) [793(d)] provides that those having lawful possession of the items described therein relating to the national defense who willfully communicate or cause to be communicated, or attempt to communicate them to an unauthorized person, or who willfully fail to deliver them to an authorized person on demand, shall be guilty of a crime. No showing of intent is necessary as an  **\*1024**  element of the offense, provided the possessor has reason to believe that the material communicated could be used to the detriment of the United States or to the advantage of a foreign nation. The absence of a requirement for intent is justified, it is believed, in contrast to the express requirement of intent in subsections 1 (a), 1 (b) and 1 (c), in view of the fact that subsection 1 (d) deals with persons presumably in closer relationship to the Government which they seek to betray.

> Subsection 1 (e) [793(e)] provides separately for those who, having unauthorized possession of certain enumerated classes of items, refuse to surrender them to authorized officials regardless of a demand being made. Existing law provides no penalty for the unauthorized possession of such items unless a demand for them is made by a person entitled to receive them. Thus subsection 1 (e) differs from subsection 1 (d)

primarily in that a demand for return is a necessary element in making out a case in the latter instance, while it is not required in the former. The term "unauthorized possession" is used deliberately in preference to "unlawful possession," so as to preclude the necessity for proof of illegal possession.[247]

The Committee clearly understood the term "willfully" to require no specific intent to do injury to the United States or to aid a foreign nation. That result was justified, the report reasoned, because "[793(d) deals with persons presumably in closer relationship to the Government." But by parity of reasoning, section 793(e), which applies to ordinary citizens, should be limited by a more extensive culpability requirement than mere willfulness. The report fails, however, even to mention the culpability question in its discussion of 793(e).

The report is also confused as to the meaning of the "reason to believe" phrase. In discussing the addition of "information," it states:

> In answer to the possible objection that this category [information] is too broad and vague, it is pointed out that the phrase is qualified by "which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation," which are words of limitation subject to definition by the courts in each particular instance. No less a term than that would be sufficient to protect the security of matters which the bill might fail to particularize. The qualification is not intended to qualify other items enumerated in the subsections.[248]

Like its Senate counterpart, the House committee was not clear about whether the "reason to believe" phrase is merely descriptive of the general quality of information, or whether it looks to the consequences of a particular communication or retention. Whatever the meaning of the phrase, it is clear in the preceding quotation that it refers only to information and not to the enumerated tangible items. The problem, however, is how to reconcile that statement with one quoted earlier: "[n]o showing of intent is necessary as an **\*1025** element of the offense, provided the possessor has reason to believe that the material communicated could be used to the detriment of the United States or to the advantage of a foreign nation." Either the author of the report slipped at that point and wrote "material" when he meant "information," or he read "willful" to require generally, as to both enumerated items and information, that the actor be aware of potential adverse consequences flowing from their revelation. If the latter was the case, it is an open question as to what is added by the special culpability requirement for information.

In the Senate, after the report on S. 595 had been issued but prior to the floor debate, several important letters pertinent to 793(d) and (e) were exchanged and entered in the *Congressional Record* by Senator McCarran, the sponsor of the bill. Senator Kilgore, a member of the Judiciary Committee and a staunch opponent of the Internal Security Act, wrote to Senator McCarran of his concern that "at least theoretically [S. 595] ... might make practically every newspaper in the United States and all the publishers, editors, and reporters into criminals without their doing any wrongful act."[249]  It seems clear that Kilgore was referring to the proposed section 793, although he did not expand on his statement in his letter. The remainder of S. 595 dealt with registration of foreign agents, protection of military places from destruction, and extensions of the statute of limitations for Espionage Act offenses. None of these are conceivable grounds for Kilgore's concern. McCarran replied that "any suggestion of such a threat naturally concerns me greatly," and referred Kilgore's letter to Attorney General Clark, to the Legislative Reference Service of the Library of Congress, and to an eminent private lawyer.[250]

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 56 of 126

The response of the Legislative Reference Service focused on the culpability requirements of the proposed section 793 and rebutted Senator Kilgore's assertions that criminality might occur without a "wrongful act." After an analysis that is a model of fallacious reasoning, the Service concluded:

> It seems clear, therefore, that none of the crimes stated in subsections (a)-(f) of proposed section 793 could be charged against newspapers or publishers, or the editors or employees thereof, where they were acting in the normal course of their duties and without the wrongful intent or reason to believe, or knowledge, as required under the statute. [251]

This conclusion was generally correct with respect to the proposed 793(a) and (b). Subsection 793(a), virtually a reenactment of section 1(a) of the 1917 Act, required both a purpose to obtain defense information and an intent or reason to believe that the information is to be used to the injury of the  **\*1026**  United States or to the advantage of any foreign nation. Section 793(b) required "the purpose aforesaid, and ... like intent or reason to believe." As we have shown, the Service was correct in regarding this culpability language as rendering these subsections inapplicable to conduct related to participation in public debate. But the Service's memorandum dealt with matters more problematic when it moved to subsections (d) and (e). The memorandum asserts that they are comparable to subsections (a) and (b), apparently reading the culpability phrase in (d) and (e), which, as a matter of syntax and congressional intent modified only "information," as if it were applicable to all the offenses. Indeed, the memorandum points out that the word willfully is used "in addition." Thus, the Service considered the culpability requirements of (d) and (e) to be, if anything, more stringent than those spelled out in (a) and (b). This reading of the statutory language is retnarkable and indubitably wrong. Nevertheless, the conclusion was announced that newspapers would not have to worry about 793 as long as they did not act with "wrongful intent or reason to believe, or knowledge as required under the statute." [252]

The second of Senator McCarran's respondents, Attorney General Clark, avoided, by general assertions, the pitfalls of trying to reason closely about the 793 provisions:

> The history and application of the existing espionage statutes which this bill would amend only in part, and the language, history, hearings, and report of the committee relative to this bill, together with the integrity of the three branches of the Government which enact, enforce, and apply the law, would indicate that nobody other than a spy, saboteur, or other person who would weaken the internal security of the Nation need have any fear of prosecution under either existing law or the provisions of this bill. [253]

Since publication of defense information can be considered to "weaken the internal security of the Nation," the Attorney General said nothing that would alleviate Senator Kilgore's concern that newspapers would be covered by the new 793 provisions. Nevertheless, the overall tone of the Attorney General's response suggests that he understood the scope of the statute to be in some way limited.

The third correspondent, Elisha Hanson, an attorney, did not analyze Senator Kilgore's charges directly. Instead, he urged that Senator McCarran reinsert into S. 595 a provision to clarify that no censorship or infringement of first amendment rights was contemplated. [254] Such a provision had been part of McCarran's original S. 595, included at the suggestion of counsel for the  **\*1027**  American Newspaper Publishers Association, [255] but had been deleted by the committee as superfluous. [256] This provision, as finally enacted, stated:

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 57 of 126

Nothing in this Act shall be construed to authorize, require, or establish military or civilian censorship or in any way to limit or infringe upon freedom of the press or of speech as guaranteed by the Constitution of the United States and no regulation shall be promulgated hereunder having that effect. [257]

Disagreeing with the decision to delete the provision, Mr. Hanson urged that its inclusion would "serve to limit overzealous administration." [258] Moreover, after noting that the United States had survived World War II without censorship, he wrote, prophetically, "there should be no occasion in time of peace for Congress to enact legislation which might be construed by an overzealous official as authority to restrict the free flow of information of vital importance to the American people." [259]

Senator McCarran sent this correspondence to Senator Kilgore, indicating his belief that with the anti-censorship provision reinserted, "the bill will be wholly acceptable." [260] He also published the underlying correspondence in the *Congressional Record* and urged his colleagues to "study the issues involved." [261] On July 20, 1949, he submitted an amendment explaining that, "regardless of whether such a provision is necessary, its inclusion in the bill would be a salutary thing." [262] With this genesis, the anti-censorship provision became a part of the Internal Security Act.

Justice Douglas used this provision to bolster his conclusion in *New York Times Co. v. United States* that the espionage statutes did not prohibit publication of the Pentagon Papers. He quoted the provision as elucidating the meaning of section 793, and concluded "[t]hus, Congress has been faithful to the command of the First Amendment in this area." [263] On its face, the proviso does nothing more than state that the 1950 Act ought not to be construed to impose censorship or violate the first amendment. This might mean only that no system of prior restraint was authorized, or that, in general, the prohibitions on communication of defense information should not be applied to particular revelations of great public importance and little defense  **\*1028**  significance. Whether the Senate perceived the proviso to be linked to a restricted meaning of 793(d) and (e) is open to question.

There was no explanation of the anti-censorship provision in any of the subsequent committee reports on the many bills that ultimately were coalesced into the Internal Security Act. [264] Furthermore, none of the floor debates mentions the anti-censorship provision in connection with section 793. Indeed, none of the first amendment concerns expressed in the floor debates were directed to section 793. Rather, criticisms concerned the controversial provisions of the 1950 Act, such as those that made it unlawful to conspire to establish a totalitarian dictatorship in the United States, the broad registration requirements, and the powers of the Subversive Activities Control Board.

Senator McCarran, however, plainly viewed the anti-censorship proviso as a corrective for what he saw as erroneous readings of 793(d) and (e). Moreover, the very fact that nothing further was said about the threat that 793(d) and (e) might pose to a free press may reflect belief that the proviso eliminated such a danger. Interestingly, for example, Senator Kilgore, joined by Senators Graham and Langer, dissented from the Judiciary Committee's favorable report of the final Internal Security Act to the floor. [265] Their minority views carefully reviewed the various provisions of the Act to which they objected. They expressly approved, however, of the amendments to *793*. [266] Given Kilgore's earlier concern for the rights of newspapers, it seems a fair assumption that his approval of 793(d) and (e) reflected the belief that those sections did not threaten publication of defense information, and the free press proviso may well have been the basis for his change of heart.

The floor debates on the revision of subsection 793(d) and (e) were perfunctory, largely submerged by the more controversial provisions of the Internal Security Act. A few informative statements were offered, however. In the debate

on S. 595, Whitaker Chambers' activities were described as the stimulus for 793(e). Senator McCarran, the floor manager of the bill, cited the pumpkin papers episode as proof of the need to make unauthorized retention a crime in the absence of demand. [267] Since Whitaker Chambers was not *1029 a government employee at any time relevant to the pumpkin papers episode, McCarran's remark demonstrates that 793(e) covers everyone, not just government employees. [268] Thus, it is impossible to construe 793(e) to reach only government servants. Such a construction would obviously strain the statute's language, but it might nonetheless have been tempting in light of the absence of a culpability requirement and the narrow intent of the 1917 legislation. Virtually the only other mention of 793 in the Senate legislative history was contained in a letter from the Attorney General to the Senate urging enactment of S. 595:

> Enactment of this legislation is urgently needed. The necessity for immediate action on this matter was forcibly demonstrated during the recent trial of Alger Hiss. Although Henry Julian Wadleigh testified under oath that he had illegally abstracted State Department documents for eventual delivery to a foreign government, existing laws appear to make his prosecution impossible. Such an incident, which is only one of several, clearly illustrates the very pressing need for corrective legislation. [269]

The House floor debates suffered from the confused reasoning of the House Judiciary Committee report, which provided the model for the attempts by Chairman Celler and Congressman Bryson to explain the coverage of 793(d) and (e). At the outset of debate on H.R. 4703, Celler stated:

> [W]e cannot allow people, citizens and aliens alike, opportunities to get valuable classified and other information, data, and records vital to our security and have that information, data, and records used and disseminated to our grave discomfort and with danger to our security. Our laws presently are weak and must be strengthened in that regard, and that is exactly what this bill purports to do. [270]

 *1030  This is the only statement in the 1950 legislative record that supports the inference that subsections 793(d) and (e) are designed to put criminal sanctions behind the classification program. Apart from this interesting remark, the remainder of the House debates touched on only two aspects of the 793 revision. First, the speakers seem clearly to have understood that the culpability requirement of subsections (d) and (e) were different from the requirements of the preceding subsections. Confusion existed, however, as to what exactly the culpability standard of (d) and (e) was. [271] Second, subsections (d) and (e) *in tandem* were thought to cover everyone. Virtually nothing was said in the House about whether this meant that its coverage extended to newspapers, although Congressman Bryson called attention to "unfounded" fears that the bill would make newspaper and reporters "criminals" without their doing any wrongful act, and referred the House to Senator McCarran's published exchange of correspondence which "answered objections of this nature." [272]

What does the legislative history of the 1950 amendments amount to? Through all the confusion and inattention to basic questions, two general themes emerge. First, fears that the new subsections 793(d) and (e) might make criminal actions taken by newspapers in "the normal course of their operations" were rebutted by statements by the Attorney General and by the Legislative Reference Service, neither of which was supported by plausible interpretation of the statutory language. More important, these fears led to the re-introduction of the anti-censorship provision, which apparently was designed to meet concerns about the breadth of the 793 provisions of S. 595. While a literal interpretation of this proviso may construe it as only a caveat against prior restraints, its role in the legislative history reflects a broader purpose. The anti-censorship provision and the interpretations solicited by Senator McCarran left Congress with an amorphous belief that 793(d) and (e) were not sweeping prohibitions against newspaper publication of information relating to the national

THE ESPIONAGE STATUTES AND PUBLICATION OF... 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 59 of 126

defense. No analytical basis for a narrower reading was suggested, however, and the legislative history thus leaves open the question of how the statute is to be accommodated to the legislative intention.

The second current running through the 1950 deliberations was the notorious activities of Whitaker Chambers, Alger Hiss, and Henry Julian Wad-leigh. Their revelation and retention of sensitive information were repeatedly cited as evidence of the necessity of "closing the loopholes" in the espionage statutes. Thus, the retention offense was extended to non-government employees, such as Whitaker Chambers, without necessity for an official demand. Furthermore, the statute of limitations for all 793 and 794 offenses was extended **\*1031** from three to ten years. [273] But beyond these two extensions of section 793, it is not at all clear what Congress intended to accomplish through the communication offenses of subsections (d) and (e). The Attorney General wrote of the need to reach a State Department employee who abstracted documents for delivery to a foreign government. Chairman Celler mentioned that it must be made illegal to obtain and disseminate classified data "to our grave discomfort and with danger to our security."

No one spoke of the government employee or ordinary citizen who gives defense information to a newspaper in the belief that the benefits of public debate on the matter outweigh any danger to national security. The focus, rather, was on employees who deliver government documents to communist study groups or Russian agents, and on others who are part of an espionage apparatus. These activities, however, fit easily into the established culpability framework of the espionage statutes, in that a purpose to injure the United States or advantage a foreign country could be inferred. Why, then, do the communication and retention offenses adopted in 1950 call for a lesser culpability standard that would presumably be met by general publication of defense information? Furthermore, 793(d) and (e) would appear to reach retention of defense information by publishers and communication of such information in the first instance from a source to a newspaper.

The 1950 legislation thus follows the frustrating pattern of so many of the espionage statutes: Congress said it, but seems not to have meant it. What are the courts and others concerned with the interpretation of these statutes to do?

### E. *Subsections 793(d) and (e)*: *Conclusion*

Cynics have claimed that if courts enforced only those criminal laws which legislatures understood, Title 18 of the United States Code would be a dead letter. Although courts should not condition the enforceability of statutes on legislative prescience about all their possible applications, the problems with subsections 793(d) and (e), go well beyond tolerable limits. At least five serious problems of statutory construction must be resolved before these laws can be applied:

(1) Is publication a "communication" within the meaning of the subsections, and are communications or retentions incident to publication criminal?

(2) What degree of culpability is required by the term "willfully?" Can the word be given a meaning narrow enough to sustain the constitutionality of the prohibitions on communication or retention in light of the vagueness of the phrase "related to the national defense?"

**\*1032**  (3) What constitutes protected "information" under the subsections, and what culpability is required before its transfer is criminal?

(4) What makes a piece of paper containing defense information a "document" or other enumerated item for purposes of the subsections?

(5) What does "not entitled to receive it" mean for purposes of the communication and retention offenses?

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 60 of 126

The uninformative language employed by the draftsmen has never been discussed by Congress in terms precise enough to give adequate guidance for the resolution of these issues. Perhaps a concrete example will illustrate the difficulties. Justice White's discussion of the retention offense in his *Pentagon Papers* opinion assumes, without discussion, that copies of government papers are "documents," and not "information," for purposes of the section. [274] This conclusion, however, is not compelled. The originals were not purloined and the Government's proprietary interest in the documents was maintained; all that was lost was the secrecy of information contained in them. Even if an exact copy is a "document" as Justice White suggests, how close to the full original must the copy be? Does a letter from a friend in the executive branch that quotes a single paragraph from a government report constitute a document? What if the letter only paraphrases the original but reveals the information? By what principle can a line be drawn between document and information, especially when significant differences in the culpability requisite to violation of 793(d) and (e) may turn on the distinction?

Courts typically undertake to resolve issues at the margin of statutory coverage by looking to a statute's purposes. On their face, however, the purposes of subsections 793(d) and (e) are mysterious because the statutes are so sweeping as to be absurd. If courts turn to evidences of legislative intent, the mystery deepens because Congess never understood these laws. It did not realize that their literal terms might apply to speech leading to public debate, or preliminary activities undertaken with that aim. When concerns were voiced that these provisions might have some effect on the press, Congress did not respond by analysis or amendment of the bills before it, but rather said it was not so--through the clumsy and problematic anti-censorship provision--and approved the statute's broad language.

In this concluding discussion of 793(d) and (e), we shall attempt to tie the materials together and show how forbidding are the problems of implementing these subsections in the context of public speech about defense matters.

1. *Publication and Conduct Incidental Thereto*. In the 1917 legislative record, the question of controls on publication of sensitive information received at least as much attention as the problem of spying, and the most significant action was the rejection of a prohibition on publication not conditioned on **\*1033** any specific intent requirement. [275] The 1950 legislative record was too confused to have had any particular focus, but the notion that somehow newspapers were not covered--except for "wrongful acts"--was never challenged. Subsections 793(d) and (e) therefore cannot be held applicable to publication of defense information that is motivated by the routine desires to initiate public debate or sell newspapers, unless this congressional purpose, confirmed by repeated subsequent refusals to enact broad prohibitions on disclosures, is ignored. [276] Failure to give effect to this legislative intention would be wrong with respect to a statute so inartfully drawn and legislative intention otherwise so opaque.

The critical question, in our view, is not whether publishing may properly be held a crime under subsections (d) and (e), for almost surely it should not. The problem instead concerns the manner in which the statutory language is to be read to exclude it. The choice is between distinguishing some concept of "publishing" immune from regulation, or by more general construction of the statute's culpability standards. Regardless of which approach is taken, is it only the act of publishing that is protected, or does the law also protect conduct incidental to publication? Is the newsman guilty of "retaining" items he plans to publish? Are his communications to others in the course of writing a story criminal? Is his source in Government an offender, and, if so, is the newsman a conspirator in that offense or an accomplice to it if he simply listens, or if he instigates the disclosure? These questions, of course, go to the heart of whether, as Justice White suggested in *New York Times*, newspapers may be criminally punished under subsection (e) for obtaining and printing national defense secrets.

In that litigation, the claim was strongly pressed by the *Times* that the statutory terms "communicate, deliver, or transmit" as used in sections 1(d) and 1(e) do not comprehend "publishing." Judge Gurfein so held in his district court opinion [277] and Justice Douglas later indicated his support for that position. [278] The argument is that the draftsmen perceived a difference between communication and publication and that they intended to make newspaper revelations criminal only when the statutes say "publish." Support for the proposition rests primarily on the structure of section

2 of the 1917 Act, currently subsections 794(a) and (b). It will be recalled that 794(a) bars **\*1034** communication, transmittal or delivery of defense information to foreigners, while 794(b) prohibits both communication and publishing in time of war with intent to reach the enemy. Moreover, the rejected subsection 2(c) as initially drafted prohibited both communication and publishing and was subsequently narrowed, prior to the ultimate defeat, to prohibit only publishing. Two later enacted statutes in the espionage chapter, sections 797 and 798, also mention publishing. [279]

The argument that the draftsmen intentionally wrote "publishes" into the statutes when they wished to prohibit it does not, despite the statutory structure, convince us. We have not found a single clear statement in the lengthy legislative history of these bills that the word "communicates" does not embrace publishing. For example, that was not the ground on which Senator Kilgore's concern for newspapers was met in 1950; [280] nor was it the apparent understanding of those who framed the crytographic bill, section 798. If that understanding were clear, one would expect to find unequivocal evidence of it to appear in the massive debates on the 1917 Espionage Act. Such evidence is lacking. Speakers frequently used the words "communicate or publish" in sequence; [281] they also consistently used the words "publishes," "publications" and "publishing" when they were referring to newspapers. Neither usage, however, given that the statute said "publishes," demonstrates that the speaker regarded the terms "commuinicate, deliver, or transmit" as necessarily excluding publishing. Moreover, the few interchanges during the debates concerning the meaning of "communicates" came primarily from speakers who questioned the wisdom, whatever was done to newspapers, of making private communications criminal. [282] Most importantly, at no point **\*1035** did anyone defend the idea that a newspaper might lawfully "publish" what an ordinary citizen was prohibited from "communicating." [283]

That no one confirmed an understanding of "communicate" that excluded publishing does not, however, explain why section 2 was drafted as it was. We can only speculate, but in our opinion, confusion and inadvertence, old friends of this legislation, are the likely causes. As initially drafted, sections 1 and 2(a) of S. 8148 were directly patterned upon the 1911 Act. [284] Subsection 2(a), like section 2 of the 1911 law, proposed severe sentences for those who breached section 1 of S. 8148 and then "communicated" the information to foreigners. [285] Nothing in the 1911 law suggests that Congress thought about the scope of the word "communicates," or if it comprehended publishing, and nothing indicates that the subsequent Congress thought about it in enacting subsection 2(a) in 1917. By contrast, subsections 2(b) and 2(c) were drafted on a fresh slate, and the drafters were concerned to prohibit disclosures of citizens and press regardless of whether they had had any contact with government places, documents, things, or personnel--necessary elements of a violation of section 1. Thus, use of the word "publish" makes clear the draftsmen's intent that it be covered in those newly drafted sections, but the failure to use the term in the carried-over subsections 1(d) and 2(a) does not prove the converse. [286]

Doubts that the legislative history justifies the conclusion that Congress saw a general distinction between communication and publication are reinforced because the distinction is not theoretically sound in the context of the espionage statutes and cannot be applied in any sensible fashion. If one has possession of information that is subject to statutory restrictions and tells it to a friend, such personal talk must clearly be characterized as a communication, or else the publishing exception would swallow the statute whole. At what point, however, does communication become publication: when one calls over six friends, or only when one hires a hall? Whatever the turning point, the anomaly is obvious: if the statute protects the right to read defense documents to a throng in Madison Square Garden, it cannot sensibly be construed **\*1036** to prohibit reading them to a friend at home. The person who publishes widely may of course be more likely to influence public decision-making, but the person who communicates to a friend may well be working out his own policy positions or trying to convince his friend. The greater enhancement of public debate achieved by widespread publication is inversely proportional to the extent to which secrecy is compromised. In the intersections of the values of public debate and secrecy, the private conversation and the public lecture are balanced at the same point. With respect to publication, the values on each side of the equation are augmented, but the same tension is maintained. If general publication is protected, it is ludicrous not to protect private conversation with similar intent. Thus, a line between publishing and communicating cannot be even generally located by reference to the purpose of the statutes.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 62 of 126

One answer to this difficulty might be that publication, to be immunized from the subsections by virtue of congressional intent, requires involvement of the media. It might be argued that communications by someone other than a newsman, no matter how obviously geared to public debate on defense matters, is not publishing for purposes of differentiating publications from the statutory coverage of communications. Leaving aside first amendment and equal protection objections, as well as congressional concern for ordinary citizens, this interpretation would necessitate guidelines as to who is a publisher and who are newsmen. The statute contains no such standards and posing them by judicial construction is, in our opinion, virtually impossible. [287]

Finally, any effort to distinguish publication by the media from communication would be vastly complicated by the fact that such publishing inevitably involves many preliminary communications and retentions. It, too, is not an event but a process. [288] Assuming that publication is protected, if a person has possession of copies of classified documents, does he publish them if he hands them to a reporter who will have them published, or is that a prohibited communication, transmittal or delivery? When the reporter hands them to a typesetter, is that a publication or a prohibited communication? If publishing is not covered by the statute, can preliminary and incidental communications and retentions--conduct by persons necessary to accomplish the sort of publication Congress wished to protect--be held a violation of the statutes?

It was with reference to this problem that Justice White's dicta in *New York Times v. United States* went astray, in our opinion. Without intimating his views on the correctness of Judge Gurfein's view that publication was not comprehended within "communication," White noted that neither publication nor communication was required to violate the statute; mere retention would suffice. [289] That approach, in our opinion, can rest on no sound interpretation  **\*1037**  of the statutes. To protect publishing but criminalize the transfer of the story to the typesetter is silly. Likewise, it would be wrong to link the reporter to an offense of initial disclosure by a government employee--if such an offense existed--by saying the reporter caused it, or by characterizing him as an accessory to the employee's disclosure. If it is conceded that Congress meant to exclude publication from criminal prohibitions pertaining to communications, it is inconceivable that they would contemplate making criminal retentions incident to that act, unless interests other than disclosure of secrets are at stake. [290]

Of course, it would not be inconceivable to treat as a crime initial disclosure of a defense secret by a government employee to a reporter, even if publication and incidental communications and retentions by non-employees within the publication process were protected. [291] We might well adopt a system which protects all acts in the publication process but makes criminal the initial revelation by the government employee. Such a system would be a rational, if a bit uneasy, compromise of the competing values of secrecy and executive branch loyalty, on one side, and freedom of speech on the other. The espionage statutes do not, however, enact such a system. The language of 793(d) governing the legality of communications and transfer by lawful possessors is exactly the same as that of 793(e) governing communications by unauthorized persons. If communications by non-government employees leading up to publication are outside the scope of 793(e), there is no statutory basis for different treatment of the government employee's disclosure of secrets to the press under 793(d).

On balance, we do not think it is feasible to give effect to the legislative intention by simply excluding "publishing" from the scope of "communication." Despite some evidence resting on the drafting of 794(a) and (b), the legislative history of the espionage statutes does not suggest that interpersonal discussions about defense policy were valued differently than newspaper publications.  **\*1038**  Congress was quite concerned to protect the individual citizen curious about defense-related matters who wanted to discuss such matters with family or friends; publication and communication motivated by concern about official policy should consequently be treated as equally legitimate.

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 63 of 126

If publication and communication or retention cannot be satisfactorily distinguished as modes of conduct in the context of these provisions, how can subsections 793(d) and (e) be read to give effect to Congress' intention not to make participation in debate about defense matters criminal? A reading of the statutes must be found which can operate generally; in other words, publication must be excluded from coverage on an analysis of the statutes that applies equally to acts of communication and retention. We must turn, therefore, to other elements of 793(d) and (e) in the effort to discover such a reading.

2. *Culpability*, (a) *Willfully*. If our conclusions concerning "publishing" are accepted--that Congress had no special understanding of "communicate, deliver or transmit" that automatically excluded it--then application of sections 793(d) and (e) to public revelation of defense secrets, and conduct preliminary thereto, hinges primarily on the meaning of the term "willfully." Can some sense of the term be found which accords reasonable respect to both the language and structure of the statutes, the legislative history of the particular term, and the evidence that Congress did not contemplate making criminal revelations in the course of public debate except in the most limited circumstances? We think so, although it is admittedly a struggle, and requires adopting a meaning of willfully that almost surely no single Congressman or Senator would have recognized as stating his own understanding.

"Willful" is one of the law's chameleons, taking on different meanings in different contexts. [292] It may be construed to require merely awareness of the physical facts of one's behavior; [293] under other circumstances, it may mean awareness that conduct is illegal, [294] or, more generally, that it be undertaken with bad motive. [295] In statutes where criminality turns upon the causing of a particular type of harm, willfully may require specific intent to cause that harm. [296] The different nuances that courts have read into the term are largely attributable to judicial desire to restrict particular criminal statutes. Narrow **\*1039** interpretations of "willfully" are especially common where legislation is at the boundaries of constitutional power--as where statutes bear upon free expression. [297] Insofar as sections 793(d) and (e) bear upon speech, the natural tendency of courts should be to accept a narrow construction of "willfully," in order to avoid first amendment problems of vagueness and overbreadth. The problem in so doing cannot be discounted, however. Neither the language nor the legislative intent of the espionage statute indicates that "willfully" should be given any particular narrow meaning. Moreover, the reported cases under 793(d) and (e) all treat "willful" as a term of broad signification, quite different from the culpability standards of 793(a) and (b).

The structure of the statutes makes apparent that whatever "willfully" means in subsections 793(d) and (e), it does not restate the culpability standards of 793(a) and (b) which require "intent or reason to believe." The distinction in statutory language surely points to a different, and broader, meaning for "willfully." The legislative history of the 1917 Act is replete with concern that these criminal statutes make use of appropriate standards of culpability to distinguish the morally innocent from the guilty. Insistence on the importance of culpability led to reformation of three provisions and played an important part in defeating a fourth. In the face of that careful inclusion of specific intent standards, the claim that Congress in 1917 intended willfully in 793(d) and (e) to be synonymous with the culpability provisions of 793(a) and (b) is untenable. Furthermore, the legislative history makes clear that the Congress understood a difference. On several occasions during the floor debates, the Senators and Representatives discussing the bills defined "willfully" in a broad fashion. [298] Congress' problem was that it did not understand the breadth of conduct reached by a literal reading of section 1(d), not that it regarded "willfully" as equivalent to "intent or reason to believe."

The 1950 revision did introduce some confusion on this point into the legislative history. The Executive draftsmen of 793(d) and (e) clearly intended "willful" to require a minimum of culpable intent. Their concern was to close loopholes in the law, not to impose stricter standards on the Government by requiring proof of illicit ulterior purpose. Consistent with this, the House Report, [299] which is in large measure taken from the Justice Department's **\*1040** letter accompanying the proposed legislation, [300] referred to the absence of an intent requirement in section 793(d), expressly contrasting it with the stricter culpability requirements imposed by sections 793(a) (b) and (c). To be sure, the Committee's justification

for such general culpability in 793(d)--that the persons covered are those who are in close relation to the Government-- argues for a higher standard of culpability in section 793(e) where coverage is general. [301] "Willful," however, cannot mean one thing as to government employees and something stricter for non-employees, particularly as sections 793(d) and (e) do not in terms refer to government employment. [302] The House Committee's statements favor the broad meaning.

In the Senate, however, the matter is in doubt. The Senate's willingness to enact the proposals without a whimper of protest probably resulted from assurances that they were of narrow scope. The legislation's sponsor, Senator McCarran, indicated that he would not support legislation that made newspapers liable without a "wrongful" act. The response McCarran's inquiries elicited from Attorney General Clark is fairly read as implying a narrow scope to the bill, and most directly on point, the Legislative Reference Service memorandum stated that sections (d) and (e) were, insofar as culpability is concerned, like sections (a) and (b). Do these strands afford a basis, despite the statutory language and the countervailing evidence of legislative intent, for construing "willfullness" to require conduct animated by anti-United States or pro-foreign interests?

On balance, we think not. From our reading of the legislative history, Congress in 1950 failed to appreciate the extent of the problem just as it had in 1917. The House clearly thought that "willfully" implied no special culpability requirements. There is, furthermore, no evidence that the Senate acted upon the Legislative Reference Service's misapprehension of the clear difference in culpability requirements that are evidenced by the structure of the Act and the statements of the drafters. Neither chamber, however, realized the impact the statute might have upon activities that it would not consciously have chosen to make criminal. In part, that failure resulted from soothing statements by the **1041** sponsors that newspapers would have nothing to fear, and from the anti-censorship provision that alleviated concerns about prohibitions aimed at publication--matters to which we will return in a moment. More important, in our view, was the preoccupation with other more clearly drawn and controversial provisions of the 1950 Act. To cure these errors by interpolating the culpability requirements of 793(a) and (b) into "willfully," when the legislative history makes clear that Congress never entertained such a notion, seems inappropriate. [303]

A narrow understanding of "willfully" in subsections 793(d) and (e) has no support in the case law, which recognizes a difference between willfully as there used, and intent as used in 793(b) and 794(a). Most importantly, in *United States v. Coplon*, [304] the court construed section 793(d) to require "no such intent; [305] it merely required that defendant Coplon obtained possession of the documents and attempted to transmit them to the co-defendant, who was not entitled to receive them." [306] Similarly, in a civil case, *Dubin v. United **1042** States*, [307] the court assumed that private retention of radar devices that "related to the national defense," erroneously sold by the Government as surplus property, would violate section 793(e) even though the retention was clearly not animated by anti-United States motives.

This legislative action, and the judicial rulings on the scope of sections 793(d) and (e), provide no support for a narrow conception of "willfully" that looks to motivation. It should be noted, however, that even if the phrase is construed to disregard the actor's ulterior purpose in communicating or disclosing, substantial narrowing of coverage may be achieved depending upon how issues of mistake of fact and law are resolved. These issues are not dealt with in any articulate way in the legislative history, but the manner of their resolution has considerable bearing upon constitutional issues of vagueness.

First, does the law make criminal transfer of a defense-related document where the transferor has no basis whatever for knowing that it is "related to the national defense?" If one happens upon a paper bearing chemical hieroglyphics and transfers it to a chemist friend, is an offense committed if the document "relates to the national defense?" Suppose it explains, if one knows the meaning of the symbols, how a top-secret explosive compound is synthesized. Surely it was not the intent, either in 1917 or in 1950, to make criminal the transfer of a defense-related document by a person not knowing or having reason to know of its significance. Subsections 793(d) and (e) are not offenses of absolute liability. That

Case 1:17-cr-00034-JRH-BKE  Document 112-1  Filed 10/03/17  Page 65 of 126

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

point was the focus of the Legislative Reference Service's response to Senator Kilgore's question concerning "wrongful" acts.[308] Such a transfer should not be termed "willful."

Second, suppose a chemist has the document and understands the formulae, but believes that the document nonetheless does not "relate to the national defense" because the existence of a comparable series of compounds is well-known, and, to his knowledge there is no military reason to prefer the documented compound over others. Is transfer of the document by him an offense, other elements of the crime being assumed, if the Government establishes that it does indeed relate to the national defense because this particular compound is stable at the extreme temperatures caused by some military usages, whereas all other comparable compounds break down? Suppose the paper had a stamp on it saying "this document relates to the national defense," but the chemist believes strongly that it has no such relationship because, despite the Government's best efforts to maintain secrecy, the formula has been printed publicly, albeit in an obscure journal? At what point is the mistake of "fact" better characterized as a misapprehension of the legal **\*1043** standard governing defense-relatedness, and what ought to be the consequence of such misapprehension?

Although Senator Cummins believed that conduct was not "willful" when done under mistake of law,[309] such issues received no real consideration in either the 1917 or the 1950 legislative history. However, the insistence that subsections 793(d) and (e) cover only wrongful acts suggests that criminality should turn on whether the actor's misapprehension of defense-relatedness for whatever reason is culpable. Certainly, the term willful may be read to accomplish this result.[310]

If willfully is read in this fashion, it may substantially affect the constitutional issues of vagueness. Although space limitations preclude lengthy treatment of complex Constitutional law problems herein, they must be briefly considered. In *Gorin* the Supreme Court set out a broad understanding of "related to the national defense," holding the term precise enough to meet due process vagueness objections because violation of 793(b) and 794(a) required demonstration that the defendant had acted with the culpable purpose of injuring the United States or advantaging a foreign nation.[311] A person who acted with such purpose could be left to speculate at his peril concerning the outer parameters of information related to the national defense. The vagueness issue raised by sections 793(d) and (e) is whether the term "national defense" is sufficiently definite when the law threatens those whose revelations are animated by desire to inform the public.

The question is an exceptionally difficult one because so much turns on how other issues of coverage are treated. For example, if transfer of "national defense information" were held not "willful" unless the actor was cognizant that the materials he communicated did "relate to the national defense,"[312] there could be no issue of vagueness. The Constitutional problem is simply whether Congress may enact proscriptions that broad. On the other hand, any statute that made simple communication of national defense information an offense without regard to the actor's appreciation of its defense-related status would in our view be unconstitutionally vague.[313] Even granting that current **\*1044** law requires that information be "secret," in the sense that the matter must be one the Government has sought to keep secret,[314] and intimates that it must be information susceptible to injurious or advantageous use,[315] there are still no constitutionally definite standards for what information is covered. That is particularly the case insofar as the law is so imprecise on when and whether widespread unauthorized disclosures preclude defense-related status despite Government assertions that information is still restricted.

These vagueness objections are lessened if, as we shall shortly argue, subsections 793(d) and (e) are not statutes which penalize unauthorized transfer of any defense information regardless of its source, but are instead intended to control dissemination of documents and information originating in the Government. Consider, for example, the government employee officially entrusted with documents that his employer indicates are defense-related. Is it unconstitutional to force him to speculate whether his superior's assessment is right?[316] We think not, giving weight to the employee's general obligation to heed his superior's instruction. If a newspaper acquires the same document, is it proper to hold official notice against them, and does it matter by what means they gain possession of the document? Suppose the newspaper

does not receive documents but learns information from government employees, or friends of employees. At some point, the fact that information traces back to a distant government source ought to have no bearing on the question whether the standards governing further dissemination are drafted with appropriate precision.

Of course, vagueness is not the only issue. Even if prohibitions on communications are perfectly precise, there are questions of whether they unconstitutionally abridge freedom of speech or press by sweeping too broadly. [317] In our opinion, subsections 793(d) and (e) are overbroad if construed to apply to documents and information without regard to source unless "willfully" is also construed to permit evaluation of the actors' motives in disclosing. Suppose an actor knows that information relates to the national defense but believes that its military significance is far outweighed by its importance for public debate. In that belief, he communicates it widely. A construction of willfullness that required awareness that the contemplated conduct was defined as illegal would not provide a defense, for there would have been no mistake of any kind and the statute says nothing about public debate as a justification. Nor can "relating to the national defense" be given a limited reading to exclude matters of public importance. Such material should and **\*1045** would be covered if sent abroad by a spy, and one can hardly construe "national defense" differently in two sections of this Act. In our opinion, the publication of much information of advantage to a foreign nation would be constitutionally protected. [318] If this simple proposition is granted, the statutes are overbroad because they do not provide a statutory basis for weighing the advantage to a foreign nation against the benefits of revelation to the United States.

The overbreadth problem is more complex, however, if courts construe subsections 793(d) and (e) to apply only to revelations of documents and information originating directly in the Government. We believe that current and former employees may constitutionally be subjected to penalties for revealing defense information entrusted to them, in circumstances where citizen communication of the same information discovered independently could not be prohibited. But does the citizen stand on the same first amendment footing as the employee if his information is attained as a direct consequence of the employee's breach of duty? Does it matter whether the "information" is orally received or is in documentary form? It may well be that the first amendment provides greater protection to reporting of information derived from observation not in itself unlawful than it does to publication of secret information directly derived from an employee's unlawful disclosure. [319] The statute is not, however, drafted to take account of these differences.

We set forth these Constitutional dilemmas not with the thought that they can be adequately treated herein, but rather to emphasize that their presence argues for constructions of "willfully" that make their resolution unnecessary. But avoidance of constitutional issues is not the only reason for construing "willfully" to take account of the purposes which animate revelation or retention.

Whatever the evidence that "willfully" was meant broadly, the fact remains that the Congress did not understand the consequences of what was done. In the 1917 legislative history there is nowhere to be found, once the debate on subsection 2(c) in S. 2 was joined, express statements that citizen revelation of secret government documents in the course of public or private debate was an offense. With respect to the 1950 legislation, not only the legislative sponsors but also the Attorney General assured Congress that the provisions were of narrow scope. In light of the recurrent conflict between the Executive and Congress over the extent to which defense policy should be kept secret, those assurances should be heavily weighted. Furthermore, there is substantial **\*1046** evidence that neither Congress, nor for that matter the Executive, has construed subsections 793(d) and (e) to bear upon conduct done to participate in public debate. We shall set forth the Congressional understanding in the course of discussing other legislative treatments of the issue of secrecy, and Executive understanding in the course of discussing the classification system.

What then should "willfully" mean, if the statute is to be saved by narrowing construction, rather than struck as vague or overbroad so that the problem can be returned to Congress for clarification. Impressed by the absence of evidence that the statutes were meant to bear upon matters of first amendment concern, we think the term should be read *in pari materia* with the proviso to the 1950 Internal Security Act. The proviso, although applicable to the Act in general,

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 67 of 126

had its roots in newspaper concern for the reach of the proposed amendments to subsection 1(d) of the 1917 Espionage Act. Its statement that nothing in the Act shall be construed "to limit or infringe upon freedom of the press or speech" supports an understanding that conduct is not willful for purposes of the section, when undertaken for any of the variety of reasons,--stimulating public debate, satisfaction of individual curiosity, or conducting private policy discussions--that reflect interests protected by the first amendment. As a practical matter, such a construction leaves "willfully" meaning almost what it does in sections 793(a) and (b)--requiring purpose or knowledge that the primary use to which information will be put is the injury of the United States or the advantage of a foreign nation. It would also allow, however, for prosecution of employees who wrongly sell defense information to commercial organizations for private gain.

(b) *Transfer or Retention of Information.* The 1950 amendments added statutory prohibitions on the transfer or retention of "information" to the list of tangible items previously covered by 793(d) and (e), purportedly to establish different culpability standards for transfer or retention depending on whether "information" or a "document" was at stake. Transfer or retention of "information" is criminal only if the actor has "reason to believe that the information could be used to the injury of the United States or to the advantage of any foreign nation." Does this phrase describe the "quality" of "information" that is transferred or retained, or does it instead speak to the consequences the actor expects to flow from his conduct?

The language of the statute implies that "reason to believe" must exist only with respect to the information's susceptibility to wrongful use. So construed, it is doubtful that the phrase adds anything. Information or documents should be held to "relate to the national defense" only if susceptible to advantageous or injurious use in the hands of an implacable foe. "Related to national defense" cannot be read to include the completely insignificant, as we have previously argued in our analysis of that term. [320] If we are correct, adding **\*1047** "reason to believe" to modify information does not limit the amount of information that would otherwise be covered by sections 793(d) and (e). [321]

A second meaning, if the phrase describes only the "quality" of information, is that it provides a defense of mistake of fact. Whether that adds anything depends upon how broadly "willfully" is read. We have argued that "willfully" requires even as to documents, at least culpable negligence with respect to defense-relatedness. [322] Only adamant insistence by Congress should require courts to adjudicate the constitutionality of strict liability in this area, and no such direct instructions have been given. [323] If this position is rejected, however, the "reason to believe" phrase adds a defense of non-culpable mistake for information that is lacking for documents.

These are the possibilities if what must be "reasonably believed" pertains only to the quality of information. What effect does the culpability standard have if it is read to require the actor's awareness of consequence that might flow from his communication or retention? For purposes of our concern--newspaper publication and conduct incident thereto--it would seem to have no effect whatever. A reporter or publisher inevitably would have reason to believe that national defense information "could" be used to injure or advantage. The primary-secondary use distinction we suggested as a limit on the culpability formulations of sections 793(a) and (b), which employ the phrase "is to be used," is linguistically untenable in this context.

3. *Documents and Information.* Subsections 793(d) and (e) prohibit communication, transmittal or delivery of a series of tangible items such as documents, blueprints, photographs and notes that relate to the national defense. They also prohibit transfer of "information" relating to the national defense, subject to an additional culpability requirement of dubious significance. Consequently, numerous issues of characterization must be considered. What makes a piece of paper a "document" within the meaning of the section? What is the line between "documents" and "information"? What does "information" encompass? Is it only information derived from tangible government papers, or does it include knowledge acquired through personal observation?

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 68 of 126

For example, assume that the Government has deemed secret all documents pertaining to a complex dialing procedure that must be followed in order to telephone a military installation directly. If a civilian accidently discovers the procedure while dialing his telephone and writes down the information, does he possess a "document" or a "note" to which either subsection applies? It is remarkable that the statutes are silent on so basic a point. Our reading **\*1048** of the legislative record, from 1950 back to 1911. shows that the people who discussed these subsections almost without exception regarded them as covering only disclosure of defense-related information that originated within the Government. [324] Thus, although section 794(a) would punish the transfer of independently discovered defense information to foreigners if done with a culpable motive, sections 793(d) and (e) do not apply.

While this reading of the statute narrows its coverage considerably, it still leaves a baffling series of questions about when a writing containing information originating in Government is a "document" or a "note." Which of the following are covered by the statute, assuming in each case that the information written on the paper "relates to the national defense": a) a piece of paper owned by the Government; b) a word-for-word copy on personal stationery of a document owned by the Government; c) a paraphrase on personal stationery of a government-owned document; d) a writing prepared by a non-employee after conversations with a government employee whom he realizes has had access to government-owned documents (following an interview with a military officer, a reporter writes: "After full review of the evidence, the Air Force has secretly determined that the new plane does not meet its velocity specifications"); e) the private writings of a government employee incorporating information he has been told ("Dear Mother: Next month we invade Normandy"); f) the private writings of an ex-government employee ("When I was in the Intelligence Service, we had a highly successful system for eavesdropping on the East German Ambassador"); or g) a writing prepared by a non-employee on the basis of personal observation at military installations ("Twenty-two B-52's are now stationed at the air-base")?

These questions cannot be answered by reference to the legislative record because so far as we can ascertain no one expressed opinions on them. We must therefore deal with them without guidance. On the one hand, the test of what constitutes a "document" or a "note" could be simply a matter of whether information happens to be written down, thus treating all the items listed above as "documents" subject to the prohibition on merely "willful" retention or transfer. This produces odd results, however, particularly if, contrary to our belief, the "reason to believe" culpability phrase has significance. In such cases, an oral revelation by a government employee might be innocent while the retention of notes of what he said would be criminal. Moreover, under this reading one's own transcribed recollection could be characterized as a government document--a most doubtful construction.

On the other hand, to limit "documents" and "notes" to physical items in which the Government has a proprietary interest makes only slightly better **\*1049** sense. In terms of protecting secrecy interests, whether what is taken is the original document or a verbatim copy is of essentially no significance; in fact, the loss of an original may be preferable, at least where the Government has other copies, because it enhances the likelihood of discovery that secrecy has been compromised. Nevertheless, three considerations might be advanced in favor of such a limited construction. First, if the "reason to believe" phrase modifying information does require additional culpability, a construction which augments the "information" category at the expense of "documents" is preferable for first amendment reasons. Second, the legislative record reveals the Justice Department's general belief that Julian Wadleigh's transfer of the abstracts of documents to a communist cell-group was not criminal under subsection 1(d) of the 1917 law, [325] a judgment suggesting perhaps that abstracts are not "documents," and should be deemed "information" covered by the 1950 amendment. Third, subsection 793(b) makes express reference to "copies," while 793(d) and (e) are silent. On balance, however, we think a mid-point should be found if these laws are found constitutional and effective; the "document" concept should include only verbatim copies.

The problem of finding dividing lines between "documents" and "information" is, of course, especially acute if the "reason to believe" phrase modifying information requires additional scienter. The revelation offenses are defined in terms of an actor who "communicates, transmits or delivers." Consider a United States government employee in possession of a classified defense document. Does he communicate, transmit, or deliver a document or only information,

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 69 of 126

if he a) lets someone read it; b) tells another the substance of the information which it contains; c) reads it over a phone; d) gives another person a writing which reveals information in it; e) gives another person a copy of it? Similarly, does the person who listens acquire possession of a "document," the subsequent transfer or retention of which is criminal under the same standards? What if he takes notes? If he takes it down word for word?

Drawing a line between "document" and "information" may also be significant for purposes of the retention offense. The law proscribes "retention" of both, but surely this command is meaningless as to information not in tangible form. If one has been told that a new airplane does not work, one cannot possibly purge oneself of that information. One could, however, turn over all notes on the subject, substantial problems of self-incrimination aside. The legislative history is mute on the point, but it seems far-fetched to conclude that Congress intended to prohibit one's writing down things he has observed or has been told; custody of government papers seems the more likely concern. Thus, the retention provision may well be overbroad and beyond reformation insofar as it applies to information.

The breadth of the "information" category raises a series of issues similar **\*1050** to those associated with "documents." While the legislative history makes clear, we think, that information originating in the Government is the intended meaning, troublesome questions nonetheless arise. Must the information come from some document as to which the Government has a proprietary interest, or can an official's knowledge be the source? The arguments in support of a limitation to documentary sources rest on evidence earlier noted. The draftsmen were quite clearly concerned with whether an oral revelation of a protected document was an offense under subsection 1(d). Although in 1917 Congressmen talked as though it were, [326] the deletion of "information" from 1 (d) made the issue less than certain. Nothing we have found indicates an intention on the part of the 1950 draftsmen to do more than plug this loophole in the protection of secret documents or an understanding that any and all defense "information" originating within the Government is covered regardless of its source in listed tangible items. Moreover, as we will discuss presently, such an expansive treatment of information, while sensible from the security perspective, would increase the strain on the concept of "entitlement." Insofar as "information" is not classified unless it is in documentary form, by what process may it be shown that a recipient was "not entitled to receive it?" Again, there is nothing substantial enough in the legislative record to make any particular answer defensible.

4. *Entitled to Receive It*. Construction of the entitlement language of 793(d) and (e) follows the frustrating pattern of these statutes. The common sense meaning of the term seems to have been rejected by Congress in 1917. and furthermore would give the statutes a sweep that was certainly not acceptable to the 1917 or 1950 Congresses. Each of the four offenses defined by these two statutes hinges upon the characterization of recipients as either entitled, or not entitled, to receive information. The two retention offenses assume the former situation; the communication offenses, the latter. Yet in a prosecution under these acts, how can either term be given effect? "Entitled to receive" is not defined in the espionage statutes or in any other provision of the United States Code. If a person is entitled to information only when authorized by statute, then very few people--including Government officials with security clearance--are entitled to anything. [327] Conversely, if one is entitled to receive information in the absence of a statute barring its acquisition, the ordinary citizen again stands on a par with a general. Accordingly, if the entitlement concept of subsections 793(d) and (e) requires statutory implementation, the communication and retention offenses are unenforceable.

Congress, however, did not intend that the entitlement concept could **\*1051** be given effect only by statute. When the "not entitled to receive it" phrase came into the law in the 1911 Act, Congress was concerned in the first three clauses with the protection of military installations and other physical places. Although no legislative history illuminates the point, Congress probably thought that the official in charge of a protected place would be the source of rules defining who was "not entitled to receive" information concerning or stored within the place. Clauses four and five of the 1911 Act, which covered government employees and others who had control over defense "information" by reason of some special relation to the Government, also failed to elucidate "not entitled." [328] Presumably, the phrase was understood to refer to orders from government superiors about the propriety of disclosing defense information. So long as the espionage

offenses concerned protected places and information in the hands of government employees, it seems only common sense that effectuation of the entitlement concept should come through orders of executive branch officials in charge of the given place or document.

The Espionage Act of 1917 introduced substantial ambiguities. Subsection 1(d), read literally, prevented disclosures by persons outside government employment, and thus not generally subject to executive rules; [329] consequently the issue of what determines entitlement became more perplexing. One possible meaning was that a citizen should not transfer government defense secrets to another unless the recipient was expressly authorized to have it. It was, however, precisely the spectre of such a construction that led Senator Cummins to protest so vigorously against the entitlement language, and his apprehensions were repeatedly met by assurances that no such construction was feasible. A person could become "not entitled to receive" information, the sponsors of the 1917 Act indicated, only if a statute or order so specified. [330]

Assuming that statutes or orders are necessary to negate entitlement, one's expectation would be that the legislation would spell out the authority by which the statutory proscription might be given effect. The usual pattern would be a statutory prohibition against communication of a secret to one "not entitled to receive it"; an express grant of the authority to define "not entitled"; and finally, implementation through orders and regulations issued by the person so authorized. The espionage laws, however, do not deal with entitlement in such a clearcut fashion. It will be recalled that the 1917 Act, as originally conceived by the Wilson Administration, would have defined entitlement explicitly. Section 6 of S. 8148 would have granted the Executive the power to designate information as secret, after which only officials duly authorized by Presidential order would be "entitled to receive it." Thus, the traditional pattern was initially contemplated and in fact survived all the  **\*1052**  debates, only to be cut, without explanation, in conference. The consequence of its elimination was that nothing in the 1917 Act delegated authority to the President, or anyone else, to formulate rules about entitlement for any purposes.

The 1950 amendments brought no clarification. Congress might easily have indicated, for example, that the executive classification program was to be used in connection with subsections 793(d) and (e). The same Internal Security Act contained the provision, now codified at 50 U.S.C. § 783(b), that makes criminal the transmission by a government employee of classified information to a foreign agent. [331] Section 798 of the espionage chapter, enacted a few months earlier, made criminal communication or publication of classified information concerning communications intelligence operations. [332] Thus, Congress knew about the classification system, and was willing to have prohibitions of narrow scope turn on it. Nevertheless, the only hint in all the 1950 legislative record that "not entitled" might be given content by the classification system was the comment of Chairman Celler that "we cannot allow ... valuable classified and other information, data, and records vital to our security ... used and disseminated to our grave discomfort." None of the statements of the Executive proponents of the 1950 legislation, none of the committee reports, and nothing else in the 1950 debates on the 793 revision, so far as we are aware, suggests that the effect of 793(d) and (e) would be to put criminal sanctions behind the classification system.

Although Congress did not expressly refer to the classification system, there is nonetheless a strong temptation to turn to it as a source of meaning for "not entitled," largely because no alternative source of meaning seems available. It would, however, be strange to imply Presidential authority to determine those not entitled to receive information when an express grant of that power, section 6, was eliminated from the 1917 Act and no similar provision has ever been adopted. Furthermore, the proposition that the President, without statutory authority, can regulate the exchange of defense information by private citizens runs directly counter to the dominant concerns expressed in the 1917 debates, the only time the entitlement concept has received the explicit attention of Congress.

A second objection to the use of classification as a guide is that even if Presidential power to define entitlement could be implied, no President has ever exercised it with any clarity or confidence. The classification system as we know it was established in 1951, [333] after the revision of 793(d) and (e)  **\*1053**  into their present form, by Executive Order 10290. [334]

This Order contained nothing aimed at implementing the statute's "not entitled" concept. Nothing suggests that the Order presumed to regulate transfers of information from citizen to citizen; quite the contrary, in purely hortatory language, the Order merely "requested" all citizens to "observe the standards ... and join with the Federal Government ... to prevent disclosure." [335]

Moreover, while it is clear that the Order was intended to instruct government employees not to transfer classified information to citizens, the only possible indirect implementation of the entitlement concept, whereby 793(d) and (e) might place criminal sanctions behind such disclosures, was a circuitous reference to sections 793 and 794 in a required classification stamp:

> When classified security information affecting the national defense is furnished authorized persons, in or out of Federal service, other than those in the Executive Branch, the following notation, in addition to the assigned classification marking, shall whenever practicable be placed on the material, on its container, or on the written notification of its assigned classification:

> This material contains information affecting the national defense of the United States within the meaning of the espionage laws, Title 18, U.S.C. Secs. 793 and 794, the transmission or revelation of which in any manner to an unauthorized person is prohibited by law. [336]

Notice the deviation from the statutory language: whereas 793(d) and (e) make criminal transmission of defense information to persons "not entitled to receive it," the classification notice states that revelation to "an unauthorized person is prohibited by law." Was the intention to shift the meaning of entitlement from "not prohibited" to not "positively authorized"? Nothing else in the Order referred even obliquely to the espionage statutes, or to the meaning of "entitlement" in the context of 793(d) and (e). One provision did note that "no person shall be entitled to knowledge or possession of, or access to, classified security information solely by virtue of  **1054**  his office or position," [337] but it was clearly designed simply to refute any implied entitlement throughout the Executive Branch and to ensure that only officials having a "need to know" classified information in order to perform their official duties would have access to it. [338] The next subsection of the Order stated that "[c]lassified security information shall not be discussed with or in the presence of unauthorized persons, and the latter shall not be permitted to inspect or have access to such information."

Superceding executive orders provide no clarification of the classification system's effect on the entitlement language of 793(d) and (e). Executive Order 10501, issued in 1953, included a virtually identical classification stamp for material furnished to persons outside the Executive Branch, [339] but contained no other provisions looking to the possibility of criminal sanctions for disclosure of classified "information" to unauthorized persons. [340] The text of Executive Order 11,652, the current Order governing classification, contains no reference to the classification stamp, although the preamble does state: "[w]rongful disclosure of [classified] information or material is recognized in the Federal Criminal Code as providing a basis for prosecution." [341] With respect to unauthorized disclosures by federal employees, the Order states:

> The head of each Department is directed to take prompt and stringent administrative action against any officer or employee of the United States, at any level of employment, determined to have been responsible for any release or disclosure of national security information or material in a manner not authorized by or under this order or a directive of the President issued through the National Security Council. Where

a violation of criminal statutes may be involved, Departments will refer any such case promptly to the Department of Justice. [342]

The Order is searched in vain for any explicit implementation of the "entitlement" language of 793(d) and (e), or any assumption that criminal sanctions are applicable to any and all unauthorized disclosures of properly classified defense information.

The Order did authorize the National Security Council to issue directives governing the marking of classified material. The NSC implementing directive requires classified information (other than "restricted data" under the Atomic Energy Act of 1954) to display the following warning:

## *1055  "NATIONAL SECURITY INFORMATION"

Unauthorized Disclosure Subject to Criminal Sanctions. [343]

These Executive Orders establishing the modern classification system are not easily construed as giving meaning to the entitlement language of 793(d) and (e) since no provision expressly defines the term. The obfuscation in the Orders as to the relevance of the criminal sanctions for breach of classification can only be purposeful; the latest Order, for example, is even less straightforward than its precursors in that it omits explicit reference to the espionage statutes.

Statutory authority for the classification program is not express. The Executive Branch, however, rightly claims that authority is implicit in a number of statutes. The Commission on Government Security, established by Congress in 1955 to review the federal loyalty and security program, found authority for the classification system in several statutes. [344] Significantly, the Commission did not mention sections 793 or 794, even though by citing sections 795 and 798 it demonstrated awareness of the espionage statutes. [345] Furthermore, numerous Executive summaries of classification problems manifest a belief, generally regretted, that violation of the classification system is not a criminal offense. [346] The Government Security Commission "found to its dismay" that unauthorized disclosure of classified information without subversive intent is "not amenable to applicable criminal statutes or other civil penalties" for persons "removed from Government Service." [347]

A number of legislative proposals have been introduced since 1950 that can only reflect the assumption that the espionage statutes do not prohibit non-culpable disclosure of properly classified information. Whether the lack of coverage was seen as stemming from the problems of giving meaning to the  *1056  entitlement concept is not clear. Other reasons for the proposals may have been the notion that all the espionage statutes, including 793(d) and (e), require a showing of purpose to injure the United States or advantage a foreign nation, or that proof of defense-relatedness would compromise the security interests of the classification program. Yet, if the only problem with current statutes were proof of defense-relatedness, one would expect the subsequent proposals to have been justified in terms of that legislative purpose. They have not been so justified.

Perhaps the most significant of these proposals, that of the Government Security Commission, would have made unauthorized disclosure of classified information a crime. [348] The measure made no progress at all in Congress, [349] and was abandoned by the Executive as politically untenable. [350] A similar proposal had been advanced in 1946 by the Joint Congressional Committee on the Investigation of the Pearl Harbor Attack. [351] It was severely cut back by the Judiciary Committees and wound up as the current section 798 of Title 18 which prohibits disclosure of the narrow category of classified communications intelligence information. [352] In 1962, Senator Stennis introduced a bill to amend section 793

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 73 of 126

THE ESPIONAGE STATUTES AND PUBLICATION OF ...,73 Colum. L. Rev. 929

to make disclosures of classified information a crime, without any narrow intent requirement.[353] The proposal was not enacted. If the classification system were thought to be protected by criminal sanctions against "willful" disclosure of defense-related information, it is remarkable that two Commissions and a Senator knowledgeable about the laws relating to national security would have seen a need for these proposals.

The relationship of the classification system to sections 793(d) and (e)'s "not entitled to receive it" formulation is thus unclear in three basic respects. First, Congress has not expressly authorized the President to define who is "entitled to receive" defense information. Furthermore, neither the statutes, the legislative history, nor the acts of the President support or point to the exercise of any such implicit authority. Second, even if "entitled to receive it" may be given meaning by Executive Order despite the deletion of express authority to define the phrase, its construction must be guided by the understanding of Congress. During the debates on S. 8148 Congress manifested an understanding that a person was "not entitled" only if a statute or valid order precluded his acquisition of particular information. Therefore, we cannot equate "not entitled" to receive with "not affirmatively authorized" to receive. Even assuming that the President has implicitly been granted authority to **\*1057**  define the terms--and assuming such delegation of power to control the speech of ordinary citizens could survive attacks on the grounds of vagueness and overbreadth--serious questions would remain whether the authority has been effectively exercised. The Executive has nowhere asserted that communication of classified information to a person not authorized by Executive regulations to receive it is a crime. The "classification stamps" are at most circuitous references to penal sanction that hardly bespeak Executive confidence that its rules and regulations give meaning to the entitlement concept. Finally, legislation has been offered from authoritative sources that proceeds on the assumption that 793(d) and (e) do not make simple disclosure of defense information a crime. Congress has always refused to enact such proposals to put criminal sanctions of general scope behind the classification system.

These confusions, in our opinion, vitiate whatever force there may be to the argument that because reference to the classification system is the only way to give meaning to the entitlement concept, subsections 793(d) and (e) should be interpreted to make criminal any communication of defense documents or information to persons unauthorized to receive it pursuant to the classification system. Reading the classification program into the "not entitled to receive it" phrase of subsections 793(d) and (e) would accomplish precisely what Congress has refused to do.

5. *Summary*. Subsections 793(d) and (e) remain mysterious even after patient efforts to analyze the legislative record that has produced them. To accord with the dominant theme of legislative intention, the culpability standard "willfully" must be imbued with a meaning which reflects the general substance of Senator McCarran's anti-censorship provision of the 1950 Act. Only by this straining of the statutory language can the legislative purpose of not enacting sweeping prohibitions on publication of defense information be respected. Moreover, a more conventional reading of "willfully" almost certainly leaves these statutes overbroad in the first amendment sense.

We doubt that reading "willfully" to save these statutes is worth the strain. The evidence is compelling that Congress ceased to have any real understanding of these statutes after 1) the provisions were broadened beyond the 1911 Act's prohibitions applicable to military places and government employees, 2) the provision which would have implemented the entitlement language was struck from the bill without explanation, and 3) Congress demonstrated by the narrowing and ultimate rejection of the Wilson Administration's broad proposed prohibition on publication of defense information that it did not intend to enact prohibitions on publication or communication motivated by the desire to engage in public debate or private discussion. The only time these provisions drew sustained legislative attention was during consideration of S. 8148, when the Senate of the 64th Congress proved itself overwhelmingly acquiescent to the Wilson Administration's interlocking  **\*1058**  proposals for broad information controls. As the more clearcut of these proposals went down to defeat in the 65th Congress, the vague and baffling provisions now codified in 793(d) and (e) survived intact, due to a combination of inadvertence in the Senate and understood narrow scope in the House. The 1950 revision exacerbated the confusion, at once making clear the applicability of the provisions to ordinary citizens as well as government employees, and reaffirming the inapplicability of the statute to publication of defense information. On top of this evidence of legislative confusion, there is the absence of any forthright executive action to implement the provisions' entitlement

language, and the refusal of later Congresses to adopt broader prohibitions on disclosure of classified information. The only reading of these provisions which is faithful to the legislative history would leave them accomplishing almost nothing not already covered by subsection 794(a) or the other subsections of 793. In these circumstances, courts should hold these provisions not applicable to communication or retention activities incidental to non-culpable revelation of defense information. Whether the courts should go further, and hold these statutes unconstitutionally vague across the board for the confusion surrounding the entitlement concept is a difficult question, but on balance we see little worth preserving in these two remarkably confusing provisions.

## VI. SUBSECTION 793(C)

Subsection 793(c) is yet another instance of Congress's enacting espionage legislation which if read literally may make criminal a considerable range of conduct pertaining to public debate. The statute provides:

> (c) Whoever, for the purpose aforesaid, receives or obtains or agrees or attempts to receive or obtain from any person, or from any source whatever, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note, of anything connected with the national defense, knowing or having reason to believe, at the time he receives or obtains, or agrees or attempts to receive or obtain it, that it has been or will be obtained, taken, made, or disposed of by any person contrary to the provisions of this chapter .... [353a]

As with subsections 793(d) and (e), the principal determinant of the statute's scope is the culpability required to violate it. That issue in turn depends on construction of "for the purpose aforesaid," a reference to the culpability standard of 793(a). Subsection 793(a) commences:

> Whoever, for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation, goes upon ....

**\*1059** Subsection 793(b) begins:

> Whoever for the purpose aforesaid, and with like intent and reason to believe, copies ....

In subsection 793(b) the words "purpose aforesaid" clearly mean only the purpose of obtaining information "respecting the national defense." Insofar as the same words "purpose aforesaid" are used in subsection (c), the argument is strong that they have the same meaning as in subsection 793(b). Such a construction permits conviction regardless of whether the actor intended or expected any harm to United States interests to result from his conduct.

Although this reading of subsection (c) is strongly supported by the statute's structure and drafting history,[354] apparently no one understood it that way. The assumption has been that the same culpability was required to violate subsection (c) as subsections (a) and (b). Thus, the single clear reference to subsection (c) in the 1917 Senate debates is Senator Sterling's comment in passing that "intent or reason to believe" is an element of the crime.[355] Similarly, the 1950 House report on the proposed amendments to section 793 states expressly that subsection (c) requires the prosecutor to prove wrongful intent;[356] and the same position was taken by the Legislative Reference Service in their response to

Senator Kilgore. [357]   In the absence of indication that subsection (c) has ever been thought by Congress to be of greater reach than subsections (a) and (b), we think it appropriate that the statute be given that gloss, even though such an interpretation is imaginative in view of the statutory language.

If this position is rejected, however, then the sweep of subsection 793(c) depends upon numerous other issues. First, it clearly prohibits receipt of tangible items only; regardless of whether oral revelation of the contents of a document is a communication, transmittal or delivery of it, certainly the person who simply listens does not thereby receive a document. Second, subsection (c) prohibits the receipt of documents or notes only when the actor knows of  **\*1060**  past or intended breaches of the espionage laws, bringing into question the reach of the other statutes. If subsections 793(d) and (e) are construed not to apply to participants in public debate, then subsection (c) has little impact on publications of defense secrets. If, however, subsections (d) and (e) are read to make any such disclosures criminal then subsection (c) makes the receipt of any tangible item that may be characterized as a "document" or "note" a criminal offense, even though no conspiratorial relationship of any sort exists between the recipient and the person who first disclosed. [358]

## VII. OTHER STATUTES BEARING ON PUBLICATION OF DEFENSE INFORMATION

In addition to sections 793 and 794, several other provisions, aimed either at narrow categories of especially sensitive information or at particular classes of actors, govern dissemination of information relating to national security. Indeed, if our understanding of the interpretation to be given sections 793 and 794 is correct, the narrower statutes constitute the only effective statutory controls on publication of defense information and preliminary retentions and communications leading up to publication. Furthermore, given the confusions of language and history in sections 793 and 794, later statutes that reflect Congress' understanding of the two general sections are valuable aids in interpreting them.

### A. *18 U.S.C. § 952*

Section 952 of Title 18 prohibits revelation by federal employees of any matter that has been transmitted in the diplomatic code of a foreign country. Although it is far narrower than the Espionage Act of 1917, the section evidences a characteristic congressional balancing of the need for secrecy and the interest in dissemination of news. Section 952 provides:

> Whoever, by virtue of his employment by the United States, obtains from another or has had custody of or access to, any official diplomatic code or any matter prepared in any such code, or which purports to have been prepared in any such code, and without authorization or competent authority, willfully publishes or furnishes to another any such code or matter, or any matter which was obtained while in the process of transmission between any foreign government and its diplomatic mission in the United States, shall be fined not more than $10,000 or imprisoned not more than ten years, or both. [359]

The statute was passed in response to the publishing activities of Herbert  **\*1061**  O. Yardley, a former director of the division of the State Department charged with breaking the diplomatic codes of other nations. [360]  The division was disbanded in 1929, apparently on the quaint notion that code-breaking was unethical during peacetime. In the same year, after leaving the Government, Yardley wrote a book entitled "The American Black Chamber," which described the Department's code-breaking procedures and included translations of coded dispatches sent by the Japanese Government to its representatives at the 1921 Disarmament Conference. Publication of these dispatches apparently embarrassed relations between the United States and Japan, and, perhaps more significantly, allegedly caused the Japanese Government to adopt a new code system and to tighten security with respect to cryptographic procedures. In late 1932, the State Department learned that Yardley had completed a second manuscript. Fearing that the second

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 76 of 126

book might contain more decoded dispatches and might further disrupt relations with Japan on the eve of the 1933 International Economic Conference, the Department quickly submitted a bill to prevent the publication of decoded messages sent by a foreign government.

The Department's proposed legislation, H.R. 4220 [361] went considerably  **1062**  beyond the needs of the Yardley case and reached more than the de-coded messages of foreign governments. The first section prohibited publication "for any purpose prejudicial to the safety or interest of the United States" of *any* "record, proceeding, map, book, document, paper or other thing" by anyone who had access to the material by virtue of his employment by the Government. Moreover, section two covered anyone, not just present or former government employees, who published "without authorization" any matter prepared in code or published anything obtained from the custody of a government employee "without authorization of competent authority," if the publication was "for any purpose prejudicial to the safety or interest of the United States." The House Judiciary Committee approved this proposal and the House passed this extraordinarily sweeping bill under suspension of rules and virtually without debate. [362] The Senate Judiciary Committee, however, balked at the vague prohibition applicable to publication of any and all government documents, [363] and once the bill was subjected to scrutiny, even the Secretary of State disavowed it. [364]

The Senate Judiciary Committee reported an amended version of H.R. 4220 that was narrowed to the scope of the current section 952. The basis for the Committee's action, it is clear, was concern that the House bill would have an unwarranted impact on freedom of the press. The sweeping ban on publication of anything obtained from the Government without authority was rejected out-of-hand, and publication of decoded diplomatic communiques was removed from the scope of the statute. The final statute regulated only the revelations of present or former government employees about diplomatic codes or matters obtained in the process of transmission.

 **1063**  In the Senate, a question was raised concerning the application of 952 when a present or former federal employee communicates and a newspaper publishes decoded foreign government messages. The debate made it quite clear that newspapers or reporters would not be guilty under the statute unless their activities met the tests of the general conspiracy statute, and that a nongovernment employee would not be covered by the bill if he happened to find some decoded messages and published them. [365] The statute was aimed solely at federal employees who breached their trust, [366] and any outsiders who "willfully contributed to that act, advised, aided, and abetted it." [367] The House accepted the Senate's much narrowed version of section 952, virtually without debate. [368]

The relevance of section 952 to the provisions of the 1917 Act is suggestive but inconclusive. It is clear that neither the Executive Branch nor Congress believed that Yardley's publication was barred by the 1917 Act. However, the precise basis for this assumption is not clear; indeed, the Espionage Act was hardly mentioned. There may have been doubt that material transmitted in a foreign diplomatic code was "information respecting the national defense. If the Espionage Act was thought inapplicable for this reason, the enactment of section 952 would shed no light on whether the Espionage Act was considered a bar on publication of defense information. Alternatively, it may have been assumed that Yardley's publishing activities did not constitute a "communication" barred by the precursors to subsections 793(d) and 794(a). [369]

Since it cannot be known which of these reasons might have led the Executive and Congress to conclude that the Espionage Act did not prevent Yardley's publications, and since the earlier Act was not expressly considered, we believe the adoption of section 952 is not a significant aid in interpreting the earlier statutes. However, the provision is a characteristic response by Congress: when faced with a clear conflict between secrecy and freedom of the press, it made a conscious judgment not to penalize publication but to protect the secrecy interest by regulation of the government employee. This pattern of reconciliation, reflected in section 952, may be instructive insofar as it supports our hypothesis that subsection 1(d) of the 1917 Act was intended at most to apply to government employees. Yet caution should be exercised about even this analogical use of 952. Congress may well have believed that the revelation of diplomatic codes

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 77 of 126

would present less of a threat to national security than the disclosure of information respecting the national defense. Less **\*1064** sweeping restraints on revelation may therefore have been regarded as appropriate.

### B. *18 U.S.C. § 798*

Ambiguities do not cloud the relevance of section 798 to the coverage of the Espionage Act of 1917. [370] This provision was enacted in 1950, virtually contemporaneously with 793(d) and (e), to cover cryptographic information, material surely at the heart of the "related to the national defense" conception. [371] Explicit assumptions were made as to the coverage of 793 and 794.

Section 798 makes criminal knowingly and willfully communicating, transmitting, furnishing or publishing classified information concerning: 1) the "nature, preparation, or use of any" code, cipher or cryptographic system "of the United States or any foreign government"; 2) the construction, use, maintenance or repair of any device used, or planned to be used for cryptographic intelligence purposes; 3) the communication intelligence activities of the United States or any foreign government; and, 4) information obtained by processes of communications intelligence from any foreign government, knowing the same to have been obtained by such processes. [372]

**\*1065** Although a few questions arise under this statute that has yet to receive judicial gloss, compared to sections *793* and 794 it is a model of precise draftsmanship. [373] First, the statute and its history make evident that violation occurs on knowing engagement in the proscribed conduct, without any additional requirement that the violator be animated by anti-American or pro-foreign motives. Second, the use of the term "publishes" makes clear that the prohibition is intended to bar public speech. Third, the inevitable vagueness in defining what cryptographic information is subject to restriction is substantially mitigated, although perhaps at the cost of overbreadth, by making classification an element of the offense.

One significant question left open under 798 is whether there is a defense of improper classification. Classified information is statutorily defined as that "which ... is, for reasons of national security, specifically designated by a United States Government Agency for limited or restricted dissemination or distribution." If "for reasons of national security" referred simply to the motive for classification, then no defense would be appropriate on the grounds that the discretion to classify was improperly exercised. The only effect of the phrase would be to make clear that information classified for reasons other than national security, and thus improperly classified under the Executive Orders authorizing the classification program, was not within the scope of 798. On the other hand, both the Senate and House Judiciary Committee Reports state: [t]he bill specifies that the classification must be *in fact* in the interests of national security." [374] This suggests that the appropriateness of the classification is a question of fact for the jury. Presumably, the courts would weigh heavily this indication of legislative intent, particularly since the resulting **\*1066** interpretation of 798 would accord with the position of 793 and 794 on this question. [375]

Whether, as a matter of sound policy, improper classification should be a defense is a difficult judgment to make. The principal argument against it is the familiar one, rejected in 793 and 794, that the Government may have to reveal too much in refuting the claim of improper classification. [376] It may be that cryptographic techniques would be rendered especially vulnerable if the Government was required to demonstrate why particular information must be classified. The countervailing consideration is, of course, the fact routinely accepted in all quarters that the Executive branch abuses the power of classification. To give the Executive unreviewable power to invoke a prohibition on the communications of everyone, even as to a relatively narrow category of information, seems to be of doubtful wisdom.

The conclusion that the legislative history would support a defense of improper classification is an important one in assessing the reasons why Congress, despite the 1917 Act, thought section 798 was necessary. Under the 1917 Act, the

Government must prove defense-relatedness as an element of its case, and such a demonstration may itself significantly compromise Government secrecy. Prohibitions on disclosure of classified information as such, with no defense of improper classification, do not put the Government to this counterproductive burden of proof. Apparently, however, the committees did not intend to relieve the Government of this burden in prosecutions under section 798, and thus elimination of this problem for the Government under the 1917 Act cannot have been what moved Congress to adopt section 798, Instead, the passage of section 798 reflects other significant congressional assumptions about the limited scope of the Espionage Act of 1917. In addition, section 798 also evidences strong concern for freedom of the press at virtually the same time Congress was revising subsection 1(d) of the 1917 Act into the present subsections 793(d) and (e).

Information about cryptographic processes would clearly meet the test of "information relating to the national defense" within the meaning of the 1917 Act. Thus, the failure of the earlier Act to cover publication of code information must have been regarded as resulting from other limits in its scope. The legislative history of the cryptography provision strongly suggests that Congress and the Executive believed general publication of communications intelligence information would fail to meet the "intent or reason to believe that the information [communicated, obtained, copied, etc.] is to be used **\*1067** to the injury of the United States, or to the advantage of any foreign nation" required by the 1917 Act. Both committees noted that the Espionage Act of 1917 "protect[ed] this information, but only in a limited way." [377] They went on to state that under the Act "unauthorized revelation of information of this kind can be penalized only if it can be proved that the person making the revelation did so with an intent to injure the United States." [378] The House Report concluded:

> The present bill is designed to protect against knowing and willful publication or any other revelation of all important information affecting United States communication intelligence operations and all direct information about all United States codes and ciphers. [379]

The committees clearly assumed that cryptographic information was covered by 793 and that "revelation" of it was proscribed, if done with intent to injure the United States. Thus, the committees must have interpreted the 1917 Act's culpability standard as tantamount to a purpose requirement, since communication to the enemy is implicit in general publication, and therefore knowledge of injury to the United States can be assumed although the purpose of publication may be different.

The enactment of section 798 accordingly supports our understanding of the culpability standards of section 794 and subsections 793(a) and (b). Passage of a special statute to protect communications intelligence information from "knowing and willful publication" also reflects a reasonably narrow understanding of subsection 1 (d) of the 1917 Act. The committees' understanding of section 1(d) is entirely speculative. About all that can be said is that the passage of 798 is consistent with a narrow reading of subsection 1(d), either as applicable only to current government employees, [380] or as embodying the restrictive Espionage Act culpability standard through the word "willfully," or as reaching communications but not publication, or because the "not entitled to receive it" phrase had never been implemented, leaving 1(d) without force. Thus, section 798 is consistent with our conclusion that Congress **\*1068** did not understand subsection 1(d) to accomplish broad prohibitions on any and all communications of defense information to persons out of the line of Executive authority.

Section 798 is also an interesting example of Congress' approach to publication controls at the time of the revision of subsection 1(d). It represents a conscious narrowing by Congress of sweeping proposals to criminalize disclosure of defense information. What Congress refused to do in 798 is as important as what it did do. The Joint Congressional Committee for the Investigation of the Attack on Pearl Harbor had urged Congress to prohibit revelation of any classified information; [381] however, the House Judiciary Committee rejected such an extensive prohibition on publication. Section 798, the committee said, "is an attempt to provide just such legislation for only a small category of classified matter, a

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE Document 112-1 Filed 10/03/17 Page 79 of 126

category which is both vital and vulnerable to an almost unique degree." [382] Even with respect to the narrow category of cryptographic information, section 798 represents a conscious narrowing of suggested coverage. The initial proposal, according to the committee, would have penalized the "revelation or publication, not only of direct information about United States codes and ciphers themselves but of information transmitted in United States codes and ciphers." [383] Such a measure would have prohibited the publication of a great number of military and diplomatic dispatches sent by the Government to its overseas posts. The committee, however, reported out a bill that covered only information from foreign governments intercepted by cryptographic techniques. In the words of the Committee:

> Under the bill as now drafted there is no penalty for publishing the contents of United States Government communications (except, of course, those which reveal information in the categories directly protected by the bill itself). Even the texts of coded Government messages can be published without penalty as far as this bill is concerned, whether released for such publication by due authority of a Government department or passed out without authority or against orders by personnel of a department. In the latter case, of course, the Government personnel involved might be subject to punishment by administrative action but not, it is noted, under the provisions of this bill. [384]

**\*1069** With the bill limited to a narrow category of highly sensitive information, and with concern for public speech having been thus respected by the committee, it is no wonder that section 798 was supported by the American Society of Newspaper Editors. [385] The House passed the bill without debate, [386] and the Senate with virtually none. [387]

Is it likely that Congress could have contemporaneously evidenced such concern for the values of public debate in the context of communications intelligence information--surely among the most sensitive categories of defense information--and at the same time intended subsections 793(d) and (e) to accomplish sweeping controls on all communications of any information related to the national defense? It is possible, of course, that Congress was operating on entirely inconsistent premises in adopting section 798 and, four months later, subsections 793(d) and (e). We believe, however, that Congress' evident concern in narrowing section 798 supports the statements in the legislative history of subsections 793(d) and (e) that indicate sweeping controls on public speech about defense matters were not intended.

### C. The Photographic Statutes: 18 U.S.C. §§ 795, 797 and 50 U.S.C. App. § 781

Section 797 of Title 18 expressly proscribes publication of a category of material whether or not undertaken with intent to injure the United States. Section 797's prohibition is derived from section 795 which prohibits the making of any "photograph, sketch, picture, drawing, map, or geographical representation" of "vital military installations or equipment," following their designation by the President "as requiring protection against the general dissemination of information relative thereto," unless the duplication is authorized by appropriate authority and submitted for censorship. [388] The offense is punishable by one year's imprisonment. Section 797 implements section 795 **\*1070** by making it an offense, also punishable by one year's imprisonment, to "reproduce, publish, sell or give away" any "photograph, sketch, picture, drawing, map, or graphical representation" of any vital military or naval installation, as defined by the President under section 795, unless the picture has been marked as censored by appropriate military authority. [389] No ulterior intent is required by either statute. Although sections 795 and 797 appear to be narrow provisions, since their enactment in 1938, Presidents have consistently defined the key language, "installations and equipment," very broadly. [390] The current Executive Order defines "vital military and naval installations or equipment requiring protection against the general dissemination of information relative thereto" as comprehending, in addition to expected places and hardware,

[a]ll official military, naval, or airforce books, pamphlets, documents, reports, maps, charts, plans, designs, models, drawings, photographs, contracts, or specifications which are now marked under the authority or at the direction of the President, the Secretary of Defense, the Secretary of the Army, the Secretary of the Navy, or the Secretary of the Airforce as "top secret", "secret", "confidential" or "restricted" and all such articles or equipment which may hereafter be so marked with the approval or at the direction of the President. [391]

This broad definition of equipment has never been subject to judicial scrutiny, and there are no reported prosecutions under these interlocking statutes and the implementing Executive Order. If the Order is valid, section 797 would appear to bar any publication of a classified military document, as opposed to information contained therein, assuming that copies constitute a "photograph, sketch, picture, drawing, map, or graphical representation" of the original. Would a Xerox copy qualify? We believe the provisions dealing with manner of copying should be construed broadly. The limits on the statute's scope should be found in objects that are subject to restraint, not artificial constriction of the manner of copying.

The Justice Department chose not to rely on section 797 in the *Pentagon Papers* case, despite the New York Times' challenge that there was no statute **\*1071** on the books barring publication of the documents. Whether that decision reflected doubt that the Papers were "official military" documents or that the Executive Order would survive judicial scrutiny, or simply resulted from oversight in the press of that litigation, we cannot know.

Judging whether the statutory phrase "vital military installations or equipment" may be defined to include documents presents the problem, familiar under the espionage statutes, of drawing inferences from skimpy legislative materials. A letter from the War and Navy Departments to the Senate Committee on Military Affairs proclaimed that the purpose of the proposal that became sections 795 and 797 was to:

permit more effective control of the activities of free-lance motion-picture and still-picture operators in vital military and naval installations, where the intent of the photographer is not necessarily so flagrant as that contemplated under [section 793]. [392]

The House committee report accompanying the same proposal, however, spoke in broader terms:

The Committee is of the opinion that this measure is necessary to prevent important facts regarding our national-defense installations from falling into the possession of persons who, through ignorance of their significance, or hostile intent, would permit them to be used to the detriment of the United States. [393]

In both reports, however, the focus is on installations rather than on information not connected directly to secret places and hardware.

The fact that sections 795 and *797* occasioned very little debate and no references to the wisdom of controls on publication suggests that Congress did not understand that those bills would operate to bar publication of all classified military documents. [394] Indeed, the establishment, without discussion, of precisely the sort of prior review system that so worried Congress in 1917 seems inexplicable except on the assumption that the only matters governed by the bill were photographs, not then clearly a matter of first amendment concern. [395] Moreover, since the enactment of sections 795

and 797, proposals to broaden government control of information have been advanced, and sections 795 and 797 have never been asserted to take care of the matter. [396]  **\*1072** Indeed, Congress was willing to enact the cryptography bill only after it was amended to remove criminal sanctions for publishing government documents that had been transmitted in code. [397] Thus, the language of sections 795 and 797, and their legislative history, cast strong doubt on the validity of the Executive Order.

On the other hand, arguments in favor of a broad construction of equipment can be made. First, the applicable executive definition was given early and has survived subsequent congressional tinkering with the law. These are factors that traditionally argue for upholding a regulation, [398] although here they are perhaps of less weight in light of the traditional tension between Congress and the Executive over government information policy and the lack of publicized litigation over the scope of the Act. Second, a classified document describing how to repair a complex radar unit can easily be considered part of a soldier's "equipment," and if that is granted, why draw the line to exclude classified instructions or reports on the best manner of carrying out aerial bombing or counterinsurgency campaigns? Third, publication of a document, as opposed to merely the information contained therein, may compromise certain types of codes and allow a good team of cryptographers to unravel all other messages sent during a given period, although that consideration may well be thought foreclosed by Congress' express refusal to extend section 798 to cover such publication.

The preceding arguments, however, go primarily to the question whether the broad Executive Order makes sense, and not to whether Congress has in fact enacted a statute which authorizes it. On balance, we are unable to find in the legislative record any evidence that Congress so intended. On the assumption that Congress intended sections 795 and 797 to apply narrowly to graphical representations of military installations and equipment in the usual sense, passage of these sections in 1938 adds further force to the conclusion that Congress did not understand the Espionage Act of 1917 to prohibit publication of defense information. Photographs of "vital" military installations surely constitute information respecting the national defense. Indeed, the perceived need for sections 795 and 797 supports a narrow reading of section 1(d) and the interpretation of the culpability requirements of the other provisions that we have adopted.

In 1942, Congress passed 50 U.S.C. App. § 781, a second prohibition on photographing military property, because of perceived gaps in the general  **\*1073** espionage statutes and in sections 795 and 797. [399] Applicable during the time of national emergency we have enjoyed since 1950, [400] section 781 prohibits knowingly photographing or sketching any military property or place whatsoever, unless authorization has been received. Although the statute does not prohibit disclosure of any sort, the legislative history indicates that the provision was enacted to prohibit the taking of photographs which were later published. [401] The espionage statutes were considered inadequate because they required "the actual proof of intent to injure the United States" and photographers seeking publication have no such intent. [402] Sections 795 and 797 were seen as inadequate because they did not authorize the President to define "an entire military or naval reservation as requiring protection against the general dissemination of information relative thereto."

### D. *50 U.S.C. § 783(b)*

Brief mention should be made of the prohibition on disclosure by Government employees of classified information to foreign agents and members of Communist organizations. This provision was passed as section 4(b) of the  **\*1074** Internal Security Act of 1950, which also brought subsections 793(d) and (e) into their present form. [403] As codified in 50 U.S.C. 783(b), it provides:

> It shall be unlawful for any officer or employee of the United States or of any department or agency thereof, or of any corporation the stock of which is owned in whole or in major part by the United States or any department or agency thereof, to communicate in any manner or by any means, to any other person whom such officer or employee knows or has reason to believe to be an agent or representative of any foreign

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 82 of 126

government or an officer or member of any Communist organization as defined in paragraph (5) of section 782 of this title, any information of a kind which shall have been classified by the President (or by the head of any such department, agency, or corporation with the approval of the President) as affecting the security of the United States, knowing or having reason to know that such information has been so classified, unless such officer or employee shall have been specifically authorized by the President, or by the head of the department, agency, or corporation by which this officer or employee is employed, to make such disclosure of such information.

Subsection 783(b) is an important strand in the web of statutes governing revelation of defense secrets, although it has little bearing on proper construction of the espionage statutes. In the important *Scarbeck* case, the provision was construed to cover employee communications of classified material whether or not classification was proper in substance, so long as the manner of classification follows the procedural guidelines established by applicable Executive Orders, [404] It is clear from both the legislative history and this authoritative judicial construction that the sweep of the information subject to the statutory prohibition was thought justified by its narrow applicability with respect to actors and recipients. [405] No particular reading of the espionage statutes is implicit in the passage of 783(b), however, because 783(b) covers any classified information while the espionage statutes cover only material which a jury finds "related to the national defense." But it is notable that even with respect to a provision aimed solely at Government employees, Congress in 783(b) only prohibited communication to a very narrow category of recipients. The legislative history nowhere suggests that such communication would be deemed to have taken place through disclosure of classified information to the press, followed by widespread publication.

### E. *The "Restricted Data" Statutes: 42 U.S.C. §§ 2271-81*

The interesting provisions which protect "restricted data"[406] concerning atomic weapons or energy from communication or disclosure to unauthorized **\*1075** persons are of little assistance in construing the general espionage statutes, although they are of intrinsic significance in assessing controls on publication of defense information. Section 2274 sets out two differently graded offenses, the more severe being communication or disclosure of "restricted data" to anyone "with intent to secure an advantage to any foreign nation," and the second covering the same communication "with reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation."[407] The split of the culpability standards in these two subsections, and the different grading--in contrast to the culpability standards of the espionage statutes--indicate that recklessness, and perhaps negligence, with respect to injury or advantage is sufficient to violate these provisions. No purpose to injure or advantage presumably need be shown to establish a violation of the lesser offense. Section 2277 makes criminal knowing disclosure of restricted data to any person not authorized by the Atomic Energy Commission, but applies only to present and former Government employees or contractors.[408] Other sections make criminal receipt of restricted data with intent to injure the United States or to secure an advantage to any foreign nation,[409] and tampering with restricted data with like intent.[410]

One provision of possible relevance to the injunction proceeding against the New York Times is section 2280,[411] which authorizes injunctions against threatened violations of any of the criminal provisions governing restricted data. Presumably, section 2280 authorizes an injunction against a present or former Government employee planning on publishing himself, or revealing to a newspaper, restricted data. Such disclosure would violate section 2277. It is not clear, however, whether a newspaper could be enjoined from publication. Newspapers are not subject to section 2277, unless they are in conspiracy with the disclosing employee, and therefore are not subject to injunction by virtue of that substantive offense. Moreover, nothing in the legislative history bears on the question whether publication should be considered a communication "to any ... person ... with reason to believe such data will be utilized to injure the United

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 83 of 126

States etc," in violation of subsection 2274(b). The arguments for and against such a construction generally follow our consideration of the meaning of communication in 793(d) and (e). [412]

These provisions and the legislative history which gave rise to them provide no insights into the meaning of the basic espionage statutes. We **\*1076** mention them briefly here to complete our overview of other statutes governing particular areas of information relating to the national security.


## VIII. CONCLUSION: ROOM FOR IMPROVEMENT

The basic espionage statutes are totally inadequate. Even in their treatment of outright spying they are poorly conceived and clumsily drafted. The gathering and obtaining offenses of subsections 793(a) and 793(b) have no underlying purpose that could not be served by more precise definition of attempts to violate the transmission offenses of subsection 794(a). No subsection of the general provisions of sections 793 or 794 has an easily understood culpability standard. Subsections 794(a), 793(a) and 793(b) employ "intent or reason to believe information is to be used to the injury of the United States or to the advantage of any foreign nation." Surely, however, Congress did not wish to subject negligent conduct to the death penalty by using the words "reason to believe"; nor is it clear what is meant by "is to be used" or "advantage" and "injury."

Subsection 793(c) is another puzzle. The culpability required turns on the meaning of the phrase "for the purpose aforesaid." The two sections immediately preceding it, subsections 793(a) and (b), state that conduct done "for the purpose of" obtaining information respecting the national defense, and with intent or reason to believe, is criminal. In light of the prior use of "purpose" and "intent" as separate requirements, the common-sense reading of subsection 793(c) is that "for the purpose aforesaid" means only "for the purpose of obtaining national defense information" and not "intent and reason to believe." Yet all the evidence we have found indicates agreement by both Congress and the Executive Branch that subsection 793(c) requires the same culpability as subsections 793(a) and (b).

Then, there are the mysteries of the term "willfully" in subsections 793 (d) and (e) and the added twist that a special "reason to believe" culpability requirement that allegedly protects in special fashion those who disclose "information," but not documents, is itself a problematic distinction. The phrase adds content to the law, however, only if the rest of the statute is read so broadly as to be clearly unconstitutional. Finally, there is 794(b)'s intent standard, which can be given a clear interpretation--intent means conscious purpose--only by making the statute paradoxical. Why did Congress choose to subject publications to controls pursuant to a standard that so rarely will be met? Why should actions taken by publications with the purpose of furthering foreign interests by disclosing national defense secrets not be criminal except in time of war? In light of this confusion about the culpability standards, it is somewhat ironic to recall the confident assertions in *Gorin* that the vague **\*1077** parameters of "national defense information" may be ignored because scienter is required.

The difficulty in finding the proper application of the laws to clandestine espionage is minor compared to the incredible confusion surrounding the issue of criminal responsibility for collection, retention, and public disclosure of defense secrets. In essence, a choice must be made between giving effect either to broad statutory language designed in the Executive Branch or to the considerable evidence spread over a half-century that Congress wanted much more limited prohibitions. The choice is particularly difficult since the evidence of congressional intent is not absolutely clear. Issues were not precisely understood by lawmakers who were often unenlightened and at cross-purposes with one another over the meaning of basic terms. Nevertheless, on the issue of the criminality of public debate, one proposition is, in our view, unquestionable: neither the Congresses that wrote the laws nor the Executives who enforced them have behaved in a manner consistent with the belief that the general espionage statutes forbid acts of publication or conduct leading up to them, in the absence of additional and rarely present bad motives.

Regardless of the proper construction of the current statutes, it is time for clarification by legislation that treats the problem anew. The ambiguity of the current law is tolerable only because the limits of the right to disclose and publish have been so rarely tested. This pressing to the limits is, in a sense, the deeper significance of the publication of the Pentagon Papers. It symbolizes the passing of an era in which newsmen could be counted upon to work within reasonably well understood boundaries in disclosing information that politicians deemed sensitive. As remarkable as the constant flow of leaked information from the Executive Branch since the classification programs were implemented [413] is the general discretion with which secret information has been used [414] (attesting to the naturally symbiotic relationship between politicians and the press). The New York Times, by publishing the Papers, did not merely reveal a policy debate within the Executive Branch; it demonstrated that much of the press was no longer willing to be merely an occasionally critical associate devoted to common aims, but intended to become an adversary threatening to discredit not only political dogma but also the motives of the nation's leaders. And if the Times should be discreet, some underground newspaper stands ready to publish anything that the Times deems too sensitive to reveal. [415]

 **\*1078**  This changing role of the press is a necessary counterweight to the increasing concentration of the power of government in the hands of the Executive Branch. There are, however, aspects to the development that are troublesome in the context of national defense secrets. We reject the Utopian notion that there are no defense secrets worth keeping and that every aspect of national security should be disclosed to facilitate adequate public comprehension of the policy choices to be made. Yet technology makes document copying ever more simple. As the lower levels of the executive bureaucracy, shut off from real participation in decision-making, are racked by the same conflicts about the ends and means of foreign policy that characterize the wider community, criminal sanctions assume greater significance in the protection of the Government's legitimate secrecy interests. Paradoxically, the likely consequence of the law's failure to give weight to security considerations would be to augment the strong tendency to centralize power into fewer hands, because only a small group can be trusted to be discreet.

If regulation of publication is necessary, it is far better for Congress to do the job than to permit the Executive Branch 10 enforce secrecy by seeking injunctive relief premised upon employee breach of adhesion contracts. In the recent *Marchetti* case, [416] a former C.I.A. agent was enjoined from publishing, without prior agency approval, accounts of his experience as an intelligence agent. [417] He had signed an agreement as a condition of employment saying that he would never reveal "information related to the national defense." [418] Although the policy of requiring government officials, past and present, to remain silent may be wise, it is not a question that ought to be relegated to judicial enforcement of executive contracts, thereby excluding from policy formation the one branch most entitled to decide. Only the fact that the  **\*1079** Government will so rarely have advance notice of intent to publish keeps the *Marchetti* precedent for injunctive relief from becoming a dangerous alternative to the necessity of legislative clarification.

The opportunity for careful reevaluation of the espionage problem is at hand, since Congress is now considering the recodification and reformulation of the federal criminal law. Few undertakings deserve greater support. The present federal criminal law suffers generally from the confusion and defects that inevitably occur when major problems in the law of crimes requiring conceptual clarity and overall design are left to the ad hoc responses of successive Congresses. [419] But revision is a task of awesome complexity, particularly as to matters like espionage where the underlying problems have not been explored in the course of recent efforts to revise state criminal codes. Unfortunately, the espionage proposals currently before Congress as part of S. 1 [420] and S. 1400, [421] the Nixon Administration's latest proposal, are inadequate to reconcile the conflicting interests at stake. Insofar as there have been five different espionage proposals [422] in the last two years, and there are surely more to come, general discussion of the approach of the two most recent revision proposals seems more appropriate than detailed analysis.

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 85 of 126

The basic problem with S. 1 is that too much of the sloppy drafting of the old law is perpetuated and the new formulations do not resolve the problems that perplexed former Congresses. S. 1 treats the matters now covered by sections 793-98 with the following provisions:

### § 2-5B7. Espionage

(a) OFFENSE.--A person is guilty of espionage if:

(1) with knowledge that the information is to be used to the injury of the United States or to the advantage of a foreign power, he gathers, obtains, or reveals national defense information for or to a foreign power or an agent of such power; or

(2) with intent that it be communicated to the enemy and in time of war, he elicits, collects, records, publishes, or otherwise communicates national defense information.

(b) ATTEMPT.--Without otherwise limiting the applicability of section 1-2A4 (criminal attempt), any of the following is sufficient to constitute a substantial step under such section toward commission of espionage under subsection (a)(1): obtaining, collecting, or **\*1080** eliciting national defense information, or entering a restricted area to obtain such information.

(c) GRADING.--The offense is a Class A felony if committed in time of war or if the information directly concerns military missiles, space vessels, satellites, nuclear weaponry, early warning systems or other means of defense or retaliation against attack by a foreign power, war plans, or defense strategy. Otherwise it is a Class B felony.

### § 2-5B8. Misuse of National Defense Information

(a) OFFENSE.--A person is guilty of an offense if in a manner harmful to the safety of the United States he:

(1) knowingly reveals national defense information to a person who is not authorized to receive it;

(2) is a public servant and with criminal negligence violates a known duty as to custody, care, or disposition of national defense information, or as to reporting an unauthorized removal, delivery, loss, destruction, or compromise of such information;

(3) knowingly having unauthorized possession of a document or thing containing national defense information, fails to deliver it on demand to a Federal public servant entitled to receive it;

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 86 of 126

(4) knowingly communicates, uses, or otherwise makes available to an unauthorized person communications information;

(5) knowingly uses communications information; or

(6) knowingly communicates national defense information to an agent or representative of a foreign power or to an officer or member of an organization which is. in fact, defined in section 782(5), title 50, United States Code.

(b) GRADING.--The offense is a Class C felony if it is committed in time of war. Otherwise it is a Class D felony.

The key term "national defense information" is explicitly defined:

"[N]ational defense information" means information regarding:

(i) the military capability of the United States or of a nation at war with a nation with which the United States is at war;

(ii) military or defense planning or operations of the United States;

(iii) military communications, research, or development of the United States;

(iv) restricted data as defined in section 2014, title 42, United States Code;

(v) communications information;

(vi) in time of war, any other information which if revealed could be harmful to national defense and which might be useful to the enemy;

(vii) defense intelligence of the United States, including information relating to intelligence operations, activities, plans, estimates, analyses, sources, and methods.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 87 of 126

In our opinion, enactment of this proposal would do no more than perpetuate the current confused state of the law. Consider the espionage **\*1081** offenses of section 2-5B7, which for the most part restates the current section 794. Like subsections 794(a) and (b), the two offenses created are nearly identical. Section (a)(1) makes knowledge that national defense information "is to be used" to the injury of the United States or to the advantage of a foreign nation the test of whether a crime is committed. Does one who publishes "reveal ... for or to a foreign power" within the meaning of the law? If not, it is only because 2-5B7(a)(2) says "publishes" while (a)(1) does not. Whatever the proper resolution, it is a mistake for recodification to treat such an important issue so opaquely. Similarly, publishing is explicitly made criminal only in time of war and only where there is "intent that [the information] be communicated to the enemy." The proposed code defines "intentionally" to require a conscious objective to cause the particular result. [423] Consequently, as in 794(b), the purported coverage of publication is largely illusory because very few newspapers intend to inform the enemy.

The new offense of "Misuse of National Defense Information" in section 2-5B8 is also perplexing, although we can be thankful that it departs from the models set out by section 793, particularly in its dispatching with the entitlement concept. Is publishing or conduct incident thereto meant to be covered? What is the meaning of "in a manner harmful to the safety of the United States?" Aside from issues of vagueness, is this phrase intended to require that the prosecutor prove that because of the actor's conduct consequences harmful to United States' safety actually resulted, were likely to result or might conceivably have come about? [424] To ignore clear resolution of these issues is to be satisfied with a statute whose basic design defies interpretation.

The Administration's proposals in S. 1400 do not suffer from these ambiguities. Their problem is that they are so excessively restrictive of public debate that their unconstitutionality, let alone their misconceptions of appropriate public policy, is, in our view, patent. Five offenses, too lengthy to be fully set out, are defined: espionage, [425] disclosing national defense information, [426] mishandling national defense information, [427] disclosing classified information, [428] and unlawfully obtaining classified information. [429] The proposed espionage offense is drafted with remarkable breadth:

(a) OFFENSE.--A person is guilty of an offense, if, with intent that information relating to the national defense be used, or with knowledge that it may be used, to the prejudice of the safety or interest **\*1082** of the United States, or to the advantage of a foreign power, he knowingly:

(1) communicates such information to a foreign power;

(2) obtains or collects such information for a foreign power or with knowledge that it may be communicated to a foreign power; or

(3) enters a restricted area with intent to obtain or collect such information for a foreign power or with knowledge that it may be communicated to a foreign power.

Insofar as "communicate" means "to make information available by any means, to a person or to the general public," [430] the statute makes it an offense to collect national defense information knowing that it may be published. [431] "National defense information" is defined slightly more narrowly than in S. 1, but does include:

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:17-cr-00034-JRH-BKE  Document 112-1  Filed 10/03/17  Page 88 of 126

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

[I]nformation, regardless of its origin, relating to:

(1) the military capability of the United States ....

* * * *

(5) military weaponry, weapons development, or weapons research of the United States ....

* * * *

(9) the conduct of foreign relations affecting the national defense .... [432]

Given the scope of "national defense information," the result would be to paralyze newspaper reporting on national defense affairs. We strongly doubt that the nation needs a far reaching official military secrets act. Surely it does not need one that makes the offense a capital crime when committed "during a national defense emergency" or when information concerns a "major weapons system or [a] major element of defense strategy," [433] and a class B felony otherwise. [434]

Similarly, the rest of the offenses, with the exception of obtaining classified information, [435] are defined in terms so broad that they mark an abrupt departure from statutory precedents. Any knowing communication of defense information to an unauthorized person would be made a class C or D felony, **1083** and unauthorized retaining of defense information would be a class D felony, both without regard to any intention or knowledge respecting injury to the United States. [436] Disclosure of classified information by a present or former federal employee, except to a "regularly constituted" Congressional committee pursuant to "lawful demand," would be a Class E felony [437] and no defense that information was improperly classified would be permitted. [438]

The consequence of S. 1400's enactment would be to prohibit virtually all public and private speech about national defense secrets, leaving to prosecutors and juries to choose victims among those who engage in reporting and criticism of our defense and foreign policies. Like Senator Cummins in 1917, we can only marvel that legislation at once so sweeping and so stringent could be seriously proposed. We trust that it will not be enacted.

What should be done? In our reasonably open society, Congress and the newspapers reveal large amounts of defense information that would be difficult and exceedingly expensive for interested foreign governments to collect on their own. That form of foreign aid to adversaries is, however, a necessary consequence of the nation's deepest values. [439] We do not accord much significance to protests that as a general matter we make it easy for others to assess our strength [440] because our strength is so awesome. The more difficult questions concern the protection of secrecy in narrower premises where specific objectives, opportunities, and advantages are lost if particular types of secrets are publicized. [441] Unfortunately, to distinguish these matters--indeed to know whether they can effectively be distinguished--requires more knowledge than we have about intelligence affairs and the extent to which truly important security interests have been compromised

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 89 of 126

by well-meant disclosures. We have nonetheless come to certain conclusions that, while general, may assist legislators and others in their consideration of the problems.

No legislation can be adequate unless it recognizes that at least three problems must be treated independently: spies, government employees and ex-employees, and newspapers and the rest of us. [442] Both the present espionage **\*1084** statutes and the proposals of S. 1 and S. 1400 [443] are fatally defective in that they ignore the necessity of separate considerations of the distinct interests in each of these contexts.

The essence of classical espionage is the individual's readiness to put his access to information of defense significance at the disposal of agents of foreign political organizations. Granted that the harm that results from his conduct is a function of the importance of the information transferred, there should be no hesitation, regardless of the banal quality of defense information involved, to punish the citizen whose priorities are so ordered or foreigners whose job it is to risk apprehension. We believe, therefore, that the information protected against clandestine transfer to foreign agents should be defined broadly, probably more broadly than in current law. In this context, we see no dispositive objection to making knowing and unauthorized transfer of classified information to foreign agents an offense, without regard to whether information is properly classified. [444] That a spy might earn complete immunity by stealing secrets so serious that their significance cannot be disclosed in court--a clear possibility under current law, [445] and also under S. 1 and S. 1400--is an outcome that should be avoided, if possible.

Two objections may be made to this broadened approach. First, it puts considerable reliance on the capacity to adjudicate accurately whether persons are in fact acting as agents of foreigners. If the prosecutor need not demonstrate the significance of the transferred information, there is an enhanced risk that casual disclosures of improperly classified information to foreign friends may be wrongly deemed espionage. Nothing in the literature, however, suggests to us that this is a serious problem, and it may be further minimized by insistence upon the actor's awareness that his disclosures are intended for primary use by foreign political organizations. [446] Second, and more troublesome to us, is the fact that for deterrence purposes the penalties for espionage are and should be exceptionally steep. Denying improper classification as a defense may expose an offender whose conduct has produced no real harm to the most serious penalties the law permits. To avoid this result the law might expressly authorize *in camera* sentencing proceedings, or, preferably to us, make the offense substantially less serious if the Government is unprepared to disclose the underlying significance of the material transferred.

Quite different issues are posed by revelations of defense secrets by government employees or ex-employees. Prohibiting employees from telling **\*1085** what they know at pain of criminal punishment obviously restricts the flow of information to the public and impairs the quality of public debate. Nonetheless, to say that any government employee or former employee is privileged to reveal anything he chooses at risk of sanctions no greater than dismissal accords too little weight to the need for security.

In our opinion some middle ground should be sought. Although statutes are no doubt exceptionally difficult to formulate, we think that the following principles provide appropriate guides to future legislative efforts. First, employee disclosures to Congress should be protected more rigorously than in S. 1400. [447] Second, no matter what information is protected against revelation, legislation should explicitly provide a justification defense, permitting the jury either to balance the information's defense significance against its importance for public understanding and debate, or to consider possible dereliction of duty by the employee's superiors. [448] To do otherwise would not recognize that the employee serves both the Government and the public.

Third, the information that is protected against employee revelation should be narrower than that protected against espionage. On this point we strongly disagree with S. 1400's drafting of simple disclosure proposals more broadly than

Case 1:17-cr-00034-JRH-BKE Document 112-1 Filed 10/03/17 Page 90 of 126

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

espionage provisions, apparently on the misguided notion that since the penalties are less severe the conduct covered may be broader. [449] Our approach is the reverse: espionage has no claim to the law's sympathy and excessive severity is better cured by flexible grading of the offense than by narrow restriction of the information protected against transfer, which necessitate Government proof of defense significance. By contrast, informing the public of what the Government is doing is presumptively desirable. The hard problem is to find standards to define what limited information cannot be revealed to the public. Certainly the fact of classification should not be determinative since substantial overclassification is inevitable given the variety of inducements to official secrecy. [450] Improper classification must be a defense, and, if possible, **1086** protected information should be defined even more narrowly and without direct reference to classification. Thus, even if the Constitution permits penalizing employee or ex-employee disclosure of any information that the Government is not legally obligated to reveal. [451] we think such a secretive position should be rejected as a matter of policy. Fourth, the offense of revealing protected information should he graded to respect the differences between loose talk and intentional efforts to compromise security.

Finally, there are the problems of the press and those who disclose defense information in the course of public and private discussion. The claim may be made that lines should be drawn in the same place as for government employees. [452] ft may seem paradoxical to provide the press with the privilege of publishing the fruits of a crime, a result that inevitably occurs if more information is protected against employee disclosure than against publication. Nevertheless, it seems to us that an asymmetry of obligations between public servants and the rest of us should be preserved, at least until such time as far-reaching institutional changes are made in congressional access to defense information. Congress has no assured access to security information and no sense of entitlement to it, as the inability of the Foreign Relations Committee to secure the Pentagon Papers demonstrates. [453]

Consequently, one cannot at the present time have confidence that more than a single elected official, if that, has given consent to whatever policy may be compromised by newspaper disclosure of defense information. Given that situation, doubts whether to protect the political efficacy of disclosure rather than stress its adverse security consequences should be resolved on the side of public debate. Peacetime prohibition of newspaper disclosure and citizen communication should be left to the most narrowly drawn categories of defense information such as the technical design of secret weapons systems or information about cryptographic techniques. Even as to such narrow categories of defense-related information, however, it is as true today as it was in 1917 that any item of information could, in some circumstances, have significance for public debate which outweighs any adverse effect on national security. Thus, prohibitions against newspaper and citizen disclosure applicable only to very **1087** narrow categories of information should also provide for a justification defense turning on superceding importance for public debate.

The dangers endemic to the administration of such a justification defense should not be minimized. Juries may be inclined to accord weight to the respectability and influence of a media defendant in assessing the justification for publication of the particular defense information. Selective enforcement is a real danger. Moreover, predictability will largely be sacrificed with a resulting chill on publication that should be justifiable in the legal sense. But uncertainty in the application of legal standards to publication of defense information is the price of rejecting simplistic solutions to the problem. Neither prohibiting nor privileging the publication of categories of defense information across the board does justice to the vital and competing social interests in secrecy and public revelation.

We have lived throughout the present century with extraordinary confusion about the legal standards governing publication of defense information. Clarification of the standards is now called for. However, uncertainties in the administration of theoretically sound legislative solutions should not force us to choose between extreme and simplistic policies. If the choice is narrowed to extremes, we hope that our current lawmakers exhibit the fortitude of their predecessors in 1917 who resisted the sweeping proposals of the Wilson Administration.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 91 of 126

Footnotes

d1      We are very grateful to Philip I. Moncharsh, J.D. 1973, Columbia University, for his research assistance in the preparation
        of this article.

a1      Associate Professor of Law, Columbia University. B.A. 1964, Harvard University; LL.B. 1967, Columbia University.

aa1     Associate Professor of Law, Columbia University. B.A. 1963, LL.B. 1966, Yale University.

1       403 U.S. 713 (1971).

2       The Pentagon Papers are officially titled "History of U.S. Decision-Making Process on Vietnam Policy." *See*, 403 U.S. at 714.
        Also at issue was a separate volume entitled "Command and Control Study of the Tonkin Gulf Incident." *See* United States
        v. New York Times Co., 328 F. Supp. 324, 328 (S.D.N.Y. 1971).

3       *See* S. UNGAR, THE PAPERS AND THE PAPERS 15-17 (1972). The Associated Press carried nothing on the story until
        Monday afternoon June 14, 1971, nor was the story carried in United Press International's "budget" of most important news.
        Both Senator Humphrey and Defense Secretary Laird appeared on television interview programs on Sunday, June 13. Neither
        was asked a single question about the Pentagon Papers.

4       *Id.* at 113-14.

5       A per curiam opinion announced the judgment of the Court. Justices Black, Douglas, Brennan, Stewart, White and Marshall
        each filed an individual concurring opinion. Chief Justice Burger and Justices Harlan and Blackmun wrote individual dissents.

6       The Court had stressed in an opinion issued in May, 1971, the "heavy burden" required to justify imposition of prior restraints.
        Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971). For brief discussion of whether the *Times* case is properly
        viewed in terms of prior restraint doctrine, *see* Kalven, *Foreword: Even When a Nation is at War,* 85 HARV. L. REV. 3, 31-34
        (1971).

7       The Government did seek to rely on the espionage statutes in the District Court proceeding against the New York Times.
        *See*, United States v. New York Times Co., 328 F. Supp. 324, 328-30 (S.D.N.Y. 1971). Judge Gurfein held them inapplicable
        to "publishing."
        The Government apparently conceded the inapplicability of 18 U.S.C. § 797 (1970) which prohibits publishing any
        "photograph, sketch, picture, drawing, map or graphical representation" of presidentially designated "vital military or
        naval installations or equipment." The applicable executive order defines all classified "official military naval or airforce ...
        documents" as protected "equipment." Exec. Order No. 10104, 3 C.F.R. 298-99 (1949-53 Comp.). *See* text accompanying
        note 391 *infra*.

8       Solicitor General Griswold, who argued the case for the Government, later observed:
        [A] serious problem in the government's case before the Supreme Court with respect to the Pentagon Papers was that there
        literally was "no law" that authorized an injunction against publishing material merely because it was classified.
        Griswold, *The Judicial Process*, 28 RECORD OF N.Y.C.B.A. 14, 19 (1973).

9       Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579 (195.2). *See* Junger. *Down Memory Lane: The Case of the Pentagon
        Papers*, 23 CASE W. RES. L. REV. 3, 18 *et seq.* (1971), for suggestive analogies to *Youngstown Steel*.

10      Justice Brennan unwittingly demonstrated the point when he outrightly condemned injunctions "predicated upon surmise
        or conjecture that untoward consequences may result" but nonetheless saw some possibility for equitable relief where
        "publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of
        a transport already at sea." 403 U.S. at 725-27. To treat "peril" as a "consequence" is not quite fair. "Imperiling" means
        increasing the risks that harm will occur. The extent to which the probability of unfavorable outcome is affected by publication
        of sailing dates may be just as, if not more, conjectural than predicting that publication will seriously compromise negotiations
        already underway and make achievement of a particular position impossible. *Cf.* Manning, *Foreign Policy and the People's*

THE ESPIONAGE STATUTES AND PUBLICATION OF ...] 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 92 of 126

*Right to Know*, 50 DEPT OF STATE BULL. 868, 870-71 (1964) (revelation of specific U.S. negotiating positions "cripples our diplomacy").

11  403 U.S. at 756-58.

12  *Id.* at 732.

13  The Roosevelt administration in 1942 contemplated prosecuting the Chicago Tribune for publishing accounts of the Battle of Midway that revealed that the United States had broken the Japanese code. Subsequently, it was ascertained that the Japanese had apparently not noticed the story. *See* S. UNGAR, *supra* note 3, at 115.

14  Evidence of what censors deem potentially useful to adversaries may be gleaned from a World War II regulation covering radio and cable transmissions to foreign countries. No mention in an international communication was permitted (except in press dispatches subject to separate regulation) of, *inter alia:* "[t]he civil, military, industrial, financial, or economic plans of the United States, or other countries opposing the Axis powers, or the personal or official plans of any official thereof"; "[w]eather conditions (past, present, or forecast)"; "[c]riticism of equipment, appearance, physical condition or morale of the collective or individual armed forces of the United States or other nations" opposing the Axis powers. U.S. Cable and Radio Censorship Regs. §§ 1801-18(d), (g), (k), 7 Fed. Reg. 1499, 1500 (1942).

15  *See* J. WIGGINS, FREEDOM OR SECRECY 109-12 (Rev. ed. 1964) (discussion of the tension between secrecy and technological advance).

16  403 U.S. at 737-38. The statute, set out in text following note 178 *infra*, makes criminal "willful" retaining of defense secrets. Justice White intimated that even though publishing such secrets might not be an offense, retaining them is. 403 U.S. at 739. n.9. We disagree with that position. *See* text accompanying note 289 *infra*.

17  *Id.* at 740.

18  *Id.* at 730.

19  *Id.* at 752.

20  *Id.* at 759.

21  *Id.* at 745.

22  Thus, Solicitor General Griswold is reported to have commented to another lawyer, shortly after the decision was announced "Maybe the newspapers will show a little restraint in the future." X.Y. Times, Jul. 1, 1971, at 1. col. 8 to 15, col. 1. In April. 1972, a Justice Department official warned the press at the annual meeting of the American Society of Newspaper Editors that they run the risk of criminal prosecution for publishing classified information. N.Y. Post. Apr. 20, 1972, at 9. col. 1.

23  Professor Bickel, counsel for the New York Times, has observed:
For law can never make us as secure as we arc when we do not need it. Those freedoms which are neither challenged nor defined are the most secure. In this sense, for example, it is true that the American press was freer before it won its battle with the government over the Pentagon Papers in 1971 than after its victory. Before June 15, l971, through the troubles of 1798, through one civil and two world wars, and other wars, there had never been an effort by the federal government to censor a newspaper by attempting to impose a restraint prior to publication, directly or in litigation. That spell was broken, and in a sense freedom was thus diminished.
But freedom was also extended in that the conditions in which government will not be allowed to restrain publication are now clearer and perhaps more stringent than they have been. We are. or at least we feel, freer when we feel we need not extend our freedom. The conflict and contention by which we extend freedom seem to mark, or at least to threaten, a contraction; and in truth they do, for they endanger an assumed freedom, which appeared limitless because its limits were untried. Appearance and reality are nearly one. \Ye extend the legal reality of freedom at some cost in its limitless appearance. And the cost is real. Bickel, *The "Uninhibited. Robust and Wide-Open" First Amendment*, 54 COMMENTARY 60, 61 (1972).

24  O. HOLMES, COLLECTED LEGAL PAPERS 207 (1921).

25  36 Stat. 1804 (1911). This statute provides:

THE ESPIONAGE STATUTES AND PUBLICATION OF...,75 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 93 of 126

SEC. 1. That whoever, for the purpose of obtaining information respecting the national defense, to which he is not lawfully entitled, goes upon any vessel, or enters any navy-yard, naval station, fort, battery, torpedo station, arsenal, camp, factory, building, office, or other place connected with the national defense, owned or constructed or in process of construction by the United States, or in the possession or under the control of the United States or any of its authorities or agents, and whether situated within the United States or in any place noncontiguous to but subject to the jurisdiction thereof; or whoever, when lawfully or unlawfully upon any vessel, or in or near any such place, without proper authority, obtains, takes, or makes, or attempts to obtain, take, or make, any document, sketch, photograph, photographic negative, plan, model, or knowledge of anything connected with the national defense to which he is not entitled; or whoever, without proper authority, receives or obtains, or undertakes or agrees to receive or obtain, from any person, any such document, sketch, photograph, photographic negative, plan, model, or knowledge, knowing the same to have been so obtained, taken, or made; or whoever, having possession of or control over any such document, sketch, photograph, photographic negative, plan, model, or knowledge, willfully and without proper authority, communicates or attempts to communicate the same to any person not entitled to receive it, or to whom the same ought not, in the interest of the national defense, be communicated at that time; or whoever, being lawfully intrusted with any such document, sketch, photograph, photographic negative, plan, model, or knowledge, willfully and in breach of his trust, so communicates or attempts to communicate the same, shall be fined not more than one thousand dollars, or imprisoned not more than one year, or both.

SEC. 2. That whoever, having committed any offense defined in the preceding section, communicates or attempts to communicate to any foreign government, or to any agent or employee thereof, any document, sketch, photograph, photographic negative, plan, model, or knowledge so obtained, taken, or made, or so intrusted to him, shall be imprisoned not more than ten years.

26   35 Stat. 1038 (1909).

27   35 Stat. 1097 (1909):
Whoever shall go upon any military reservation, army post, fort, or arsenal, for any purpose prohibited by law or military regulation made in pursuance of law ... shall be fined not more than five hundred dollars, or imprisoned not more than six months, or both.

28   35 Stat. 1097 (1909):
Whoever shall embezzle, steal or purloin any money, property, record, voucher, or valuable thing whatever, of the moneys, goods, chattels, records. or property of the United States, shall be fined not more than five thousand dollars, or imprisoned not more than five years, or both.

29   40 Stat. 217 et seq. (1917).

30   64 Stat. 1004 (1950).

31   48 Stat. 122 (1933).

32   64 Stat. 159 (1950).

33   *See* text accompanying note 348 *infra.*

34   18 U.S.C. § 794(a) (1970).

35   *See* text accompanying note 51 *infra.*

36   *See* text accompanying note 73 *infra.*

37   *See* text accompanying note 69 *infra.*

38   18 U.S.C. § 794(b) (1970).

39   67 Stat. 133 (1953). Congress inadvertently enacted two statutes codified as 18 U.S.C. § 798. The other pertains to cryptography.

40   A helpful consequence of legislative specificity as to the information covered by section 794(b) is to bypass the issue under 794(a) of whether and to what extent information must be secret in order to relate to the national defense. That problem is

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 94 of 126

most difficult as to matters like troop movements that are plainly not secret to some but nonetheless constitute information that should surely be kept from enemy hands. *See* text accompanying note 140 *infra*.

41    The full text of proposed S. 8148 is set out at 54 CONG. REC. 2820-21 (1917).

42    S. 8148, 65th Cong., 1st Sess. § 2(c) (1917).

43    54 Cong. Rec. 3492. Although effective only in time of war, Cummins argued nonetheless that Section 2(c) went too far: Instead of overturning the freedom of the people by one act, we have simply delegated the authority to the President to overturn and obliterate that freedom. Under this provision the President can absolutely command silence in the United States upon every subject mentioned in the paragraph. He can suppress every suggestion concerning the national defense in every newspaper of the land.

44    *Id.*

45    Although Cummins also objected strenuously to the delegation to the President of power to make regulations, it is clear that the absence of intent was, by itself, grounds for objecting to 2(c)'s prohibition on publication. Section 2(c), as originally forwarded by the Justice Department to the Senate Judiciary Committee, included no reference to regulations prescribed by the President. Cummins objected to it before the Committee as a suppression of free press, when his objection actually must have focused only on the absence of intent:

As this bill was originally introduced, as it was drawn in the office of the Attorney General, the crime was described without any reference to regulations to be prescribed by the President. It was simply made criminal for anyone to promulgate, collect, record, publish, or communicate, and so forth, any information with respect to any of these things, all of which may be combined in the one expression "relating to the national defense."

This is the paragraph of which 1 said before in the committee, and which I now say again, had it been in force in the last two years three-fourths of the people of the United States would have been in the penitentiary, or ought to have been in the penitentiary, because it was an absolute suppression of free speech, it was an absolute overthrow of a free press. I made that objection to it before the committee; and the way in which it has been amended is to insert the words "in violation of regulations to be prescribed by the President ...."

I was very unwilling to make it an offense directly to do these things, and I am quite as unwilling to give the President the authority to prescribe any such regulations ....

*Id.* at 3492. Cummins did not elaborate further Ids objections to 2(c), though he noted that it was the paragraph which "will arouse most interest throughout the country." *Id.*

46    The point arose early in the debates on S. 8148, when the Senate was debating the provisions of section 1, the predecessor to 793. but is nonetheless illustrative of the meaning of intent in 794. Senator Nelson stated:

I want to call the Senator's attention to how utterly futile it would be to put in clauses requiring the information to be given to a foreign country. What we suffered from during the Civil War more than anything else was the fact that our newspapers contained full information as to the number of troops, their location, the movement of the troops, and everything. The newspapers did not do it with an evil intent. They did it for the purpose of selling their newspapers, getting a market for purveying the news to the American people, and yet it was one of the greatest evils that we had to contend with during the Civil War.

*Id.* at 3488.

Cummins' position was also understood to mean a requirement of purpose by Senator Walsh of Montana, another member of the Judiciary Committee and the most knowledgeable proponent of the legislation:

I desire to say, Mr. President, that I am not in harmony with the view expressed just now by the Senator from Iowa. I do not think we ought to make the intent to do harm to the United States or to convey aid or comfort to the enemy an element in these crimes. We differ radically there, and I would not like to be understood that it is in any such spirit that these amendments tendered by myself are proposed.

Mr. President, we could very readily conceive that some enterprising newspaper man, some writer for the magazines, would go about to get this information without any purpose whatever to convey it to the enemy. He simply wants to do it for the enlightenment of the American people, as he believes, for their information, and perhaps his purpose does not go any further than to make a story that he can sell to some periodical. I think that ought to be guarded in the way that this legislation seeks to guard it.

*Id.* at 3498-99.

THE ESPIONAGE STATUTES AND PUBLICATION OF ...,73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE Document 112-1 Filed 10/03/17 Page 95 of 126

[47] The same understanding of intent crops up in the debates over section 3 of chapter 1 of S. 8148, which prohibited making statements with intent to cause disaffection in or interference with military forces. Section 3 provided:

Whoever, in time of war, shall, by any means or in any manner, spread or make reports or statements, or convey any information, with intent to cause disaffection in or to interfere with the operations, or success of, the military or naval forces of the United States, or shall willfully spread or make false reports or statements or convey any false information calculated to cause such disaffection or interference, shall be punished by a fine of not more than $10,000 and by imprisonment for life or any period less than 30 years.

*Id.* at 3494.

Although Cummins had espoused a reading of intent limited to purpose in his unsuccessful efforts to have such a requirement added to subsection 2(c), he objected to section 3, presumably for purposes of argument, on the clear premise that the intent requirement there specified could be satisfied constructively. He argued that it would prohibit any criticism of military policy which might result in disaffection among the troops. Walsh, again the bill's leading supporter, met Cummins' criticism with a reading of intent as amounting to conscious purpose.

MR. CUMMINS. Now, if any citizen saw great blunders being made, disaster immediately before us, and if he could not rise and intentionally interfere by speech, if possible, with the operations that were in progress, we have become indeed a nation without spirit and without liberty.

....

They may be perfectly true; they may be highly necessary and desirable; but if the intent is to interfere with the operations of the military or naval forces of the United States, the man who utters or makes these statements becomes a criminal. If this were the law in England, I wonder whether the agitation which led to the leadership and the promotion of Lloyd George would have taken place? I wonder if the articles in the London Times which exposed the errors, the mistakes, the blunders which had been committed in the Dardanelles campaign would ever have seen the public eye or been heard by the public ear? I wonder if the agitation in France which finally led to the deposit of great power in the hands of the premier would ever have taken form? Is it possible that Members of Congress are to be told that in time of war no man can utter a criticism that may interfere with the military or naval forces of the United States?

....

MR. WALSH. Mr. President, suppose that Lloyd George had known about some fatal weakness in the English forces in the unfortunate and disastrous Gallipoli Peninsula campaign, and he had told about that weakness. Does the Senator desire to leave him at liberty to do so? Why, Mr. President, that was not the way that the revolution was accomplished, either in England or in France. No one had accused Lloyd George of seeking to create disaffection and dissention among the troops in the field. He criticized, and so did Lord Northcliffe, very severely indeed, the general conduct of that campaign and the wisdom of carrying it on at all; but neither of them could be accused, in anything that he said in connection with the matter, either of a desire to create disaffection among the troops in the field or of a desire to interfere with the military operations.

*Id.* at 3606-07.

By specifying intent as meaning purpose in section 3, Senator Walsh supported a reading which would not prohibit general criticism of military plans aimed at changing policy, even though a predictable consequence might be some disaffection among the troops. Even criticism of military policy which aired general information of use to the enemy, Walsh made clear, would not meet the intent standard. On the other hand, if criticism should disclose some specific "fatal weakness" in a military operation, Walsh suggests, albeit his language is most unclear, that the intent requirement of section 3 might be satisfied by imputation. Walsh seems to advocate a sliding intent scale as a matter of evidentiary inference: where criticism is clearly aimed at persuading the people to back a change of policy, no purpose to create disaffection or interfere with success will be imputed (though both may occur), but when a specific weakness is disclosed, the revealer could, in Walsh's words, "be accused ... of a desire to create disaffection among the troops or ... to interfere with the military operations." *Id.* at 3607.

[48] *Id.* at 3665.

[49] Subsection 2(c) of S. 2 provided:

Whoever, in time of war, in violation of regulations to be prescribed by the President, which he is hereby authorized to make and promulgate, shall collect, record, publish, or communicate, or attempt to elicit any information with respect to the movement, numbers, description, condition, or disposition of any of the armed forces, ships, aircrafts, or war materials of the United States, or with respect to the plans, or conduct, or supposed plans or conduct of any naval or military operations, or with respect to any works or measures undertaken for or connected with, or intended for the fortification or defense of any place, or any other information relating to the public defense calculated to be, or which might be, useful to the enemy,

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 96 of 126

shall be punished by a fine of not more than $10,000 or by imprisonment for not more than 10 years, or by both such fine and imprisonment: Provided, That nothing in this section shall be construed to limit or restrict, nor shall any regulation herein provided for limit or restrict, any discussion, comment, or criticism of the acts or policies of the Government or its representatives, or the publication of the same: Provided, That no discussion, comment, or criticism shall convey information prohibited under the provisions of this section.

50   Senator Hiram Borah was the most vociferous critic of what he regarded as 2(c)'s authorization of a system of prior restraint. Does not it clearly provide in advance of publication that unless the censor-- to wit, the President--consents, either direct or through his regulations, that upon certain subjects publication shall not be had. And if you can make the President a censor you can make anybody else a censor. Now, you may, if Congress has any jurisdiction at all, punish for results of publication, but you can not set up licensors.
55 CONG. REC. 779 (1917). His comments reflect a squarely Blackstonian understanding of freedom of the press. Borah had no doubt that newspapers could constitutionally be punished after the fact for publishing material which injures the war effort, though, as he made clear later in the debates, he doubted the wisdom of prohibiting publication of war information:
You can not prohibit his publishing in the first instance, but you can make it a crime if there is any injurious result from the publication.
*Id.*

51   Walsh repeatedly stated that the bill did not envision pre-publication controls:
[W]e do not attempt in this proposed act to restrain the commission of the acts made punishable, to prevent by the process of injunction the publication of such articles. The publication of them is made criminal. So the bill under consideration presents exactly the case of a libel statute in which a penalty is prescribed for the publication of the article, and not of an injunction statute, which attempts to prevent the publication of the article in the first place.
*Id.* at 786. Opponents of the measure, however, continued to attack 2(c) throughout the debates as an effort to authorize a system of prior restraint. Senator Brandegee argued that the prohibitions on publication under 2(c) would likely be so vague that a system of prior approval would be essential to forestall chaos. *Id.* at 838.
Senator Ashurst agreed that the effect of 2(c) would be to set up an unconstitutional system of prior restraints. *Id.* at 2004, 2010. Senator Walsh, however, continued to insist that a prior restraint reading of 2(c) was not intended:
I want to say to the Senator that those of us who are responsible for the language do not give it that interpretation.
*Id.* at 2010. Senator Knox joined Walsh in challenging Borah's insistence that 2(c) would establish a censorship system. *Id.* at 836.

52   Thus, we disagree with Justice White's apparent position that the rejection of subsection 2(c) revealed congressional antipathy to prior restraints, but not opposition post-publication punishment. *Sec* 403 U.S. at 733-34. *See also* Carroll, *Freedom of Speech and of the Press in War Time: The Espionage Act*, 17 MICH. L. REV. 621, 627 (1919) ("The real question, therefore, was whether any real restraint could be laid upon publication in war time.").

53   *Id.* at 784.

54   *Id.*

55   *See. e.g.*, the fears expressed by Senator Lodge, *id.* at 781. and Senator Sherman. *Id.* at 2113.

56   *See. e.g.*, the colloquy between Senators Colt and Thomas. *Id.* at 789-90.

57   *See. e.g.*, the remarks of Senator Johnson:
War is the natural enemy of freedom and democracy. We have already conferred practically autocratic powers financially; we doubtless shall in the future, where imperative necessity demands it, accord extraordinary and unheard-of powers to our President; but we must stop short of successful assault upon democracy's basic principles. No free people should be subjected to undefined and indefinable laws. To subject a people to unwritten penal statutes, resting from day to day in the bosom of any one man, however exalted, in nebulous and elastic language, even where no evil intent exists by construction of any one official, however high and highly respected, to make felons of our people, is an excursion into autocracy in America that can not be justified or excused by our desire to destroy autocracy in Europe.
*Id.* at 841.

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 97 of 126

THE ESPIONAGE STATUTES AND PUBLICATION OF ...,79 Colum. L. Rev. 929

58    *Id.* at 787.

59    The full colloquy between Senators Borah and Brandegee made use of constructive intent:

MR. BRANDEGEE. As I understand the Senator from Montana [MR. WALSH], his question is, If a man publishes in a paper plans of our military authorities which do become of use to the enemy, although the publisher did not intend that they should, is it within the power of Congress to pass any law to punish him for publishing such things, although he did not intend to furnish aid or comfort to the enemy?

MR. BORAH. The Senator says with the absence of intent?

MR. BRANDEGEE. Yes; with the absence of intent on his part; and yet the plans published are of such a nature that a wise man would have seen that it would furnish aid and comfort to the enemy, but he did not see the effect of what he was doing.

MR. BORAH. I apprehend the rule would be invoked there that every man intends the natural consequences of his own act, and in that respect there would be not an actual intent but a constructive intent.

MR. BRANDEGEE. I think so myself.

*Id.* at 834.

Senator Thomas also read intent as broader than Walsh's "sinister purpose" in urging that 2(b) was sufficient:

The element of intent is an essential ingredient to the commission of a criminal offense. Some acts are so reckless, so utterly indefensible and unjustifiable, that the law infers the intent from the act. For example, if I drive an automobile recklessly down Pennsylvania Avenue without regard to the rights or the safety of others, and somebody is injured or killed, the law presumes, and ought to presume, an intention to accomplish that result, because of my reckless disregard of the laws of my country and of the rights of others. In other instances the intent may not be predicated directly upon the act, but depends upon independent proof for its establishment. In other words, if the intent is not obvious from the act, it must be established by a proper line of testimony or there can be no conviction. It is a fundamental element of the criminal laws of this country that offenses against them must be committed with criminal or unlawful intent; and in that particular the recitals of subsection (b) are in entire harmony with this legal requirement. When we come to subsection (c), however, no element of intent is there involved.

The President may make a regulation, and instantly the doing of any of the things mentioned in subsection (c) innocently, ignorantly, or in good faith constitutes a crime as completely as the doing of the same thing by the worst traitor in the United States, with full intent to obtain information and communicate it to the enemy; and what is, I think, equally important, it is the regulation of the Executive which imposes such a tremendous responsibility, which creates such tremendous consequences to the citizen, and not a statute of the United States. This can not be under our Constitution if it be any more than a scrap of paper. I believe that subsection (b) covers the entire subject ....

*Id.* at 848.

60    *Id.* at 2111-12 (emphasis added). Senators Cummins, Smith and Reed took positions similar to Johnson. *Id.* at 2164-65. The story about the submarine net across New York Harbor to which Walsh referred was initially discussed by him and put in the Record the previous evening. *Id.* at 2073. The story had a powerful effect on the Senate's consideration of 2(c). As Senator Underwood put it, "this vote seems to turn on the question, by way of illustration, of the stretching of a net in New York Harbor ...." Senator Overman added further force to Walsh's reference about the submarine nets by complaining that "the newspapers are constantly publishing the dates of sailing of vessels." *Id.* at 2114

61    *Id.* at 2166. Overman made one last effort to reclaim 2(c) by seeking to add the Cummins's disclosure version of 2(c), *see* note 63 *infra*, to the bill. This amendment was more resoundingly defeated: 48 nays, 34 yeas, and 14 not voting. *Id.* at 2265.

62    Senator Smith of Georgia first moved an amendment to 2(c) to strike the words "or which might be" within the provision's original phrase "information relating to the national defense calculated to be or which might be useful to the enemy ...." *Id.* at 872. He also moved to strike the words "collect, record, ... or communicate," thus leaving 2(c) applicable only to publication. Further narrowing by Smith included striking the phrases "or attempt to elicit" and "or supposed plans or conduct." Senator Overman announced his acceptance of all the Smith amendments, and they were agreed to. *Id.* at 876.

63    Cummins proposed to alter the basic conception of 2(c) by converting it from a control on publication to a control on the initial disclosure from within the government. Cummins' proposed disclosure provision read:

In time of war the President is hereby authorized to prescribe and promulgate reasonable rules and regulations, not abridging the freedom of speech or of the press, for the purpose of preventing the disclosure to the public, and thereby to the enemy, of information with respect to the movement and disposition of any of the armed forces of the United States or the plans of naval or military operations; and whoever in time of war shall willfully violate any such rule or regulation shall be punished

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 98 of 126

by a fine of not more than $10,000 or by imprisonment for not more than five years, or by both such fine and imprisonment: Provided, however, That no such rule or regulation shall apply to the proceedings of the Congress of the United States nor to the debates therein.

Cummins explained the purpose of his alteration of the provision to one directed at disclosure rather than publication in terms strikingly apposite to the Pentagon Papers situation:

If the purpose is not obvious, I am afraid I can not make it clear. I assume that the President can, in so far as his supervision goes, prevent the disclosure by the several departments of information relating to the Army and the Navy; but suppose it is disclosed to individuals or to the newspapers, then the President's power ceases and the individual who communicates or the individual who publishes can not be punished. The purpose of this paragraph is to inflict punishment upon the person who in violation of the rules of the President discloses to the public the information. I think that is the only object.

*Id.* at 881.

Cummins urged that the category of information should be reduced in scope. He argued that only troop or naval movements should be covered, stating very clearly his objection to the breadth of the phrase "relating to the public defense":

If Congress desired to give to the President of the United States the right to prohibit anybody from securing any information with regard to the movements of the Army and the Navy, I would not feel disposed to object; but this paragraph--and it is characteristic of the entire chapter, so far as that is concerned--extends the operation of secrecy to every energy of the American people. There is nothing in which the American people can now engage which is not related to the national defense. It is now the supreme duty of the Republic to prepare for the national defense. It is the one thing which consumes and absorbs the thought and the purpose of the American people.

*Id.* at 877. Cummins also spoke to the first amendment implication of his proposal:

My amendment differs mainly from the committee's proposal in this, that it limits the subjects upon which the President can make the regulations of secrecy to the movement of our Army and our Navy--that is, our armed force--and to our plans for military and naval operations. I think the court will hold, if the question is ever submitted to it, that that does not constitute an abridgment of the freedom of the press or an abridgment of the freedom of speech. I think, upon the doctrine that Alexander Hamilton himself laid down so eloquently and conclusively in the somewhat famous libel case which involved Thomas Jefferson, a statute of that kind can be sustained.

But when we advance beyond that and take in or embrace all the things in the country which may relate to the public defense, and when we attempt to close the columns of the newspapers to all information relating to everything which may be interesting to the enemy but which touches the national defense; when we attempt to lay the obligation upon every citizen that he shall not publish or communicate, for there is no difference between the two words in substance; when we attempt to prohibit every citizen from saying anything with regard to the vast multitude of subjects which relate to the public defense, I think we offend the Constitution; I think it is an abridgment of the freedom of speech and the freedom of the press, and I think any court in America to which that question is submitted will declare that such a law followed by such a regulation is unconstitutional, because it is an abridgment of speech and an abridgment of the freedom of the press.

*Id.* at 880. Cummins' substitute was rejected by a vote of 40 to 34 (22 not voting). *Id.* at 886.

[64]  A major success for the opponents of 2(c) came when the Senate accepted an amendment offered by Senator Thomas which followed both the disclosure and the troop movement pattern which had been earlier offered unsuccessfully by Cummins. *Id.* at 2111. The information subject to regulation under the Thomas amendment was the movement, etc. of the armed forces in military operations. Senator Walsh attempted to expand this definition to include "the plans of" military operations. Cummins argued against the expansion because he wanted to be sure that any limitation on the right of publication be "confined to matters purely military in character." *Id.* at 2110. Walsh was defeated and the Thomas amendment passed.

[65]  Section 4 of H.R. 291 provided:

During any national emergency resulting from a war to which the United States is a party, or from threat of such a war, the President may, by proclamation, declare the existence of such emergency and, by proclamation, prohibit the publishing or communicating of or the attempting to publish or communicate any information relating to the national defense which, in his judgment, is of such character that it is or might be useful to the enemy. Whoever violates any such prohibition shall be punished by a fine of not more than $10,000 or by imprisonment for not more than ten years, or both: Provided, That nothing in this section shall be construed to limit or restrict any discussion, comment, or criticism of the acts or policies of the Government or its representatives, or the publication of the same.

[66]  *See, e.g.*, remarks by Congressman Dillon, *id.* at 1712, Congressman Chandler, *id.* at 1751-52, and Congressman Graham. *Id.* at 1705.

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE Document 112-1 Filed 10/03/17 Page 99 of 126

67     *See, e.g.*, remarks of Congressman Towner, *id.* at 1750-51, and Congressman Fess. *Id.* at 1773-74.

68     *See, e.g.*, remarks by Congressmen Walsh and Igoe, *id.* at 1601, and Congressmen Gordon and Webb. *Id.* at 1715.

69     *See, e.g.*, remarks of Congressman LaGuardia, *id.* at 1701, and Congressmen Wood and Madden. *Id.* at 1718.

70     Given the prominence of Graham's views in our analysis of the House's understanding of the culpability standards of the Espionage Act, it may be of interest to note that he was no stranger to such conceptual problems in the criminal law. Holder of an LL.B. from the University of Pennsylvania, Graham was the elected District Attorney of Philadelphia County from 1880 to 1899. For the next eleven years, Graham was Professor of Criminal Law at the University of Pennsylvania until his election to Congress in 1912. 1 WHO WAS WHO IN AMERICA 1897-1942 at 475.

71     Graham's opposition to section 4 was not based on constitutional objections. He indicated that he was not fully persuaded by the constitutional objections to section 4, either that the provision violated the first amendment or that it unconstitutionally delegated power to the President. *Id.* at 1718.

72     The suggestions that have been made on this floor as to the treatment of soldiers, how they are fed. clothed, and handled, the policy under which the war is being conducted, and a hundred subjects that would spring to our minds that ought not to be prohibited but that ought to be freely discussed for the welfare of the country, are subjects of national importance whose discussion ought not to be left to any one man or any set of men; and it is better to meet whatever evil may ensue from the discussion of them than to throttle the discussion and prevent the airing of evils that exist which will make against the welfare of the country and its success in the war. My own mind has reached the conclusion with respect to this section, and I give notice now, Mr. Speaker, that it is Try intention to move to strike out of this bill section 4 [applause] and to leave the bill in all of its other provisions, with whatever slight amendments your wisdom may think ought to be made to them, to stand as the act of this House.
*Id.* at 1719.

73     *Id.* at 1719. Graham indicated that one way to correct the overbreadth of section 4 would be to add an intent requirement, but he feared such an addition would make convictions nearly impossible to procure.
The difficulty is apparent to anybody, for that would relegate the whole question to a jury, the jury would determine every fact in connection with it. and the probabilities are that except in some extreme case that would inflame the public mind and drive men away from a cool. calm, deliberate judgment; you would never secure a conviction in a case of the violation of the prohibition.
*Id.* at 1720.

74     *Id.* at 1816. The effort to perfect section 4 by amendment began with an amendment introduced by Chairman Webb designed to meet the delegation objection. Webb's amendment simply changed the form of section 4 by authorizing the President to designate information and then making publication of such information a crime. *Id.* at 1765. Webb's amendment was accepted. *Id.* at 1815. Webb also struck the words "or communicate" from the section. *Id.*
Other amendments designed to meet particular objections were unsuccessful. For example, Congressman Dempsey offered an amendment which would have removed all Presidential discretion by converting the section into a flat ban on publication of "information relating to the national defense which is of such a character that it is or might be useful to the enemy." *Id.* at 1771, 1815. Congressman McCormick sought unsuccessfully to amend section 4 by enumerating the specific types of information publication of which the President could prohibit by proclamation. *Id.* at 1771, 1815.

75     The Gard version of section 4 provided:
During any national emergency resulting from a war to which the United States is a party, or from imminence of such war, the publishing willfully and without proper authority of any information relating to the national defense that is or may be useful to the enemy is hereby prohibited, and the President is hereby authorized to declare by proclamation the existence of such national emergency, and is hereby authorized from time to time by proclamation to declare the character of such information which is or may be useful to the enemy, and in any prosecution hereunder the jury trying the cause shall determine not only whether the defendant or defendants did willfully and without proper authority publish the information relating to the national defense as set out in the indictment, but also whether such information was of such character as to be useful to the enemy: Provided, That nothing in this section shall be construed to limit or restrict any discussion, comment, or criticism upon any fact or any of the acts or policies of the Government or its representatives, or the publication of the same.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 100 of 126

Whoever violates the foregoing provision shall upon conviction thereof be punished by a fine of not more than $10,000, or by imprisonment for not more than 10 years, or both.
*Id.* at 1817.

76    [I]t says that the jury shall determine whether or not the information was calculated to give aid and comfort to the enemy, or whatever the particular language may be in the proposed substitute--"useful" is the word. There is nothing in this with regard to the intent, and the vice of all of the preceding legislation circled around that thought. Where a man does a thing with intent to hurt his country, then he ought to be punished; but when an individual or a newspaper criticizes the act of the Government with the hope of bettering conditions for his Government, although what he may say would in some aspects of it be considered by a jury as useful information to the enemy, that man, I say, in the interest of liberty and the welfare of the country ought not to be prosecuted or convicted.
*Id.* at 1818. Congressman Dillon sought to amend the Gard version by adding a requirement of "intent to aid the enemy" but his amendment was rejected. *Id.* at 1819.

77    *Id.* at 1819.

78    The Conference Report version of section 4 provided:
When the United States is at war, the publishing willfully of information with respect to the movement, numbers, description, or disposition of any of the armed forces of the United States in naval or military operations, or with respect to any of the works intended for the fortification or defense of any place, which information is useful to the enemy, is hereby prohibited; and the President may from time to time by proclamation declare the character of such above described information which in his opinion is not useful to the enemy, and thereupon it shall be lawful to publish the same. In any prosecution hereunder the jury trying the cause shall determine not only whether the defendant did willfully publish such information but also whether such information was of such character as to be useful to the enemy: Provided, That nothing in this section shall be construed to limit or restrict any discussion, comment, or criticism of the acts or policies of the Government or its representatives or the publication of the same, if such discussion, comment, or criticism does not disclose information herein prohibited.
Whoever violates this section shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by impisonment for not more than five years, or both.
Three new aspects of this version should be noted. First, the provision specifically defined the types of information to which its prohibition applied, and contained no general *ejusdem generis* category. Second, the President's proclamation power was to be affirmative rather than prohibitory; the Executive was empowered to declare what information (presumably, either specifically or by type) within the defined categories could legally be published. Finally, the jury was required to find that the information published "was of such character as to be useful to the enemy."

79    Webb's statement was as follows:
In fact, gentlemen, unless this House wants to put itself on record as favoring the right of the newspapers to furnish and publish information as to the movement, numbers, and disposition of the armed forces of this country in time of war in a naval or military operation, which information is useful to the enemy, I think the House ought to support the amendment. In other words, it seems to me that if you want the newspapers of the country to publish that kind of information, then you will vote to recommit this bill with instructions to strike out section 4.
*Id.* at 3131.
This opener led to the following colloquy with Congressman Slayden:
MR. SLAYDEN. I would like to know if the gentleman really believes the statement he made in the first part of his remarks, that a man who could not support this measure would be in favor of having information conveyed to the enemy?
MR. WEBB. NO; I did not say that.
MR. SLAYDEN. The gentleman said what would be interpreted that way.
MR. WEBB. Of course, I do not mean or say that. But I mean this, that what is prohibited here is the willful publication of information concerning the armed forces of the United States in military or naval operations which would be useful to the enemy. Now, if you vote that down, you can construe your act just as you please.
*Id.* at 3132.
Webb repeated his charge of partisanship at the conclusion of debate, when he quoted the Wilson letter.
I want to say, as a man who loves his country above all other countries, that I regret that there was any effort to make a partisan matter of this censorship bill. I do not believe that you ought to be bound, especially the 26 Members who voted for the Gard amendment, ought to be bound by your Republican conference. I say it regretfully that our Republican friends for

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE    Document 112-1    Filed 10/03/17    Page 101 of 126

the first time since the declaration of war have undertaken to make a partisan question of these matters of vital importance to the national defense. [Applause on the Democrat side.] Oh, yes; we know that they wanted to coerce the 26 Republican Members who voted for the Gard amendment.
*Id.* at 3143.

80    MR. HERSEY. Mr. Speaker, when this House, after the able constitutional argument of the gentleman from Pennsylvania [MR. GRAHAM], and the eloquent appeal for liberty from our beloved Speaker, voted by a huge majority to condemn the attempt to deprive the American citizen of the priceless right of free speech and a free press, the friends of liberty everywhere rejoiced that the Congress still represented the people of the United States. [Applause.]
And yet, I regret to say it to our shame, on that same day of freedom's victory, a small minority of this House, taking advantage of empty seats, under the guise of an amendment passed on to the Senate this tyrannical measure. And now under the plausible argument of an infamous compromise the administration again demands that we crucify liberty and then, like Pilate of old, we are to wash our hands before the people and declare that we are innocent of this shameless crime.
*Id.* at 3134. Congressman Gard himself, moreover, disapproved the Conference Committee's provision. Gard objected that section 4 went beyond his amendment in authorizing the President, in effect, to set entire categories of information outside the area of permissible publication.

81    *Id.* at 3140. Graham's determined opposition to section 4 led to a comical display of animosity between Graham and Carlin, provoked by Carlin's claims that Graham had changed his mind repeatedly about the wisdom of section 4 and had frequently not been present at Judiciary Committee meetings.

82    *Id.* at 3137.

83    *Id.* at 3144.

84    *Id.* at 3144-45.

85    *Id.* at 3306-07.

86    *Id.* at 3149.

87    *Id.* at 3264.

88    Sections 2 and 3 of Title XII of the Espionage Act of 1917 made criminal any attempt to mail any publication "urging treason, insurrection, or forcible resistance to any law of the United States ...." 40 Stat. 230 (1917). *See also* section 3 of Title I. *Id.* at 219.

89    *Id.* at 553-54 (1918).

90    *Id.* at 411-27 (1917).

91    *See* section 19 of the Act. *Id.* at 425-26.

92    The Espionage Act of 1918 made criminal an extensive variety of utterances "intended to ... encourage resistance to the United States, or to promote the cause of its enemies ...." *Id.* at 553 (1918).

93    *See, e.g.*, 55 CONG. REC. 7021-22 (1917) (pungent remarks of Senator King in the debate on section 19 of the Trading With the Enemy Act).

94    The definition of information is essentially the same as that in 18 U.S.C. 794(a) (1970).

95    Subsections 793(d) and (e) are quoted and discussed in text following note 178 *infra*.

96    Subsection 793(f) provides:
Whoever, being entrusted with or having lawful possession or control of any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, note, or information, relating to the national defense, (1) through gross negligence permits the same to be removed from its proper place of custody or delivered to anyone in violation of his trust, or to be lost, stolen, abstracted, or destroyed, or (2) having knowledge that the same has been illegally removed from its proper place of custody or delivered to anyone in violation of his trust, or lost, or

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 102 of 126

stolen, abstracted, or destroyed, and fails to make prompt report of such loss, theft, abstraction, or destruction to his superior officer--

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

97    18 U.S.C. §§ 793(a), (b) (1970).

98    Even if publication were regarded as a form of "copying" under 793(b). a dubious reading indeed, it would nonetheless not be undertaken "for the purpose of obtaining information respecting the national defense."

99    United States v. Heine, 151 F.2d 813, 815 (2d Cir. 1945).

100   36 Stat. 1804 (1911). The 1911 Act is quoted in full at note 25 *supra*.

101   H.R. REP. NO. 1942, 61st Cong., 3d Sess. (1911).

102   *Id.* at 2.

103   For example, Congressman Bennet asked whether a tourist would be liable under the statute if he took a photograph which happened to include a military installation, adding "we ought to pass with some hesitation a bill which makes the innocent act of a person a crime." Congressman Hobson replied that the taking of such a photograph would not be criminal because it "would not be giving away any national defense secret," a near absurdity since most of sections of the 1911 Act were directed at gathering activities and not at subsequent dissemination. 46 CONG. REC. 2030 (1911). Conclusory statements of this kind constituted all the debate in the House, which passed the bill without objection. *Id.* The Senate was even more lackadaisical, its debates made no mention whatever of non-espionage activities. *Id.* at 3516.

104   Subsection 1(a) of S. 8148 proposed to punish:

[W]hoever, for the purpose of obtaining information respecting the national defense, to which he is not lawfully entitled, approaches, goes upon, or enters, flies over, or induces or aids another to approach, go upon, enter, or fly over any vessel, aircraft, work of defense, navy yard, naval station, submarine base, coaling station, fort, battery, torpedo station, dockyard, canal, railroad, arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building, office, or other place connected with the national defense, owned or constructed, or in progress of construction by the United States, or under the control of the United States, or of any of its officers or agents, or within the exclusive jurisdiction of the United States, or any place in which any vessel, aircraft, arms, munitions, or other materials or instruments for use in time of war are being made, prepared, repaired, or stored under any contract or agreement with the United States, or with any person on behalf of the United States, or otherwise on behalf of the United States ....

54 CONG. REC. 2820 (1917). The places covered by S. 8148 but not by the first clause of the 1911 Act were aircraft, work of defense, submarine base, coaling station, dockyard, canal, railroad, mine, telegraph, telephone, wireless, and signal station. Some of these items, such as dockyards, railroads, and mines do suggest a broadening of the *ejusdem generis* phrase "place connected with the national defense" beyond what that phrase imported in the 1911 Act.

105   Subsection 1(b) of S. 8148 is quoted in note 165 *infra*.

106   Subsections 1(c) and 1(d) of S. 8148 are quoted in note 165 *infra*.

107   Cummins' full statement on the breadth of the term "national defense" is as follows:

Is it confined to the Army and the Navy? Evidently not, for it is universally agreed that it extends to all manufactures engaged in producing arms and munitions of war. But is it confined to manufactories engaged in producing the things that are directly used in war, or is it to be extended to every national energy which makes up an adequate and effective national defense?

I have heard it applied, and so have you, to agriculture. It is said that it is necessary to make stable, permanent, and general the development of our fields in order that in time of war our armies may be successfully sustained, or our citizens adequately fed. I have heard it applied to schools, because it is alleged that we can not create an adequate national defense unless we have cultivated the heart and the mind. I do not believe it will be asserted here that the words "national defense" do extend to these things, but no one can tell to what they extend. They may mean, I suppose, anything that is necessary in order successfully to defend ourselves against an enemy or successfully to attack an enemy, if attack is the approved method of defense at any given time. I should think that it would include everything from the mines and the forests which ultimately passes into the

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 103 of 126

structures or the arms that are used in war, no matter whether they are used immediately in battle, or whether they are used in general connection with the Army or the Navy.

54 CONG. REC. at 3485.

108    *Id.* at 3599. Overman opposed the amendment however, arguing:

It would be impossible to specify these places. No Senator knows what are these plans or what specific articles are in some buildings that ought to be protected, and we made it general to protect everything connected with the national defense.

*Id.* at 3601. The Senate rejected Cummins' amendment. *Id.*

109    Cummins read the proposed subsection 6 of chapter 1 which provided:

The President of the United States shall have power to designate any place other than those set forth in paragraph (a) of section 1 hereof as a prohibited place for the purposes of this chapter, on the ground that information with respect thereto would be prejudicial to the national defense; he shall further have the power, on the aforesaid ground, to designate any matter, thing, or information belonging to the Government, or contained in the records or files of any of the executive departments, or of other Government offices, as information relating to the national defense, to which no person (other than officers and employees of the United States duly authorized) shall be lawfully entitled within the meaning of this chapter.

*Id.* at 3487. Under this provision, Cummins culminated, the President could "padlock the lips of every man in America respecting the national defense." *Id.* Cummins persuaded Senator Walsh, the most knowledgeable and influential of the bill's proponents, that subsection 6 should be narrowed. *Id.* at 3610.

110    The disagreement between Cummins and Overman about section 6 produced a typical exchange:

MR. OVERMAN .... For fear that we have not covered everything, in order to protect the national defense, in section 6 we give power to the President to designate, in his judgment, other places and stations that are to be protected. That is the reason for section 6. Senators do not know, the Senator from Iowa does not know, of the places that ought to be protected. If the time shall come when some places that ought to be protected are not included in the section then we want to give the Executive of the Government the power to designate other places which should be protected from spies. That is what it is for--to protect the Government from spies and from traitors. I would hang every one of them.

MR. CUMMINS. I wish the Senator from North Carolina would use the word "spy" in the act and the word "traitor" in the act instead of in his speeches.

*Id.* at 3600.

111    Section 1 of H.R. 291 provided:

Whoever, with intent or knowledge, or reason to believe that the information to be obtained is to be used to the injury of the United States, copies, takes, makes, or obtains, or attempts to copy, take, make, or obtain, any sketch, photograph, photographic negative, blue print, plan, model, instrument, appliance, document, writing, code book, or signal book, connected with the national defense, or any copy thereof, or with like intent or knowledge, or reason to believe, directly or indirectly, gets or attempts to get information concerning the national defense, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both.

H.R. REP. NO. 30, 65th Cong., 1st Sess. 1 (1917).

Section 2 provided:

Whoever, with intent or knowledge, or reason to believe that it is to be used to the injury of the United States, communicates, delivers, transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether or not recognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, any information, document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, model, note, instrument, or appliance, relating to the national defense, shall be punished by a fine of not more than $10,000, or by imprisonment for not more than twenty years, or both: Provided, That whoever violates this section in time of war shall be punished by imprisonment for not more than thirty years or by death. *Id.*

112    H.R. 291, 65th Cong., 1st Sess. § 4 (1917).

113    H.R. REP. NO. 30, 65th Cong., 1st Sess. 9 (1917).

114    H.R. REP. NO. 65, 65th Cong., 1st Sess. 1 (1917).

115    The House managers stated:

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 104 of 126

The several provisions under this title in the conferees' report do not materially change the provisions of this title as passed by the House. Section 1 sets out the places connected with the national defense to which the prohibitions of the section apply while the similar provision of the House bill designates such places in general terms.

....

Section 7 [Section 6 of the Act] was not in the House bill but was taken from the Senate amendment. It was adopted because of the changes made in section 1, and for the further reason that section 1202 of the House bill, which gave the words "national defense" a broad meaning, was stricken out.

*Id.* at 18-19.

These statements were asserted by the defendants in *Gorin v. United States,* 111 F.2d 712 (9th Cir. 1940), to mean that subsection 1(a) of the 1917 Act should be limited to the enumerated places, and that phrase "other place connected with the national defense" added nothing. The Supreme Court rejected the argument, presumably because the Senate had quite clearly understood the national defense language in subsection 1(a) to include more than just the enumerated places. An amendment had been offered in the S. 8148 debates to limit 1(a) to enumerated places, 54 Cong. Rec. 3599-3600. but was rejected after Senator Overman urged its defeat. *Id.* at 3601.

*Id.* at 3601.

116     312 U.S. 19 (1941).

117     Gorin v. United States, 111 F.2d 712, 715-16 (9th Cir. 1940).

118     312 U.S. at 26, 27-28.

119     *Id.* at 29.

120     *Id.* at 28. The observation is curious because it is precisely the intensity of civilian support and the extension of the combat arena that made war truly a struggle between nations.

121     *Id.* (emphasis added).

122     *See* text accompanying note 145 *infra.*

123     *See* text accompanying note 292 *infra.*

124     *See* text accompanying note 148 *infra.*

125     We do believe that well-drafted espionage laws would limit the prosecutor's duty to disclose significance in cases of clandestine transfer of military information. *See* text accompanying note 444 *infra.*

126     SO U.S.C. § 783(b) (1970). It is set out and discussed in the text accompanying note 403 *infra.*

127     In *Gorin,* defendants claimed that the information Salech transferred had been published in popular magazines, indicating its unimportance. The court of appeals noted,

> "while a serious question might arise in a case where the only information divulged was such as could be found in newspapers ... such question does not arise in this case, because the article in the periodical does not, and does not purport to relate all information contained in the reports in question."

111 F.2d at 722.

128     The Government's brief argued:

In a broad sense, it protects military information which is secret or confidential. Its secret nature may arise from the fact that it is held confidential by the Government, or from the fact that through independent investigations the offender has secretly accumulated data which has a military importance such that it should not be placed at the disposal of a foreign nation. The Act, then, quite plainly is directed at espionage, not at innocence.

Brief for the United States at 60, Gorin v. United States, 312 U.S. 19 (1941).

129     312 U.S. at 28.

130     Indeed the considerable sums the United States government spends on systematic monitoring of foreign news are otherwise inexplicable. *Cf.* A. DULLES, THE CRAFT OF INTELLIGENCE 240 (1963):

> [W]hen he was Director of CIA Bedell Smith was so disturbed by the situation that he decided to make a test. In 19S1 he enlisted the services of a group of able and qualified academicians from one of our large universities for some summer work. To save their time he furnished them publications, news articles, hearings of the Congress, government releases, monographs, speeches, all available to anyone for the asking. He then commissioned them to determine what kind of an estimate of U.S. military capabilities the Soviets could put together from these unclassified sources. Their conclusions indicated that in a few weeks of work by a task force on this open literature our opponents could acquire important insight into many sectors of our national defense. In fact, when the findings of the university analysts were circulated to President Truman and to other policymakers at the highest level, they were deemed to be so accurate that the extra copies were ordered destroyed and the few copies that were retained were given a high classification.

131     *See, e.g.*, Slack v. United States, 203 F.2d 152 (6th Cir.). *cert. denied*, 396 U.S. 888 (1953) (explosive compound transferred); United States v. Rosenberg, 195 F.2d 583 (2d Cir.), *cert. denied*, 394 U.S. 838 (1952); United States v. Crete, 140 F.2d 413 (2d Cir. 1944) (airplane deicers).

132     138 F.2d 261 (9th Cir. 1943). The provisions were then codified at 50 U.S.C. §32.

133     *Id.*

134     *Id.* at 163.

135     151 F.2d 813 (2d Cir. 1945), *cert. denied*, 328 U.S. 833 (1946).

136     *Id.* at 815.

137     *Id.* at 816.

138     *Id.* ("'secrets' is an equivocal word whose definition might prove treacherous.")

139     312 U.S. at 28.

140     The present espionage legislation does not provide an adequate basis for distinguishing the person who provides a foreigner with readily available information pertaining to military affairs, from the person who does research work albeit in published sources to assemble the best possible picture of some aspect of United States military capacity. *Heine* makes innocent the conduct of both.

If the problem is treated anew, however, we see no reason why Heine's systematic compilation of defense information for the benefit of foreigners ought not be made criminal. It is not self-evident that foreigners can do the job of assembly as well or as cheaply at home, and we see little danger to first amendment interests in prohibiting such conduct. This approach was taken by the National Commission on Reform of Federal Criminal Laws. It proposed to make criminal the person who "reveals" national security information, a phrase which encourages distinction between assembly and analysis and simple transmittal. *See* FINAL REPORT OF THE NATIONAL COMMISSION ON REFORM OF FEDERAL CRIMINAL LAW, PROPOSED NEW FEDERAL CRIMINAL CODE, § 1112.

141     Espionage charges are typically brought under conspiracy indictments. On several occasions defendant's efforts to invoke *Heine* has been defeated by showing that some aspect of the information transferred was secret. *Sec. e.g.*, Slack v. United States, 203 F.2d 152 (6th Cir.), *cert. denied*, 346 U.S. 888 (1953) (formula for explosive compound RDX may have been known but facts of its manufacture at a particular plant was not); United States v. Rosenberg, 108 F. Supp. 798, 807-808 (S.D.N.Y.) *aff'd*, 200 F.2d 666 (2d. Cir. 1952), *cert. denied*, 345 U.S. 965 (1953) (theory of atomic energy in the explosives field may have been known, but no evidence that practicability and feasibility of applying theory was known). United States v. Soblen, 301 F.2d 236, 239 (2d Cir.), *cert. denied*, 370 U.S. 944 (1962) ("The fact that the source of the information [bearing on organization of O.S.S.] was classified as secret distinguishes this case from *United States v. Heine*"). *Cf.* Gorin v. United States, 312 U.S. 19 (1941).

These cases do not treat the problem whether continued classification in the face of public knowledge permits invocation of the *Heine* rule. In United States v. Rosenberg, 195 F.2d 583, 591 (2d Cir.), *cert. denied*, 344 U.S. 838 (1952), Judge Frank characterized *Heine* as applying to "information which our armed forces had consented to have made public." *But compare*

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 106 of 126

Judge Ryan's approach in a different phase of the same litigation, where the opportunity to show the absurdity of continuing a policy of non-consent was assumed. 108 F. Supp. 798, 808 (S.D.N.Y.), *aff'd* 200 F.2d 666 (2d Cir. 1952). *cert. denied*, 345 U.S. 965 (1953).

142   111 F.2d at 721. The rationale was followed in United States v. Drummond, 354 F.2d 132, 152 (2d Cir. 1965), *cert. denied*, 384 U.S. 1013 (1966).

143   301 F.2d 236 (2d Cir.), *cert. denied*, 370 U.S. 944 (1962).

144   *Id.* at 239 n.2. In Dubin v. United States, 363 F.2d 938 (Ct. Cl. 1966), *cert. denied*, 386 U.S. 956 (1967), the court made use of classification in deciding that radar systems mistakenly sold as surplus property were "related to the national defense" and had to be returned to the government.

145   In subsections 793(a) and (b) the prohibited purpose is obtaining information "respecting" the national defense, with intent or reason to believe it is to be used to advantage "any" foreign nation. Subsection 794(a) prohibits transfer of information "relating" to the national defense, with intent or reason to believe it is to be used to advantage "a" foreign nation. No explanation for the differences appear and we doubt that they were noticed.

146   *See, e.g.*, I NATIONAL COMMISSION ON REFORM OF FEDERAL CRIMINAL LAWS, WORKING PAPERS 119-20 (1970).

147   The free-lance saboteur would be the most likely candidate for violating these statutes without contemplating any revelation of information he had obtained.

148   Slack v. United States, 203 F.2d 152 (6th Cir.), *cert. denied*, 346 U.S. 888 (1953).

149   United States v. Soblen, 301 F.2d 236 (2d Cir.), *cert. denied*, 370 U.S. 944 (1962).

150   *See* United States v. Scarbeck, 317 F.2d 546 (D.C. Cir. 1962), *cert. denied*, 374 U.S. 856 (1963), a prosecution of a public servant brought under 50 U.S.C. § 783.

151   The Rosenbergs' activities arguably fit this model. *See* United States v. Rosenberg, 195 F.2d 583 (2d Cir.). *cert. denied*, 344 U.S. 838 (1952).

152   312 U.S. at 29-30.

153   The possible exception is revelation of matters which are diplomatically embarrassing. Thus, the claim might be made that disclosure of official documents confirming the extent of the United States' "tilt" against India "injured" both countries, in that it made resumption of normal relations both desired more difficult as a practical matter.

154   In *Heine*, Judge Hand noted that the opposite conclusion does not hold. Foreign nations may he "advantaged" without the occurrence of any "injury" to the United States. 151 F.2d at 815 (2d Cir. 1945). The point is made plain by the Attorney General's ruling that transfer of defense secrets to allies under the Lend Lease program did not violate the statute. *See* note 179 *infra*.

155   The Senate formulation probably reflected Senator Cummins' willingness to make criminal those who would "injure" the United States or "aid and abet" foreigners. *See* 54 CONG. REC. 3485 (1917) (remarks of Senator Cummins). Acting with "reason to believe" that minimal benefits will accrue to foreigners is not "aiding and abetting." *Cf.* United States v. Peoni, 100 F.2d 401 (2d Cir. 1938) (L. Hand, J.).

156   Taking that course requires an inappropriately narrow definition of "advantage" in the scope of content of clandestine spying, or else mandates defining "advantage" differently depending upon what motive animates transfer.

157   *Cf.* Commonwealth v. Pierce, 138 Mass. 165 (1884) (Holmes, J.).

158   111 F.2d at 717 (emphasis added).

159   *See* MODEL PENAL CODE COMMENTS § 2.02, at 127-29 (Tent. Draft No. 4 1955).

160   *Cf.* Wechsler & Michael, *Rationale of the Law of Homicide*: I, 37 COLUM L. REV. 701, 710-712 (1937).

161   See also text accompanying note 308 *infra*.

162   In its brief in *Gorin*, the Government treated this point very lightly:

Sections 1(b) and 2(a) cannot be applied to punish surprised innocence. The newspaper correspondents, the critical statesmen, the political commentators, the students of military affairs, who obtain and reveal information regarding the national defense are automatically excluded from the reach of those provisions. For they apply only to those who obtain and reveal confidential or secret information, broadly defined, of a military nature, with a conscious desire, or with a reasonable expectation, of causing injury to the United States or advantage to a foreign nation.

*See* Brief for United States at 82-83, Gorin v. United States, 312 U.S. 19 (1941). The reasoning upon which "automatic exclusion" of newsmen is based eludes us. Obviously, newsmen have a "reasonable expectation" of causing advantage when they publish military secrets.

163   Their failure to have done so apparently influenced the decision to publish the Pentagon Papers. *See* S. UNGAR, *supra* note 3, at 101-102.

164   Section 1 of S. 8148, 65th Cong. 1st Sess. (1917), as reported by the Senate Judiciary Committee on February 28, 1917, is quoted in note 112 *supra*.

165   While most of the debate on the lack of intent requirements focused on subsection 1(a), dealing with entry into defense-related places, similar objections were advanced against the other provisions of subsection 1 of S. 8148, which roughly parallelled the present subsections (b). (c), (d), and (e), of section 793.

Paragraph (b), the parallel to the present § 793(b), covered:

(b) Whoever, for the purpose aforesaid, and without lawful authority, copies, takes, makes, or obtains, or attempts, or induces or aids another to copy, take, make, or obtain, any sketch, photograph, photographic negative, blue print, plan, model, instrument, appliance, document, writing, or note of anything connected with the national defense--

Paragraph (c) provided:

Whoever, for the purpose aforesaid, receives or obtains or agrees or attempts or induces or aids another to receive or obtain from any person, or from any source whatever, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, model, instrument, appliance, or note, of anything connected with the national defense, knowing or having reasonable ground to believe, at the time he receives or obtains, or agrees or attempts or induces or aids another to receive or obtain it, that it has been or will be obtained, taken, made or disposed of by any person contrary to the provisions of this chapter.

The text of paragraph (d) was as follows:

Whoever, lawfully or unlawfully having possession of, access to, control over, or being intrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, model, instrument, appliance, note, or information relating to the national defense, willfully communicates or transmits or attempts to communicate or transmit the same to any person not lawfully entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it.

166   54 CONG. REC. 3487-88 (1917) (emphasis added). Several other statements by Senator Cummins clarified the intent requirement he thought desirable. For example:

You can not make a law, Mr. President, too severe for me aimed at the acquisition of information concerning our Army and Navy and military armament intended to be revealed to an enemy or even intended to be disclosed to a foreign country; I shall make no opposition to any proposition as that; but when, in order to reach a person who has such an intent, you find it necessary to say to me that I can not know anything about our ships and our armies and our docks and our munition factories and our fields and our forests, all of which are related to the national defense, then you are trampling upon a right that is infinitely more important to be preserved than it is to preserve our secrets from a foreign country.

*Id.* at 3488. *See also id.* at 3486. Cummins made similar criticisms of sections 1(b) and (c). *Id.* at 3489. Senator Works focused on the same criticism.

Senator Cummins' other objections to section 1 centered on the related problems of vagueness and executive and prosecutorial discretion. *Id.* at 3485.

167   *Id.* at 3586, 3590, 3597.

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 108 of 126

168    *Id.* at 3586.

169    Overman argued:

Now, what does this provide?

"Whoever goes upon or approaches"--for what? "For the purpose"--that is what it says--for the purpose of what? "For the purpose of obtaining information." What business has any citizen of the United States going in or upon the radio stations or the naval stations or into the great war-defense stations of the United States for the purpose of getting information? The Senator from Iowa would not do it without some authority.

*Id.*

Overman's position led to a colorful response from Senator Works:

It is shocking to me that any officer of the Government should even suggest, much less recommend, legislation of this kind. It absolutely closes the door against any inquiry or any effort to obtain information by any and every citizen of this country relating to our national defense.

If the Czar of Russia should ever see this legislation, if it becomes a law, he would turn green with envy at the extent to which the Government of the United States has gone to close the eyes and stop the ears of its citizens against any information as to what the Government is doing.

The Senator from North Carolina says that it only prohibits these things as a means of gaining information--not information obtained with any ulterior or improper motive, or in order that any improper use may be made of it, as in the case of a spy, for example. We are spending millions and millions of dollars for the national defense. The people of the country are compelled to bear that burden, and if any one of them or any body of them should undertake to obtain information as to whether that money is being properly expended as provided in the appropriations he would, under this proposed statute, be a criminal, subject to fine and imprisonment.

*Id.* at 3586-87.

170    54 CONG. REC. 3665 (1917).

171    55 CONG. REC. 778 (1917).

172    Section 1 of H.R. 291, 65th Cong., 1st Sess. (1917) provided:

Whoever, with intent or knowledge, or reason to believe that the information to be obtained is to be used to the injury of the United States, copies, takes, makes, or obtains, or attempts to copy, take, make, or obtain, any sketch, photograph, photographic negative, blue print, plan, model, instrument, appliance, document, writing, code book, or signal book, connected with the national defense, or any copy thereof, or with like intent or knowledge, or reason to believe, directly or indirectly, gets or attempts to get information concerning the national defense shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both.

173    [I]n that old statute the words are employed "to which he is not lawfully entitled"; but nobody knows what information the ordinary man is entitled to receive, and consequently we were building on a foundation of sand. Before you subject a man to a highly penal law, put him in prison for 20 years or take his life, you ought to make everything you require of him or forbid him absolutely specific.
55 CONG. REC. 1591.

174    *Id.* at 1541.

175    Webb's purpose construction of the culpability standard was clear in several statements:

Our difficulty was to ascertain to what a man was lawfully entitled, because there was no law to define what he was entitled to. We provide that any man who takes photographs, blue prints of a fort or a fortification having a purpose to injure the United States. [sic] We have made it a definite offense and provided that any such person should be punished.

*Id. See also* Webb's remarks, *id.* at 1756, and the remarks of Congressman Mann to the same effect. *Id.*

176    *Id.* at 1717-18.

One other item from the House debates on section 1 deserves mention in connection with the culpability formulation of 793(a) and (b). In response to a question whether section 1 would cover a person who stole information relating to the national defense for personal use--*e.g.*, a blueprint of a defense building a person appropriated for his own private use--Webb replied that "injury of the United States" would probably be construed to mean "military injury." *Id.* at 1591. *See also id.* at 1721

THE ESPIONAGE STATUTES AND PUBLICATION OF... 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 109 of 126

(comment of Congressman Gard). However, Webb later helped to defeat an amendment to add the words "military prejudice or" before "injury of the United States," the purpose of which was to make section 1 applicable to military matters only. *Id.* at 1756-57. Thus, we are doubtful that the House debates support the proposition that "injury of the United States" should mean military injury only in some strict sense.

177     The Conference Committee made two changes in the phrasing of the precursor to subsections 793(a) and (b). The first change altered the culpability standard of 793(a) and (b), and 794(a), and was thus reported by the House managers:
Section 2 of the House bill made the person guilty for doing the things enumerated therein "with intent or knowledge, or reason to believe that it is to be used to the injury of the United States." Under section 2(a) as agreed upon. this provision is made to read, "with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation."
*Id.* at 3130. There was no explanation offered for the deletion of knowledge and no debate in the House or Senate on the significance, if any, of it. *Id.* at 3264. The second change promulgated by the Committee was the addition of "otherwise obtains" as a mode of conduct covered by 793(a). No comment was offered on the significance of the addition, and we believe "otherwise obtains" should accordingly be interpreted to cover acts of physical intrusion or surveillance of the same *genus* as the enumerated acts: "goes upon, enters, flies over.

177a    *See* Gorin v. United States, 111 F.2d 712 (9th Cir. 1940), *aff'd,* 312 U.S. 19 (1941); United States v. Drummond, 354 F.2d 132 (2d Cir. 1965); *cert. denied,* 384 U.S. 1013 (1966).

178     40 OP. ATT'Y GEN. 250 (1942).

179     18 U.S.C. §§ 793(d), (e) (1970).

180     The full text of the 1911 Act is quoted at note 25 *supra.*

181     The five-page report of the House Judiciary Committee, H.R. REP. NO. 1942, 61st Cong., 3d Sess. (1911), adopted without change as the Senate Committee Report, S. REP. NO. 1250, 61st Cong., 3d Sess. (1911), contains no clarification of the meaning of such key terms as "information respecting the national defense," "place connected with the national defense," "knowledge ... to which he is not entitled," or "without proper authority." The stated purpose, according to the Report was "to protect the nation against spying in time of peace." *Id.* at 2. All the examples cited in the Report to demonstrate the need for the statute were cases in which information concerning defense installations, military capabilities, or other similar information useful in war were collected by agents of foreign governments. The Report makes no mention of any general need for military secrecy and does not discuss whether publication by a newspaper for the purpose of informing the public about military affairs would constitute "communica[tion]," "without proper authority," "to any person not entitled to receive [the information], or to whom the same ought not, in the interest of the national defense. be communicated at that time."

182     The House debates covered less than two pages of the Congressional Record. *See* 46 CONG. REC. 2029-30 (1911). The Senate debates were even less extensive. *Id.* at 3516.

183     *Id.* at 2030. Bennet persisted, asking whether a tourist would be liable under the Statute if he took a photograph which happened to include a military installation, and adding "we ought to pass with some hesitation a bill which makes the innocent act of a person a crime." Congressman Hobson replied that the taking of such a photograph would not be criminal because it "would not be giving away any national-defense secret." These conclusory statements constituted the whole of the debate in the House, which passed the bill without objection. The Senate debates contain no mention of the possible application of the statute to non-espionage situations.

184     As proposed by the Justice Department, the 1911 legislation contained a presumption of criminal intent from the fact of communication along the lines of the presumption of intent contained in the British Official Secrets Act of 1911, 1 & 2 Geo. 5, c. 28. This presumption was eliminated by the House Judiciary Committee, as Chairman Parker explained, because it was regarded as "not fair." However, no indication was given as to what meaning should be given the culpability standard "willfully."

185     The relevance of the Executive classification system to the meaning of entitlement in 793(d) and (e) is discussed at text following note 327 *supra.*

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 110 of 126

186     1916 ATT'Y GEN. ANN. REP. 19.

187     See text following note 277 *infra*.

188     The penalty for violation of any section 1 offense was 1 year, while section 2 provided 10-year maximum sentence for one who committed section 1 offense and communicated information thus illegally obtained to an agent of a foreign government.

189     40 Stat. 217 (1917).

190     *Id.* at 218.

191     *See* text accompanying note 214 *infra*.

192     *See* 54 CONG. REC. 3409 (1917).

193     For example, Cummins argued "We have no statute prescribing who is entitled to such information. There is no common law determining who is entitled to such information, and I do not know whether all of the officers of the Army would be entitled to it, or the officers of the Navy. I do not know whether anybody but the Commander in Chief would be entitled to it." 54 CONG. REC. 3486 (1917). *See also id.* at 3487, 3489, 3492 (similar statements by Cummins). Senator Works treated entitlement the same way. *Id.* at 3484, 3486.

194     54 CONG. REC. 3499 (1917) (remarks of Senator Cummins).

195     Thus Senator Sutherland observed, "the phrase 'lawfully entitled' means nothing more and nothing less than that the particular information must have been forbidden, not necessarily by an act of Congress; because in dealing with military matters the President has very great power." 54 CONG. REC. 3489 (1917). *See also id.* at 3490 (remarks of Senator Walsh); *id.* at 3492 (remarks of Sen. Sutherland).

196     54 CONG. REC. 3586. *See also id.* at 3489.

197     Although Executive Branch drafting of major legislation is now commonplace, that S. 8148 had been so authored evoked Cummins' vigorous criticism. *See, e.g.*, 54 CONG. REC. 3493 (1917). Undoubtedly, that the technical aspects of the legislation were so ill-understood by the sponsors reflected their lack of participation in its drafting. Thus, the House Debates on H.R. 291 were much clearer because the Congressmen in charge knew the content of the legislation they were discussing.
In general, a major difficulty with these laws is that Congress has too often let the Executive Branch do the drafting while at the same time trying to control the results by seeking assurances concerning the limited intention of broad formulations. Given that information control is an area where President and Congress inevitably differ, the approach is sure to breed confusion as to coverage.

198     54 CONG. REC. 3409 (1917).

199     From the proviso to section 6, it is clear at the very least that 1(a) was not thought limited to information defined as restricted under section 6. However, section 1(a) was primarily designed to prohibit acquisition of information about places; such information would be in plain view to a person on the premises.

200     *See, e.g.*, 54 CONG. REC. 3484, 3487 (1917).

201     54 CONG. REC. 3589 (1917).

202     54 CONG. REC. 3491-92 (1917). Cummins asked whether Presidential power extended to prohibiting entry into a steel factory. Sutherland's response was "not unless it has become a part of the national defense." *Id.* at 3492.

203     54 CONG. REC. 3586 (1917).

204     54 CONG. REC. 3587 (1917). Senator Townsend was either ignorant of, or disagreed with, the view that "entitled" meant forbidden by statute or order. *Id.* Unfortunately, Sutherland was absent from the floor when Cummins' amendment was discussed.

205  54 CONG. REC. 3588 (1917).

206  After his efforts to amend 1(a) failed. Cummins offered a comparable amendment to 1(d) for the record. He proposed to change the language of section 1(d)--"not lawfully entitled to receive it"--to "who is forbidden by a statute or a lawful order of the President of the United States to acquire or receive it." *Sec* 54 CONG. REC. 3601 (1917). The amendment was rejected without discussion, presumably because it was thought that the issues were the same ones that had been involved in the defeat of l(a)'s amendment.

207  54 CONG. REC. 3601-04 (1917).

208  *Id.* at 3602.

209  *See id.* at 3603 (remarks of Sen. Williams) "Any man who would refuse to communicate to the government ... upon proper inquiry would be spiritually a traitor to his own land." Sen. Fall was more cautious, urging that courts would presume that the legislature had not intended "a futile or foolish thing." *Id.* at 3603. Nonetheless, "if it became necessary ... to ascertain how many bushels of wheat were today in the elevators within the State of Iowa as a part of the national defense ... and the Senator from Iowa was to refuse to deliver that information ... to the party whose business it was to obtain it, I should say that the Senator from Iowa was guilty under this act." *Id.* at 3604.

210  54 CONG. REC. 3605 (1917).

211  *Id.* at 3665.

212  55 CONG. REC. 3605 (1917).

213  That section 1(d) was taken from clauses 4 and 5 of the 1911 act also supports this construction.

214  The following exchange occurred:
MR. POMERENE. I am very clearly of the opinion that if a man had information which he had gleaned from some document or record which might be of value to an enemy and it was given to the enemy he ought to be penalized for it.
MR. OVERMAN. If the Senator will read paragraph (d), with reference to papers, signal books, photographs, photographic negatives, and so forth, he will see that there is no occasion for these words here. That covers information.
MR. POMERENE. I realize that, but it seems to me it ought to be more comprehensive, and it would not be wrong to have the words retained. If, however, it is provided for in another portion of the bill I have no objection.
55 CONG. REC. 778 (1917).

215  *See, e.g.*, 55 CONG. REC. 792 (1917) (remarks of Sen. Cummins) (in response to a newspaper article reporting an Admiral's protests that defense contractors "divulge the contents of plans given to them for estimating purposes," Cummins said 1(d) covers "precisely" the case.). 55 CONG. REC. 2064 (1917) (remarks of Senator Sterling) (1(d) covers "contents"). Whether the Justice Department realized this is problematic. *See* text accompanying note 269 *infra*.

216  *See* text following note 51 *supra*.

217  Surprisingly, many newspapers were willing to endorse limited censorship. For text of the New York Newspapers proposal *see* 55 CONG. REC. 788 (1917).

218  *Compare* the breadth of section 2(c) as initially proposed, *see* text accompanying note 42 *supra, with* its scope as last urged by the conference, *see* note 78 *supra*.

219  *See* note 214 *supra*.

220  *See, e.g.*, 55 CONG. REC. 2122 (1917) (remarks of Sen. Borah) ("These facts with reference to the movements of troops, and so forth, are in the hands of officers in the first instance, and must come from them.").
Whether section 1(d) was understood at that point in the debate to make disclosure by government employees criminal is not clear. Senator Overman sought to add an anti-disclosure provision to the bill which would clearly have made revelations in violation of Presidential orders criminal. It was rejected. 55 CONG. REC. 2265 (1917). The proposal is set out at note 73 *supra*.

221    Lord Northcliffe's vigorous denunciation of British conduct of the war, in disregard of censorship policies, led to substantial reforms. Congress consistently referred to it as the sort of journalism they did not wish to impede. *See, e.g.*, 54 CONG. REC. 3607 (1917) (Remarks of Sen. Cummins.); 55 *id.* at 780-781 (Sens. Walsh and Lodge); 55 *id.* at 2121 (Sen. Borah.).

222    55 CONG. REC. 2073 (1917). *See* text at note 69 *supra*.

223    *Id.* at 2114 (Remarks of Sen. Underwood).

224    *Id.* at 2115 (Remarks of Sen. Smith).

225    *Id.* at 873.

226    Section 3 is set out in H.R. REP. NO. 30, 65th Cong. 1st Sess. 2 (1917).

227    *Id.* at 10.

228    *See* text accompanying note 185 *supra*.

229    55 CONG. REC. 1603 (1917).

230    *Id.* at 1605 (1917).

231    55 CONG. REC. 1759-60 (1917).

232    *Id.* at 1760.

233    *Id.*

234    *Id.*

235    55 CONG. REC. 3301, 3306 (1917).

236    The statutes passed after 1917 bearing on publication of defense information are discussed at text following note 354 *infra*.

237    64 Stat. 1003 (1950).

238    *Id.* at 987.

239    *Id.* at 993.

240    *Id.* at 992.

241    *Id.* at 991.

242    The Attorney General's submission letter to Senator McCarran appears at 95 CONG. REC. 441-42. S. 595 as introduced by Senator McCarran is set out, *id.* at 440. See also the gratuitous legislative recommendations of a federal grand jury in New York. *Id.* at 6590-91.

243    S. REP. NO. 427, 80th Cong., 1st Sess. 7 (1949).

244    *Id.* at 4.

245    *Id.*

246    H.R. REP. NO. 647, 81st Cong., 1st Sess. (1949).

247    *Id.* at 3-4.

248    *Id.* at 4.

249    Senator Kilgore's letter appears at 95 CONG. REC. 9747 (1949).

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 113 of 126

250    *Id.*

251    *Id.* at 9748.

252    *Id.*

253    *Id.* at 9749.

254    *Id.* at 9748-49.

255    96 CONG. REC. 15185 (1950).

256    S. REP. NO. 427, 80th Cong., 1st Sess. 6 (1949) (referring to section 8 of the bill as introduced).

257    This provision began as section 8 of S. S95, *id.* at 441, and eventually became the opening substantive provision of the Internal Security Act of 1950, 64 Stat. 987 (1950). The slight difference in language in the provision as adopted reflected one of Mr. Hanson's suggestions.

258    95 CONG. REC. 9749 (1949).

259    *Id.*

260    *Id.* at 9750.

261    *Id.* at 9747.

262    *Id.* at 9746.

263    403 U.S. 713, 722.

264    The Internal Security Act of 1950 was the product of numerous successive bills and committee reports, all finally coalesced in H.R. 9490 in the 81st Congress. None of the subsequent committee reports contain as much discussion as the first reports on S. 595 and H.R. 4703. *See, e.g.,* S. REP. NO. 2369, 81st Cong., 2d Sess. 8-9 (1950); CONF. REP. NO. 3112, 81st Cong., 2d Sess. 52-53 (1950).

265    S. REP. NO. 2369, 81st Cong. 2d Sess., part 2 (1950). *See also* Senator Kilgore's letter to Sen, McCarran, 96 CONG. REC 12068-69.

266    S. REP. NO. 2369, part 2, at 3-4.

267    McCarran's statement about Chambers was as follows:
The next case for remedial attention was the discovery that under existing law, the unauthorized possession of enumerated restricted items relating to national defense is not a penal offense unless a demand has been made against the possessor, by the authorities entitled to receive the items in question, and the said demand has been refused. The inadequacy of this provision is self-evident, since by the very nature of things an unauthorized possession would most likely not be known to those entitled to receive the restricted enumerated items. The most famous example of this situation is, of course, the Chambers pumpkin papers. Chambers had in his possession--that is in his unauthorized possession--certain restricted or classified items which related to national defense. Yet, his possession of such items was not a crime. He could not be charged with a crime in respect of his possession of the pumpkin papers until a person entitled to receive those items made a demand upon him for their delivery, and then only if he refused the demand.
96 CONG. REC. 14178 (19S0).

268    Chambers' account of his activities was that he obtained typewritten copies of State Department documents from Alger Hiss, among others, which Chambers photostated and then passed along to the couriers of the Communist Party, U.S.A., with the understanding that the microfilms were destined for Moscow. W. CHAMBERS, WITNESS. 27-33, 421-27 (1952). According to Chambers' story, when he decided to break with the Party in 1937, he retained some of the documents and films as a "life-preserver" and hid some of them at his brother-in-law's, and the rest in a hollow pumpkin in his own garden. *Id.* at 38-42, 445.

One of the perplexing aspects of the 1950 legislation is that Chambers' own account of his activities surely brought him within the offense encompassed by section 2(a) of the Espionage Act of 1917, now subsection 794(a). There could have been no question that Chambers met the culpability standard characteristic of all the 1917 offenses applicable to non-employees. It is thus not at all clear why the notorious pumkin papers episode led Congress to enact in 793(e) a broadly applicable offense not conditioned on the characteristic 1917 Act culpability standard.

269  96 CONG. REC. 12069 (1950).

270  *Id.* at 3404-05.

271  *See, e.g.*, the comments of Cong. Tackett, *id.* at 3408.

272  *Id.* at 5494.

273  64 Stat. 1005 (1950).

274  403 U.S. 713, 739.

275  As earlier indicated, we reject as untenable the view tentatively suggested by Justice White in New York Times v. United States, 403 U.S. 713, 733-40 (1971), that Congress in 1917 intended to bar prior restraints but allow post-publication prosecutions for publication. Many in Congress thought that their constitutional power was restricted to making publication criminal after-the-fact. As the debates became more focussed, however, the legislative choice was seen to be whether or not to punish.

To be sure, section 1(d) covered tangible items and their contents only, whereas the rejected censorship provision pertained to information no matter what its source. But there is nothing indicating that the 1917 Congress saw this as a key distinction.

276  *See* text following note 354 *infra*.

277  United States v. New York Times, 328 F. Supp. 324, 328-29 (S.D.N.Y. 1971).

278  403 U.S. 713, 721.

279  *See* text accompanying notes 370, 388 *infra*.

280  Had any of the. respondents to Senator Kilgore's letter believed that publishing was not covered by sections 1(d) and (e) because not mentioned, they would surely have mentioned it.

281  *See, e.g.*, 55 CONG. REC. 781 (1917) (Remarks of Senator Cummins).

282  The principal comments in the Senate are at 55 CONG. REC. 873 (Remarks of Senator Overman) (The word publishing is broad enough to cover the word communicate. Communication of plans to a person, is a publication to that person); 55 CONG. REC. at 877 (1917) (Remarks of Senator Cummins):

the word "publish" is not confined to the publication by a newspaper. I suppose that if I stand upon the street and make a statement I publish the statement in the sense of the law. If this were confined to the newspapers, it would still be objectionable, but not so objectionable as it is in its present form.

In the House, similar points were made. *See, e.g.*, the following interchange:

MR. SHERLEY. Now 1 submit to the gentleman the inquiry as to whether it is necessary to embrace in your prohibition any sort of communication which would embrace a conversation that might not in any way have or be intended to have anything to do with publication, which is what you are really aiming at.

MR. WEBB. It would be very little profit to prohibit the publication of a thing and then let a man verbally go upon the stump and proclaim it to the public by word of mouth.

MR. SHERLEY. That would be more than a communication. The gentleman is assuming that "communicate" is the only word whereby you can define the offense. I suggest that it is broader than we need.

55 CONG. REC. 1716 (1917). *Cf. id.* at 1698 (Remarks of Rep. McCormick) ("when I say 'published' I mean by word of mouth or by print"). *Id.* at 1712 (Remarks of Rep. Igoe) ("anything that affects the newspaper will affect the individual").

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 115 of 126

283   The newspapers were, of course, loudly condemning subsection 2(c). Some who supported the provision urged that their colleagues were cowering under newspaper pressure, a criticism that may have produced statements in response that citizens were to be protected more than the press.

284   The 1911 law is set out at note 25 *supra*.

285   *See* 54 CONG. REC. 2064 (1917).

286   Moreover, there was no need to add "publish" to 1(d) because the censorship regulations issued under section 2(c) would surely have covered, and subjected to greater sanctions, publication of defense secrets gleaned from wrongly divulged documents. Adding "publishes" to section 794(a), after it had been changed to prohibit communication to foreigners with intent or reason to believe that information is to be used to injure the United States or advantage a foreign nation, would have had little effect if our "primary" use distinction, text *supra* at note 178, is accepted.

287   *Cf.* Branzburg v. Hayes, 408 U.S. 665, 682 (1972).

288   *Cf.* Roe v. Wade, 93 S. Ct. 705, 731 (1973); FREUND *et al.*, REPORT OF THE STUDY GROUP ON THE CASE LOAD OF THE SUPREME COURT 1 (1972).

289   403 U.S. 713, 738 n.9.

290   It might be an appropriate policy to protect the form of expression in government documents even if the revelation of their contents is privileged. Two considerations might support such a position which would justify treating taking or retention of documents more strictly than revelation of secret information. First, there are differences, particularly in diplomatic matters where national prestige is at stake, between widespread knowledge and official proof, as is indicated by the intense embarrassment occasioned by official acknowledgement of wiretaps on foreign embassies. *Cf.* Giordano v. United States, 394 U.S. 310 (1969).

Second, there may be a considerable "chilling effect" on government employees if they know that their prose--written under time pressure for superiors who are generally aware of the complexities of the situation, and need not be reminded of qualifications discussed orally--is likely to be printed in the newspapers as representing the entirety of their advice.

On the other hand, nothing persuades like the actual document. For example, the Pentagon Papers reveal little that was not already publicly known; they had impact because they confirmed widely held beliefs with official prose. Prohibiting revelation of the actual documents in circumstances where revelation of the information contained therein would not warrant penalties may serve primarily to protect inappropriate Government deception. Thus, here again the same tension is maintained.

291   *See* text accompanying note 447 *infra*.

292   *See generally* Weinreb, *Extended Note B*, "*Willfullness*," in I WORKING PAPERS OF THE NATIONAL COMMISSION ON REFORM OF FEDERAL CRIMINAL LAWS 148 (1970). *See also* Weinreb, *Comment on Basis of Criminal Liability; Culpability; Causation: id.* at 105, 128: "There may be no word in the Federal criminal lexicon which has caused as much confusion as the word 'willfully' (or 'willful')." The Model Penal Code limits use of the term to describing when it should be construed if employed by other draftsmen. MODEL PENAL CODE § 2.02(8) (Proposed Official Draft 1962).

293   *See, e.g.*, Ellis v. United States, 206 U.S. 246 (1907).

294   *See, e.g.*, United States v. Murdock, 290 U.S. 389 (19.33).

295   *See, e.g.*, Felton v. United States, 96 U.S. 699 (1877).

296   *See, e.g.*, Screws v. United States, 325 U.S. 91 (1945); Hartzel v. United States, 322 U.S. 680 (1944), *construing* section 3 of the Espionage Act of 1917, *as amended*, 18 U.S.C. § 2388 (1970).

297   *See, e.g.*, Dennis v. United States, 341 U.S. 494 (1951).

298   *See* 54 CONG. REC. 3604-05 (1917) (remarks of Senator Cummins) (proposed amendment of the censorship provision, § 2(c), to require "willful" violation. Effect conceived to be preservation of ignorance of law defense); 55 CONG. REC. 1717-18 (1917) (remarks of Representative Graham) (Sections 1 and 2 of H.R. REP. NO. 291 protect the innocent because Government

THE ESPIONAGE STATUTES AND PUBLICATION OF...,  7 Colum. L. Rev....

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 116 of 126

must prove "a guilty purpose, to wit, to injure the United States ... Section 3 [House version of 793(d) and (e)] has not the intent in it"); *id.* at 1763 (Remarks of Representative Mann) ("A man who delivers a thing does it willfully. That is what this [§ 31] says"); *id.* at 2064 (remarks of Senator Sterling) ("The element of intent or knowledge that the information [is] to be used to the injury of the United States or advantage of any foreign nation is omitted from these two subdivisions.").

299    H.R. REP. NO. 647, 81st Cong., 1st Sess. (1949).

300    95 CONG. REC. 441-42 (1949).

301    *See* text at note 247 *supra.*

302    The extent to which courts may revise inartfully drawn legislation to effectuate policies which might have been chosen but were not chosen clearly is a difficult issue. *See. e.g.* Scales v. United States, 367 U.S. 203, 211 (1961) (strain but not pervert). *Compare* Dennis v. United States, 341 U.S. 494, 499-500 (1951) ("intent to overthrow ... the government of the United States by force and violence as speedily as circumstances would permit" interpolated into statute to save it) *with* United States v. Reese, 92 U.S. 214, 221 (1875). "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders and leave it to the courts to step inside and say who could be rightfully detained and who should be set at large." The problem with section 793(d) is that it is not limited to government employment but rather speaks to "lawful" possession, a term which catches much more than current government employees. *Cf.* Aptheker v. Secretary of State, 378 U.S. 500, 515-17 (1964) (prohibition on applying for or using passports may not be limited to high ranking members of registered Communist organization to save a broadly drawn statute).

303    To be sure, in Dennis v. United States, 341 U.S. 494 (1951) the Court construed the advocacy provisions of the Smith Act, 18 U.S.C. § 2385 (1970) to require specific intent to overthrow the Government, even though other provisions expressly required such intent. But we do not think this precedent is compelling in the context of § 793(d) and (e). First, in *Dennis*, there was no direct evidence of contrary congressional intent. Second, as Judge Learned Hand noted in the Court of Appeals, the "specific intent" may be thought to inhere in the concepts of "teaching" and "advocating" use of force. 183 F.2d 201, 214-215 (2d Cir. 1950).

304    88 F. Supp. 910 (S.D.N.Y. 1949). The issue was presented in the context of claimed double jeopardy. Defendant Coplon had been convicted in the District of Columbia for violating 18 U.S.C. § 793(b). In the Southern District of New York she was indicted for conspiracy, attempt to communicate in violation of 18 U.S.C. § 793(d) (section 1(d) of the 1917 Espionage Act), and attempt to communicate in violation of 18 U.S.C. § 794(a). Applying the additional material fact test of Blockburger v. United States, 284 U.S. 299 (1932), the court held the offenses to be distinct. Although the court said that lesser intent distinguished 793(d) from 793(b), it did not state why proof of violation of 793(b) did not necessarily establish attempt to communicate in violation of 793(d) as well, insofar as "intent or reason to believe injury or advantage" requires that the actor contemplate unauthorized revelation.

Interestingly, the jury convicted Coplon of conspiracy, and attempt to communicate in violation of 18 U.S.C. § 794(a). She was acquitted of the charges under 18 U.S.C. § 793(d), indicating that the jury misapprehended the law, as well they might, given the sloppiness with which it is drafted. The Court of Appeals rejected the claim of error based on inconsistent verdicts, invoking the law's *deus ex machina* for such matters—presumed jury leniency or compromise. *See* United States v. Coplon, 185 F.2d 629 (2d Cir. 1950) *citing* Dunn v. United States, 284 U.S. 390, 393 (1932).

Perhaps the most ominous aspect of *Coplon* is its assumption that a recipient of wrongly disclosed defense information can be prosecuted as a conspirator with the person who discloses. Note that even if the current 18 U.S.C. § 793(d) and (e) are construed to apply only to government employees, application of conspiracy doctrines to recipient newsmen would make criminal receipt of defense information where the reporter cannot claim a good faith belief that the employee was privileged to disclose the particular matter. That result might properly be barred by regarding 18 U.S.C. § 793(c), construed to require "intent or reason to believe," as preemptive of conspiratorial or accessorial liability, at least absent aggravating factors. *See* text accompanying note 354 *infra. Compare* the Administration's recent espionage proposal S. 1400, 93d Cong., 1st Sess., § 1124 (1973), which precludes prosecuting unauthorized recipients of classified information disclosed by government employees or former employees as accomplices or conspirators. The proposals are discussed at text following note 425 *infra.*

305    "[S]pecific intent that the information be used to the injury of the United States and to the advantage of a foreign nation." 88 F. Supp. at 911.

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 117 of 126

306    *Id.*

307    289 F.2d 651 (1961). *See also* United States v. Sawyer, 213 F. Supp. 38 (1963).

308    The Service understood Senator Kilgore to be asking whether the offenses created absolute liability and responded that they did not.

309    *See* 54 CONG. REC. 3604-05 (1917).

310    *See, e.g.* United States v. Murdock, 290 U.S. 389, 396 (1933) (conduct not will-ful when bona fide misunderstanding of law).

311    *See* text accompanying note 122 *supra*.

312    Reading willfully to require intent to transfer defense related material, *cf.* Screws v. United States, 325 U.S. 91 (1945).

313    *See* Coates v. City of Cincinnati, 402 U.S. 611 (1971) for a recent statement of vagueness standards. It seems to us that vagueness is inevitable insofar as the same standard "related to the national defense," purports to govern espionage and public disclosure. Courts in the espionage context have properly construed that standard broadly and imprecisely, counting on culpability to make it fair. It is better to remit the issue of the criminality of the disclosure to Congress, *cf.* Kent v. Dulles, 357 U.S. 116 (1958), than attempt precision in formulating defense-relatedness that will undercut prosecutions for espionage proper.

314    *See* text accompanying note 141 *supra*.

315    *See* text accompanying note 124 *supra*.

316    An interesting problem is whether classification, purportedly done in the interests of national defense, serves as adequate notice insofar as overclassification is so admittedly widespread.

317    *See* United States v. Robel, 389 U.S. 258 (1967); Baggett v. Bullitt, 377 U.S. 360 (1964); NAACP v. Button, 371 U.S. 415 (1963).

318    Again, this follows unless information protected against culpable espionage is restricted by tighter formulation of what constitutes an "advantage." We think it wrong to do so.

319    *See generally* Henkin, The *Right to Know and the Duty to Withhold: The Case of the Pentagon Papers* 120 U. PA. L. REV. 271 (1971) pointing out the Supreme Court's failure to face these issues in New York Times Co. v. United States, 403 U.S. 713 (1971). *But cf.* Liberty Lobby v. Pearson 390 F.2d 489 (D.C. Cir. 1968).

320    *See* text accompanying note 125 *supra*.

321    If we are wrong, then "reason to believe" precludes penalizing disclosure of trivial information, but not trivial documents.

322    *See* text accompanying note 310 *supra*.

323    The Senate Report quoted *supra* note 245, may be read as indicating a belief by its authors that no such defense is present as to documents.

324    Section 3 of H.R. 291 was expressly limited to matters "belonging to" the Government. *See* text at note 226 *supra*. For the Senate discussion, *see* text following note 207 *supra*.

325    *See* text at note 269 *supra*.

326    *See* notes 214-15 *supra*.

327    Statutes which authorize specific officials to have particular information are very rare. *See, e.g.*, 42 U.S.C. §§ 2161-2163, 2277 which empower the Atomic Energy Commission to decide who may lawfully have access to "restricted data," as defined in 42 U.S.C. 2014(y).

328    *See* text following note 184 *supra*.

329    Subsection 1(d) applied to person "lawfully or unlawfully having possession of" any tangible item relating to the national defense.

330    *See* text following note 196 *supra.*

331    *See* text accompanying note 403 *infra.*

332    *See* text following note 370 *infra.*

333    General discussions of the history of the system of Executive classification appear in *Developments in the Law--The National Security Interest and Civil Liberties*, 85 HARV. L. REV. 1130, 1189-1243 (1972) [hereinafter cited as *Developments];* Parks. *Secrecy and the Public Interest in Military Affairs*, 26 GEO. WASH. L. REV. 23, 46-77 (1957); REPORT OF THE COMMISSION ON GOVERNMENT SECURITY [hereinafter cited as REPORT] pp. 151-172 (1957). There have been numerous Congressional hearings devoted to the classification system. *See, e.g., Commission on Government Security, Hearings on S. J. Res. 21 Before the Subcomm. on Reorganisation of the Senate Comm. on Government Operations*, 84th Cong., 1st Sess. (1955); *U.S. Government Information Policies and Practices--The Pentagon Papers, Hearings before a Subcomm. of the House Comm. on Government Operations*, 92nd Cong., 1st Sess. (1971). It is remarkable that all these discussions skirt the basic question of whether revelation of properly classified material is a crime.

334    16 Fed. Reg. 9795 (1951). Indeed, section 1(b) of the Order's Regulations states: "Nothing in these regulations shall be construed to replace, change, or *otherwise be applicable* with respect to any material or information protected against disclosure by any statute." *Id.* at 9795.
       Prior to 1951, the classification program existed within the Departments of the Army and Navy, having been created in 1917. *Developments* at 1193. The military classification program was first extended to civilian departments by President Truman in 1951 by Exec. Order No. 10290.

335    Preamble to Exec. Order No. 10290, *id.*

336    Exec. Order No. 10290, section 32(4) (c), *id.* at 9800. A similar stamp was used in the Army classification system, having first been utilized in 1935. *Developments* at 1194-95.

337    Exec. Order No. 10290, section 29(a), *id.* at 9799.

338    The Order limits dissemination of classified information within the Executive Branch "to persons whose official duties require knowledge of such information." Section 30(a), *id.* at 9799. Section 29(b), *id.* at 9799.

339    18 Fed. Reg. 7049 (1953). The classification stamp appears in section 5(i), *id.* at 7052.

340    Similar to the earlier Order, Exec. Order No. 10501 states that "[k]nowledge or possession of classified defense information shall he permitted only to persons whose official duties require such access in the interest of promoting national defense and only if they have been determined to be trustworthy." Section 7, *id.* at 7053.

341    Exec. Order No. 11652, 37 Fed. Reg. 5209 (1972).

342    Section 13(B), *id.* at 5218.

343    37 Fed. Reg. 10053, 10059 (1972).

344    REPORT at 158. *See also, Developments* at 1198.

345    REPORT at 158-59.

346    *See, e.g.*, statement of William Florence, *Pentagon Papers Hearings* at 195; Morrison, *The Protection of Intelligence Data:* An individual who simply reveals to the public at large classified data is for all practical purposes immune from prosecution since his defense, of course, would be that he thought the American public had a right to know and the Government would not be able to prove intent to aid a foreign government or to harm the United States. The fact that any reasonable man would know that revelation to the general public ipso facto reveals to foreign governments is immaterial. Even if the one making the

exposure is a government employee well versed in the rules governing classified information, there can be no presumption of intent which would bring him within the terms of present espionage laws,

(unpublished paper on file in the Columbia Law Library) (Morrison was Assistant General Counsel of the C.I.A. when this paper was written); Miskovsky, *The Espionage Laws*, pp. 15 *et seq.* (unpublished paper on file in the Columbia Law Library) details the numerous proposals by Executive Departments to deal with the perceived inadequacy of the espionage statutes to protect classified information from unauthorized disclosure. *But see* statement of William Tompkins, *Hearings before a Subcomm. on Reorganization of the Senate Committee on Govt. Operation*, 84th Cong., 1st Sess. 63 (1955).

347    REPORT at 619-620.

348    REPORT at 619-20. The Commission's proposed statute is set out *id.* at 737.

349    Senator Cotton introduced a bill, S. 2417, in the 85th Congress, to implement this proposal of the Commission, but the bill was never reported favorably by the Senate Judiciary Committee.

350    *See* Miskovsky at 23.

351    *See* note 381 *infra.*

352    The legislative history of section 798 is discussed at text following note 373 *infra.*

353    108 CONG. REC. 23140-41 (1962).

353a    *See* 18 U.S.C. § 793(c) (1970).

354    Section 1 of S. 8148 as first introduced contained these provisions:
(a) whoever, for the purpose of obtaining information respecting the national defense, to which he is not lawfully entitled, ...
(b) whoever, for the purpose aforesaid, and without lawful authority, ...
(c) whoever, for the purpose aforesaid, ...
The placing of the commas indicates that a purpose to obtain was a common element of the three proposed offenses, with non-entitlement, absence of lawful authority, and knowledge or belief that the Espionage Act had been or would be violated as three distinct requirements. See 54 Cong. Rec. 2820 (1917). When S. 2 was introduced, "intent or reason to believe" was substituted for entitlement in § 1(a), and "without lawful authority" in § 1(b). 55 CONG. REC. 778 (1917). Nothing was done to § 1(c).
In the House, on the other hand, all the gathering offenses required the same intent to injure the United States. Insofar as the House believed that § 1 as adopted effected no "material change" in H.R. 291's scope, § 1(c)'s language ought not to be pressed in the face of legislative confusion.

355    55 CONG. REC. 2064 (1917).

356    *See* text at note 247, *supra.*

357    *See* text at note 251, *supra.*

358    For example, if the Pentagon Papers were national defense documents, and if *Heine* is read narrowly so that information the Government has sought to suppress does not lose its defense-related character despite its disclosure, and if verbatim copies are "documents," then every person who bought the New York Times to read them violated 18 U.S.C. § 793(c).

359    18 U.S.C. § 952 (1970).

360    Yardley is probably better known to students of the laws of chance than students of the law of espionage. Subsequent to the *The American Black Chamber*, Yardley wrote *The Education of a Poker Player* which has become a classic in the literature concerning speculation on the turn of a card. Yardley's central role in the adoption of section 952 is reflected in Cong. Celler's statement. *77* CONG. REC. 5333 (1933).

361    H.R. 4220 provided:
That whoever, by virtue of his employment by the United States, having custody of, or access to, any record, proceeding, map, book, document, paper, or other thing shall, for any purpose prejudicial to the safety or interest of the United States, willfully and unlawfully conceal, remove, mutilate, obliterate, falsify, destroy, sell, furnish to another, publish, or offer for sale, any

such record, proceeding, map, book, document, paper, or thing, or any information contained therein, or a copy or copies thereof, shall be fined not more than $2,000 or imprisoned not more than three years, or both, and moreover shall forfeit his office and be forever afterwards disqualified from holding any office under the Government of the United States.

SEC. 2. Whoever shall willfully, without authorization of competent authority, publish or furnish to another any matter prepared in any official code; or whoever shall, for any purpose prejudicial to the safety or interest of the United States, willfully publish or furnish to another any matter obtained without authorization of competent authority, from the custody of any officer or employee of the United States or any matter which was obtained while in process of transmission from one public office, executive department, or independent establishment of the United States or branch thereof to any other such public office, executive department, or independent establishment of the United States or branch thereof or any matter which was in process of transmission between any foreign government and its diplomatic mission in the United States; or whoever shall for any purpose prejudicial to the safety or interest of the United States, willfully, without authorization of competent authority, publish, or furnish to another, any such matter or anything purporting to be any such matter, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

SEC. 3. In any prosecution hereunder, proof of the commission of any of the acts described herein shall be prima facie evidence of a purpose prejudicial to the safety or interest of the United States.

The proposal is set out in the Report of the House Judiciary Committee, which recommended passage without any effort to analyze the scope of the proposal. H.R. REP. NO. 18, 73rd Cong., 1st Sess. (1933).

362    Narrow concern was voiced that the bill would interfere with members of Congress who sought information about foreign policy. Mr. Hooper, the Chairman of the House Judiciary Committee, assured the critics that "[a] Member of Congress is not an employee of the [United States] within the ... meaning of the bill .... The bill does not apply to them." 77 CONG. REC. 1152 (1933).

Two members, Mr. Black and Mr. McFadden, pointed out that the bill might prevent a newspaper reporter from obtaining information about corruption within a government department, and that there would be a broad prohibition on newspaper publication was acknowledged by a member of the Judiciary Committee. *Id.* at 1153.

Nevertheless, H.R. 4220 was overwhelmingly passed in the House by a vote of 103 ayes to 27 noes.

363    S. REP. NO. 21, 73d Cong., 1st Sess. (1933). The Senate Report was even more cursory than its House counterpart.

364    In the Senate debates, Senator Pittman noted:
The bill as it came from the House provided that certain acts committed by the press should be considered as criminal acts. All of that portion of the measure has been eliminated. The only act made a crime by the measure as it now stands is that of a person who, by virtue of his employment, acquires certain Government records, or correspondence between governments, and publishes it, or gives it to another to publish. 77 CONG REC. 3125 (1933).

Pittman quoted a letter from Secretary of State Cordell Hull which urged that the final bill should not be applicable to newspaper publication because "[s]uch effects as to the press, of course, were not remotely contemplated by myself .... [M]y individual view is that the American public should suffer incalculable injuries in other respects before the freedom of the press should be injuriously affected ...." *Id.* at 3126.

365    Remarks of Senator Connolly. *Id.* at 3134.

366    Remarks of Senator Pittman. *Id.* at 3126.

367    Remarks of Senator Robinson. *Id.* at 3135.

368    The Conference Report urging acceptance of the Senate version is printed and briefly debated at *id.* at 5333-34.

369    *See* text following notes 275 and 34 *supra*. Subsection 794(b) was not applicable to Yardley's publishing because the activities took place in peacetime.

370    Congress inadvertently enacted two provisions codified as 18 U.S.C. § 798.

371    Section 798 was enacted about four months prior to the enactment of 793(d) and (e) in the Internal Security Act of 1950. However, the bill was introduced, reported, and debated in the same period as 793(d) and (e) were making their way through the legislative process.

THE ESPIONAGE STATUTES AND PUBLICATION OF ..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 121 of 126

372  The full statute provides:

§ 798. Disclosure of Classified Information

(a) Whoever knowingly and willfully communicates, furnishes, transmits, or otherwise makes available to an unauthorized person, or publishes, or uses in any manner prejudicial to the safety or interest of the United States or for the benefit of any foreign government to the detriment of the United States any classified information--

(1) concerning the nature, preparation, or use of any code, cipher, or cryptographic system of the United States or any foreign government; or

(2) concerning the design, construction, use, maintenance, or repair of any device, apparatus, or appliance used or prepared or planned for use by the United States or any foreign government for cryptographic or communication intelligence purposes; or

(3) concerning the communication intelligence activities of the United States or any foreign government; or

(4) obtained by the processes of communication intelligence from the communications of any foreign government, knowing the same to have been obtained by such processes--

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

(b) As used in subsection (a) of this section--

The term "classified information" means information which, at the time of a violation of this section, is, for reasons of national security, specifically designated by a United States Government Agency for limited or restricted dissemination or distribution;

The terms "code," "cipher," and "cryptographic system" include in their meanings, in addition to their usual meanings, any method of secret writing and any mechanical or electrical device or method used for the purpose of disguising or concealing the contents, significance, or meanings of communications;

The term "foreign government" includes in its meaning any person or persons acting or purporting to act for or on behalf of any faction, party, department, agency, bureau, or military force of or within a foreign country, or for or on behalf of any government or any person or persons purporting to act as a government within a foreign country, whether or not such government is recognized by the United States,"

The term "communication intelligence" means all procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients;

The term "unauthorized person" means any person who, or agency which, is not authorized to receive information of the categories set forth in subsection (a) of this section, by the President, or by the head of a department or agency of the United States Government which is expressly designated by the President to engage in communication intelligence activities for the United States.

(c) Nothing in this section shall prohibit the furnishing, upon lawful demand, of information to any regularly constituted committee of the Senate or House of Representatives of the United States of America, or joint committee thereof.

18 U.S.C. § 798 (1970).

373  There has been at least one prosecution which ended in a guilty plea. As is true with other espionage cases, covert transmission to an agent of a foreign government was involved. *See Hearings on Resolution to Establish Commission on Government Security* at 141 (1955).

374  S. REP. NO. 111, 81st Cong., 1st Sess., at 3 (1949), H.R. REP. NO. 1895, 81st Cong., 2d Sess., at 3 (1950) (emphasis added).

375  *Compare* Scarbeck v. United States, 317 F.2d 546 (D.C. Cir. 1962), refusing to hear a defense of improper classification under 50 U.S.C. § 783(b) which bars government employees from knowingly giving "information of a kind which shall have been classified by the President ... as affecting the security of the United States" to agents of foreign governments or Communist party members or organizations.

376  *See* text accompanying note 124 *supra*.

377  H.R. REP. NO. 1895, 81st Cong., 2d Sess., at 2 (1950); S. REP. NO. 111, 81st Cong., 1st Sess., at 2 (1949).

378  *Id.*

379  H.R. REP. NO. 1895, 81st Cong., 2d Sess., at 2 (1950).

380  Both Committees assumed that nothing in the Espionage Act of 1917 would prohibit *former* government employees from disclosing cryptographic information acquired during public service:

As the matter now stands, prevention of the disclosure of information of our cryptographic systems, exclusive of State Department codes, and of communication intelligence activities rests solely on the discretion, loyalty, and good judgment of numerous individuals. During the recent war, there were many persons who acquired some information covered by this bill in the course of their duties. Most of these individuals are no longer connected with the services and are not now prohibited from making disclosures which can be most damaging to the security of the United States. They are subject to the temptations of personal gain and of publicity in making sensational disclosures of the personal information within the purview of this act. H.R. REP. NO. 1895 at 2; S. REP. NO. 111 at 2.

381    The Report of the Joint Committee urged:
Based on the evidence in the Committee's record, the following recommendations are respectfully submitted: ... That effective steps be taken to insure that Statutory or other restrictions do not operate to the benefit of an enemy or other forces inimical to the Nation's security and to the handicap of our own intelligence agencies. With this in mind, the Congress should give serious study to, among other things, ... to legislation designed to prevent unauthorized sketching, photographing, and mapping of military and naval reservations in peacetime; and to legislation fully protecting the security of classified matter. REPORT OF THE JOINT COMMITTEE ON THE INVESTIGATION OF THE PEARL HARBOR ATTACK, S. DOC. NO. 244, 79th Cong., 2d Sess. 252-531 (1946).

382    H.R. REP. NO. 1895, 81st Cong., 2d Sess., at 2 (1950).

383    *Id.* The proposals referred to were S. 805, 79th Cong.; S. 1019, 80th Cong.; S. 2680, 80th Cong.

384    *Id.*

385    *See* remarks of Senator Hunt, 95 CONG. REC. 2774 (1949).

386    96 CONG. REC. 6082 (1950).

387    The Senate debates on 798 add little. Senator Hunt explained the bill was proposed out of fear that persons no longer in the government might reveal communications intelligence information "for personal gain," and because "the present laws are not adequate in this particular respect." He emphasized that the bill "would not control in any way the free dissemination of information which might be transmitted in code or cipher." 95 CONG. REC. 2774-75 (1949).

388    18 U.S.C. § 795 (1970). Section 795 provides:
(a) Whenever, in the interests of national defense, the President defines certain vital military and naval installations or equipment as requiring protection against the general dissemination of information relative thereto, it shall be unlawful to make any photograph, sketch, picture, drawing, map, or graphical representation of such vital military and naval installations or equipment without first obtaining permission of the commanding officer of the military or naval post, camp, or station, or naval vessels, military and naval aircraft, and any separate military or naval command concerned, or higher authority, and promptly submitting the product obtained to such commanding officer or higher authority for censorship or such other action as he may deem necessary.
(b) Whoever violates this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

389    18 U.S.C. § 797 (1970). Section 797 provides:
On and after thirty days from the date upon which the President defines any vital military or naval installation or equipment as being within the category contemplated under section 795 of this title, whoever reproduces, publishes, sells, or gives away any photograph, sketch, picture, drawing, map, or graphical representation of the vital military or naval installations or equipment so defined, without first obtaining permission of the commanding officer of the military or naval post, camp, or station concerned, or higher authority, unless such photograph, sketch, picture, drawing, map, or graphical representation has clearly indicated thereon that it has been censored by the proper military or naval authority, shall be fined not more than $1,000 or imprisoned not more than one year, or both.
Section 796, unimportant for our purposes, prohibits the use of an aircraft as an aid in violating section 795, 18 U.S.C. § 796 (1970).

390    Exec. Order No. 8381, 5 Fed. Reg. 1147 (1940).

391    Exec. Order No. 10104, 15 Fed. Reg. 597 (1950).

392     The letter is set out in S. REP. NO. 108, 75th Cong., 2d Sess. 2 (1938).

393     H.R. REP. NO. 1650, 75th Cong., 2d Sess. 1 (1938).

394     The cursory House debates are found at 83 CONG. REC 70-72; the Senate passed the statute without debate. 81 CONG. REC. 1534.

395     Responding to questions exactly on this issue, Rep. Edmiston stated that the (then) present law prohibited sketches of our coastal defenses, but without a penalty, the only sanction being the admonition of a soldier: "Mister, move on." The purpose of S. 1485 was to provide penalties for the taking of pictures of our national defenses, both in this country and in our possessions. There was no hint of any First Amendment concerns. 83 CONG. REC. 71-72.

396     On this point, it is interesting to note that in describing the authority for the government document classification program the REPORT OF THE U.S. COMMISSION ON GOVERNMENT SECURITY (1957) noted that Exec. Order No. 10104 "covers information classified by the agencies of the military establishments" at 159. In contrast, the report's discussion of criminal sanctions assumes 795's limitation to photographing and sketching. *Id.* at 618.

397     *See* text accompanying note 384 *supra.*

398     *See, e.g.,* Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315 (1933); Zemel v. Rusk, 381 U.S. 1 (1965); Cammarano v. United States, 358 U.S. 498 (1959).

399     50 U.S.C. App. § 781 (1964) provides:
        Whoever, except in performance of duty or employment in connection with the national defense, shall knowingly and willfully make any sketch, photograph, photographic negative, blueprint, plan, map, model, copy, or other representation of any navy yard, naval station, or of any military post, fort, camp, station, arsenal, air-field, or other military or naval reservation, or place used for national-defense purposes by the Departments of the Army or the Navy, or of any vessel, aircraft, installation, equipment, or other property whatsoever, located within any such post, fort, camp, arsenal, airfield, yard, station, reservation or place, or in the waters adjacent thereto, or in any defensive sea area established in accordance with law; or whoever, except in performance of duty or employment in connection with the national defense, shall knowingly and willfully make any sketch, photograph, photographic negative, blueprint, plan, map, model, copy, or other representation of any vessel, aircraft, installation, equipment, or other property relating to the national defense being manufactured or under construction or repair for or awaiting delivery to the Departments of the Army or the Navy or the government of any country whose defense the President deems vital to the defense of the United States under any contract or agreement with the United States or such country or otherwise on behalf of the United States or such country, located at the factory, plant, yard, storehouse, or other place of business of any contractor, subcontractor, or other person, or in the waters adjacent to any such place, shall be punished as provided herein.

400     50 U.S.C. App. § 785 (1969).

401     H.R. Rep. No. 2189, 77th Cong., 2d Sess. 1 (1942).

402     *Id.* The Senate Report on the bill quotes a letter from Secretary of War Stimson which stated that the Espionage Act of 1917: prohibits the making of photographs, sketches, etc., of military and naval property where there exists intent to use the information obtained to the injury of the United States or to the advantage of a foreign nation. Frequently, however, photographs of military and naval property are made by persons who have no intention of injuring the United States or of aiding a foreign nation, yet such photographs if published or if they otherwise become available to the public generally may result in prejudice to the national defense. The proposed bill differs from the Espionage Act in that proof of intent to injure the United States or to aid a foreign nation will not be necessary to support a conviction.
        S. Rep. No. 606, 77th Cong., 1st Sess. 2 (1941).

403     64 Stat. 991 (1950).

404     Scarbeck v. United States, 317 F.2d 546, 558 (D.C. Cir.), *cert. denied,* 374 U.S. 856 (1963).

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 124 of 126

405    *Id.* at 559; Judge Washington's opinion for the D.C. Circuit contains an admirable treatment of the legislative history of 783(b), and we see no need to duplicate his efforts here.

406    "Restricted data" is defined in 42 U.S.C. 2014(y) as: all data concerning (1) design, manufacture, or utilization of atomic weapons; (2) the production of special nuclear material; or (3) the use of special nuclear material in the production of energy, but shall not include data declassified or removed from the Restricted Data category pursuant to section 2162 of this title.

407    42 U.S.C. § 2274 (1970).

408    42 U.S.C. § 2277 (1970).

409    42 U.S.C. § 2275 (1970).

410    42 U.S.C. § 2276 (1970).

411    42 U.S.C. § 2280 (1970).

412    *See* text following note 277, *supra.*

413    *See* THE NEW YORK TIMES COMPANY V. UNITED STATES: A DOCUMENTARY HISTORY 397 (Comp. by J. Goodale, 1971) (affidavit of Max Frankel) (1971).

414    The most famous recent case is the New York Times' decision not to report the upcoming Bay of Pigs venture. S. UNGAR. THE PAPERS AND THE PAPERS 101-02 (1972). More significant perhaps, the United States fought World War II without any official censorship of the press.

415    Thus, Ramparts printed claims that the United States has had remarkable success in breaking the codes of the U.S.S.R., a matter of great importance if true. *See U.S. Electronic Espionage: A Memoir*, RAMPARTS, August, 1972, at 35.

416    United States v. Marchetti, 466 F.2d 1309 (4th Cir.), *cert. denied*, 93 S. Ct. 553 (1972).

417    The Court held that the C.I.A. might disapprove publication only of matters that were both classified and had not been publicly disclosed. But "rumor and speculation are not the equivalent of prior disclosure ...." 466 F.2d at 1318. Opportunity for judicial review of the propriety of classification was denied. *Id.*

418    466 F.2d at 1312. The agreement stated, in part:
1. I, Victor L. Marchetti, understand that by virtue of my duties in the Central Intelligence Agency. I may be or have been the recipient of information and intelligence which concerns the present and future security of the United States. This information and intelligence, together with the methods of collecting and handling it, are classified according to security standards set by the United States Government. I have read and understand the provisions of the espionage laws, Act of June 25, 1948, as amended, concerning the disclosure of information relating to the National Defense and I am familiar with the penalties provided for violation thereof.
2. I acknowledge, that I do not now, nor shall I ever possess any right, interest, title or claim, in or to any of the information or intelligence or any method of collecting or handling it, which has come or shall come to my attention by virtue of my connection with the Central Intelligence Agency, but shall always recognize the property right of the United States of America, in and to such matters.
The agreement does not reflect current law on either our, or apparently the C.I.A.'s, reading of it. *See* Memorandum of the Central Intelligence Agency entitled "The Espionage Laws" by M. G. Miskovsky, Assistant General Counsel, 1961. (Copy on file at Columbia Law Library).

419    *Cf.* Wechsler, *The Challenge of a Model Penal Code*, 65 HARV. L. REV. 1097 (1952).

420    S. 1, 93d Cong., 1st Sess. §§ 2-5A1, 2-5B7-8 (1973). The bill, reputedly the lengthiest ever introduced, is derived, with substantial changes, from the FINAL REPORT OF THE NATIONAL COMMISSION ON REFORM OF FEDERAL CRIMINAL LAWS, PROPOSED NEW FEDERAL CRIMINAL CODE (1971).

421    S. 1400, 93d Cong., 1st Sess. §§ 1121-26 (1973).

422    In addition to the current S. 1 and S. 1400, see §§ 2-SB7-8 in the Committee Print leading to S. 1, the FINAL REPORT OF THE NATIONAL COMMISSION ON REFORM OF FEDERAL CRIMINAL LAWS, PROPOSED NEW FEDERAL CRIMINAL CODE, §§ 1112-1116 (1971) and the COMMISSION'S STUDY DRAFT OF A NEW FEDERAL CRIMINAL CODE §§ 1113-6 (1970).

423    S. 1, 93d Cong., 1st Sess. § 1-2A1(a)(2) (1973).

424    Whether the statute is intended to achieve the results it does is problematic. Note for example, that it would repeal section 793(e)'s retention offense. In addition, the treatment of communications information, earlier defined as "national defense information" is either redundant or hopelessly opaque.

425    S. 1400, 93d Cong., 1st Sess. § 1121 (1971).

426    Id. at § 1122.

427    Id. at § 1123.

428    Id. at § 1124.

429    Id. at § 1125.

430    Id. at § 1126(c).

431    It is difficult for us to believe that this was intended. It nonetheless is the technical result of the statute in that he who "obtains or collects" information "with knowledge" that it "may" be used to the advantage of a foreign power, and knowing that it "may be communicated to a foreign power" commits the highest offense.

432    S. 1400, 93d Cong., 1st Sess. § 1121, § 1126(g) (1971).

433    See § 2401(a)(1)(B). The death penalty is mandatory if the defendant "knowingly created a grave risk of substantial danger to the national security" and mitigating factors not likely to be present in publication are absent.

434    Id. at § 1121(b). Class B felonies are punishable by a maximum of 30 years imprisonment. § 2301(b)(2).

435    Id. at § 1125. It applies only to agents of foreign powers. Classified information is defined, § 1126(b), as "information, regardless of its origin," which is marked by statute, or pursuant to executive order or implementing rules or regulations as "information requiring a specific degree of protection against unauthorized disclosure for reasons of national security."

436    Id. at §§ 1122(b), 1123(b). Class C felonies are punishable by a maximum of 15 years imprisonment § 2301(b)(3); class D felonies are punishable by a maximum of 7 years imprisonment, § 2301(b)(4).

437    Id. at § 1124(a) (c) (e). Class E felonies are punishable by a maximum of 3 years imprisonment § 2301(b)(5). How Congress can "demand" what it is ignorant of is left unexplained.

438    Id. at § 1124(d).

439    Cf. United States v. Robel, 389 U.S. 258, 264 (1967): "Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart."

440    See, e.g., A. DULLES, THE CRAFT OF INTELLIGENCE 241-247 (1963).

441    The archtypical case is revelation that a foreign code has been broken. Apparently, developments in codes make that prospect increasingly unlikely where sophisticated equipment may be used. For a fascinating discussion of code-breaking, see D. KAHN, THE CODEBREAKERS (1967).

442    Additionally, it may be wise to differentiate employees from ex-employees, and public revelations from private ones.

443    In structure, S. 1400 is preferable to S. 1 in that it does differentiate government employment as a problem to be treated separately from espionage proper. Its failure is that it treats newspapers with a severity appropriate for spies.

THE ESPIONAGE STATUTES AND PUBLICATION OF..., 73 Colum. L. Rev. 929

Case 1:17-cr-00034-JRH-BKE   Document 112-1   Filed 10/03/17   Page 126 of 126

444    We thus disagree with the analysis in I WORKING PAPERS OF THE NATIONAL COMMISSION ON REFORM OF FEDERAL CRIMINAL LAWS. 454-55 (1970).

445    *See* text following note 124 *supra.*

446    If necessary, special protection for government servants authorized to negotiate with foreign governments might be created.

447    There are obviously exceedingly difficult issues to be resolved here, particularly insofar as revelation to a particular Senator or Congressman may be merely a conduit to public revelation immunized by congressional privilege, rather than a prelude to independent congressional investigation.

448    Any such defenses may result in lengthening trials and compromising security further. Nonetheless, there are clearly instances where broader duties to the public warrant the disclosure of defense information and where the issue would be confused by characterizing the problem as one of improper classification.

449    To be sure, the employee has obligations of loyalty, but so does the citizen contemplating espionage.

450    For recent reports on overclassification, see *Hearings on U.S. Government Information Policies and Practices--The Pentagon Papers--Before a Subcomm. of the House Comm. on Government Operations*, 92d Cong., 1st Sess. pts. 1-3, 7 (1971) (Moorhead Hearings).
There are numerous possible treatments of the problem of overclassification, particularly automatic declassification of nearly everything after an arbitrary time period. For proposals, see MCHUGH, PROPOSED ALTERNATIVES TO THE PRESENT SYSTEM OF CLASSIFYING GOVERNMENT DOCUMENTS. *Id.* at 2293. Nonetheless, given that there are multiple reasons, some good and some bad, why Government officials want secrecy, we think substantial overclassification is inevitable.

451    *Cf.* Environmental Protection Agency v. Mink, 93 S. Ct. 827 (1973).

452    *Cf.* Henkin, *The Right to Know and the Duty to Withhold: The Case of the Pentagon Papers* 120 U. PA. L. REV. 271, 278-79 (1971).

453    *See* S. UNGAR, *supra* note 3 at 69-71. Two intriguing aspects of the *New York Times* litigation were first, the Government's prompt concession in court that much of the material could be immediately declassified, and second, the claim that considerable time should be granted to winnow out the truly important information among that which was potentially sensitive. Both propositions provide insight on the seriousness with which Senator Fulbright's repeated requests were treated. This is a central difference between the secrecy situation in Great Britain and our own. The British Official Secrets Act provides far greater protection for Government secrecy than do our espionage laws. But in Great Britain, the persons with principal executive authority and access to secrets sit as elected officials, and their comments in Parliament are privileged, providing greater assurance against policies gone wild.

73 CLMLR 929

---

**End of Document**        © 2017 Thomson Reuters. No claim to original U.S. Government Works.